1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF COLORADO

3
     Civil Action No. 17-CV-00025-WYD-KHR
4

5      VALERIE JEFFERS,                          Volume I of III
                                                 (Pages 1 - 104)
6            Plaintiff,

7            vs.

8      OCWEN LOAN SERVICING, LLC,

9            Defendant.

10   ------------------------------------------------------------

11                        REPORTER'S TRANSCRIPT
                              JURY TRIAL
12                      (EXCLUDING JURY SELECTION)

13   ------------------------------------------------------------

14           Proceedings before the HONORABLE WILEY Y. DANIEL,
     Judge, United States District Court for the District of
15   Colorado, and a jury of ten, commencing at 8:31 a.m. on the
     20th day of February, 2018, in Courtroom A1002, Alfred A.
16   Arraj United States Courthouse, Denver, Colorado.

17
                             APPEARANCES
18
     For the Plaintiff:
19   MATTHEW R. OSBORNE, MATTHEW R. OSBORNE, P.C., 11178 Huron
     Street, Suite 7, Northglenn, CO 80234
20
     For the Defendant:
21   PAUL J. LOPACH, BRYAN CAVE, LLP, 1700 Lincoln Street,
     Suite 4100, Denver, CO 80203
22
     ROBERT J. HOFFMAN, BRYAN CAVE, LLP, 1200 Main Street, One
23   Kansas City Place, Suite 3800, Kansas City, MO 64105

24
         JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25       Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

              Proceedings reported by mechanical stenography;
                  transcription produced via computer.

17-CV-00025-WYD-KHR              Jury Trial                        I - 2

I N D E X

JURY INSTRUCTIONS                                                 PAGE

Instructions of the Court                                          24


OPENING STATEMENTS                                               PAGE

Mr. Osborne                                                        32
Mr. Hoffman                                                        47


PLAINTIFF'S WITNESSES                                            PAGE

KEVIN FLANNIGAN
     Direct - Mr. Osborne                                          58



              PLAINTIFF'S
              EXHIBITS                        RECEIVED

              6                                    97

              7                                    95

              22                                   84

              25                                   83



              DEFENDANT'S
              EXHIBITS                        RECEIVED

              A                                    66



              EXHIBITS
              REFUSED                             PAGE

              2                                    65

1      (Proceedings commenced 8:31 a.m.,

2      February 20, 2018.)

3           THE COURT:  All right, have a seat.  Okay.  This is

4  17-CV-25, Jeffers versus Ocwen.  Would counsel enter their

5  appearances.

6           MR. OSBORNE:  Good morning, Your Honor.  Matthew

7  Osborne for the plaintiff.

8           MR. HOFFMAN:  Good morning, Your Honor.  Robert

9  Hoffman and Paul Lopach for the defendant.

10           THE COURT:  So I want to comment on some of the

11  things that have been filed.

12           I take it you have made no progress in settling the

13  case.  Right?

14           MR. OSBORNE:  That's correct.

15           THE COURT:  All right.  Fair enough.

16           So, all right, on plaintiff's trial brief and

17  defendant's responding trial brief on the proposed scope of

18  testimony, I'm going to reaffirm what I said, and I've got the

19  realtime transcript, but I have one question.  I know I said

20  in there that the settlement agreement shouldn't be admitted,

21  but, as a matter of fairness, I think if plaintiff wants to

22  attempt to offer it, I don't think I can foreclose it, because

23  I haven't seen it.  I don't know what it says.  So does

24  someone have a copy of it?

25           MR. OSBORNE:  Yes, Your Honor.  It was originally in

```
 1   our witness -- or in our exhibit list.

 2            THE COURT:  And I know what I said.  Let me see it.

 3            MR. HOFFMAN:  Sure.  It should be Plaintiff's

 4   Exhibit No. 1.

 5            THE COURT:  There's nothing in No. 1.

 6            MR. OSBORNE:  I took it out based on the Court's

 7   comments, but I do have it here.

 8            THE COURT:  Yeah, that's fine.  Let me see it.  And I

 9   really don't think it should come in if it goes into a

10   detailed history of all the underlying disputes, but I just

11   don't know that that's what it does.  So let me take a look at

12   it.

13            All right.  So, Counsel, what are the three things

14   that you believe the defendant failed to do -- Ocwen failed to

15   do based on what the obligations are in this agreement?  What

16   are the three things?

17            MR. OSBORNE:  Well, I believe it's actually two.

18   It's --

19            THE COURT:  Two?

20            MR. OSBORNE:  -- failure to fix the loan within

21   30 days to show it was always current through September 2016,

22   and failure to ask the credit bureaus to fix the credit

23   reporting within 30 days.

24            THE COURT:  All right.  So let me make sure I

25   understand what we're talking about as it relates to what is
```

1   expressed here.  Number 1, it says payment of settlement

2   funds.  That occurred; right?

3            MR. OSBORNE:  Yes, Your Honor.

4            THE COURT:  Okay.  Dismissal of the action.  That

5   occurred.

6            MR. OSBORNE:  Yes.

7            THE COURT:  3, attorneys' fees.  That just says each

8   party bears their own fees.

9            4, credit reporting.  Is that one of the things that

10  didn't happen?

11           MR. OSBORNE:  Yes, Your Honor.

12           THE COURT:  And what's the other thing that didn't

13  happen?

14           MR. OSBORNE:  Fix the loan internally.

15           THE COURT:  But how is that expressed in the -- where

16  is that expressed in the settlement agreement?

17           MR. OSBORNE:  Um.

18           THE COURT:  That's really what I'm asking.

19           MR. OSBORNE:  If I could look at Mr. Hoffman's copy,

20  Your Honor.

21           THE COURT:  You may.

22           MR. HOFFMAN:  Sure.

23           THE COURT:  All right.  So it's the last sentence of

24  number 1, isn't it, where it says --

25           MR. OSBORNE:  Yes.

1    THE COURT:  -- "In addition, within thirty (30) days

2    of receipt of the Borrower's signature on this agreement by

3    Ocwen, Ocwen will perform the necessary and appropriate

4    corrections to Borrower's Loan account to reflect that it is

5    current as of September 2016."

6            All right.  We can do this one of two ways.  And,

7    again, the spirit of what I said was fine, but when I said the

8    settlement agreement shouldn't come in, I think that was

9    premature when I hadn't even seen it.  But to me what you

10   could do, and I'll see if there's any objection here from

11   defendant, you could have an extremely redacted version of

12   this that would have some of the information on the front,

13   like the recitals, and then it would merely have the reference

14   to the two things that you -- that your client claims that

15   Ocwen failed to do.

16           Or, alternatively, she could explain those verbally.

17   I mean, I think that your side is entitled to say there was an

18   agreement, and you can talk about the alleged breaches of that

19   settlement agreement as it relates to the issues that you are

20   seeking recovery on on this case.  But I'm unclear as to

21   whether or not you need the whole agreement or if the whole

22   agreement would do anything other than confuse the jury.  So

23   give me your thoughts, and then I want to hear from

24   Mr. Hoffman about this.

25           MR. OSBORNE:  Well, Your Honor, I mean, I'm not sure

1  that we necessarily need the whole agreement to come in.  So I

2  think we could just verbally get it in.  Actually, I think

3  it's undisputed, as far as I know, that they -- they will

4  admit they didn't comply with those things.

5          So I guess a couple of clarifications that I had was

6  can I -- another thing that I think will come up is that there

7  was a confidentiality order for plaintiff.  I think I should

8  be allowed to mention that.

9          THE COURT:  Where is that expressed in here?

10         MR. OSBORNE:  Section 5.

11         THE COURT:  What's the reason for wanting to mention

12 that?

13         MR. OSBORNE:  Well, as I understand it, one of the

14 defenses will be that she didn't tell the credit bureaus about

15 the settlement when she did her disputes, and our counter

16 argument would be that she was prevented from doing that under

17 this agreement.

18         THE COURT:  Is that something that's going to be

19 raised by the defendant?

20         MR. HOFFMAN:  It is, at least in cross-examination,

21 yes.  And certainly there was no agreement that the fact of

22 settlement was not confidential.  That wasn't the issue.  The

23 terms, yes, but the fact of settlement was not a confidential

24 point.  And, in fact, there were public filings to that effect

25 with the Court that indicated that -- the fact of settlement,

1    the public had been notified.

2              MR. OSBORNE:  Well, I think plaintiff could explain

3    what her understanding is.  I mean, she is not a lawyer.  She

4    just knows what she understood it to mean.

5              THE COURT:  Let me do this because I want to make

6    sure I'm being abundantly fair to Miss Jeffers here.  If you

7    wanted to seek to admit a significantly redacted version of

8    this agreement so that it would only reflect some of the

9    recitals and then the portion of paragraph 1 that you say was

10   not complied with and then paragraph 4 and maybe the

11   confidentiality agreement, I wouldn't have any objection to

12   you seeking to admit that if it's acceptable to Mr. Hoffman.

13             Or, alternatively, you can obviously have her explain

14   her understanding of this.  The problem is I don't want her to

15   refer to this agreement and have it in front of her if it's

16   not going to be something the jury sees.  And I don't think

17   the jury should see all of this, but they could see

18   significant redaction of it.

19             So tell me how you want to proceed.

20             MR. OSBORNE:  I think I would prefer to do the

21   redacted.

22             THE COURT:  Is there any objection to that from you?

23             MR. HOFFMAN:  Well, our preference, Your Honor, would

24   be to have a stipulated, you know, language about what the

25   history was and what the settlement agreement provided.  We

17-CV-00025-WYD-KHR                 Jury Trial                          I - 9

1    proposed that.  I think it's consistent with what you have

2    just described, at least broadly.  And if there were things

3    that the plaintiff wanted to add in, we could certainly

4    continue to discuss that.  But I think that it's going to be

5    confusing to have a redaction of a, what, an eight-page

6    document or a six-page document that has only a few lines in

7    it.

8          There are other provisions that if the entire

9    document or portions of the entire document are coming in --

10   for instance, we think that paragraph 16, the last sentence

11   about agreeing to give reasonable cooperation and assistance

12   to the other party to effectuate the intended benefits ought

13   to come in as well.  But -- so that -- so that the jury

14   understands that there was also an agreement to work together

15   to make sure this got done the way that it was intended to get

16   done.  But we think we ought to be able to come up with

17   stipulated language rather than have a highly redacted

18   document, which we think is confusing.

19         THE COURT:  There's some merit to that as well.  All

20   right.  What I'm going to say is I went back and reread, and I

21   stand by everything else I said except I think it was

22   premature for me to say you can't introduce this document when

23   the Court hadn't seen it.  And so if I had looked at this when

24   we were here last week, I probably would have said I will

25   offer you an opportunity to do a significant redaction.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1           The other approach, and I think it's an approach that

2   makes the most sense and is less confusing to the jury, is if

3   the two of you can stipulate to this agreement being entered

4   and then highlight just some of the provisions that may have

5   some relevance to what's being tried here.  And then I could

6   even read that as something the parties have stipulated to.

7   That is, I think, a better way to handle it.

8           MR. OSBORNE:  Sure.

9           THE COURT:  Do you agree with that, Mr. Osborne?

10          MR. OSBORNE:  Yes, Your Honor.  I think we can do

11  that.

12          THE COURT:  So let's take a minute and do this.  Tell

13  me -- and I can have Mr. Keech make a copy of this for me so I

14  will at least have one.  Starting with you, Mr. Osborne, what

15  portions of this would you like to see incorporated in a

16  stipulation?

17          MR. OSBORNE:  Well, it would be the paragraph 1 that

18  talks about correcting the loan within 30 days.  The --

19          THE COURT:  You mean the last sentence of

20  paragraph 1.

21          MR. OSBORNE:  That's correct.

22          THE COURT:  Okay.

23          MR. OSBORNE:  And then I think paragraph 4 and 5 in

24  its entirety.  And then I can agree with what Mr. Hoffman

25  requested about --

 1          THE COURT:  And what paragraphs do you want,

 2   Mr. Hoffman?

 3          MR. HOFFMAN:  We would like that there was a payment,

 4   but not the amount of the payment.

 5          THE COURT:  Where is that?

 6          MR. HOFFMAN:  That's the first paragraph.

 7          THE COURT:  Then what I think I would do is read

 8   basically Ocwen agreed to pay a sum certain by check within

 9   30 days of the date upon which borrower -- borrower's counsel

10   delivered -- well, that you made the payment that's referenced

11   in paragraph 1.

12          MR. HOFFMAN:  Correct.

13          THE COURT:  You don't have any objection to that, do

14   you?

15          MR. OSBORNE:  No, Your Honor.

16          THE COURT:  Okay.  So here's what I think we need to

17   do is -- if the parties have agreed to that, we can do one of

18   two things.  I think what you can do is take this agreement

19   and just simply mark it up, put a line, and then I think

20   that -- what's the date of this agreement?

21          MR. HOFFMAN:  September 9th of 2016, I believe.

22          THE COURT:  All right.  So I think the first part

23   ought to be that the parties on September 9th -- no,

24   September 8th.

25          MR. HOFFMAN:  Ocwen signed it on September 9th, the

1    next day.

2              THE COURT:  Okay.  Well, all right.  What date do you

3    want to use?  I don't care.

4              MR. HOFFMAN:  Doesn't matter.

5              THE COURT:  Okay.

6              MR. OSBORNE:  I think it should be the 8th because it

7    says 30 days from the date you get Jeffers' agreement.

8              THE COURT:  I think we should use the 8th.  That's

9    fine.

10             So the first paragraph would say, On September 8,

11   2016, the parties entered into a confidential settlement and

12   release agreement.  Certain of the terms set forth in that

13   agreement are relevant to the issues that are in dispute in

14   the pending lawsuit.  And then something to the effect the

15   provisions that the parties stipulate to, which should be

16   presented to the jury through a stipulation, are as follows.

17   Then I would then read what you give me.  So is that something

18   you can do?

19             MR. OSBORNE:  Yes, Your Honor.

20             THE COURT:  Okay.  All right.  And I don't think I'd

21   read that during jury selection.  That would be read when we

22   actually have a jury and before the plaintiff testifies.

23             MR. OSBORNE:  Sure.

24             THE COURT:  Or at some point while the plaintiff is

25   testifying.  You can tell me when you want me to read it.  But

17-CV-00025-WYD-KHR            Jury Trial                      I - 13

1    I think if you stipulate to that, then I should read it, and

2    that's the end of it.  Does that work for everybody?

3           MR. OSBORNE:  Yes, Your Honor.

4           THE COURT:  Okay.

5           MR. HOFFMAN:  Yes.

6           THE COURT:  So with that clarification, I affirm what

7    I said when we were together last week -- what day of the week

8    were you here last week?

9           MR. OSBORNE:  It was February 7th.

10          THE COURT:  February 7th.  Okay.  And you don't need

11   me to reread what I said last week, do you?

12          MR. HOFFMAN:  No.

13          MR. OSBORNE:  Well, I'm still a little unclear

14   because I thought that you said I could give a little bit of

15   context but I can't retry the case.

16          THE COURT:  Let me reread what I said.  I said:  I'm

17   not going to allow a retrial of the issues that were settled.

18   That is unfair to the defendant.  However, there needs to be a

19   context.  And so I can -- I don't know what the word is, but

20   it didn't come out right, but what the essence of it is I say

21   there can be some limited testimony that -- and I'm not going

22   to tell you what to do, but I'm just going to tell you what

23   sounds like -- sounds reasonable to me.

24          Miss Jeffers can talk about she took out a loan, and

25   in 2006 -- in 2006.  And Ocwen began servicing the loan in

1   2013.  There were some issues and problems that arose between

2   Ocwen and Miss Jeffers over a period of years, and it resulted

3   in her filing a prior lawsuit and proceeding with a

4   separate -- I say lawsuit, but a separate adversary proceeding

5   or lawsuit in bankruptcy court.

6           And then you would have to elicit, without going into

7   the details of what those issues were, that all of those

8   matters were subject to a settlement agreement entered into

9   between Ocwen and Jeffers bearing date of September, whatever

10  the right date is.  You can't admit the agreement because if

11  the jury saw that, they would understand the underlying

12  dispute, but you can acknowledge it.  Now we have settled that

13  dispute by the stipulation.  So let me move on.

14          And then I think it would be fair and appropriate to

15  have Miss Jeffers talk about the settlement agreement --

16  excuse me -- to talk about what the settlement agreement

17  required and that certain things had to be done by a date in

18  October 2016.  And she can specify what those things were and

19  what was not done, and she can talk about the impact of these

20  things not being done.  But I will not allow her to get into

21  the details of her underlying dispute with Ocwen which then

22  formed the settlement because that's not what the jury has to

23  decide.  That doesn't relate to the Fair Credit Reporting Act

24  matters.  So I'm ordering you, Mr. Osborne, not to go any

25  further than the outline I've given.

 1          MR. OSBORNE:  Yes, Your Honor.

 2          THE COURT:  So I enforce all of that with the

 3   understanding we have reached an understanding of how we are

 4   going to present through a stipulation the pertinent

 5   provisions of the settlement agreement.

 6          And so, Mr. Keech, let me have you give this back to

 7   Mr. Osborne.

 8          And then would you -- do you have an extra copy of

 9   this?  Or is that your only copy?

10          MR. OSBORNE:  It is, but I'm going to make copies

11   on --

12          THE COURT:  Okay.  So give me back an unredacted copy

13   of that when you give me back the stipulation, unless you need

14   Mr. Keech to make a couple copies.

15          MR. OSBORNE:  If you wouldn't mind.

16          THE COURT:  But don't do it right now.  Hold on.

17   Because I want to finish this because I want to get going with

18   jury selection in a few minutes.  All right.  So he can do

19   that on the break.

20          All right.  We have resolved everything about the

21   scope of the testimony.

22          MR. HOFFMAN:  Yes.

23          THE COURT:  Is what I've said clear to both sides?

24          MR. OSBORNE:  Yes, Your Honor.

25          THE COURT:  All right.  Let's talk about these

17-CV-00025-WYD-KHR                Jury Trial                        I - 16

 1   exhibits.  All right.  So there's really no issue on Exhibit 1

 2   because we have covered that.  So defendant gave a notice of

 3   withdrawal and clarifications to stipulations to plaintiffs.

 4   Now what we're talking about, Exhibits 20 and 21.  And what

 5   are the issues?

 6            MR. HOFFMAN:  Judge, I think we have resolved that.

 7   We have agreed to just stipulate to 20 and 21.

 8            THE COURT:  Okay.

 9            MR. HOFFMAN:  We think they have hearsay in them.  We

10   raised that with the plaintiff and tried to correct it.  But

11   he disagreed about and thought that he had relied upon

12   representations we had made.  I don't want him to be hamstrung

13   by something that we told him and then, you know, clarified.

14   So we just agree to the stipulation.

15            THE COURT:  Yeah, and I think that's the best course

16   of action.  If you agreed to this -- No. 1 was predicated on

17   what I said.  There's no issue there.  But the other two, if

18   you agreed to them, I think you need to stick to your

19   agreement.

20            All right.  So let's do this.  Is there anything else

21   we need to cover?

22            MR. HOFFMAN:  The other issue that I think was

23   pending was the -- and I don't know if you were going to take

24   it at a different time, maybe when they address the evidence,

25   but the similarity, the substantial similarity of the

Julie H. Thomas, RMR, CRR                              (303)296-3056

1  *Daugherty* and *Llewellyn* cases.

2          THE COURT:  I don't want to take that up now because

3  I need to hear some testimony, but you are ordered by me,

4  Mr. Osborne, not to get into anything about the West Virginia

5  lawsuit and the outcome, which, as you know, was reduced to

6  600,000, because I need to hear some testimony first.  And

7  we'll take that up when you signal to me that you want to have

8  the jury hear it, and I will make a ruling.

9          MR. OSBORNE:  Right.  And you wanted me to wait until

10  cross-exam of --

11          THE COURT:  Yeah.  I don't want you to raise it when

12  you call -- who is the witness?

13          MR. FLANNIGAN:  Kevin Flannigan, Your Honor.

14          THE COURT:  Okay.  Mr. Flannigan.  When you call

15  Mr. Flannigan, I don't want you to do it on your initial

16  adverse testimony because they are going to recall him as part

17  of their case.  Is that right?

18          MR. HOFFMAN:  Well, what we thought we would do -- I

19  thought we discussed on the 7th that we would just go into his

20  direct immediately following.

21          THE COURT:  That's right.  Yeah.  Because that's what

22  I wanted you to do was just keep him on the stand one time.

23  So the initial round of testimony will be your cross, their

24  cross of your cross, and then redirect and recross.  And then

25  he stays on the stand, and then they ask him direct

1    examination questions.  And then your cross of their direct is

2    where, if you choose to, or if I allow you to, then you can

3    raise issues about this other case.  So let's take it up --

4              MR. OSBORNE:  Sure.

5              THE COURT:  -- at that time, which will give me an

6    opportunity to have heard what your client says and also what

7    Mr. Flannigan says in response to your questions of him as an

8    adverse witness.

9              All right.  Anything else we need to take up?

10             MR. HOFFMAN:  I think the plan is to call

11   Mr. Flannigan first, isn't it?

12             MR. OSBORNE:  Right.

13             THE COURT:  Are you going to call Mr. Flannigan

14   first?

15             MR. OSBORNE:  Yes.

16             THE COURT:  All right.  Then I won't hear

17   Miss Jeffers first.  That's fine.

18             COURTROOM DEPUTY:  I was just going to mention that

19   evidently Miss Jeffers is not here yet.  She's gotten caught

20   in traffic.

21             THE COURT:  All right.  Well, I would like to start

22   not later than 9:15 with the jury here.  And I know exactly

23   what voir dire questions I'm going to ask.  And I was going

24   to, like I said, give each side 15 to 20 minutes per side.

25   But I want to get the jury, if at all possible, picked before

1    lunch, unless we have a longer delay.  So let's plan to

2    reconvene not later than 9:15.

3              Mr. Keech, you can let me know when Miss Jeffers is

4    here.  And then let's just have the jurors come, and we'll get

5    started with the trial.

6              MR. OSBORNE:  Okay.  Great.

7              THE COURT:  All right.

8              MR. OSBORNE:  Thanks, Your Honor.

9              MR. HOFFMAN:  Thank you, Your Honor.

10        (Proceedings recessed 8:51 a.m. to 9:24 a.m.,

11        resuming in the presence of the jury panel.)

12        (Jury selection not transcribed.)

13                  *      *      *      *      *

14             THE COURT:  All right.  The ten of you who remain, I

15   want five in the back row and five in the front row.  So

16   someone from the back row may need to move to the front row.

17             All right.  So let me tell you what we are going to

18   do.  We are going to take a lunch break in a minute, but we

19   are going to administer the oath, which means that the ten of

20   you are now formal jurors in the case.  When we come back

21   after the lunch, I'm going to read you some preliminary

22   instructions.  But there are two things I want to emphasize,

23   and there will be a longer instruction on both of these.

24             Number one, we will let you take notes.  I will

25   explain what note-taking is and what it isn't.  But more

1    importantly, several years back we discovered, not in a trial

2    I presided over but in a trial presided over by another judge,

3    that one of the jurors had done some snooping on the Internet

4    about issues in the case.  And you can't do that because all

5    the information that you learn about the case must come from

6    what you hear in this courtroom.

7            So I've got a detailed instruction that makes it

8    pretty clear that you can't use your smart phones or any of

9    these websites to learn about the case.  So what I'm telling

10   you now is stay away from using any cell phone or any other

11   device to learn anything about the parties or about this case.

12   If you do that, then you are in trouble.  You are in trouble

13   with me.  You could cause a mistrial, and you could face some

14   separate charges.  So I will read the detailed instruction,

15   but the bottom line is, don't do any snooping on the Internet.

16   Is that clear what I'm saying?

17           JURORS:  Yes.

18           THE COURT:  All right.  And I will have a formal

19   instruction that goes into a lot more detail.

20           All right.  With that said, please stand, and

21   Mr. Keech will administer an oath to each of you.

22           COURTROOM DEPUTY:  Please, each of you, raise your

23   right hand.

24       (Trial jury sworn.)

25           THE COURT:  All right, have a seat.  So we are going

1    to take a break, and I want to do an hour and 20 minutes.  So

2    come back so we can start around 1:45.  And then this

3    afternoon, I will read the preliminary instructions.  Then we

4    will have opening statements by the attorneys, after which you

5    will hear evidence from the witnesses and perhaps evidence in

6    the form of exhibits.  So we will be in recess for one hour

7    and 20 minutes.

8         (Proceedings recessed 12:28 p.m. to 1:57 p.m.,

9         resuming outside the presence of the jury.)

10             THE COURT:  All right.  You may be seated.

11             So what was the time limit?  Was it 25 minutes?

12             COURTROOM DEPUTY:  30, Your Honor.

13             MR. HOFFMAN:  30.

14             THE COURT:  Yeah.  But you're not necessarily going

15    to take all 30; right?  It's up to you.

16             MR. OSBORNE:  I'm going to try not to.

17             THE COURT:  It's up to you.  All right.  Let's --

18             MR. HOFFMAN:  Your Honor, we are working on that

19    stipulation still.  We have not -- we kind of started working

20    on it just a bit ago.  We don't have it yet for you.

21             THE COURT:  All right.  When do you want me to read

22    it during the trial?

23             MR. OSBORNE:  Well, I was envisioning having you read

24    it during Mr. Flannigan's testimony.

25             THE COURT:  That's fine.  I think what you can do is

1    if you take the original agreement and just X some things out

2    and write in some words that you think, transition words, and

3    then make it clear to me what you want me to read from the

4    agreement, I don't think you have to retype it all.

5            MR. OSBORNE:  Sure.

6            THE COURT:  And -- but however you all want to do it

7    is fine with me.

8            MR. OSBORNE:  We're just -- right now we are just

9    writing it on a piece of paper for you, if that works, and

10   then --

11           THE COURT:  Well, that's fine.  I don't care how you

12   do it.  Just make sure if you write it, I can read it, please.

13           MR. OSBORNE:  Then I just want to clarify.  So in

14   opening I'm allowed to say what is in the paper we are writing

15   right now; right?  As far as what we --

16           THE COURT:  Well, as long as the two of you have

17   reached a meeting of the minds of the paragraphs that are

18   going to be in there, I don't have any issue with you saying

19   that there are certain things that will be presented to the

20   jury, in your own words, based on the settlement agreement and

21   the provisions that were not, from the plaintiff's

22   perspective, implemented --

23           MR. OSBORNE:  Right.

24           THE COURT:  -- or honored by the defendant.  And then

25   whatever the defendant wants to say about other provisions,

17-CV-00025-WYD-KHR                Jury Trial                      I - 23

1    you can do that.  Just so long as you all have agreed on the

2    substantive provisions you want to use, I don't have any

3    problem with you raising it in opening.

4            MR. OSBORNE:  I think we have agreed to those.

5            MR. HOFFMAN:  I think we are in agreement.

6            THE COURT:  That's fine.

7            MR. HOFFMAN:  I don't anticipate any problem with it.

8            MR. OSBORNE:  Okay.

9            THE COURT:  Okay.  I can't read it until you give it

10   to me, so just give it to me when it's ready.  So you can sit

11   down now because I'm going to read some preliminary

12   instructions, and then we will have opening statements.  It

13   won't take long.  Let's bring the jury in.

14       (Jury in at 2:02 p.m.)

15           THE COURT:  Thank you.  I wanted to mention one other

16   thing.  When we start our deliberations -- when you start your

17   deliberations and after the jury has selected a foreperson,

18   which will be the first thing you do, when you return to court

19   thereafter, whoever is the foreperson would sit in seat number

20   6.  So just remember, when you have a foreperson -- that,

21   again, is when you deliberate -- thereafter, whoever is the

22   foreperson, would sit in seat number 6.

23           All right.  So I'm going to read some preliminary

24   instructions.  You don't need to take notes because many of

25   these you will get in the final set.

1    We are about to begin the trial of the case you heard

2  about during the jury selection.  Before the trial begins, I

3  am going to give you instructions that will help you to

4  understand what will be presented to you and how you should

5  conduct yourself during the trial.  During the trial, you will

6  hear me use a few terms that you may not have heard before.

7  Let me briefly explain some of the most common to you.

8        The party or parties who sue are called the plaintiff

9  or the plaintiffs.  In this case the plaintiff is Valerie

10  Jeffers.  The party being sued is called the defendant.  In

11  this action the defendant is Ocwen Loan Servicing, LLC.  You

12  will sometimes hear me refer to "counsel."  Counsel is another

13  way of saying lawyer or attorney.  I will sometimes refer to

14  myself -- and I think I have already done that -- as the

15  Court.  But when we say "Court," I am referring to yours

16  truly.

17        When I sustain an objection, I am excluding that

18  evidence from this trial for a good reason.  When you hear

19  that I have "overruled" an objection, I am permitting that

20  evidence to be admitted.  When I say "admitted into evidence"

21  or "received into evidence," I mean that this particular

22  statement or the particular exhibit may be considered by you

23  in making the decisions you must make at the end of the case.

24        By your verdict you will decide disputed issues of

25  fact.  I will decide all questions of law that arise during

1    the trial.  Before you begin your deliberation at the close of

2    the case, I will instruct you in more detail on the law that

3    you must follow and apply.

4         That will constitute my final jury instructions, and

5    they will be read to you before closing arguments.  And it's

6    my practice to make both an original and individual copies

7    available to the jurors so you will have an opportunity to

8    have your own set of the final instructions and the form of

9    verdict.

10        Because you will be asked to decide the facts of this

11   case, you should give careful attention to the testimony and

12   evidence presented.  Keep in mind that I will instruct you at

13   the end of the trial about determining the credibility or

14   believability of the witnesses.

15        During the trial, you should keep an open mind and

16   should not form or express any opinion about the case until

17   you have heard all of the testimony and evidence, my final

18   instructions to you on the law, and the attorneys' closing

19   arguments.

20        While the trial is in progress, you must not discuss

21   the case in any manner among yourself or with anyone else.  In

22   addition, you should not permit anyone to discuss the case in

23   your presence.  From time to time during the trial, I may make

24   rulings on objections or motions made by the lawyers.  It is a

25   lawyer's duty to object when the other side offers testimony

1    or other evidence that the lawyer believes is not admissible.

2    You should not be unfair or partial against the lawyer or the

3    lawyer's client because a lawyer has made objections.

4         If I sustain or uphold an objection to a question

5    that goes unanswered by the witness, you should not draw any

6    inferences or conclusions from the question.  You should not

7    infer or conclude from any ruling or other comment I may make

8    that I have any opinions on the merits of the case favoring

9    one side or the other.  I do not favor one side or the other.

10        The trial lawyers are not allowed to speak with you

11   during this case.  When you see them at a recess or pass them

12   in the halls and they do not speak to you, they are not being

13   rude or unfriendly.  They are simply following the law.

14        Now, I have a judge's elevator I take, and I do my

15   best to stay away from jurors during the trial for the same

16   reason.  But if any of you sees me leaving the building or

17   coming into the building, I don't even want you to say hello.

18   Just ignore me, and I will ignore you.  It's not because we

19   don't respect one another; it's because we don't want to be in

20   a situation where inappropriate communication occurs.  So

21   respect that as it relates to me, and the same with the

22   attorneys, the parties, and their witnesses.

23        During the trial, it may be necessary for me to talk

24   with the lawyers out of your hearing about questions of law

25   and procedure.  Sometimes you may be excused from the

  1  courtroom during these discussions.  I will do my best to

  2  limit these interruptions as much as possible, but you should

  3  remember the importance of the matter you are here to

  4  determine and should be patient, even though the case may seem

  5  to go slowly.

  6       Order of trial.  The case will proceed as follows:

  7  First, the attorneys for each side may make what are called

  8  opening statements.  What is said in the opening statements is

  9  not evidence but is simply an outline to help you understand

 10  what each party expects the evidence to show.  A party is not

 11  required to make an opening statement.

 12       After the opening statements, the plaintiff,

 13  Miss Jeffers, will present evidence in support of her claim,

 14  and the defendant, Ocwen, Ocwen's lawyer may cross-examine any

 15  witnesses called by the plaintiff.  The defendant is not

 16  required to introduce any evidence or call any witnesses.

 17  However, if Ocwen introduces evidence, Miss Jeffers, the

 18  plaintiff, may then present what is called rebuttal evidence.

 19  That's evidence to rebut evidence presented by the defendant.

 20       After the evidence is presented, then I will read the

 21  Court's final instructions of law, after which the lawyers for

 22  the parties may make closing arguments explaining what they

 23  believe the evidence has shown.  What is said in the closing

 24  arguments is not evidence.  And once the closing arguments

 25  have been presented, you will start your deliberations, and

1    you will then decide the case.

2            Now, the evidence in the case will consist of the

3    following:

4            1.  The sworn testimony of the witnesses, no matter

5    who called the witness;

6            2.  All exhibits received in evidence regardless of

7    who may have produced the exhibits;

8            3.  All facts that may have been judicially noticed

9    and that you must take as true for purposes of this case.

10           It is unlikely that I will take judicial notice of

11   anything in this case, but in the rare event I did decide to

12   do that, that's why I read the third prong of what I've just

13   said.

14           Will there be any depositions used in this case,

15   Counsel, for any reason?

16           MR. OSBORNE:  Only for impeachment if --

17           THE COURT:  But not as evidence?

18           MR. OSBORNE:  Right.

19           THE COURT:  Do you agree with that?

20           MR. HOFFMAN:  Same with us.

21           THE COURT:  All right.  Statements and arguments of

22   the lawyers are not evidence in the case unless made as an

23   admission or stipulation of facts.  A "stipulation" is an

24   agreement between both sides that certain facts are true.

25   When the lawyers on both sides stipulate or agree to the

1   existence of a fact, you must, unless otherwise instructed,

2   accept the stipulation as evidence and regard that fact as

3   proved.  If I sustain an objection to any evidence or if I

4   order evidence stricken, that evidence must be entirely

5   ignored.

6           Some evidence is admitted for a limited purpose only.

7   When I instruct you that an item of evidence has been admitted

8   for a limited purpose, you must consider it only for that

9   limited purpose and for no other purpose.  You are to consider

10  only the evidence in the case, but in your consideration of

11  the evidence, you are not limited to the statements of the

12  witnesses.  In other words, you are not limited solely to what

13  you see and hear as the witnesses testify.  You may draw from

14  the facts that you find have been proved such reasonable

15  inferences or conclusions as you feel are justified in light

16  of your experience.

17          At the end of the trial, you will have to make your

18  decision based on what you recall of the evidence.  You will

19  not have a written transcript to consult, and it is difficult

20  and time-consuming for the reporter to read back lengthy

21  testimony.  I, therefore, urge you to pay close attention to

22  the testimony as it is given.

23          Now, I'm going to let you take notes in this case,

24  and you may use the notepads that Mr. Keech has provided to

25  you to take notes during the trial.  However, you are not

1   required to do so.  If you take notes, you should not allow

2   the note-taking to detract from your close attention to the

3   testimony and demeanor of each witness and all other evidence

4   received during the trial.

5         Take notes sparingly.  Do not try to summarize all

6   testimony.  For example, notes can be particularly helpful

7   when dealing with measurements, times, distance, identities,

8   and relationships.

9         Whether you take notes or not, you should rely on

10  your memory as much as possible and not upon your notes or

11  notes of other jurors.  Any notes you take are to refresh your

12  own individual memory.

13        The notepads may only be used in the courtroom or the

14  jury room.  You may take these notepads from the courtroom to

15  the jury room and vice versa.  However, the notepads may not

16  be taken anywhere else.  Please write your name on the

17  notepad.  Be assured that no one else will ever read your

18  notes.  At the end of the case, these notes will be returned

19  to the Court and destroyed.

20        Now, I'm going to read you this instruction, this

21  preliminary instruction, which is the last one, on the

22  Internet.  And what I'm telling you through this instruction

23  will be self-evident by these words.

24        In your deliberations your duty is to apply my

25  instructions of law to the evidence that you have seen and

1    heard in the courtroom.  You are not allowed to look at, read,

2    consult, or use any material of any kind, including any

3    dictionaries or medical, scientific, technical, religious, or

4    law books; the Internet; or any material of any type or

5    description in connection with your jury service.

6        I want to emphasize that you must not seek or receive

7    any information about this case from the Internet, which

8    includes Google, Wikipedia, blogs, and any other website.  You

9    are not allowed to do any research of any kind about this

10   case.

11       You are not allowed to visit any places mentioned in

12   the evidence.  If this is an area that you normally go

13   through, you should try to take an alternate route.  If you

14   are not able to take an alternate route, you should not gather

15   any information from that location.

16       During your deliberations, you must not communicate

17   with or provide any information to anyone through any means

18   about this case.  You may not use any electronic device or

19   media such as a telephone, cell phone, smart phone, iPhone,

20   Blackberry, or computer; the Internet; any Internet service;

21   any text or instant messaging service; or any Internet chat

22   room, blog, or website, such as Facebook, MySpace, LinkedIn,

23   YouTube, or Twitter, to communicate to anyone any information

24   about this case or to conduct any research about this case

25   until I accept your verdict.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1        In other words, you cannot talk to anyone on the

2   phone, correspond with anyone, or electronically communicate

3   with anyone about this case.  You can only discuss the case in

4   the jury room with your fellow jurors during deliberations.  I

5   expect you will inform me as soon as you become aware of

6   another juror's violation of these instructions.

7        You may not use these electronic means to investigate

8   or communicate about the case because it is important that you

9   decide this case based solely on the evidence presented in the

10  courtroom.  Information on the Internet or available through

11  social media might be wrong, incomplete, or inaccurate.  You

12  are only permitted to discuss the case with your fellow jurors

13  during deliberations because they have seen and heard the same

14  evidence you have.

15       In our judicial system, it is important that you are

16  not influenced by anything or anyone outside this courtroom.

17  Otherwise, your decision may be based on information known

18  only by you and not your fellow jurors or the parties in the

19  case.  This would unfairly and adversely impact the judicial

20  process.

21       All right.  So those are the Court's preliminary

22  instructions.

23       And, Mr. Osborne, you may proceed with your opening

24  statement.

25       MR. OSBORNE:  Good afternoon.  In 2013 Ocwen got --

 1    or they purchased Valerie's loan, and the biggest problem has

 2    been that the entire time Ocwen has had the loan, Valerie has

 3    been current on all of her payments, but, for a variety of

 4    reasons, Ocwen has, for the most part, always treated her as

 5    in default.  So she's, unfortunately, experienced all of the

 6    things that go along with that, such as false threats to

 7    foreclose, false credit reporting, improper fees and charges,

 8    forced placed insurance.  And that's where the lender thinks

 9    you don't have insurance --

10            MR. HOFFMAN:  Objection, Your Honor.  May we

11    approach?

12            THE COURT:  You may.

13        (At sidebar.)

14            MR. HOFFMAN:  Your Honor, this is what we discussed,

15    I thought, by motion in limine, and I thought there was an

16    agreement that Mr. Osborne wouldn't go into the history of the

17    settlement -- of the things, the issues that were settled by

18    the settlement agreement.  I thought that the Court had

19    addressed that and that we were all on the same page.  But

20    that's -- the first minute what we have heard was just

21    historic about the dispute that predates.

22            THE COURT:  Respond.

23            MR. OSBORNE:  Well, you said I could give them some

24    context.  There's what I'm doing.  I'm not going to go into

25    any more details about that than what I just said.  The next

17-CV-00025-WYD-KHR        Plaintiff's Opening                    I - 34

1    thing I was about to say is there was a lawsuit and a

2    settlement agreement and go into that.

3            THE COURT:  Here's what I -- I was focused more on

4    sort of the knowledge of the evidence, and I didn't really

5    make a ruling about opening statements.  I think if you want

6    to object, I would probably overrule the objection but remind

7    the jurors that what is said in opening statements is not

8    evidence.  So, I mean, if you want to register an objection

9    directly to what he said, I will probably overrule it, but I

10   will say that.  If you don't want to object, I will leave that

11   up to you.

12           MR. HOFFMAN:  Well, I have already objected --

13           THE COURT:  Yeah.

14           MR. HOFFMAN:  -- so I think that's fine --

15           THE COURT:  Okay.

16           MR. HOFFMAN:  -- however you want to address it.  I

17   do think it's improper.

18           THE COURT:  Yeah.

19           MR. HOFFMAN:  I do think there won't be evidence to

20   support it, and I think that the Court's already addressed

21   that.

22           THE COURT:  But I will tell you this, Mr. Osborne.  I

23   think that in your direct examination of your client, you need

24   to stay away from all of her past beefs about Ocwen that were

25   in effect merged into the settlement agreement.  We need to

17-CV-00025-WYD-KHR          Plaintiff's Opening                    I - 35

1    focus on a more general statement of the past relationship.

2    And I think it will be okay to say that some of those past

3    disappointments were covered by the settlement agreement

4    without going into detail about the agreement.  But I don't

5    want there to be a retrial of matters that have already been

6    settled.

7            MR. HOFFMAN:  Yeah, the problem is that those issues

8    were disputed, and the settlement agreement makes clear that

9    they were disputed and not admitted.  And I don't have a

10   witness to come in and address those things because that's not

11   the issue that's being tried.  And now it's been injected to

12   the jury and I think improperly so.  And now I can't undo that

13   because the first thing he said, for impact, was about 2013,

14   2013 and alleged wrongful foreclosure notices and alleged --

15   we can't address that in this trial, we are not prepared to,

16   and it's not appropriate for the scope of this trial, but now

17   it's in the room.

18           THE COURT:  Well, if you -- I will let you object in

19   front of the jury because all you said -- did you say

20   "objection"?

21           MR. HOFFMAN:  I did say "objection."

22           THE COURT:  Here's what I'm going to do.  I'm going

23   to tell the jury that what is said in openings is not

24   evidence.  And as I understand from the plaintiff's

25   perspective, she is really -- the case is focusing on what

17-CV-00025-WYD-KHR          Plaintiff's Opening                    I - 36

1    happened on or after -- when?

2            MR. OSBORNE:  September 2016.

3            THE COURT:  -- September of '16.

4            MR. HOFFMAN:  Right.

5            THE COURT:  So I will say something, and I am going

6    to direct you to move on.

7            MR. HOFFMAN:  Thank you.

8        (End of sidebar.)

9            THE COURT:  All right.  Ladies and gentlemen of the

10   jury, in response to the objection from the defendant, I will

11   just remind you of what I said in one of the preliminary

12   instructions.  What is said in opening statements is not

13   evidence.  And, further, I want to indicate that it's my

14   understanding that the claims asserted by the plaintiff arise

15   out of a certain September 2016 agreement that was entered

16   into by the parties to settle an underlying lawsuit and that

17   the claims in this case arise from things that didn't happen

18   or did happen after the settlement agreement was entered into.

19           All right.  So let's proceed, Mr. Osborne, in moving

20   forward here.

21           MR. OSBORNE:  Okay.  So it got bad enough there was a

22   lawsuit that Valerie filed against Ocwen for that stuff, and

23   it was resolved.  There was a settlement agreement in

24   September of 2016, and it required Ocwen to do three things.

25           Number one, they had to pay her a confidential sum of

1    money.  And there's no dispute that they did that.

2            Number two, they had to fix the loan to show that it

3    was always current the entire time they had it, and they had

4    30 days to do that.  They didn't do that part.

5            Number three, they had to fix -- or ask the credit

6    bureaus to fix the credit reporting to show it was always

7    current the entire time they had it, and they had 30 days to

8    do that.  And they didn't do that either.

9            So the month after the settlement agreement, Valerie

10   is out at Park Meadows mall, and she goes into the Sunglasses

11   [sic] Hut.  She finds a pair of sunglasses that she likes.

12   And they were running one of those promotions that says, well,

13   if you try to take out a credit card, we will give you a

14   discount.  So she applies for the credit card, denied.  But

15   they did say if you go get a cosigner, we will approve you.

16   So she did ask her boyfriend to be a cosigner, and he did

17   agree, and she was able to go back later that night and get

18   it.

19           A few days after that, she thinks to herself, well, I

20   better go check my credit report and see what's going on

21   because the only reason I can think of that I have been denied

22   is because of Ocwen.  And sure enough, they were still

23   reporting false information.  They were reporting that as of

24   September 2016 she was 90 days late.  She was thousands of

25   dollars past due.  She hadn't made a payment in several

1   months, maybe even a year.

2            And so she thinks, okay, here we go again.  It's like

3   a bad Freddy Krueger movie.  It just keeps coming back.  And

4   so the next step she does is she disputes it with the credit

5   bureaus.

6            All right.  And I have to explain the way this works

7   because it's kind of confusing, but when you have false

8   information on your credit report, you dispute it with the

9   credit bureaus, and then the credit bureaus take your dispute

10  and they send it to the bank or the mortgage company, and they

11  ask the bank or the mortgage company, okay, please do an

12  investigation, this consumer is disputing this.  And then the

13  bank is supposed to do an investigation and figure out is it

14  correct.  They have like 30 days to do that.  And then they

15  respond back to the credit bureau with their findings.  Okay.

16           And it was always Valerie's understanding that if she

17  were to dispute directly with Ocwen, that it doesn't really

18  count as a dispute.  You have to go through this mechanism of

19  going through the credit bureaus.

20           So she does that four times.  And every single time,

21  Ocwen writes back with the same stuff:  Oh, no, she is 90 days

22  late.  She is thousands of dollars past due.  Hasn't made a

23  payment in several months.

24           And so they're starting to do other weird things.

25  Like the day after the settlement agreement, they are refusing

17-CV-00025-WYD-KHR          Plaintiff's Opening                    I - 39

 1   to accept payments from her.  And she sends them a payment;

 2   they send it back.  They are doing other stuff like refusing

 3   to send her mortgage statements and refusing -- they have

 4   locked her out of her online account.  So the way that she has

 5   to make a payment is she has to take one of her old statements

 6   that's all screwed up, make a bunch of copies of it, cross out

 7   the inaccurate stuff, and then write in the correct amount, go

 8   down to the post office, mail it certified mail.  Usually

 9   takes them a couple weeks to cash the payments.  They never

10   give her any information about how the payments are being

11   applied, what's going to principal, what's going to interest,

12   what the balance is.  Uh, and so the whole thing started over

13   again, and so she filed a lawsuit in January of 2017.

14          Now, you would expect Ocwen, when they get served

15   with that lawsuit, they would say:  Oh, my God, what have we

16   been doing?  We've screwed this up big time.  We need to fix

17   this like today or at least a couple days.

18          They just kept on as business as usual.  Even after

19   their attorneys come in the case, they're still reporting

20   false information about her.  They are still reporting 90 days

21   late.  Almost four months after this lawsuit was filed, they

22   sent her a letter rejecting her payment, saying:  You are in

23   default.  This payment is not enough to cure it.  And if we

24   have started a foreclosure, it's still going.  Your money is

25   not stopping that foreclosure.

 1          And keep in mind that she is current.

 2          Two months later, the day before her deposition in

 3     this case, they sent her the same letter rejecting her June

 4     2017 payment, saying:  We're not going to accept this.  And if

 5     a foreclosure has started, it's resumed.

 6          So, finally, in July of 2017, this is about seven

 7     months after the lawsuit has been filed, they, for the first

 8     time, ask the credit bureaus to fix the credit reporting.  And

 9     even then, they still screwed it up, so they had to ask again

10     in August of 2017.  And I think they probably have it right

11     now.  It's probably been right for about five months or so

12     now.

13          So the real question is, how did all of this happen?

14     Was it a mistake?  Well, what you are going to find is that

15     everybody agrees that when a credit bureau notifies Ocwen that

16     one of its borrowers is disputing the loan, Ocwen has to

17     perform an investigation.  And the problem with that, if you

18     are the people who own Ocwen, is that that costs money in the

19     form of wages.  You have to pay people to actually

20     investigate, like they would have to do things to figure out

21     if the information is true.

22          And so they set up a system to where they were going

23     to do basically like fake investigations.  And the way that it

24     works is when Ocwen gets notice of a dispute, they outsource

25     it to overseas locations, and the people spend about one or

 1   two minutes doing the so-called investigation.  And literally

 2   all they do is they pull up their computer, and they look at

 3   how the loan is currently reporting.  And then they pull up on

 4   another computer screen what they previously reported to

 5   Equifax or Experian.  And then all they do is match the data.

 6   So they say, okay, the name, Valerie Jeffers.  Yeah, that

 7   matches on the first screen and the second screen, so that's a

 8   match.  Date of birth, yeah, that's the same.  Social, that's

 9   the same.  Oh, the balance changed a little bit, so we'll

10   update that.  And that's all they do.  And then they certify

11   back to the credit bureaus that the information is accurate

12   and that they have done their investigation.

13          And so they are going to say it's a mistake, but this

14   is intentional.  This is the way the system was designed, and

15   all the investigations they did worked exactly the way that

16   they designed it.  There's no mistake.

17          So the three Ocwen employees that worked on the

18   investigation, their name is Shweta, Bindu, and Maithreyi.

19   And we are not going to hear from them as far as what they did

20   to investigate.  And, unfortunately, I can't force them to

21   testify because they are overseas, and I can't issue subpoenas

22   to them.  So, instead, we are going to hear from Kevin

23   Flannigan, and he's Ocwen's witness.  And his job is, when

24   Ocwen gets sued, he researches the loan to try to figure out

25   what happened, he provides litigation support, and he travels

1   around the country and he gives testimony.  He's probably

2   testified in about 60 trials and 60 depositions.

3           And I'll tell you one of the hard things about this

4   case for me is that, you know, Kevin is a really nice guy.  I

5   mean, even I like him.  You'll probably like him, too.  But

6   what I think you will see is that that's not the real version

7   of Ocwen that people actually deal with.  So the real version

8   of Ocwen that people deal with is it's a company that likes to

9   do things on the cheap, and it tries to automate everything.

10  And the few things that can't be automated are outsourced.

11  And the employees aren't trained properly, and everything is

12  scripted.  And when the computer is wrong, everybody is

13  trained to just assume it's right.  Everybody -- nobody knows

14  how to fix it.  Phone calls won't work to fix it.  Letters

15  won't work.  Credit disputes won't work.  The only way to get

16  the loan fixed when the computer screws up is you have to file

17  a lawsuit.  And sometimes, in our case, you have to file two

18  lawsuits.

19          So that's what the evidence will show from our

20  perspective.  What can we expect Ocwen to say?  Well, the

21  first thing that I think they are going to say is they are

22  going to say the reason we didn't comply with the settlement

23  agreement and do these things is because Kevin got sick and he

24  experienced some medical issues.  Well, it is true that he did

25  get sick, and I am glad he's okay, but he didn't get sick

1    until January of 2017, and that's already three months after

2    they breached the settlement.

3            Secondly, he was never assigned to be the guy to fix

4    it.  So it really doesn't have anything to do with it.  When

5    you look at their loan notes, because they have this document,

6    which you will see, every time an employee works on the file,

7    they have to document what they did, and his name doesn't

8    appear at all in that time frame as doing anything.  And I

9    asked him in his deposition:  Who at Ocwen was actually

10   responsible to fix this?  And he says:  Well, maybe it was the

11   cashiering department, maybe the legal department.  I don't

12   really know.

13          So I don't really think the medical issues have

14   anything to do with this case.

15          Now, the other thing I expect them to say is they are

16   going to say, ladies and gentlemen, we screwed up, and we

17   really are sorry.  But pay very special attention to what

18   exactly they are sorry for.  They are not going to admit that

19   they are sorry for doing a fake investigation.  In fact, I

20   think they are going to say:  Mr. Osborne's crazy.  We do real

21   investigations.  We don't know what he's talking about.

22          But when I press them for the details, they don't

23   have any.  They don't know any of the details about what was

24   done other than they matched the data.

25          And they are not going to accept responsibility for

1    the damages that they caused.  They are going to always say

2    she doesn't have damages or it's always somebody else's fault.

3    It's not our fault.  It's the credit bureau's fault.  Or it's

4    always going to be somebody else.  So see if they are really

5    sorry.

6           Now, one thing that I don't really think is all that

7    relevant, but they do, and so you might as well hear it from

8    me, is that, yes, it is true in 2011 my client, Valerie, did

9    file a Chapter 13 bankruptcy.  And she's a good person who

10   just fell on some bad times.  She was laid off from her job.

11   She was a single mom with two daughters.  She wasn't receiving

12   child support.  She was able to find work, but it was never

13   making as much as what she was originally making.  And she

14   struggled for a decade working, you know, two jobs and odds

15   and ends and doing what she had to do to survive.  And

16   eventually it got to the point where, you know, she could

17   barely survive, and she had a file a Chapter 13 bankruptcy in

18   2011.

19          Now, the way that a Chapter 13 bankruptcy works is

20   it's a little different from a Chapter 7.  So you have to make

21   a monthly payment each month to the bankruptcy court, and they

22   take your money, and then they distribute it to the creditors

23   for a period of three to five years.  So her plan was four

24   years long, and she made all the payments on time.  And after

25   she filed the bankruptcy, things started to turn around for

1  her.

2          She was able to find a good job with Travelers

3  Insurance where she still works to this day.  And the income

4  wasn't quite enough to make her bankruptcy plan payments, so

5  she took on a second job at Wendy's for a couple years.  And

6  then she also worked at Wal-Mart as well.  And throughout

7  those jobs, she was able to pay Ocwen on time, and she was

8  able to pay all of her bankruptcy payments and get it

9  discharged.

10          And so where I think this will come up is they're --

11  Ocwen will probably say, well, you were denied credit not

12  because of us but because of the bankruptcy.  But the evidence

13  is going to show something different.  So what you will hear

14  is that two months after she got her bankruptcy discharged,

15  Ocwen was not reporting anything, this was June of 2015, about

16  her.  She was able to go get a brand-new car loan, and

17  that's -- she did it because she's advised that's how you

18  rebuild your credit.  And she made all of her car payments on

19  time.  That loan is now paid off.

20          By the time Ocwen starts its false reporting, she

21  can't even get a credit card at the Sunglasses Hut.  So I

22  think what you will see is that their reporting had the

23  biggest impact of all.  I mean, I can't sit here with a

24  straight face and tell you that a bankruptcy has no impact on

25  your credit, but what I can say is, you know, a good analogy I

1  heard is a bankruptcy, if you think of it like a submarine,

2  before you file you are on top of the water.  And you file,

3  and you go down a little bit.  And then you start to go back

4  up.

5        Well, Ocwen did everything that they could to make

6  sure her submarine would never come back up.  They did

7  everything to prevent her from ever getting a fresh start and

8  trying to rebuild her financial life.  She's the last person

9  in the world they should be reporting false information about

10  because this is the time she is supposed to be rebuilding.

11        And so you will see that she also at one point in

12  time, I forgot to mention this, before this lawsuit was filed

13  and Ocwen started doing these things again, she kind of

14  panicked and said:  Well, I should look into a refinancing

15  because I don't know if they are going to try to foreclose on

16  me or what they are going to do.  I don't know if I can even

17  get approved, but I'm going to see.

18        And so she goes onto LendingTree.com.  And the way

19  that that works is you put in your information, they give it

20  to a couple banks, and then a couple banks send you loan

21  applications and packets and stuff.  And one of the packets

22  she got said under no circumstances can you be late on your

23  existing mortgage payment.  And so she didn't move forward

24  with the refis because it was her understanding that she

25  couldn't get approved because Ocwen was reporting her existing

1    mortgage as late.  And even the proposed terms that they sent

2    her were probably worse than what she already had, so it

3    didn't make sense to move forward with it.

4              And, finally, I think what Ocwen is going to say is:

5    Well, she didn't go to the doctor, and, therefore, she's

6    faking it.  She says that she was so damaged by this.  Why

7    didn't she go to the doctor?

8              Well, I -- I think the simple answer is a doctor

9    can't fix her credit reports.  A doctor can't get Ocwen to

10   comply with the settlement agreement.  All the doctor could

11   really do is probably prescribe prescription medications, and

12   she just didn't feel comfortable taking those with the side

13   effects.

14             And so that's what I think the case will show.  Thank

15   you.

16             THE COURT:  All right.  Opening for the defendant.

17             MR. HOFFMAN:  Thank you, Your Honor.

18             Well, good afternoon, ladies and gentlemen.  The

19   first thing I'd remind you of is that even during the

20   plaintiff's opening statement, the Court reminded you that

21   opening statements are not evidence.  The evidence comes from

22   the witnesses and the exhibits that you will see.  And I

23   expect that the evidence in this case, the testimony, the

24   exhibits that you will see, will fall far short of what has

25   just been promised to you by plaintiff's counsel, far short.

17-CV-00025-WYD-KHR           Defendant's Opening                    I - 48

1          He is correct that Ocwen admits to having made

2    errors.  He is correct that the first thing I am going to say

3    to you is Ocwen has apologized for that.  Ocwen does apologize

4    for that.  Ocwen belatedly implemented the settlement

5    agreements that it entered into with Miss Jeffers.  There is

6    no question about that.  It's acknowledged that.  It did it.

7    That's fully implemented.  There's no question about that

8    either.  But it did it late, admitted, and apologized for.

9    That's not the first time she's heard that apology.

10   Mr. Flannigan apologized to her personally last summer

11   sometime when they met, first time they met, told her that,

12   addressed that directly with her.  And you will hear about

13   that as well.

14          Mr. Osborne is incorrect that we blame

15   Mr. Flannigan's illness for that.  That is not what happened.

16   What happened is human error, simple human error.  A -- the

17   person that was responsible for this, the case manager

18   responsible, a man named Manish Verma, failed to go through

19   the entire settlement agreement, got the payment portion of it

20   issued, and didn't address the other portions.  And so he

21   failed to get it done because of human error.  And it wasn't

22   input into the system.

23          And when it came to Miss Jeffers' attention later,

24   she did not do what one would ordinarily expect in the

25   circumstances.  You will see and you will hear no evidence

17-CV-00025-WYD-KHR          Defendant's Opening                    I - 49

1    that she called, wrote a letter, called Ocwen directly, called

2    her lawyer, or sent a letter from her lawyer, anything like

3    that saying, hey, I think maybe you have messed something up.

4    There was none of that, none of that at all.

5            She filed reports with the credit reporting agency,

6    and I'll show you those.  You will see those reports in

7    evidence.  They don't mention anything about a settlement

8    agreement.  They don't mention anything about prior

9    litigation.  They send the investigation the wrong direction.

10   They send the investigation towards checking the account.  The

11   account numbers are in error.

12           And it's true that the settlement agreement was not

13   implemented on time, and there was a human error at the front

14   end of this system.  It is not true that there was a fake

15   investigation or an inadequate investigation or even an

16   unreasonable investigation, and that is what the issues in the

17   case will be.

18           We have fixed the credit reporting errors, the credit

19   reporting issues.  There's no question about that.  You heard

20   Mr. Osborne himself say it.  In addition, what he didn't

21   mention is when we did that, the payments that were sent back

22   erroneously because the credit was -- because the credit

23   reporting information and the account information was held in

24   error, because of that, they sent the checks back to her.

25   That happened twice, on two occasions.  And when the account

17-CV-00025-WYD-KHR          Defendant's Opening                    I - 50

1    was corrected, Ocwen said:  We made that mistake.  That was an

2    error on our part.  We will credit the account for those

3    checks that we sent back -- that we received and sent back to

4    you.  You are not charged the money.  Account credited.

5           There's a total of $2,440 that, because of those

6    credits, that worked in Miss Jeffers' favor already because

7    Ocwen recognized its error, acknowledged it made an error,

8    made corrections, and credited the account money that it

9    didn't receive or didn't -- had received but sent back, didn't

10   cash, and has already tried to address that in the fashion

11   that a responsible company tries to address errors when they

12   happen.  And that is the way that Ocwen addressed it, in

13   addition to apologizing with her -- apologizing to her and

14   attempting to address the issue head on.

15          You will hear -- and I don't believe that the

16   evidence will be disputed -- that at least since February of

17   2017, Miss Jeffers' credit reporting has been completely

18   satisfactory from Ocwen.  There have been no negative credit

19   reports from Ocwen concerning Miss Jeffers since at least

20   February of 2017.  So there was a short period of time, the

21   end of October, November, December, and portions of January,

22   where she had a rightful complaint about an issue because of

23   failure to implement that settlement agreement.  After

24   February, there is going to be no negative reporting.  You

25   will see that, and I believe that will be all of the evidence

 1   that you will see on that subject.

 2          Now, there are two claims in this case, and this is

 3   the part that's going to be perhaps challenging.  I'm going to

 4   ask you to focus as you hear the evidence, to not conflate the

 5   two claims.

 6          There is a breach of contract claim.  In that claim

 7   Miss Jeffers alleges that we breached -- that Ocwen breached

 8   the settlement agreement by failing to timely implement the

 9   procedures.  And in that claim, the principal issue that we

10   are going to address is what damages were incurred as a result

11   of that.

12          Let's reasonably look at the damages that were

13   incurred, and let's hear the evidence about the damages.  I

14   have already told you that we acknowledge an error and have

15   apologized for it.  I have already told you that you will hear

16   and see that the evidence concerning Miss Jeffers' credit

17   after February of 2017 was fully satisfactory, that there was

18   no negative credit reporting relating to Ocwen; that she did

19   receive credit at times when she requested it; that she will

20   not present to you, and I don't believe she has any evidence

21   to show you at all, a single denial of credit letter, a single

22   notification from a creditor, a would-be creditor saying we

23   are not giving you credit at all, much less because of the

24   Ocwen account versus other derogatory remarks that were made

25   about her credit by others relating to her bankruptcy and

17-CV-00025-WYD-KHR          Defendant's Opening                    I - 52

 1    other issues, but no denial of credit at all during that time

 2    period.  You will see none of those, I believe.

 3             The credit reports that she will show you, the ones

 4    that reflect negative reporting or derogatory reporting from

 5    Ocwen, both are dated in the same month, December 2016,

 6    because of the error in implementing the settlement agreement

 7    that I already mentioned.  They also reflect other negative

 8    credit reporting.  They reflect a prior bankruptcy that she's

 9    acknowledged.  They reflect -- one reflects a Honda failed

10    payment and other issues that relate to the credit problems

11    that she had.  We were not the only negative credit report, so

12    that we believe it's unfair to say all of my credit concerns,

13    all of my failure to address credit or receive credit are the

14    fault of Ocwen because of this error in implementing the

15    settlement agreement.  And we will challenge that.  You will

16    also see that she did receive credit where requested, and she

17    was able to function in a normal fashion with her credit

18    issues.

19             The other issue that I'm asking you to be very

20    careful not to conflate with the breach of contract issue is

21    the Fair Credit Reporting Act claim.  And the Fair Credit

22    Reporting Act claim -- I expect, at the end of the case, that

23    the Court will instruct you that the Fair Credit Reporting Act

24    claim centrally focuses on the reasonableness of the

25    investigation that a credit furnisher does when confronted

 1   with a dispute from a consumer.  And I expect that the Court

 2   will instruct you that it's possible for -- it is not

 3   necessarily true that an inaccurate credit report, an

 4   inaccurate response to a dispute is always because of an

 5   unreasonable investigation.  That is, inaccuracy in the report

 6   does not prove unreasonableness of the investigation in and of

 7   itself.  There needs to be more.  And I believe there will be

 8   no evidence of anything more.

 9           This notion that Ocwen does not take its credit

10   reporting obligations or its investigations seriously is

11   entirely unsupported by evidence.  There will be no evidence

12   of it.  You will not hear a witness come in, anybody at all

13   come in and tell you:  I understand how ordinary

14   investigations run.  I understand.  I have experience in this

15   industry.  I have looked at these types of things.  Here's

16   what should happen in an ordinary and reasonable

17   investigation.  This is what the industry standard is, and

18   this is where they fell short.

19           That's not going to happen.  There is no such

20   evidence in this case.

21           And at the end of the case, I'm going to ask you to

22   consider why.  Why isn't that evidence presented to you in a

23   case like this one?  But the plaintiff will bear the burden of

24   proof on that issue, and we expect the evidence will show the

25   plaintiff fails on that issue.

1          The Fair Credit Reporting Act claim tests only the

2     reasonableness of the investigation.  Mr. Flannigan will

3     explain to you why and what the credit operations

4     investigators did and why they did what they did.  What he

5     will tell you is that the circumstances of the dispute frame

6     the nature of the investigation.

7          And as I mentioned to you, there were some -- there

8     were some things that impacted this investigation.  The first

9     one is that there had been an error in implementing the

10    settlement agreement on the front end.  So the system data did

11    not reflect the settlement agreement in any obvious way.  That

12    is true, and that was error on the part of Ocwen that we

13    acknowledge.

14         The other thing that happened is that the disputes

15    themselves -- there were three on the same day, October 27th

16    of 2016, and you will see them -- don't mention that there was

17    a settlement agreement.  They don't mention that there was

18    litigation.  If they had done that, what -- and Mr. Osborne is

19    correct that the way it works is, for the Fair Credit

20    Reporting Act claim, is that Miss Jeffers sends a dispute to

21    the credit reporting agency, and the credit reporting agency

22    then forwards that dispute to the credit furnisher, in this

23    case Ocwen.

24         When the credit reporting agency in the middle gets

25    the dispute, it codes it.  And you will hear from

17-CV-00025-WYD-KHR          Defendant's Opening                    I - 55

1    Mr. Flannigan about the coding system and what the codes are

2    that they utilize.  They have a code for settlement agreement.

3    They have a code for litigation.  But they didn't flag those

4    codes from the credit reporting agency because the dispute

5    that Miss Jeffers sent to them didn't mention that.  And so

6    they coded accounts reported in error, which flagged for the

7    credit reporting agency to address to Ocwen account reported

8    in error and to verify the account numbers.  And as I

9    mentioned, the system error on the front end, the same error,

10   prevented that from being accurate.

11           So it wasn't a failure -- the evidence will be it

12   wasn't a failure of the investigation.  It was a failure on

13   the front end to implement the settlement agreement.

14   Acknowledged.  Don't conflate that with the idea that the

15   investigation was thereby unreasonable.  Ocwen takes these

16   issues very seriously.  It takes its obligation under the Fair

17   Credit Reporting Act very seriously.  It addressed that issue

18   with seriousness, with full responsibility, and

19   appropriateness.

20           It yielded inaccurate information, that is true, for

21   a short period of time.  That is absolutely true.  But not

22   because it didn't investigate reasonably.

23           Again, there were no letters.  There were no calls.

24   There were none of the ordinary things that one would expect

25   to hear in this circumstance from a consumer to flag the issue

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    to, hey, we had the settlement agreement.  And that's

2    notwithstanding the fact that Miss Jeffers already had a

3    relationship with Mr. Osborne, and Mr. Osborne already had a

4    relationship with counsel for Ocwen, already knew them.  Easy

5    persons to address that issue with, but that was not

6    addressed.  They filed a lawsuit instead.

7            And Mr. Flannigan will explain to you what happened

8    after the lawsuit was filed.  And then -- and let me point

9    this out very clearly.  By the time the lawsuit was filed, the

10   reasonable investigation issue was done.  The Fair Credit

11   Reporting Act violation, that claim, the window was closed on

12   the Fair Credit Reporting Act investigation.  There's no

13   issue.  There were no credit disputes raised after the timing

14   of the lawsuit.  So once the lawsuit is filed and the credit

15   reporting issues -- once we start talking about the window

16   after the lawsuit is filed, the only claim that is relevant in

17   that time period is the breach of contract claim.  And it is

18   true that it took longer than we would like to address those

19   issues following the settlement agreement.  That's not a Fair

20   Credit Reporting Act violation, clearly not, because that

21   relates to the prior period.

22           Now, Mr. Flannigan will explain why that was.  He did

23   get ill.  He was the person with the most information.  And in

24   that time period, his illness is relevant.  It happened in

25   January.  He had a back issue.  They had to sort out the

1    account.  They fixed the credit reporting, not going to be a

2    dispute about that, in February of -- by February the credit

3    reporting was all satisfactory.  No concern about that.  I

4    don't believe you will see any evidence to the contrary.

5         Mr. Flannigan will describe for you the investigation

6    that the credit operations people undertook.  He will describe

7    for you the procedures that they follow and why they view

8    those procedures as appropriate and important, and the

9    plaintiff will bring you no other evidence.  And we believe

10   that evidence will cause a failure of the claim on the Fair

11   Credit Reporting Act violation claim.

12        We expect the evidence will prove to you that Ocwen

13   does take those issues very seriously and does investigate

14   those issues very seriously.  It's true that its investigation

15   yielded inaccurate information during the short period of

16   December -- in the late fall of 2016.  That is true.

17        We do not believe that the plaintiff will demonstrate

18   to you damages that are credible or anything that supports the

19   numbers that I expect that she will ask you for at the

20   conclusion of this trial.  And we certainly do not believe

21   that there will be any evidence, or we do not expect that

22   there will be any evidence whatsoever of intentional conduct

23   or willful or reckless conduct by Ocwen, which is what claim

24   is being made in this case.

25        So that's the evidence that we think you will hear

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 58

1    and see, and we will ask for your verdict at the conclusion of

2    the case.  Thank you.

3            THE COURT:  All right.  Call your first witness.

4            MR. OSBORNE:  I call Kevin Flannigan.

5            THE COURT:  All right.  Let me just talk a little bit

6    about timing.  I have a 4 o'clock sentencing that I'm going to

7    push back to 4:20.  So we are going to stop around 4:10 at the

8    latest, and then we will pick it up again tomorrow morning.

9    When I say "sentencing," I am talking about in a criminal case

10   unrelated to this case.  All right.

11           COURTROOM DEPUTY:  Please raise your right hand.

12      (The witness was sworn.)

13           COURTROOM DEPUTY:  Please be seated.  Please state

14   your full name, and spell your full name for the record.

15           THE WITNESS:  My name is Kevin Flannigan,

16   F-l-a-n-n-i-g-a-n.

17      **KEVIN FLANNIGAN, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

18   BY MR. OSBORNE:

19   Q.  Good afternoon, Mr. Flannigan.

20   A.  Good afternoon.

21   Q.  You are employed at the Ocwen office in Houston; right?

22   A.  That's correct.

23   Q.  And your job is a senior loan analyst?

24   A.  Yes, sir.

25   Q.  And your job entails researching Ocwen loans when Ocwen is

Julie H. Thomas, RMR, CRR                              (303)296-3056

1  sued; right?  At least part of your job?

2  A.  Yeah, in -- a little bit more than that, but in a

3  nutshell, I guess that's a fair statement.

4  Q.  Yeah.  You do other stuff too.  You also provide support

5  to Ocwen's litigation attorneys.  You attend settlement

6  conferences.  You testify.  Is that all fair?

7  A.  That's true.

8  Q.  Okay.  And you have probably testified in roughly 60

9  depositions or 60 trials on Ocwen's behalf?

10  A.  Maybe, maybe more, yes.

11  Q.  And you don't work in the credit reporting or credit

12  dispute department; true?

13  A.  I do not.

14  Q.  So a little bit about Ocwen.  Ocwen is a loan servicer;

15  right?

16  A.  That's correct.

17  Q.  And that entails things like collecting the borrower's

18  payment, managing the escrow account, credit reporting, stuff

19  like that; right?

20  A.  That's correct.

21  Q.  And Ocwen's headquarters is at West Palm Beach, Florida?

22  A.  Yes.

23  Q.  Ocwen also has locations in India and the Philippines;

24  true?

25  A.  Correct.

1    Q.  And much of the credit dispute department is located in

2    India; right?

3    A.  We do have a location that handles credit reporting

4    verifications in India, that's right.

5            THE COURT:  Mr. Osborne, why don't you turn the

6    lectern around to the front since we're not making opening

7    statements.  Mr. Keech will help you.  You got it?

8            MR. OSBORNE:  I think I've got it.

9            THE COURT:  All right.

10    BY MR. OSBORNE:

11    Q.  All right.  So I want to ask you about the 2016 settlement

12    agreement.  Would you agree that the two basic conditions that

13    Ocwen was to do was to fix the loan in 30 days and fix the

14    credit reporting in 30 days?

15    A.  Uh, that was two of the three, uh, items that needed to be

16    done.  That's correct.

17    Q.  Right.  The third one was Ocwen was to pay her a

18    confidential sum of money.  And there's no dispute that

19    happened; right?

20    A.  That's correct.  Within 30 days, that's right.

21    Q.  Right.  So the 30 days would have expired October 8th,

22    2016; right?

23    A.  I believe that's a fair statement, yes.

24    Q.  And the two things that Miss Jeffers was required to do

25    was, number one, she had to keep the agreement confidential;

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 61

1    right?  She couldn't tell other people about the settlement

2    agreement?

3    A.  Well, um, the terms of the settlement agreement were

4    confidential.  The existence of the settlement agreement is

5    not something that's confidential.  As a matter of fact, I

6    believe there was a notice of settlement that was -- that was

7    filed, um, but, again, the existence of a settlement agreement

8    is not something that's confidential.

9    Q.  Okay.  Well, we will rely -- we will get to that later.

10   We will rely on the exact language of that.

11          The other thing she was required to do is that she

12   had to dismiss her lawsuit against Ocwen; right?

13   A.  I believe that's correct, yes.

14   Q.  Okay.  And if -- if Miss Jeffers ever breached her

15   confidentiality agreement, Ocwen could have sued her for that;

16   right?

17   A.  If she were to breach the confidentiality agreement?

18   Q.  Right.

19   A.  Um, you know, I think that's a legal issue.  I don't want

20   to -- I don't want to get into that.  But, uh, I think the

21   document speaks for itself when it comes to the breaches.

22   Q.  So sitting here today, you are not sure who at Ocwen was

23   even assigned to implement the settlement agreement; right?

24   A.  Who was assigned to implement it?  Um, well, we had the

25   legal -- Ocwen's legal department has paralegals and case

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 62

1    managers that actually make sure that settlement agreements

2    get implemented.

3    Q.  Well, you -- let me rephrase that.  You were not the

4    person that was assigned the task to implement this settlement

5    agreement; right?

6    A.  I was not, no.

7    Q.  And you don't know who at Ocwen was provided the

8    settlement agreement and what the instructions were to

9    implement it; right?

10   A.  The instructions for the settlement agreement, um, were

11   laid out in the settlement agreement.  As far as making sure

12   that the terms of the settlement agreement got implemented,

13   there were representatives at Ocwen -- the paralegals at Ocwen

14   were responsible for doing that.

15   Q.  Okay.  Who specifically at Ocwen was -- like, can you give

16   me the name of a person that was supposed to be doing this?

17   A.  Manish Verma was the paralegal that was responsible.

18   Q.  All right.  And you believe that -- or strike that.

19          You experienced some medical issues yourself in

20   January of 2017; right?

21   A.  Yes, sir, I did.

22   Q.  And you believe that played a part in why Ocwen did not

23   comply with the settlement agreement; right?

24   A.  I do.

25   Q.  Okay.  That is, however, already three months after or

1    approximately three months after Ocwen was supposed to already

2    implement the settlement; right?

3    A.   That's correct.  Yes, sir.

4    Q.   So while you were out on leave with medical issues, your

5    projects were assigned to somebody else; right?

6    A.   Yes.

7    Q.   And that was a person named Sony Prudent; right?

8    A.   That's right, Sony Prudent.

9    Q.   And I'm going to ask you to look at -- well, before we do

10   that, do you contend that between September 8th, 2016 through

11   October 2016 that you personally did anything to try to fix

12   this loan?

13   A.   From September through -- what was the other date?

14   Q.   September 8th, 2016 through October 8th, 2016.

15   A.   I did not personally, uh, no.  I did not personally handle

16   that during that time, no.

17   Q.   All right.  So I'm going to ask you to look at Exhibit 2,

18   please.  And you should also have a copy in those notebooks as

19   well, but --

20   A.   And I just want to add to the statement that I just made.

21   Um, although I was not personally responsible for implementing

22   the settlement package between the period of September of 2016

23   to October of 2016, I did have a role in reviewing the loan

24   prior to that.  I just wanted to make that point, but . . .

25   Q.   Prior to the settlement agreement?

 1  A.  Prior to the settlement agreement, right.

 2  Q.  All right.  So Exhibit 2, this is a letter that Ocwen sent

 3  to Miss Jeffers September 9th, 2016; is that correct?

 4  A.  Yes.

 5  Q.  And so this is the day after the settlement agreement;

 6  right?

 7  A.  This letter is dated --

 8  Q.  It's on the very bottom.

 9  A.  9/9/2016, I see it at the bottom there, yes.

10  Q.  And this is a letter rejecting her payment and sending it

11  back to her; right?

12  A.  That's correct.

13  Q.  Okay.

14          MR. OSBORNE:  Your Honor, I move to admit Exhibit 2.

15          MR. LOPACH:  Your Honor, we object to Exhibit 2 as

16  not stipulated given the dates of September 9th, 2016.  As we

17  have heard testimony, Ocwen had until October 9th to implement

18  the terms of the settlement agreement.  So what happened with

19  this payment during that window during which Ocwen was

20  implementing the terms of the settlement agreement is

21  irrelevant to the issues in the case.

22          THE COURT:  Do you have any response to that,

23  Mr. Osborne?

24          MR. OSBORNE:  Well, Your Honor, it's relevant to show

25  they are still treating the loan as in default.

1    THE COURT:  I'm going to sustain the objection

2  because the 30-day period for the loan account to be brought

3  current was 30 days of the receipt of the borrower's signature

4  on this agreement.  And so the signature by Miss Jeffers is

5  September 8th, and that would take us into at least the first

6  week of October.  So sustain the objection.  And so Exhibit 2

7  is disallowed.

8  BY MR. OSBORNE:

9  Q.  All right.  Let's go to the next month, October 2016.  Do

10  you dispute that Valerie Jeffers made her October 2016 payment

11  to Ocwen?

12  A.  Do you have a document that I can look at to actually see

13  that?

14  Q.  Well, we do, but I'm asking you, just before we get to

15  that, do you dispute that she made her payments after October

16  of 2016?

17  A.  Well, I know that there were payments made, but I'd like

18  to look at the history to determine exactly when they were

19  made.

20  Q.  Okay.  I'm going to ask you to look at Exhibit A.  It's

21  probably in the other notebook in front of you.

22  A.  Okay.

23  Q.  If we can go to A, 27.

24    THE COURT:  A what?  27?

25    MR. OSBORNE:  A, page 27.

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 66

1           THE COURT:  Page 27?  All right.

2           MR. OSBORNE:  And Exhibit A is a stipulated exhibit,

3    so I'd move to admit it, Your Honor.

4           THE COURT:  All right.  Exhibit A is received.

5           COURTROOM DEPUTY:  Your Honor, my list does not show

6    A as stipulated.

7           THE COURT:  Well --

8           COURTROOM DEPUTY:  I don't know if that's correct or

9    not.

10          MR. LOPACH:  We offered it, Your Honor, as a defense

11   exhibit.  If Mr. Osborne is stipulating to it, we are happy to

12   have it --

13          THE COURT:  All right.  So Exhibit A is received.

14      (Defendant's Exhibit A received.)

15   BY MR. OSBORNE:

16   Q.  All right.  Sir, do you see that the payment of $1200 was

17   received for the October payment?

18   A.  October -- yes, sir, I do see that.

19   Q.  And that was enough to cover what her payment was; right?

20   A.  Well, her P&I payment -- and, again, at that particular

21   time, the settlement agreement had -- all the portions of the

22   settlement agreement had not been made, meaning the account

23   had not been brought current.  So at this particular time, her

24   loan was still showing to have an escrow account.  And so

25   $1200 would not have been enough to actually make a full

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   monthly payment.  As a matter of fact, I don't believe that

2   the $1200 would have been enough to satisfy a principal and

3   interest payment.  But -- but, nevertheless, it was applied in

4   October of 2016.

5   Q.  Well, isn't it true, sir, that the principal and interest

6   payment was $1,198.68 as of September of 2016?

7   A.  Back then -- you may be correct.  I'd have to do the math

8   to actually add it up, but I guess I'm thinking as of today

9   but -- she does have an adjustable rate loan where the P&I

10  does float, go up and down, but I'd have to add that up to

11  determine that.

12  Q.  Right.  And the escrow issue that you mentioned, that was

13  part of the issues that were resolved, right, in the previous

14  case?  True?

15  A.  What do you mean in the -- you mean with the settlement?

16  Q.  Right.  Wasn't one of her contentions that she didn't even

17  have an escrow account and she paid her taxes and insurance

18  directly?

19  A.  That is correct.  That is correct.  What I'm -- I guess

20  the point that I'm making here is that her payments were still

21  showing to be more than $1200.  The payment was applied on

22  that date, but the escrow item had not been fixed at this

23  point.

24  Q.  Right.

25  A.  But the payment was received.  You are right.

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 68

1    Q.  Right.  And as of today, the escrow has finally been

2    removed by Ocwen; right?

3    A.  The escrow was removed in I think it was July of 2017,

4    right.

5    Q.  Right.  And if the escrow part of the payment was not on

6    there, the $1200 was enough to cover the principal and

7    interest payment.

8    A.  I believe that's a fair statement, yes, sir.

9    Q.  All right.  If you can please go to page 32, same exhibit.

10   And tell me if this reflects that Miss Jeffers made her

11   November 2016 payment.

12   A.  Are we looking at a specific payment here?  Let's see.

13   Okay.  Page 32 goes through October, the page that I'm looking

14   at.  32 of 117?

15   Q.  Right.  That's her November payment; right?

16   A.  Well, that's the payment that was received on October the

17   16th -- on October the 27th of 2016.

18   Q.  Right.  We just established she made her October payment

19   previously.  So this would be the November payment; right?

20   A.  Okay.  I don't want to get confused, but I thought we were

21   talking about a payment being made in October of 2016.  That's

22   what I was referring to, that a payment was made.  I didn't

23   say the month that it was actually being applied to.  What I'm

24   saying is that a payment was actually made in October 2016.

25   Q.  Understood.  And so what I'm trying to show is that would

17-CV-00025-WYD-KHR    Flannigan - Mr. Osborne                    I - 69

1    have been for the November payment; right?  We have already

2    agreed that the settlement said she was current through

3    September of 2016.  Right?

4    A.  I think the settlement agreement said as of September.

5    Q.  Same thing; right?

6    A.  I'm not sure, because when you say "as of September,"

7    that, to me, would imply a due date of September of 2016.

8    Q.  Right.  That's what we looked at where you sent it back to

9    her; right?

10   A.  I'm confused on the question.

11   Q.  It's true that she made her September payment, and Ocwen

12   rejected it; true?

13   A.  In September 2016?

14   Q.  Yes, sir.

15   A.  Yeah, the letter did state that the funds were sent back,

16   yes.

17   Q.  Right.  And then we established she made a payment in

18   October -- or she made another payment.  We just looked at it

19   on page 27.  Right?

20   A.  Yes.

21   Q.  Okay.  And then she made another payment on what we looked

22   at, page 32 of Exhibit A; right?

23   A.  Okay.  So the payment that was sent in October that we are

24   looking at on the payment history, on page 3 -- let me just go

25   back there real quick.  That's a payment that was received,

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne              I - 70

1    $1200 payment, October 27, 2016.

2    Q.  Right.

3    A.  This transaction that we are looking at here on page 32 is

4    the same exact date.  So this notation that they are referring

5    to here in the loan comments is referring to the payment that

6    was actually applied here on the payment history.

7    Q.  All right.  Let's try this a different way.  Between

8    September 2016 to today, please tell me the months that you

9    say Valerie Jeffers did not make her payments to Ocwen.

10   A.  Well, it is true that, um, the letter did state that a

11   payment was returned in September.  It is true that this

12   payment was applied -- the payment of $1200 was applied to the

13   loan on October 27th.  And I think that's as far as we got so

14   far.

15   Q.  Well, what I'm asking is between September 2016 to today,

16   what months, if any, does Ocwen contend that Valerie Jeffers

17   did not make her payments?

18   A.  It's my understanding that part of complying with the

19   settlement agreement was to bring the loan current.  And I

20   think ultimately that's what Ocwen did was to bring the

21   borrower's loan current.  As of today, the loan is actually

22   due for April of 2018.  I think the last payment that posted

23   to the loan was in February.  So her loan is actually due for

24   April of 2018 when I last checked.

25   Q.  So it's paid two months ahead?

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 71

1    A.   Yes.

2    Q.   Okay.

3    A.   And that partly could have to do with the two payments

4    that were returned to her were credited to the account without

5    them being received back from Mrs. Jeffers.

6    Q.   Right.  But you don't fault Miss Jeffers for Ocwen sending

7    the payments back; right?

8    A.   No, no, sir.

9    Q.   Okay.  But the question is:  There's -- you can't show me

10   one month specifically between September of 2016 to the

11   present where you say Miss Jeffers didn't make the payments;

12   right?

13   A.   I'm -- yeah, the -- I think we have to go back to the

14   issue of the loan not being brought current and the settlement

15   terms not being implemented.  We are not denying the fact that

16   the settlement terms weren't implemented.  That would have

17   caused the loan to show past due.  And because of that, um,

18   there were -- the payments were sent back to the borrower, to

19   Ms. Jeffers.

20   Q.   Let's try this one last time.  What month and year between

21   September 2016 to the present do you contend, if any, that

22   Valerie Jeffers missed?

23   A.   I don't know how to explain it other than the way I've

24   already explained it.

25   Q.   Isn't the answer as simple as she didn't miss any during

1  that time frame?  She didn't not -- she didn't fail to make a

2  payment during that entire time frame; right?

3  A.  I'd have to look through the history to determine that to

4  be exact.  I mean, I don't want to just say the answer to that

5  is yes without actually looking at the payment history.

6  Q.  You don't have any documents in front of you that Ocwen

7  has sent to Miss Jeffers during that time frame telling her

8  she missed a payment; right?

9  A.  Well, again, as I stated before, because the loan was

10 showing to be past due because of the fact that the settlement

11 terms weren't implemented, the payments were sent back.  I

12 mean, that's -- I don't think that's in dispute.

13 Q.  Okay.  That wasn't what I was asking.

14 A.  I guess I'm not understanding the question.

15 Q.  The question is:  You don't have any documents in front of

16 you where Ocwen sent Miss Jeffers a letter saying that you

17 failed to make a payment during this time frame, September of

18 2016 to the present; right?

19 A.  Well, the reason that --

20 Q.  Well, let's just start with a yes or no to that, and

21 then --

22 A.  Well, I don't think it's as simple as a yes-or-no answer,

23 and that's because the payments were being sent back because

24 at the time the loan was still showing to be past due.

25 Ocwen's records were reflecting that, yeah, the account wasn't

 1   current.  And with that being the case, those payments were

 2   being sent back.

 3   Q.  Okay.  I'm not asking you about sending payments back.

 4   What I'm trying to ask you is -- like, you are familiar with a

 5   default notice; right?

 6   A.  Sure.

 7   Q.  It's a letter that a servicer sends to a borrower that

 8   says you are late on your payments, you didn't make a payment

 9   on whatever month.  Right?  That's generally what a default

10   notice is; right?

11   A.  Substance, yeah, that's the substance of it, yes.

12   Q.  From September 2016 to today, Ocwen has never sent

13   Miss Jeffers a notice of default; true?

14   A.  I -- I'm not sure about the notice of default.  I don't

15   know if she's ever received a notice of default or not.  I

16   don't believe I've seen a notice of default in the records.

17   Q.  Okay.  So let's talk about Exhibit A, page 7, please, if

18   you could go there.

19   A.  Page 7?

20   Q.  Yes.

21   A.  Okay.

22   Q.  So if you can see right here, it says "BPO ordered."

23   Right?

24   A.  I do see that, yes.

25   Q.  Okay.  And so Ocwen was ordering a BPO, which is called a

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 74

1   broker price opinion; true?

2   A.   That's correct.

3   Q.   And what that means is that Ocwen is asking a Realtor to

4   determine the value of the house for foreclosure purposes;

5   right?

6   A.   No.   This is -- this is a BPO that's being ordered for a

7   modification.

8   Q.   Wasn't Ocwen working on a foreclosure at this time?

9   A.   Well, it says it clearly here that the investor approves

10  the use of a hybrid for modification.   It doesn't say for

11  foreclosure.

12  Q.   Well, right below that it says "collateral file follow

13  up"; right?   And what a collateral file follow-up means is

14  that you are asking the investor to produce the original note

15  to start a foreclosure; right?

16  A.   That's part of a foreclosure proceeding, but you were

17  asking me about the reason that the BPO was ordered.

18  Q.   Well, Ocwen was processing a foreclosure right after the

19  settlement agreement; true?

20  A.   Well -- and, again, as I explained before, because the

21  settlement agreement had not been fully implemented, the loan

22  was still showing to be past due, and because of that, because

23  the loan was showing to be past due, you know, there were

24  steps that were taken that had to be made for loans that are

25  in default, yes.

Julie H. Thomas, RMR, CRR                                 (303)296-3056

1    Q.  Right.  And a broker price opinion, that's where a Realtor

2    goes out and does a drive-by, takes some pictures of the

3    house; right?

4    A.  That's part of it.

5    Q.  And then if you can go to page 11, please.

6    A.  Okay.

7    Q.  And what is a SCRA foreclosure referral check?

8    A.  Where are we exactly?

9    Q.  It should be towards the bottom.  See right here?

10   A.  Yes.  And it specifically tells what that abbreviation

11   that you just mentioned.  It -- it's -- actually the

12   abbreviation for that is SCRA, you are correct, but it

13   actually stands for Servicemembers Civil Relief foreclosure

14   referral check.  And I think that just has to do with

15   verifying whether or not the borrowers have any military

16   status and that kind of thing or if they may be in the

17   military.

18   Q.  Right.  Because you can't foreclose on somebody if they

19   are on active duty; right?

20   A.  That's correct.

21   Q.  And so Ocwen wanted to make sure that she wasn't on active

22   duty before they started foreclosure; right?

23   A.  And as I mentioned before, the terms of the settlement

24   agreement had not been implemented.  That goes without saying.

25   Q.  That's been established already.

1    A.   Okay.

2    Q.   And let's go to the next page, page 12.  So this is now

3    about two weeks after the settlement agreement, and Ocwen has

4    documented in the file that it couldn't offer Miss Jeffers a

5    loan modification because it couldn't verify income; right?

6    A.   Because it couldn't verify income?  That's basically -- I

7    think that's what it says here.  "We are unable to offer you a

8    Shared Appreciation Modification because:  We have validated

9    that you have no monthly income and therefore we are unable to

10   offer any affordable payment."

11        That's what it says.

12   Q.   And at this point in time, Miss Jeffers had never even

13   applied for a loan modification, had she?

14   A.   Well, part of what the Ocwen process is is to try and cure

15   a default.  Part of that can be submitting the loan for a

16   modification and to see if the default can be cured by a

17   modification.  Ocwen also does, you know, other things to try

18   to, you know, prevent loss -- to do loss mitigation, such as

19   short sales, deeds in lieu of foreclosure, repayment plans.

20   Those sorts of things are offered by Ocwen.  Those things are

21   offered when a loan is considered to be in default.

22        But, you know, as we go through these, I guess, notes

23   of records showing that the loan is, you know, is in default,

24   I think it's important for me to mention that, yeah, the

25   settlement terms had still not been implemented.  That's

1    correct.

2    Q.  Well, yeah, that wasn't my question, though.  My question

3    was, and I think this is really a yes or no, isn't it true

4    that Valerie Jeffers had not even asked Ocwen for a loan

5    modification?  Right?

6    A.  At this point, I don't believe so.  But as I stated

7    before, Ocwen is always attempting to provide better terms to

8    put the borrower in a better position.  That includes offering

9    a modification.

10   Q.  A better position?  And so your testimony is this

11   modification was for -- you were looking to see for her

12   benefit; right?

13   A.  I couldn't hear the question.

14   Q.  You were looking at the loan modification for Valerie's

15   benefit.  Is that your testimony?

16   A.  A loan modification?

17   Q.  Yes, sir.

18   A.  Yeah.  Because as I stated before, the loan at this time

19   had not been -- the settlement terms had not been implemented.

20   The loan was, in our system, considered to be in default.

21   Um . . .

22   Q.  Well, let's --

23   A.  And so what we were doing by offering a modification was

24   to take the loan out of default.

25   Q.  Let's look at the proposed terms on the next page,

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 78

1   page 13.  If you go towards the bottom there.  All right.  So

2   they were going to try to modify her loan for a P&I payment of

3   $1,088.33; right?

4   A.  I do see that, yes.

5   Q.  This was going to be a 480-year [sic] modification; right?

6   A.  Where are you looking to see that?

7   Q.  Is it on the next page?  Yeah, so if you look at the top

8   of page 14, 480 months with an additional balloon of 144,000

9   at the end.

10  A.  I don't think that -- that's not how that works.  It's

11  actually -- she would have a maturity date of her regular

12  loan, um, meaning her original note, it would have matured at

13  this point in 244 months, as it says at the bottom, "Offer

14  Maturity Term:  244 [sic] months."

15          What the 480 months is applying to is that the loan

16  is being amortized over that period, meaning the P&I payments

17  would actually be lower because you have the terms that are

18  being spread out over 480 months.  However, the actual

19  maturity date would actually end prior to the 480 months.  As

20  a matter of fact, it would end in 241 months as it's listed

21  here.  The reason for the balloon was that that would be the

22  amount that would be owed at the time the loan matures.

23  Q.  Right.  So she'd pay 244,000 plus another 144,000 balloon.

24  A.  Well, where is the -- what are we looking at as far as the

25  principal balance here?  So you'd actually have to go down I

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    think a little bit.  So it says new modified UPB of -- it says

2    $217,000 would be the modified unpaid principal balance here,

3    with a modified monthly payment amount of $842.  And I'm

4    assuming that the rest of that would have come from an escrow

5    payment to bring it up to 1,088.33.  But I'm looking here for

6    the escrow payment.  It says new T&I, which is taxes and

7    insurance, of 245,000 -- $245.84.

8    Q.  Right.  So let's go to page 31.  So this is now

9    October 17th, 2016.

10   A.  31?

11   Q.  Right.

12   A.  Okay.

13   Q.  And Ocwen is, again, still internally referring to a

14   foreclosure, right, doing a foreclosure check?

15   A.  That -- yes, that the Servicemembers -- the SCRA

16   foreclosure referral check is being sent.

17   Q.  And this is now past the deadline for Ocwen to comply with

18   the settlement; right?

19   A.  Yes.

20   Q.  All right.  And the settlement agreement is not even

21   mentioned in Exhibit A at any point in that time frame; right?

22   A.  That's correct.  And that -- and that has to do with, you

23   know, litigation purposes.

24   Q.  Well, what do you mean by that?

25   A.  Well, you know, litigation purposes, you know, you

1    don't -- you're not always going to see that listed in, um,

2    these loan comments.  What you will have is that there is a

3    specific code for a loan that's in litigation.  So you won't

4    see anything about, um, the settlement agreement in the loan

5    comments because it's being handled by the litigation team.

6    All you would really see on the loan, if you were to look in

7    the real -- in the database, is the litigation flag.

8    Q.  So is there a separate note somewhere that exists that

9    shows what was done on the settlement agreement?

10   A.  Well, again, that would have been handled by the

11   litigation team.  And that's where I was mentioning that they

12   had persons -- the paralegals would have been responsible for

13   handling that portion of it.  That's why you don't see

14   anything mentioned here about an undisclosed amount that was

15   paid for, um, one of the terms of the settlement agreement.

16   Q.  Okay.  But --

17   A.  You don't see that here.

18   Q.  But the question is:  Is there separate notes that exist

19   that show what the legal team at Ocwen was doing to work on

20   the settlement?

21   A.  I don't believe that there were separate notes.  There

22   would just have been maybe correspondence between our legal

23   team and, you know, outside counsel.

24   Q.  And you have never produced any documents in this case to

25   show that the legal team was doing anything to try to

1   implement the settlement agreement; right?

2   A.  Well, again, that -- that's something that was done

3   between our legal team and outside counsel to -- I think one

4   of the things that was actually done was to send the check

5   back to, um, I think it was Ms. Jeffers or yourself.  I'm not

6   sure exactly who it went to.  But, again, that would have been

7   done by the legal -- by the legal team by way of the

8   cashiering team.  The other settlement terms that we -- as

9   mentioned before, had not been implemented at this point.

10  Q.  Well, my question was really just yes or no.  You haven't

11  produced any documents to show what the legal team was doing

12  to implement the settlement agreement; right?  You can't point

13  me to an exhibit in front of you that shows that; true?

14  A.  I don't -- I don't believe we have anything here.  I'm not

15  sure if we do or not.  I don't think so.

16  Q.  All right.  And you would agree with me that Ocwen was

17  sued in this case in January of 2017; right?

18  A.  Can you say that again?  I'm sorry.

19  Q.  You would agree with me Ocwen was sued in this case in

20  January 2017; right?

21  A.  That's correct.

22  Q.  And then I will have you look at page 89 of Exhibit A.

23  A.  Okay.

24  Q.  So this is now March 7, 2017, so two months after you had

25  been sued.  And, again, Ocwen is still doing a foreclosure

1   check; right?

2   A.  Yes.  And, you know, again, this is -- this is right

3   after, uh -- well, not right after, but you're right.  The

4   litigation had been filed.  The lawsuit was filed I think

5   early part of, uh, 2017, January 2017.  At that particular

6   point, the matter was referred to myself.

7           Okay.  As Counsel has mentioned and as you have

8   mentioned already, I had become very ill, uh, with a herniated

9   disc.  I was, uh -- I guess I'm going to humanize myself a

10  little bit.  I was basically paralyzed.  Okay?  To the point

11  where I was very limited on what I could do.  I mean, I was

12  bedridden, you know, for almost a month and a half.  And to

13  that extent, I was not able to perform some of the duties.  I

14  was -- I had to actually leave.  I was out on medical leave

15  for a while.

16          And this matter was actually one that I was, you

17  know, supposed to handle.  It did eventually get assigned to

18  another loan analyst to handle, but during the January period,

19  it was my responsibility.

20  Q.  Well, and Mr. Sony Prudent was handling your assignments

21  when you were out; right?

22  A.  He was handling this particular case, yes, sir.

23  Q.  And then I want you to look at Exhibit 25, please.

24  A.  Okay.

25          MR. OSBORNE:  This is a stipulated exhibit, Your

1    Honor.  I'd ask that this be introduced -- or admitted.

2    Sorry.

3              THE COURT:  This is Plaintiff's Exhibit 25?

4              MR. OSBORNE:  Yes, Your Honor.

5              THE COURT:  All right.  Exhibit 25 is received.

6         (Plaintiff's Exhibit 25 received.)

7    BY MR. OSBORNE:

8    Q.  This is now April of 2017; right?  And this is a letter

9    that Ocwen sent to Miss Jeffers.

10   A.  That's correct, yeah.  This is -- this is one of the

11   payments that I mentioned earlier was returned back to

12   Miss Jeffers.

13   Q.  And it tells her right here that her payment won't stop

14   any foreclosure proceedings that have begun; right?

15   A.  Yeah.  And it also -- I guess I'm looking at the prior

16   sentence about a notice of default as well.  And like I said,

17   I don't recall seeing that at this time, so I'm not -- I'm not

18   sure, but it does mention one in this sentence.  So I'm --

19   Q.  This is a form letter, though; right?

20   A.  Right.  And, well --

21   Q.  It's possible that Ocwen put a notice of default had been

22   sent if, in fact, it hadn't been sent; right?

23   A.  Again, I'm not sure if one had been sent or not, but,

24   nevertheless, it does say what you just mentioned, that it

25   will not stop any foreclosure proceedings.

1    Q.  All right.  And then I'll ask you to look at Exhibit 22.

2            MR. OSBORNE:  This is stipulated as well, Your Honor.

3    Move to admit Exhibit 22.

4            THE COURT:  All right.  Exhibit 22 is received.

5        (Plaintiff's Exhibit 22 received.)

6    BY MR. OSBORNE:

7    Q.  And this is basically the same letter we just saw, only

8    this is now June 2017; right?

9    A.  That's correct.  June 14.

10   Q.  And you had been back from medical leave well before then;

11   right?

12   A.  I had been.  And I think at this particular point, I

13   believe it was in June, is when it was brought back to my

14   attention, uh, that this matter needed to be taken care of.  I

15   have to -- I have to preface that by saying this was -- this

16   was not an easy loan to look into.  This was one that had some

17   complicated issues with not only a bankruptcy, but also it

18   being an adjustable rate mortgage.

19           You know, Sony, who is a very, uh, you know, fine

20   loan analyst, would have taken time to, you know, look to see

21   what the issues were with the loan, as in most cases with loan

22   analysts.  You want to make sure that whatever corrections

23   that you are doing are going to be correct and that are going

24   to be done, you know, the right way.

25           This loan had some complicated issues involving, you

1   know, bankruptcy, an adjustable rate loan, and escrow.  And so

2   me being familiar with the loan, it was brought back to my

3   attention that, you know, these things needed to be taken care

4   of.  And I think it was around this time when I got back

5   involved in the loan, and we were able to make sure that the

6   loan got -- got the proper adjustments that it needed.

7   Q.  How many man-hours did you personally spend fixing the

8   loan?

9   A.  Personally?  Uh, I don't -- I don't recall.

10  Q.  Give me your best -- best estimate, please.

11  A.  You know, like I said before, I mean, I had been involved

12  with this loan since, I guess, 2016, so that would have

13  involved me looking into things prior to the actual settlement

14  agreement.

15  Q.  Well, yeah, and that's not what I'm asking you about.  So

16  I'm asking you after the settlement --

17  A.  Oh, you are asking me how many hours did I put into

18  investigating this loan, because that would have entailed my

19  investigation.  So, of course, there would have been a lot

20  less time spent at this particular point in time for me.  And

21  so I'm not sure.  I can't give you an honest answer on how

22  many -- how many hours or -- that I put in after the

23  settlement agreement was reached.

24  Q.  Well, you can't even give me an estimate?

25  A.  I don't know.  Sitting here today, I don't know.

1   Q.  Well, it wasn't like you were sitting there every day,

2   eight hours a day, for 10 months working on this loan, was it?

3   A.  No.

4   Q.  And, in fact, if we look at Exhibit A, your name is only

5   mentioned like one time, right, as having done anything?

6   A.  Exhibit A.

7   Q.  The loan notes.

8   A.  As I mentioned before, you're not going to see a lot of

9   the litigation, a lot of the privileged information between

10  our attorneys, that kind of thing.  You're not going to see

11  the work that I do, um, listed here in the loan comments.

12  Q.  So you wouldn't document this file showing what you did to

13  try to fix it?

14  A.  Not in the loan comments, no.

15  Q.  In another file would you document it?

16  A.  I would advise counsel, you know, of what -- of what would

17  be taken -- what steps would be taken to actually get it

18  resolved.

19  Q.  All right, but that's not what I'm asking.  I'm asking,

20  like, would you put in a note on some computer system at Ocwen

21  saying that I, Kevin Flannigan, on this date worked on this

22  loan to fix it?

23  A.  I would have -- that information I would have sent to

24  counsel.  For example, um -- now, I don't know exactly --

25  thinking back on the case, prior to the settlement agreement,

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 87

1    I don't know exactly how much time I spent on it.  But I would

2    have sent counsel that information on what I felt was

3    necessary to actually get the account resolved.

4    Q.  All right.  And you have never produced in this case the

5    document you are referring to that you would note in the

6    computer showing what you did; right?

7    A.  I don't believe so, because --

8    Q.  All right.  I mean, that's --

9    A.  Again, that would have been between myself and counsel, if

10   anything would have been -- been done on that.  But I think

11   ultimately it led to the decision to, um, you know, to

12   ultimately, I guess, to reach the settlement agreement.

13   Q.  Let me talk to you about credit reporting in general.

14   A.  Okay.

15   Q.  So Ocwen reports to four different credit bureaus,

16   Equifax, Experian, TransUnion, and Innovis; right?

17   A.  Yes.

18   Q.  And when Ocwen is notified by a credit bureau that one of

19   Ocwen's borrowers is disputing something, the credit bureau

20   sends what's called an ACDV form; right?

21   A.  That's correct.

22   Q.  And essentially what the ACDV form is is it tells Ocwen:

23   This is what we have on file for this loan.  Please

24   investigate this and tell us if this is accurate.

25             Right?

1  A.  Specifically, yes.  I mean, the ACDV form will

2  specifically lay out what it is that, you know, the consumer

3  is disputing.

4  Q.  Right.  And so it would tell Ocwen what Ocwen previously

5  reported and then ask them to compare it; right?

6  A.  That's basically what it is.  That's right.

7  Q.  And essentially Ocwen's investigation process is to match

8  the data and make sure that what's showing in the computer

9  matches what was previously reported; right?

10  A.  Well, you know, it depends on what information is being,

11  you know, asked for.  If, for example, the borrower said you

12  are not spelling my name correctly, then, yeah, we would go

13  in, uh, or our credit ops team would actually go in and make

14  sure that the information that's listed in Ocwen's database is

15  correct with what's showing on -- with the credit reporting

16  agencies.  You know, the principal balance, for example, the

17  originating balance, those sorts of things are verified with

18  what's in Ocwen's records.  That information is validated and

19  then reported back to the credit bureau agencies by way of the

20  ACDV.

21  Q.  All right.  And you recall when I took your deposition in

22  this case; right?

23  A.  I do.  Twice.

24  Q.  Well, once in this case.

25  A.  Once in this case, that's right.

1    Q.  And I asked you a similar question, that Ocwen's

2    investigation process is to basically match what Ocwen has on

3    file with what it previously reported.  And do you recall

4    testifying that that's basically what the process is?

5    A.  Well, again, if it's a match or at least to verify that

6    the information is correct.  So if -- for example, if we are

7    showing that, you know, on the ACDV that the loan is being

8    reported as 30 days past due, if we go into our database and

9    see that the loan is being reported as 30 days past due, then

10   yeah, the information matches.

11   Q.  Right.

12   A.  However, if we are showing, you know, 60 or 90 days past

13   due, the information is not going to match, but we are going

14   to report what our system actually shows.

15   Q.  And the Ocwen investigators that are working on the

16   dispute, they don't have the ability to change what the

17   computer shows; right?

18   A.  Well, the information -- the information that they are

19   pulling forth is what validates their report.

20   Q.  Well, if their investigation reveals that the information

21   is inaccurate, the Ocwen investigators can't even change it;

22   isn't that true?

23   A.  Well, the -- it depends on what the information is that's

24   being sent in.  If, for example, you know, the borrower is

25   sending in information to say that her loan is, you know, on a

1  repayment plan and she submits additional information, you

2  know, in regards to a repayment plan with Ocwen, the credit

3  ops team would, you know, contact our payment plan team to

4  find out what -- if, in fact, the plan was set up on -- or the

5  loan was set up on a repayment plan.

6         It just depends on the specific information that's

7  being asked in the ACDV form.  So whatever the ACDV form is

8  asking for, that's what the credit ops team is going to

9  review.

10 Q.  Do you recall testifying in your deposition that the Ocwen

11 investigators do not have the ability to change what's in the

12 computer and that that would have to be done by the cashiering

13 department?

14 A.  Correct.  If there needed to be changes, the credit ops

15 team would submit requests to various departments to make

16 changes if necessary.  Um, for example -- I will give you an

17 example.  This loan -- this loan has, uh, a settlement that's

18 actually involved.  If the ACDV included information about a

19 settlement agreement, the credit ops team would have noted

20 that -- well, the borrower has some sort of an issue with the

21 settlement agreement.  They would have contacted the

22 litigations team, and they would have been, you know, informed

23 about that issue.  And that would have prompted them to look

24 more into the settlement agreement.

25 Q.  And the settlement agreement, that would be a document

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                I - 91

1  that they would review as part of their investigation; right?

2  A.  That's correct.  Are you referring to the litigation team?

3  Q.  Yes, sir.

4  A.  Yes.

5  Q.  And you would also agree with me that, as a general rule,

6  when Ocwen is notified that a borrower is disputing its credit

7  reporting, Ocwen would mark the account as disputed regardless

8  of what their investigation shows?

9         MR. LOPACH:  Your Honor, I'm going to -- may I

10  approach?

11         THE COURT:  No.  Just tell me your objection.

12         MR. LOPACH:  So I think counsel is eliciting a

13  question about a different section of the FCRA, and the

14  Complaint and the Final Pretrial Order are solely about

15  section 1681s-2(b).  This question is towards a completely

16  different section of the FCRA that's not a part of this case.

17         THE COURT:  Respond, Mr. Osborne.

18         MR. OSBORNE:  That's not true.  The *Llewellyn* case

19  from the Tenth Circuit says that failure to report a debt as

20  disputed can be viewed as inaccurate --

21         THE COURT:  All right.

22         MR. OSBORNE:  -- under s-2(b).

23         THE COURT:  I will overrule the objection.

24  BY MR. OSBORNE:

25  Q.  Do you need me to repeat that question?

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 92

1    A.  Yes.

2    Q.  When Ocwen is notified that a borrower is disputing

3    Ocwen's credit reporting, Ocwen's policy would be to mark the

4    account as disputed; true?

5    A.  If, in fact, the information was sent directly to Ocwen,

6    not -- not through a credit agency -- not through a credit

7    reporting agency.

8    Q.  Do you recall testifying in your deposition that Ocwen's

9    policy would be to mark the loan as disputed when --

10   A.  I believe my testimony was that I wasn't sure at that

11   particular time.

12           MR. OSBORNE:  Well, Your Honor, I'd request to give

13   the witness a copy of his deposition transcript.

14           THE COURT:  All right.  Mr. Keech.

15           COURTROOM DEPUTY:  I hand the witness the transcript

16   of his deposition taken June 17, 2016.

17           THE WITNESS:  Thank you.

18   BY MR. OSBORNE:

19   Q.  All right.  Sir, I'm going to ask you to turn to page 30,

20   line 24.

21   A.  30, line, uh -- which line are we talking about?

22   Q.  Line 24.

23   A.  24.  Okay.

24   Q.  I asked you the following question:  "Okay.  What is

25   Ocwen's policies concerning marking accounts as disputed when

1    they're" --

2    A.   Okay.  Let me stop you.  I am on page 30.  Line 24 does

3    not -- does not say that here.  Not in my page 30.  My page 30

4    has -- line 24 it has "ever cleared an account to not show a

5    payment."  So I don't know if I have the right one.  This was

6    June 17, 2016?  Because I think I took the deposition in '17.

7    I took two of them, but I think this was the first one.

8            MR. OSBORNE:  Yeah, you know, I think somehow we

9    accidentally grabbed the wrong transcript.

10           THE COURT:  All right.  And this is being shown to

11   the jury?

12           JURORS:  Yes.

13           THE COURT:  It probably shouldn't be.

14           COURTROOM DEPUTY:  Oh, yes, it is.

15           THE COURT:  It shouldn't be.

16           MR. OSBORNE:  Your Honor, can I approach him with my

17   copy that I printed?  I'm happy to show it to counsel so they

18   can review.

19           THE COURT:  Well, I always prefer an original.  It's

20   just -- do you have an original?  Does your original have the

21   same page you asked him to reference?

22           MR. OSBORNE:  Well, the original I guess is at the

23   office.  We accidentally grabbed the wrong one.  But I have an

24   exact copy of the original right here.

25           THE COURT:  All right.  Do you have any objection to

 1   using a copy, Counsel?

 2           MR. LOPACH:  Can I inspect it, Your Honor?

 3           THE COURT:  Go ahead.

 4           MR. OSBORNE:  Can I get this turned off for the jury?

 5           COURTROOM DEPUTY:  It's off to the jury.

 6           THE WITNESS:  Okay.

 7           COURTROOM DEPUTY:  What is the date on this

 8   deposition?

 9           MR. LOPACH:  It's June 16th, 2017.

10           COURTROOM DEPUTY:  Thank you.

11   BY MR. OSBORNE:

12   Q.  All right.  So line 24, I asked you the following

13   question:  "Okay.  What is Ocwen's policies concerning marking

14   accounts as disputed when they're doing an investigation into

15   a borrower's dispute of credit reporting?"

16           Did I read my question correctly, sir?

17   A.  Yes.

18   Q.  And you answered as follows:  "Well, I believe it's just

19   that.  I mean, if there's a dispute, Ocwen regularly goes in

20   and marks that account is in dispute.  And the loan is

21   researched, and when the conclusion is reached, the proper

22   codes are placed on the account to show that the dispute has

23   been resolved."

24           Did I read your answer correctly?

25   A.  Right.  And I think I go on to say later in the line of

1    questioning that I didn't know specifically -- I think you

2    asked me about should have Ocwen have told Equifax that

3    Mrs. Jeffers' loan was being disputed.  I went on to say that

4    I didn't know specifically.

5    Q.  For now my question was:  Did I read your answer

6    correctly?

7    A.  That's -- yes, you did.

8    Q.  Okay.  And I'm going to ask you to turn to Exhibit 7,

9    please.

10          MR. OSBORNE:  And this is a stipulated exhibit, Your

11   Honor.  I move to admit Exhibit 7.

12          THE COURT:  All right.  Exhibit 7 is received.

13      (Plaintiff's Exhibit 7 received.)

14   BY MR. OSBORNE:

15   Q.  And if you can go to the bottom of the page, please.

16   A.  Okay.

17   Q.  Do you see the compliance condition codes right here?

18   This tells you how to mark an account as disputed.  You would

19   put code XB, which stands for account information disputed by

20   a consumer; right?

21   A.  Yes.

22   Q.  Would you agree with me that it's important that Ocwen

23   report accurate information to the credit bureaus?

24   A.  Yes.

25   Q.  Can you explain why?

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 96

1    A.  Well, because, um, like in any case, any person who is

2    applying for credit or applying for a loan, they would want

3    the creditors to see accurate information from various

4    creditors.

5    Q.  Also, Ocwen does maintain written policies on doing credit

6    reporting investigations; right?

7    A.  Yes.  Yes, that's right.

8    Q.  And you have refused to produce those in this case; isn't

9    that true?

10   A.  Well, that's -- that's more of a litigation issue.  Um, so

11   I don't -- I don't want to get into that.  That's more --

12   again, that's more of a --

13   Q.  Well, let me ask it to you in a different way.  You

14   haven't brought the policies with you to court; right?

15   A.  I have not, no.

16   Q.  All right.  I'm going to ask you to look at Exhibit 6,

17   please.

18          THE COURT:  Okay.  We are going to stop in 10 minutes

19   for today, so let's find a convenient stopping point in

20   10 minutes.

21          MR. OSBORNE:  Yes, Your Honor.

22   BY MR. OSBORNE:

23   Q.  And I want to talk to you about the first investigation.

24   So it's Exhibit 6, page 7.

25          COURTROOM DEPUTY:  This is also a stipulated exhibit

1   that has not been received yet.

2            MR. OSBORNE:  I'd like to move to admit Exhibit 6,

3   Your Honor.

4            THE COURT:  All right.  Exhibit 6 is received.  Do

5   you also want to move to admit exhibits -- well, I'll wait

6   until you get to them.  All right.

7        (Plaintiff's Exhibit 6 received.)

8   BY MR. OSBORNE:

9   Q.  And the first investigation that Ocwen did, they were

10  notified by TransUnion, right, that Miss Jeffers was disputing

11  credit reporting?  Is that true?  Are you on page 7 of

12  Exhibit 6?

13  A.  The dispute specifically says -- I think if you can scroll

14  down just a little bit, I can read it.  Yeah, it says -- it's

15  a dispute code 1 -- 112 --

16  Q.  Well, I'm not -- my question is:  Was Ocwen notified by

17  TransUnion that Miss Jeffers was disputing the credit report?

18  A.  They were notified by TransUnion that she was disputing

19  specific information in regards to the credit reporting, yes.

20  Q.  Right.  And the person who worked on this investigation,

21  if we turn to the second page or page 8, is Maithreyi; is that

22  correct?  At the bottom here?

23  A.  You have to scroll down just a little bit.  Yes, it's got

24  it in the left-hand corner there.  That's right.

25  Q.  Is it Mr. Maithreyi or Mrs.?

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    I - 98

1    A.  It's Ms. Maithreyi.

2    Q.  When I took your deposition, you testified you didn't know

3    if Maithreyi was Mr. or Mrs.; true?

4    A.  I want to clarify something about depositions, because you

5    keep referring back to depositions.  A lot of times when I'm

6    asked questions in depositions, I don't always have the

7    answers, especially when the topics are so broad.

8           But what I then do, to clarify or gather additional

9    information, is to go back and recollect my thoughts, um,

10   research the items to find out if there's additional

11   information that I can provide for maybe a later deposition or

12   trial.  And that's what I do in cases like this.  And so I was

13   able to identify that, yes, Mrs. Maithreyi listed here is a

14   female, as well as the other two representatives that assisted

15   with the ACDVs.

16   Q.  All right.  And you prepared extensively for your

17   deposition in this case, though; right?

18   A.  Again, to the -- to the best of my ability with the broad

19   topics that were listed, yes.

20   Q.  All right.  And you never interviewed Maithreyi to see

21   what they did as part of their -- he -- or I'm sorry -- what

22   she did as part of her investigation?

23   A.  I never specifically interviewed either one of them, no.

24   Q.  All right.  So Maithreyi completed her investigation on

25   November 4th, 2016; true?  If you look at page 7 in the top

1   right corner.

2   A.  Yes.

3   Q.  And the amount past due was, if you can go down just a

4   little bit, right here.  So the top box is what Ocwen was

5   previously reporting, which was past due $1,541; right?

6   A.  Yeah.  That report, um, let's see, I think the date of the

7   initial review was -- if you go up to the top, it will tell

8   you specifically what the date received was.

9   Q.  Okay.  My question was, though, that we're looking at the

10  amount past due.

11  A.  Okay.  And that -- if you -- if you go down, and you

12  can -- date of the account information that's listed here

13  is -- it says April 18, 2016.  And Ocwen, below that in the

14  shaded area, is advising that the account information that's

15  listed here is November 4, 2016.  And the reason that I say

16  that is because you have got a time lapse in which your amount

17  of delinquency would have increased from one point to the

18  other.

19  Q.  Right.  So right here, the amount past due, 1541 is what

20  Ocwen previously reported.  And they responded back to

21  TransUnion to modify it to say $6,945; right?

22  A.  As of the date of -- as of the date of the submission,

23  that's right.

24  Q.  As of November 4th, 2016.

25  A.  Correct.

1  Q.  Right.  And you would agree with me that's inaccurate.

2  A.  Again, at that particular point in time, the settlement

3  agreement, the settlement terms to correct the account had not

4  been placed on the account yet, and so the account was still

5  showing to be past due.  The information that the credit ops

6  team was reviewing in the database was actually correct as far

7  as what they were able to review.

8          The settlement terms that the legal team was handling

9  had not been put into, uh, the database at that particular

10  point.  And if I haven't explained it, I will go ahead and

11  explain it to you now, that the reason for that was is because

12  Manish Verma, the person who was responsible for making sure

13  that that got done, um, didn't get that particular portion of

14  the settlement terms done.  And that's why it was showing to

15  be past due.

16  Q.  Right.  But my question was:  That was inaccurate.  I

17  mean, she wasn't 6,945 past due; true?

18  A.  It was accurate to what was showing in the info -- in the

19  database.

20  Q.  Well, doesn't accuracy generally mean that something is

21  true?

22  A.  It was true to what was showing in the database.

23  Q.  But it wasn't true to what was showing in reality; right?

24  A.  No.  The reality is is that the settlement agreement had

25  not been implemented yet.  It had not been set up in the

 1    database yet.  And because it had not been set up in the

 2    database yet, the information that was showing up in the

 3    database is what was sent to the credit -- the ACDV to the

 4    credit bureau agencies.

 5    Q.  I understand that.  My question was:  She wasn't in

 6    reality $6,945 past due; true?

 7    A.  I don't know how else to explain it, what I've just

 8    explained.

 9    Q.  Well, it's a yes-or-no answer, which you haven't given me.

10    She wasn't --

11    A.  I don't --

12    Q.  She wasn't 6,945 past due November of 2016.

13    A.  According to the database, the information that was in the

14    database, what our credit verifications team was working with,

15    that information was accurate to what was being reported.

16    Q.  I'm not asking you about the computer database.  You would

17    admit the computer database can be wrong; right?  So what I'm

18    asking you, sir, is:  In reality she was not $6,945 past due

19    in November of 2016; isn't that true?

20    A.  I don't --

21    Q.  Yes or no?

22    A.  I don't know how else to answer the question.

23            MR. OSBORNE:  Your Honor, I request that the witness

24    answer the question.

25            THE COURT:  Well, the question was yes or no.  So do

1   your best to answer the question with a yes or no.

2   A.  Was the -- can you repeat the question again?  I'm sorry.

3           THE COURT:  Do you want it read back?

4           MR. OSBORNE:  Yes, Your Honor, please.

5           THE COURT:  All right.

6       (The record was read by the reporter.)

7   A.  If, in fact, the settlement terms were implemented, she

8   would not have been that amount past due.  That's correct.

9           MR. OSBORNE:  All right.  I'm at a good stopping

10  point.

11          THE COURT:  All right.  So we are going to start

12  tomorrow morning at 9 o'clock, and we will go until around

13  12:15 before we take our lunch break.  And then we will come

14  back, and we have all afternoon to finish whatever we can get

15  finished tomorrow.  So remember the admonitions I have given

16  you, and return tomorrow morning so we can promptly start at

17  9:00 a.m.

18          COURTROOM DEPUTY:  All rise.

19      (Jury out at 4:05 p.m.)

20          THE COURT:  All right, have a seat.  I have some

21  questions.  So I'm talking about timing here.  How much longer

22  do you estimate we'll be with this witness?

23          MR. OSBORNE:  I probably have an hour and a half

24  left.

25          THE COURT:  All right.  What about for the defendant?

17-CV-00025-WYD-KHR                Jury Trial                        I - 103

 1          MR. LOPACH:  I will be brief, Your Honor, as brief as

 2   I can.  I would hope I could limit it to -- I mean, I may not

 3   have to go far beyond the scope of the direct examination, but

 4   I would imagine maybe 40 minutes.

 5          THE COURT:  I'm not asking that to limit you.  I am

 6   trying to determine if I need to give you the jury

 7   instructions tonight, or is this case likely to go into

 8   Wednesday.  And, if so, then I will wait and give them, the

 9   jury instructions and verdict form, to you tomorrow.  That's

10   why I'm asking.  I'm trying to see -- so do you think we have

11   another at least half a day with this witness tomorrow?

12          MR. OSBORNE:  Most likely.

13          THE COURT:  And then what about for Miss Jeffers?

14   How long is the totality of her testimony?

15          MR. OSBORNE:  I probably have around, from my side,

16   hour and a half, two hours.

17          THE COURT:  What about for the defendant?

18          MR. HOFFMAN:  I would expect 45 minutes, in that

19   range.

20          THE COURT:  Okay.  All right.  So here's what we are

21   going to do then, because it may be that if we finish

22   Miss Jeffers tomorrow, we probably have a charge conference,

23   work on jury instructions.  And I would bring the jury back

24   Wednesday morning.

25          THE REPORTER:  Tomorrow is Wednesday.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1           THE COURT:  I mean Thursday morning.  You're right,

2    tomorrow is Wednesday.  I was forgetting we had the day off.

3           I will bring the jury back Thursday morning for the

4    reading of the final instructions and closing argument.  But

5    we should obviously be able to get that in by Thursday.  So

6    what I want you to do is just hang around here, and I will

7    have my law clerk bring out -- we have got to make a few minor

8    changes -- the instructions this afternoon.  And then look at

9    these over the evening, and -- if we have a charge conference

10   tomorrow.  And then we will give you the verdict form, which I

11   still have to work on sometime tomorrow, but obviously the

12   verdict form is shorter.

13          So just hang out in the courtroom, and those will be

14   brought out to you in the next 20 minutes.

15      (Proceedings recessed 4:07 p.m.,

16      February 20, 2018.)

17

                    REPORTER'S CERTIFICATE
18

19          I, JULIE H. THOMAS, Official Court Reporter for the
     United States District Court for the District of Colorado, a
20   Registered Merit Reporter and Certified Realtime Reporter,
     CA CSR No. 9162, do hereby certify that I reported by machine
21   shorthand the proceedings contained herein at the time and
     place aforementioned and that the foregoing pages constitute a
22   full, true and correct transcript.
          Dated this 12th day of March, 2018.
23

24          _____/s/ Julie H. Thomas_____
               Official Court Reporter
25


Julie H. Thomas, RMR, CRR                        (303)296-3056