1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF COLORADO

3
     Civil Action No. 17-CV-00025-WYD-KHR
4

5      VALERIE JEFFERS,                          Volume II of III
                                                (Pages 105 - 337)
6            Plaintiff,

7            vs.

8      OCWEN LOAN SERVICING, LLC,

9            Defendant.

10   ----------------------------------------------------------------

11                      REPORTER'S TRANSCRIPT
                          JURY TRIAL
12
     ----------------------------------------------------------------

13
            Proceedings before the HONORABLE WILEY Y. DANIEL,
14   Judge, United States District Court for the District of
     Colorado, and a jury of ten, commencing at 9:16 a.m. on the
15   21st day of February, 2018, in Courtroom A1002, Alfred A.
     Arraj United States Courthouse, Denver, Colorado.

16

17                          APPEARANCES

18   For the Plaintiff:
     MATTHEW R. OSBORNE, MATTHEW R. OSBORNE, P.C., 11178 Huron
19   Street, Suite 7, Northglenn, CO 80234

20   For the Defendant:
     PAUL J. LOPACH, BRYAN CAVE, LLP, 1700 Lincoln Street,
21   Suite 4100, Denver, CO 80203

22   ROBERT J. HOFFMAN, BRYAN CAVE, LLP, 1200 Main Street, One
     Kansas City Place, Suite 3800, Kansas City, MO 64105

23

24
          JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25      Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

            Proceedings reported by mechanical stenography;
                transcription produced via computer.

1                          I N D E X

2

   JURY INSTRUCTIONS                                              PAGE
3
   Instruction Conference                                         309
4

5
   PLAINTIFF'S WITNESSES                                          PAGE
6
   KEVIN FLANNIGAN
7      Direct (Resumed) - Mr. Osborne                             110
       Cross - Mr. Lopach                                         158
8      Redirect - Mr. Osborne                                     213
   VALERIE BARAJON JEFFERS
9      Direct - Mr. Osborne                                       240
       Cross - Mr. Hoffman                                        269
10     Redirect - Mr. Osborne                                     294

11
                        PLAINTIFF'S
12                      EXHIBITS                   RECEIVED

13              4                          260

14              5                          181

15              8                          246

16              15                         257

17              19                         156

18              20                         256

19              21                         254

20
                        DEFENDANT'S
21                      EXHIBITS                   RECEIVED

22              B                          176

23
                        EXHIBITS
24                      REFUSED                     PAGE

25              9                          252

17-CV-00025-WYD-KHR                    Jury Trial                    II - 107

1    <u>MOTIONS</u>                                                    <u>PAGE</u>

2    Rule 50 Motion
        Mr. Lopach                                             299
3       Mr. Osborne                                            307
        Ruling of the Court                                    308

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1      (Proceedings resumed 9:16 a.m.,

 2      February 21, 2018, outside the presence of the

 3      jury.)

 4          THE COURT:  All right.  We now have all the jurors

 5  here, so let's -- let me look, though, at this proposed

 6  stipulation.

 7          Okay.  When do you -- I don't have any issue with

 8  this proposed stipulation.  When it says "proposed," this is a

 9  stipulation between the parties; right?

10          MR. OSBORNE:  Correct.

11          MR. HOFFMAN:  It is.

12          THE COURT:  When --

13          MR. HOFFMAN:  My understanding, Your Honor, if I

14  might, is that it will be read by the Court, not used as a

15  document.

16          THE COURT:  No, no, no.  That's what I said all

17  along.  But I want to make sure even though this says

18  "proposed," I would tell the parties that -- I would tell the

19  jury that the parties have reached a stipulation.

20          MR. HOFFMAN:  Yes.

21          THE COURT:  And I'm going to read the stipulation.

22          MR. HOFFMAN:  Yes.

23          THE COURT:  When do you want me to read it?

24          MR. OSBORNE:  Um.

25          THE COURT:  Everybody can have a seat except the

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   attorneys who are speaking.

2           MR. OSBORNE:  Maybe -- maybe we should start reading

3   it.

4           THE COURT:  Where are we now in the examination?  You

5   are still doing your adverse examination; right?

6           MR. OSBORNE:  Yes.

7           THE COURT:  It's up to you.  I'm asking.

8           MR. OSBORNE:  Well, actually, maybe -- maybe when the

9   questioning goes down that path, I'll just ask the Court to

10  read it, if that works.

11          THE COURT:  Any objection to that?

12          MR. HOFFMAN:  No objection.

13          THE COURT:  All right.  So let me know, and I'll read

14  it.

15          All right.  Let's bring the jury in.

16      (Jury in at 9:20 a.m.)

17          THE COURT:  All right, have a seat.  And if you

18  already sat, that's okay, you can stay where you are.  Good

19  morning.

20          So one of you had a fender bender.  Who had an

21  accident this morning?

22          JUROR NO. 2:  It's just a minor fender bender.

23          THE COURT:  But I said who.  So it's Juror No. 2.  So

24  any injuries?

25          JUROR NO. 2:  No.

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne              II - 110

 1            THE COURT:  All right.  Where was the accident?

 2            JUROR NO. 2:  I-25.

 3            THE COURT:  All right.  Well, we're glad you made it

 4   here safely.

 5            JUROR NO. 2:  Thank you.

 6            THE COURT:  Let's continue with the examination of

 7   the witness, and he's reminded that he's still under oath.

 8            **KEVIN FLANNIGAN, PLAINTIFF'S WITNESS,**

 9                 **DIRECT EXAMINATION** (Cont.)

10   BY MR. OSBORNE:

11   Q.  All right.  Sir, we left off talking about the first

12   investigation Ocwen performed by an individual named

13   Maithreyi.  Correct?

14   A.  Yes.

15   Q.  All right.  Can you please turn to Exhibit 6, page 7.

16            All right.  Would you agree with me, sir, that in

17   November -- November 4th, 2016, Maithreyi responded to

18   TransUnion that Miss Jeffers was 90 days past due?  True?

19   A.  Yeah.  That -- there is an account status code listed as

20   an 80 on the report.

21   Q.  And for the record, you're talking about right there.  I

22   marked it on the screen.  Right?  See the red dot?

23   A.  That's correct, yes, sir.

24   Q.  That means 90 days past due?

25   A.  That's correct.

1  Q.  And in reality Miss Jeffers was not 90 days past due, was

2  she?

3  A.  Right.  Well, with what -- I think what my comment was on

4  yesterday was that if, in fact, the settlement terms had been

5  implemented at that time, um, the loan would have not shown to

6  be 90 days past due.  That is correct.

7  Q.  Okay.  You don't have any notes in your possession showing

8  what Maithreyi did to investigate Miss Jeffers' dispute; true?

9  A.  I don't have any notes with me, no.

10 Q.  And Maithreyi never called Miss Jeffers to get her side of

11 the story; true?

12 A.  I don't believe so, no.

13 Q.  And Maithreyi never called the legal department at Ocwen

14 to inquire about the status of the litigation or the

15 settlement; true?

16 A.  He never called the legal department, right.  And, um, I

17 may have mentioned it yesterday, but I'll go ahead and mention

18 it again at this point.  Um, if the ACDV doesn't have a

19 specific code to prompt an investigation as to, you know, a

20 dispute in litigation, a inquiry about a settlement, then

21 there would be no reason for Maithreyi or anyone in the

22 credit, you know, reporting team to check with the legal

23 department.

24 Q.  Well, wouldn't a good practice be, as just a step one, to

25 just pick up the phone and call Miss Jeffers and say:  We got

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 112

1    notice you're disputing this.  We want to interview you and

2    get your side of the story, and then we'll go look at the

3    other records and talk to other departments.

4            Wouldn't that be a good first step to do?

5    A.  Well, I think, again, Ocwen's job or, you know,

6    representatives in the credit reporting team's job would be to

7    respond, you know, accordingly to what the information is on

8    the ACDV.  You know, their job is to respond specifically to

9    what it says.  In this case, you know, there was nothing

10   about -- listed about litigation, only about that, you know,

11   the status of the account.  And so like I said before, if

12   there was some notification about, you know, settlement or

13   litigation, then, sure, they would have contacted, you know,

14   maybe not Miss Jeffers but someone in the -- in the legal

15   department.

16   Q.  So as far as Ocwen is concerned, it would basically never

17   contact the borrower as part of the investigation; right?

18   A.  I don't believe anyone in the credit reporting team would

19   have -- would have contacted Miss Jeffers about, um, the

20   settlement, no.

21   Q.  Well, or --

22   A.  Or litigation.

23   Q.  -- or about the dispute.  Just to interview the borrower

24   and say:  We got your dispute.  Let's hear your side of the

25   story.

17-CV-00025-WYD-KHR       Flannigan - Mr. Osborne              II - 113

1           Ocwen would not do that, would they?

2   A.  Well, number one, if the borrower has an attorney, then,

3   you know, chances are that, you know, there's some legal

4   reasons on why we wouldn't contact the borrower, obviously.

5   But, um, you know, like I -- just was said in this case,

6   because there was no coding that would identify this as, you

7   know, a legal matter, there was no prompt for someone in the

8   credit reporting team to, you know, to reach out to the legal

9   department.

10          There are specific codes that would, you know, be

11  listed on this form that, uh, you know, someone in the credit

12  reporting team could look at and say, oh, yeah, here's

13  something that we need to contact the legal team about, and

14  they would do that.  But in this case that didn't happen.

15  Q.  Okay.  Well, I appreciate that, but I didn't ask you about

16  the codes.  All right.  So my --

17  A.  Okay.

18  Q.  -- question is:  As a matter of practice, Ocwen does not

19  call the borrower to interview the borrower to get their side

20  of the story as part of its investigation; right?

21  A.  You're talking -- you are referring to, um, the credit

22  reporting team; is that right?

23  Q.  Yes, sir.  That's correct.

24  A.  I don't believe that's part of the practice, right.

25  Q.  All right.  Now, on page 8 of Exhibit 7, if you can please

1   turn there.

2   A.   Okay.  I'm there.

3   Q.   Sorry.  We are going to get it up on the screen.  I'm

4   sorry.  I said -- Exhibit 6.  I meant Exhibit 6, page 8.

5   Sorry.

6          MR. NOBEL:  Page 8, Exhibit 6?

7          MR. OSBORNE:  Yeah.

8   BY MR. OSBORNE:

9   Q.   And isn't it true, sir, that when TransUnion respond --

10  I'm sorry -- when Ocwen responds to the credit bureaus, Ocwen

11  has to certify that the information is accurate; right?

12  A.   I believe so, yes.

13  Q.   And Maithreyi did, in fact, certify to TransUnion that she

14  verified the accuracy of this information; true?

15  A.   Yes.

16  Q.   Would you agree with me that was a false certification?

17  A.   I wouldn't say that that's the case.  Like I said, I

18  believe that information was validated by what was in the

19  system.

20  Q.   I don't understand that answer.

21  A.   I'll explain it again.  Um, the way I explained it

22  yesterday is the information that's listed within Ocwen's

23  database is what Maithreyi or -- was responding to in this

24  particular ACDV.  The system validated her information.

25  That's why she put it into the system that -- I think I tried

1   to explain it that way yesterday.  I don't know if I did a

2   good enough job or not, but --

3   Q.  So nobody at Ocwen, as part of the credit dispute

4   investigation process, tries to learn if the computer itself

5   is wrong; right?

6   A.  In what -- in what way?  Maybe I should ask that question.

7   In what way are you talking about being --

8   Q.  Well, first to figure out is the loan actually 90 days

9   past due; right?

10  A.  Right.  I mean, the information that the system was

11  showing was, in fact, that the loan was 90 days past due.

12  Q.  Right.  And Maithreyi never made any attempt to verify if

13  that was actually true, other than just look briefly at the

14  computer.  Right?

15  A.  Maithreyi would not have had a reason to verify that

16  information if, in fact, there was not a -- any -- any codes

17  or dispute codes to say, you know, we need to look into, you

18  know, other issues, for example, litigation.  And I sound like

19  I'm beating a dead horse, but, you know, codes, specific

20  codes, description codes make a difference in what the credit

21  review team would look into.

22  Q.  And, in fact, if the people at Ocwen who work on these

23  investigations don't call anybody and don't try to figure out

24  what's going on, they're never going to know if the computer

25  is inaccurate or not; right?

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 116

1   A.  Again, um, I don't -- I don't know how -- you know, I

2   don't know if I keep saying it over and over again if it's

3   going to change anything, but --

4   Q.  Well, I don't even think that's responding to my question.

5   I mean, I'm not -- I am literally just asking you, yes or no,

6   if people at Ocwen who work on the investigation don't call

7   anybody and don't try to figure out if the information in the

8   computer is accurate, they are never going to know if it's

9   right.  True?

10  A.  If -- if specific codes are laid out for the specific type

11  of review that's needed, the credit -- let me see if I can

12  explain it a different way.

13         And, again, I thought I explained this yesterday, but

14  if there was a, for example, a litigation code that was --

15  that was in the ACDV, um, the credit ops team would have

16  contacted the legal department to say, hey, it looks like

17  there's something that needs to be reviewed in legal; you guys

18  might want to take a look at this.

19         Legal at that point would have contacted, you know,

20  if -- of course, you know, if Miss Jeffers was represented by

21  counsel, they would have contacted counsel to say:  Well,

22  what's going on with the litigation?  Let's get whatever needs

23  to be done taken care of.

24         That's the extent -- there's a system of checks and

25  balances that has to go into place here.  The credit review

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   team does not just go in and, let's say, randomly make changes

2   to an account -- a payment history.  They would have to go

3   through the cashiering department to make sure that that gets

4   done.  So there's a system of checks and balances that have to

5   go on.

6   Q.  But, ultimately, at the end of the day, the credit dispute

7   team, their job is to find out if the previous reporting was

8   accurate; right?  That's their job?

9   A.  Their job is to verify if that information is accurate,

10  right.  And they validate that by going into the system and

11  determining what the system is -- is showing compared to

12  what's on the ACDV.  That's correct.

13  Q.  Right.  So all they are doing as part of this

14  investigation is they are pulling up the system, and they are

15  just comparing it to what was previously reported and then

16  matching the data and making any changes that are different.

17  Right?  That's --

18  A.  They're -- they're making -- they're making responses to

19  the verification or the -- the dispute codes that are listed.

20  The --

21  Q.  And probably that takes about one or two minutes to do

22  that; right?

23  A.  No.

24  Q.  Ocwen is cranking these things out like a factory line; is

25  that true?

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                II - 118

1    A.  That is definitely not true, no.

2    Q.  You don't have any notes to show how much time Maithreyi

3    spent on this investigation.  Isn't that a fact?

4    A.  I'm not about to get into a -- you know, a -- you know, a

5    match or, you know, back and forth with you on that, but

6    you're making it sound like, you know, these people aren't,

7    um, capable -- capable of -- of doing a job and doing it

8    properly.

9            Ocwen regularly trains employees to do their jobs and

10   to do it well.  Across the board, there's regular training,

11   whether it's via webinar.  Each department has their own

12   specific type of training all through Ocwen, even in India.

13   It's -- they have a location that's set up in a very high-tech

14   place.  As a matter of fact, you have companies like eBay,

15   companies like PayPal that are listed in this -- in this, you

16   know, this tech park where they all work.  And they're very

17   educated in what they do, and they're very trained at what

18   they do.  And so for you to, I guess, make the assumption

19   that, you know, these people just need to click a button to

20   get the job done is just simply not true.

21   Q.  Sir, my question to you was:  You don't have any proof or

22   documents showing how much time Maithreyi spent on this

23   investigation.  That was my question.  It's a yes or a no.

24   A.  What we have here is dates on which the responses were

25   actually completed.  We have a date that it was actually

1   received and a date that it was completed.

2   Q.   Okay.

3   A.   From --

4   Q.   Let me clarify that question.  I mean like minutes and

5   hours.  You don't have that information.

6   A.   Well, I mean, you can -- you can look at it in days or

7   weeks because they have the actual response time.

8   Q.   But, sir, I'm not asking you about days or weeks.  I'm

9   asking about minutes and hours.  You don't know how many hours

10  and minutes Maithreyi spent on this investigation; isn't that

11  true?

12  A.   I don't know -- I don't know the answer to that.  I do

13  know what -- when the response was received, and I do know

14  when the response was completed.  I can tell you that.

15  Q.   And it's your position in this case that Maithreyi

16  performed a reasonable investigation; true?

17  A.   That is correct.

18  Q.   And as far as you are concerned, Maithreyi completely

19  followed Ocwen's policies and procedures in investigating this

20  dispute?

21  A.   I believe that's a fair statement.

22  Q.   And it's fair to say this is the way we can expect Ocwen

23  to continue to investigate disputes in the future; true?

24  A.   I believe that's a fair statement.

25  Q.   On a scale of A through F, with A being excellent and F

1   being fail, what grade do you give Maithreyi for this

2   investigation?

3   A.  I don't make grades on stuff like this, but --

4   Q.  You can't tell me what --

5   A.  I don't even want to speculate on that.

6   Q.  Well, I'm not asking you to speculate.  I'm just asking

7   you to tell me your assessment as the company spokesperson

8   today.

9   A.  I don't think I'm here to give grades.

10  Q.  You would also agree with me, sir, that if we can go back

11  to page 7 of Exhibit 6, Maithreyi did not tell TransUnion that

12  Valerie Jeffers disputed this credit reporting; right?  If you

13  look at the compliance condition code -- let me circle it,

14  right there.

15  A.  Yes, I see that.

16  Q.  And the way you tell the credit bureaus that somebody is

17  disputing something is you would put code XB in there; true?

18  A.  That's correct.  That's the way you would report it, but

19  as I explained yesterday, and I'll go ahead and explain it

20  again, when a borrower submits a dispute directly through the

21  credit reporting agency, it's listed on this form.  It's

22  called an ACDV form.  That's considered an indirect dispute

23  because it's going from the borrower through the credit

24  reporting agency ultimately to Ocwen.  Then you have what's

25  called a direct dispute where it goes directly from the

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                II - 121

1   borrower to Ocwen.

2         When there is a direct dispute, Ocwen performs and

3   completes the dispute -- the compliance condition code, with a

4   code.  It actually includes that code when there's a direct

5   dispute.  When there's an indirect dispute where it comes from

6   the credit bureau agency, that code is not put on this form.

7   Q.  Well, the reality is that as of the date Maithreyi

8   responded with this form, she knew Miss Jeffers disputed their

9   credit reporting, regardless of how you want to characterize

10  it.  Right?

11  A.  I think -- I think it's, yeah, it's clear that there was a

12  dispute.

13  Q.  Right.

14  A.  And there was an actual specific dispute, and it's listed

15  here on the form as a code, um -- I guess it's 112.  And

16  Maithreyi's job was to respond to that specific code, and

17  that's what was done here.

18  Q.  Right.  And do you think it's accurate to respond to a

19  credit bureau that the borrower does not dispute your credit

20  reporting when you have actual knowledge that they do dispute

21  your credit reporting?  Is that accurate?

22  A.  I -- well, like I said before, this was actually responded

23  to.  The response was done by Ocwen.

24  Q.  I'm aware of that.  My question is:  Was it accurate to

25  report that Miss Jeffers did not dispute your credit reporting

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 122

1    when you had actual knowledge that she did?

2    A.  So your question is was it accurate to not include a

3    compliance condition code?

4    Q.  Was it accurate to not report that she disputed your

5    credit reporting?

6    A.  To report that the account was disputed would have been

7    to -- would be to have added a compliance condition code.  I

8    assume that that's your question.

9    Q.  Yes, sir.  That's the way it works; right?

10   A.  Okay.  That's --

11   Q.  You enter a code.

12   A.  Then if that's your question, then no.  She was accurate

13   in what was done here.  She did not include a compliance

14   condition code for the reasons that I just gave you earlier.

15   Q.  Okay.  So it's your position that that's perfectly

16   acceptable?

17   A.  That is correct.

18   Q.  Let's talk about the second investigation, and it starts

19   on page 5 of Exhibit 6.

20   A.  Okay.

21   Q.  All right.  The second investigation was completed by an

22   individual at Ocwen named Bindu; is that correct?

23   A.  Uh, yes, sir.

24   Q.  And you've never spoken to Bindu; right?

25   A.  No, I have not.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                II - 123

1    Q.  You never interviewed Bindu to see what he or she did as

2    part of their investigation?

3    A.  I've never spoken with him, no, but --

4    Q.  Don't you think that would be kind of important to do

5    before you came to trial if you are going to say that they

6    acted completely reasonable?

7    A.  Well, and, again, that information is -- is included in,

8    um, you know, loan comments.  You know, they -- they put what

9    it is that they do in the loan comments section.  And so, you

10   know, it's obvious what was done here was that they went into

11   the system and validated the information in regards to the

12   dispute code that was listed here.

13   Q.  They basically did the exact same thing; right?  They just

14   compared the data and responded; right?  That's it.

15   A.  They -- they reviewed the information that was included in

16   Ocwen's database.

17   Q.  Bindu never called Valerie Jeffers; right?

18   A.  That's correct.

19   Q.  Bindu never contacted the legal department; true?

20   A.  That's correct.

21   Q.  And, in fact, during this investigation, Bindu, in fact,

22   learned that this was a loan involved in litigation; isn't

23   that true?

24   A.  What -- I don't -- I'd like to see some documentation.

25   Q.  Well, yeah, let me ask you to go to your exhibit.  It's A,

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 124

1   page 41.

2   A.   Okay.  Let me get there.

3        Okay.  I'm on page 41.

4   Q.   All right.  And I'm going to blow it up for you on the

5   computer because that exhibit is kind of hard to read.

6        So right here do you see where it says "Note:  Did

7   not make correction as there is a litigation pending flag"?

8        Right?

9   A.   Okay.  Did not make correction in payment grid as there is

10  a LP, litigation flag.  Okay.  I see that.

11  Q.   Right.  Is that really Ocwen's policy that if you learn

12  that a loan is involved in litigation, you don't make the

13  corrections?

14  A.   It says a payment grid.

15  Q.   Right.  The payment grid talks about the payment history;

16  right?  That's where it shows if you are 90 days past due or

17  whatever.

18  A.   Well, it looks like on this account, on this particular --

19  well, the account status, it does show that the status is

20  80 -- listed as an 80, which is a 90-day past due code.

21  Q.   Right.  And Bindu chose not to correct that because it was

22  a litigation pending flag; right?  That's what Exhibit A,

23  page 41 shows.

24  A.   What Bindu is saying here, again, is that -- yeah, there

25  is a litigation pending code on the account, but she had no

1    reason to be -- you know, to say that there was a litigation

2    dispute because there was no code submitted on the ACDV form.

3         A 010 would have prompted Bindu in this case to

4    contact the legal department.  At this point, yes, she

5    realized that there was an LP flag, but litigation has

6    different types of, I guess, areas.  There was no reason for

7    her to think that there was some type of a dispute because

8    there was no L -- or litigation code listed here on the ACDV.

9    Q.  Well, the very fact that Bindu learned that the account

10   had been marked as a litigation pending, doesn't that put

11   Bindu on notice to contact the legal department and say:

12   okay, I need -- I see this is pending.  There's been a

13   lawsuit.  There's been all of these problems with these

14   parties over the last few years.  What's going on here?

15        That would have then led to Bindu finding the

16   settlement agreement; isn't that true?

17   A.  That is not true, and for the same reasons that I just

18   mentioned before.  They are going to look at a litigation

19   pending flag.  As I mentioned before, litigation can mean, you

20   know, different types of things.  It doesn't necessarily mean

21   that there's a dispute that's going on.  In this case she

22   would have -- she wouldn't have known that there was a dispute

23   because there's no code that's listed here, you know, from

24   the -- from the credit bureau agency to say that there was a

25   dispute going on.

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 126

1    Q.  Isn't that what litigation is, sir?  Isn't a litigation a

2    dispute between two parties?

3    A.  But -- but a lot of times there's not a dispute, um,

4    between the parties or at least, you know, for the credit

5    review team to contact the legal department to say:  Hey,

6    look, we got something from the borrower that says there's a

7    problem with the litigation.  It needs to be looked into.

8           So when -- and when a litigation flag is listed

9    there, that doesn't necessarily prompt the credit review team

10   to contact the legal department.

11          All this is saying is:  Hey, look, there's an issue

12   with my account.  Can you look into my payment history to find

13   out what's going on?  Or can you -- can you provide some

14   account information on my -- on my account?

15          That's what this is asking for.  And so it was an

16   investigation into the account information, not into the

17   litigation.  So there's a difference between the two.

18   Q.  It was an -- it was supposed to be an investigation into

19   the accuracy of the data; true?

20   A.  An investigation into the account information, right, not

21   into the litigation.  Not according to this ACDV.

22   Q.  Well, sir, if you have to find out the truth or the

23   accuracy of this information, you've got to review the entire

24   file in Ocwen's possession; isn't that right?

25   A.  If, in fact, there was a code to list a litigation dispute

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 127

1   for the credit review team to contact the legal department,

2   then, yeah, they would have -- they would have done that.

3           But in this case that's not what happened.  If there

4   was a specific code to prompt the credit reporting team to

5   contact the litigation department, they would have done that,

6   but this code that's listed here is not in response to any

7   type of litigation.  This is basically telling the credit

8   review team to verify or validate that this information that's

9   been reported is correct, the account information.  And so

10  they verify the information in accordance to the dispute code.

11  Q.  Ocwen has what's called loan servicing notes, right, where

12  it shows the entire history and all the communications between

13  Miss Jeffers and Ocwen?  True?

14  A.  I believe that -- I believe you are talking about the

15  composite report.  That's right.

16  Q.  Yes, sir.  And, in fact, Bindu should have reviewed that

17  as part of her investigation; true?

18  A.  Depending on what type of, I guess, review that the ACDV

19  is asking for.

20  Q.  Well, just as part of an investigation to figure out the

21  truth, that would be a document that Bindu should have

22  considered; isn't that true?

23  A.  I think -- I think what you are asking is -- it almost

24  sounds like you are asking a question if whether or not the

25  credit reporting team is to handle all aspects of the

1    investigation without involving other departments at Ocwen.

2    And that's -- and that's not the case.  The --

3    Q.  That's not what I'm asking, sir.  That's --

4    A.  That's -- well, that's the way I'm understanding it.

5    What --

6    Q.  My question --

7              THE COURT:  You need to talk one at a time.

8              THE WITNESS:  Okay.

9              THE COURT:  So the witness needs to let the examiner

10   finish the question and vice versa.

11             THE WITNESS:  Okay.

12             THE COURT:  So -- so let's see if we can not talk

13   over each other.

14             THE WITNESS:  Okay.

15   BY MR. OSBORNE:

16   Q.  Let's just try this with a simple yes or no.

17   A.  Sure.

18   Q.  Okay.  Under Ocwen's policies, should Bindu have reviewed

19   the loan servicing notes for Miss Jeffers' loan?

20   A.  Depending on what was being requested.

21   Q.  Had Bindu reviewed the loan servicing notes, she would

22   have seen the entire history of the parties going all the way

23   back to 2013; right?

24   A.  Again, I -- I'm going to, I guess, say the same thing that

25   I've been saying, and that is if, in fact, there was a

1  specific code, a litigation code, a settlement dispute code

2  that was listed on the ACDV for Bindu to go in and con- -- to

3  contact the litigations team to respond to the litigation or

4  the settlement agreement, then, yeah, she would have given

5  that -- forwarded that information to the litigation team at

6  that point.

7          But because of the code that's listed here, for her

8  to go in and review the date the file was opened, the balance

9  on the account, the amount past due, the -- the origination

10  amount of the loan, the terms of the loan, the frequency of

11  the payments, the date of the account information, all of

12  those things is what she was -- what she was verifying.  So

13  her response was in -- was proper in that it was -- she was

14  responding to what was listed here on the ACDV.

15  Q.  Had Bindu simply picked up the phone and called

16  Miss Jeffers, she would have learned about the settlement

17  agreement; isn't that true?

18  A.  I don't think that's part of her, uh, part of her duties

19  to call the -- the borrowers, no.

20  Q.  That wasn't the question.  The question was had Bindu

21  called Miss Jeffers, she could have found out about the

22  settlement agreement; right?

23  A.  She would not have been doing her job if she would have

24  been -- if she would have done that.

25  Q.  Because she would have been doing too much to try to

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                II - 130

1  investigate the truth; right?

2  A.  That is incorrect.

3  Q.  She would have been spending too much time on this

4  particular dispute; right?

5  A.  That is incorrect.

6  Q.  You don't even know if Bindu reviewed the loan servicing

7  notes; right?

8  A.  I don't know specifically.  I know that, you know, the

9  information that was listed here is what she responded to.

10  For example -- and I'll, you know -- you know, the scheduled

11  payment amount, the things that's listed here is what she

12  would have gone and reviewed.  There are various, uh, parts of

13  the database that Bindu would have been able to go into in

14  Ocwen's database to be able to validate the information for

15  her reporting on this ACDV.

16  Q.  And you also don't know if Bindu reviewed the whole

17  previous history between Miss Jeffers and Ocwen and the first

18  lawsuit and all the phone calls and all that stuff; right?

19  You don't know if Bindu reviewed any of that stuff?

20  A.  I don't know that.  I don't believe so.

21  Q.  And you don't know if Bindu reviewed the settlement

22  agreement or not; right?

23  A.  I don't believe she had a reason to.

24  Q.  All right.  So let's go back to Exhibit 6, page 5, please.

25  A.  Okay.

1           Okay.  I'm there.

2    Q.  All right.  So I just want to clarify for the record,

3    Bindu responded to Experian that Valerie Jeffers was 6,945

4    days [sic] past due; true?

5    A.  Did you say page 5?

6    Q.  Yes, sir.  Exhibit 6, page 5.

7    A.  Okay.  Yeah, I do see that, yes.

8    Q.  So right here; right?

9    A.  I see that.

10   Q.  And also in the account status Bindu responded that

11   Miss Jeffers was 90 days past due?

12   A.  That's correct, yes, sir.

13   Q.  And the code above code 80 is code 11; right?

14   A.  Yes, sir.

15   Q.  And code 11 actually means 30 days past due; right?

16   A.  That's correct.

17   Q.  So Bindu actually asked Experian to change it from 30 days

18   past due to 90 days past due; right?

19   A.  As of the date that it was reported.

20   Q.  Right.

21   A.  And the date of the account information would have been

22   almost a year after, um, this date of account information

23   that's listed here.

24   Q.  Well, let's go back down to the bottom.  Do you see the

25   date of last payment?  Bindu responded to Experian the date of

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 132

1   last payment was July 8th, 2016; right?

2   A.  Uh, let's see.  July 8th, 2016?  I do see that, yes.

3   Q.  And that's false; right?  You already admitted yesterday

4   she made a payment on November [sic] 27th, 2016; right?

5   A.  Oh, this response was done on November the 9th.

6   Q.  That's correct.  So the date of last payment as of this

7   response was 10/27/2016; right?

8   A.  Okay.  Maybe I'm confused.

9   Q.  I'm saying that in reality you admitted yesterday that

10  Miss Jeffers' last payment -- or Miss Jeffers made a payment

11  October 27, 2016; correct?

12  A.  I do recall saying that, yeah.

13  Q.  Okay.  So if we're Bindu and we are responding on

14  November 9th, 2016, the date of last payment would be

15  10/27/2016.  Isn't that a fact?

16  A.  Now, the payment I believe that came in on that day was

17  actually $1200 or somewhere thereabouts.  I think it was

18  actually $1200.

19  Q.  Right.

20  A.  The monthly payment amount at that particular point in

21  time would have been more than that.

22  Q.  Well --

23  A.  And so -- and so what happens is is that that would be

24  considered a partial payment.  And so what happens with a

25  partial payment is that partial payments actually get applied

Julie H. Thomas, RMR, CRR                                (303)296-3056

1   to a suspense balance.  And so they're not actually applied in

2   the form of a payment.

3   Q.  All right.

4   A.  So --

5   Q.  Let me show you Exhibit A.  I want you to go to page 116.

6        All right.  Let's look at the 10/27 payment.

7   A.  Which page are we --

8   Q.  We're on page 116.

9   A.  116.  Let me just -- okay.

10  Q.  Please tell me of the 10/27/2016 payment, tell me the

11  amount of the principal.

12  A.  Let's see.  Let me -- I just want to -- I just want to

13  clarify -- yeah, that's what I wanted to do.  I wanted to look

14  at the dates that we've got here so I can make sure.  Let's

15  see.  That -- on 10/27 there's the $1200 that actually comes

16  in right, uh -- is that 10/27?  I didn't -- if you can go

17  back.

18        MR. NOBEL:  Yeah, those are --

19        THE WITNESS:  Those are 10/27?

20        That payment, when it actually comes in -- okay.  If

21  you go back -- I'm sorry.  I just want to make sure I'm

22  looking at the right information here.  Go back to the dates

23  so that I can just kind of look at those again.

24        Okay.  Go -- all right.

25  BY MR. OSBORNE:

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne              II - 134

1    Q.  All right, sir.  Let me show you right here.  The amount

2    of the principal payment is 582.82; right?

3    A.  Okay.  I do see that.

4    Q.  And the interest is 615.86; right?

5    A.  Yes.

6    Q.  And if we add those two figures together, it's $1,198.68;

7    right?

8    A.  Yes.

9    Q.  So if she made a payment of $1200, that would be enough to

10   cover the principal and interest; right?

11   A.  Yes.

12   Q.  And you already admitted yesterday she wasn't even

13   supposed to have an escrow account with you because she pays

14   her taxes and insurance directly; isn't that true?

15   A.  I did say that.  That's correct.

16   Q.  So the $1200 payment was not a partial payment.  It was a

17   full payment.  Right?  It was only treated as a partial

18   payment by Ocwen because they were trying to charge escrow

19   that wasn't even due; right?

20   A.  And, again, as I stated yesterday, this was -- this was

21   before the correction had been made on the loan.  That's

22   right.

23   Q.  Okay.  So going back to my original question with Bindu,

24   responding to Experian that the date of last payment was July

25   of 2016 is false; right?  That's Exhibit 6, page 5.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR       Flannigan - Mr. Osborne              II - 135

1    A.  Yeah.  It does, in fact, look like the payment was applied

2    on October 27th.

3    Q.  So is that a yes to my question, it was false to report

4    the date of last payment was July 2016?

5    A.  Um, you know, again, it does, in fact, look like a payment

6    did come in on that day, or at least the payment was applied.

7    As I mentioned to you before, I think that a payment

8    originally went to the suspense balance, but it was taken out

9    of suspense and then applied as a regular payment.  And so --

10   Q.  So tell me what the suspense thing is.  This is where

11   Ocwen gets a payment and instead of applying it to the loan,

12   they put it in what's called a suspense account; right?

13   A.  Right.  If it's not enough to make a full payment, right.

14   Q.  And Ocwen earns interest on that suspense account; right?

15   A.  I don't know the answer to that.

16   Q.  Now, if Bindu is responding that the last payment made was

17   July and this is November of 2016, any lender that looks at

18   this is going to think she hasn't made a payment in several

19   months; right?

20   A.  I mean, it does look, in fact, like the payment was

21   applied there.

22   Q.  Okay.  That wasn't my question.  My question was:

23   Wouldn't that create a misleading impression to anybody that

24   looks at her credit report in November, 2016?  It would show

25   she hadn't made a payment in several months; right?

1   A.  It would definitely give the impression that the last

2   payment -- the last date of payment is 7/8/2016.

3   Q.  Right.  Okay.  As far as you are concerned, Bindu did a

4   reasonable investigation; right?

5   A.  Uh, I believe so.  And, again, you know, whether or not --

6   yeah, and, again, I think, based on the information that was

7   in the system and the loan not being brought current because

8   of the settlement agreement, that may have caused some

9   confusion here.

10  Q.  And as far as you are concerned, Bindu completely followed

11  Ocwen's policies and procedures; right?

12  A.  To the best of my knowledge.

13  Q.  And this is the way we can expect Ocwen to continue

14  investigating going forward; right?

15  A.  I don't believe that's -- I don't believe that's the case.

16  Again, I believe in this situation, because of the issues with

17  the loan that the settlement agreement hadn't been put into

18  place, there were some serious issues with the loan.  There's

19  no -- there's no disputing that.

20  Q.  But as far as Ocwen's position of not calling the

21  borrower, that's how we can expect Ocwen to continue doing it;

22  right?

23  A.  Well, the reason that I said Ocwen wasn't contacting the

24  borrower was very clear.  That's because there wasn't a

25  specific code to have anyone at Ocwen to contact the borrower

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne            II - 137

1   listed on the ACDV.

2   Q.  Right.  And my question is:  This is the way we can expect

3   Ocwen to continue investigating; right?

4   A.  The investigation process would have, you know -- as far

5   as litigation was concerned, would have been conducted if

6   there was a litigation code listed here.

7   Q.  All right.  I'll just move -- well, I did have one other

8   thing to ask you.  Let's go to Exhibit A, page 42, please.

9        All right.  So on -- so two days after Bindu

10  completed her investigation, Ocwen called Miss Jeffers'

11  insurance company to verify that she had insurance coverage;

12  isn't that a fact?

13  A.  Are we looking at the comment here "checked and found the

14  policy is updated with Travelers Insurance"?  Is that where --

15  Q.  Yeah, it says called insurance company, spoke with Debbie,

16  informed policy paid in full; right?

17  A.  Maybe I'm looking a little too high.  Let me go down a

18  little bit.

19  Q.  All right.  Sir, I'm talking about right here.  See where

20  it says --

21  A.  Okay.

22  Q.  -- called --

23  A.  That's right.

24  Q.  -- insurance company.  S/W, that means spoke with Debbie;

25  right?

1   A.  I see that, okay.

2   Q.  And then they were apparently transferred to Molly, and

3   she informed that policy premium is $1170 and PIF, which means

4   paid in full.  Right?

5           So my question to you is:  How is it that Bindu

6   doesn't have the time to contact Valerie Jeffers to interview

7   her, but Ocwen still has time two days later to call the

8   insurance company?

9   A.  If you go to the left with the -- with the comments, I

10  think you will see that this is not -- this was not the credit

11  verifications that's actually looking into this.  This is --

12  these are separate departments from Bindu's department.  This

13  is not the credit, you know, the credit verifications team.

14  Her role here, again, was not to look into any other matters

15  than what was actually listed here on the ACDV.

16          She doesn't -- she doesn't work in the escrow

17  department.  She doesn't -- she doesn't work in the legal

18  department.  Her role was to respond to matters concerning --

19  matters listed in the ACDV.  And, you know, it did -- this

20  didn't include, you know, anything about a specific escrow

21  review, so -- or insurance review.  That's the role of the

22  insurance department.  It didn't prompt her to contact someone

23  in the insurance department.

24  Q.  All right.  And then, again, on November 9th, Bindu

25  certified to Experian that this information on Exhibit 6 was

1   accurate; right?

2   A.  I believe so.  I believe this has to be certified, yes.

3   Q.  All right.  Let's talk about the third investigation,

4   which was Exhibit 6, page 3.  And this is a couple of weeks

5   later, November 24th, 2016; right?

6   A.  Hang on just a second.  I want to pull it up in the book

7   here --

8   Q.  Okay.

9   A.  -- so I can see everything.

10          Okay.  We're page 6?

11  Q.  Exhibit 6, page 3.

12  A.  Page 3.  Okay.  I'm there.

13  Q.  And the third investigation was also worked on by Bindu;

14  true?

15  A.  Uh, yes.

16  Q.  And just to clarify for the record, is it the same person

17  as Exhibit 2?

18  A.  Yes.

19  Q.  Okay.  And Bindu responded to TransUnion that Miss Jeffers

20  was 90 days past due; right?

21  A.  Yes.

22  Q.  And Bindu responded that Miss Jeffers was $5,467 past due;

23  right?

24  A.  Yes.

25  Q.  And Bindu told TransUnion that the date of last payment

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 140

1    was July 8th, 2016; right?

2    A.  No.  Listed here there's no information listed about a

3    date of last payment received.

4    Q.  Well, do you see that?

5    A.  I do see that, yes, but Bindu's response would have been

6    included in the shaded area.

7    Q.  Right.  And if there's no response, that means leave it

8    the same; isn't that true?

9    A.  I don't know if that's the case because if you look at a

10   lot of these other codes, you have the same information being

11   repeated, um --

12   Q.  Well --

13   A.  -- in different --

14   Q.  So there's really two possibilities.  Either Bindu

15   confirmed that the date of last payment was July 8, 2016, or

16   Bindu left the field entirely blank; right?

17   A.  Well, it looks like it was just left blank here.

18   Q.  Well, if it's entirely blank, that would be incomplete and

19   inaccurate, wouldn't it?

20   A.  I'm looking there to see if one of the codes actually

21   identifies date of last payment, and it could have been that,

22   you know, the reason is is that, um -- that the reason that

23   it's left blank is because there's no code for a date of last

24   payment.  Again, that would be my assumption on that.

25   Q.  Well, there's got to be a way to put a date in there if

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                II - 141

1    they had previously put in July 8, 2016.  You can't tell me

2    there's no way to put a date in that field; right?

3    A.  Yeah, I'm not saying that there's no way to put it in

4    there.  It's just that I don't see that listed as one of the

5    dispute codes here, as one of the disputed items.

6    Q.  So you're talking about these dispute codes right here?

7    Is that what you are talking about?

8    A.  That's right.

9    Q.  And those are provided to Ocwen by the credit bureau;

10   right?

11   A.  Yeah, in response to what the borrowers actually send in.

12   Like, for example, if they sent in, you know, a specific

13   letter saying, you know, can you find out what's going on with

14   this particular area of my credit report, the credit bureau

15   agencies will, you know, identify the borrower's dispute by

16   certain codes.  And that's why they list the -- these

17   different dispute codes here.

18   Q.  Well, this dispute code basically lists almost everything,

19   doesn't it?  It says "Disputes Current Balance, Original Loan

20   Amount, Scheduled Monthly Payment Amount, Actual Payment

21   Amount, Amount Past Due," and on and on and on.  It's

22   basically saying investigate everything; right?

23   A.  Um, well, again, I don't see date of last payment.  And

24   look, I'm not -- I'm not -- you know, that's the one thing

25   that you had a question about, but I don't see that listed

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 142

1   here specifically.  That's the only thing I'm saying.  And

2   that may have been a reason why that wasn't listed here.

3   Q.  Okay.  And, again, Bindu did not tell TransUnion that

4   Miss Jeffers disputed Ocwen's credit reporting on the third

5   response; right?

6   A.  And I think I've given the reasons why that is.

7   Q.  I understand the reasons.  I just needed to clarify it

8   wasn't done the third time.  Right?

9   A.  That's correct.

10  Q.  Just like in the second investigation, during the third

11  investigation Bindu did not call Miss Jeffers; right?

12  A.  That's correct.

13  Q.  Bindu did not reach out to the legal team and talk to them

14  at all; right?

15  A.  Right.  That would not have been her job.  That's correct.

16  Q.  And Bindu did not speak with any other departments at

17  Ocwen as part of her investigation; true?

18  A.  I don't believe -- because of the specific codes listed

19  here, I don't believe that there was a necessary need to do

20  that.

21  Q.  And you have no knowledge of how many hours or minutes

22  Bindu spent on the third investigation; right?

23  A.  Only by the determination of when the date the dispute was

24  received and when it was actually responded to.

25  Q.  So you are looking at the top of Exhibit 6; right?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   A.  Yes.  The date that we received this was, it looks like,

2   November 12th.  The date that it was responded to was about

3   12 days later.

4   Q.  And you had 30 days; right?  Isn't that what the law says?

5   A.  I think that's what the law says, yeah, 30 days to

6   respond.  That's right.

7   Q.  And this is just the date of the response.  You are not

8   implying that Ocwen actually spent 12 full days investigating

9   this dispute, are you?

10  A.  Well, you're right.  If you are looking at a specific time

11  frame and how long it took for Ocwen to respond, then that's

12  what I would -- that's what I would actually go by.  I don't

13  know the number of man-hours that actually was put into this,

14  but if you want a reference on how long it took from the

15  dispute when it came in to when we actually responded, that's

16  what I would look at.

17  Q.  The most likely reality is that Bindu probably spent one,

18  two, or three minutes on this comparing the fields and then

19  responding; right?

20  A.  Again, that's -- that's pure speculation.  And, again, you

21  are assuming that, you know, that, um, they're working from

22  one computer in India, and that's just not true.

23  Q.  Well, Bindu is located in India; true?

24  A.  Yes.

25  Q.  All right.  And that's -- that's what this form shows is

17-CV-00025-WYD-KHR       Flannigan - Mr. Osborne                    II - 144

1    that's what they do, is they just match the data; right?

2    A.   I don't know why you have the assumption that people in

3    India are not capable of, you know, performing --

4    Q.   Sir, I didn't say that.   That wasn't the question.

5    A.   That's -- it seems like that's the assumption you are

6    giving about Ocwen employees, and that's just not true.

7    Q.   It doesn't matter if they are in India or San Antonio or

8    Florida or anywhere.   If this style of investigation happens,

9    you are going to spend a couple of minutes on it; right?

10   A.   You're assuming that they only looked at this for a couple

11   of minutes, and, no, that's -- I don't believe that that's

12   true at all.

13   Q.   But you don't have any evidence --

14   A.   There is --

15   Q.   -- to show that they spent anything more than that; right?

16             MR. LOPACH:   Objection: argumentative, Your Honor.

17             THE COURT:   Yeah, you are arguing with each other.

18   I've got to remind the witness, do your best just to answer

19   his questions.   Your attorney will have a chance to ask some

20   other questions.   Listen to his question and answer it --

21             THE WITNESS:   Okay.

22             THE COURT:   -- by either a yes or no, or if you can't

23   answer it yes or no, answer it.   So you are not asking him

24   questions.   He is asking you questions.

25             THE WITNESS:   Okay.

Julie H. Thomas, RMR, CRR                               (303)296-3056

17-CV-00025-WYD-KHR       Flannigan - Mr. Osborne                    II - 145

1           THE COURT:  So let's see if we can move this along.

2    BY MR. OSBORNE:

3    Q.  Okay.  As far as you are concerned, Bindu's third

4    investigation was reasonable; right?

5    A.  Yes.

6    Q.  And Bindu completely followed Ocwen's policies and

7    procedures with investigation number 3; right?

8    A.  To the -- to the best of my knowledge.

9    Q.  Okay.  Let's talk about the fourth investigation, which is

10   now Exhibit 6, page 1.

11   A.  Okay.  I'm there.

12   Q.  Okay.  The fourth investigation was performed by an Ocwen

13   employee named Shweta; is that correct?

14   A.  Yes.

15   Q.  And like all the others, you never interviewed Shweta to

16   see what she did as part of her investigation; right?

17   A.  I did not interview her, no.

18   Q.  And you have no notes showing what she did to investigate

19   this.

20   A.  I don't have specific notes.

21           MR. LOPACH:  Your Honor, objection.  I think this is

22   calling for facts not in evidence.  There was an opportunity

23   for opposing counsel to conduct discovery on these issues, and

24   he never -- he never did.  So if he wanted to speak with an

25   Ocwen representative in India, he certainly had the procedural

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne              II - 146

1    mechanisms to accomplish that, and he never did.  So these are

2    argumentative questions.

3              THE COURT:  Well, the last question was:  And you

4    have no notes showing what she did to investigate this.

5    Overruled.  The witness can answer the question if he knows.

6    BY MR. OSBORNE:

7    Q.  Do you know the answer to that, sir?

8    A.  Well, the notes that show what she did is actually listed

9    here in the document by making comparisons and validating what

10   was listed in the document.  So, again --

11   Q.  Well, all the document shows is matching data; right?

12   A.  Well, you are asking what was done.  Ocwen, again, as I

13   explained before, has a database that contains various amounts

14   of information that persons within the credit review team

15   actually go into and verify the information that's listed or

16   validate the information that's listed on the ACDVs as

17   compared to what's in its system.

18   Q.  And the credit dispute team has access to the entire file;

19   right?

20   A.  They have access to the database in order to make -- in

21   order to respond to the various parts of the ACDV.

22   Q.  All right.  And not to be redundant, but I just have to do

23   this for the record.  Shweta responded to Equifax that

24   Miss Jeffers was $5,808 past due; right?

25   A.  That's correct, yes.

1  Q.  And this is as of January 2nd, 2017; true?

2  A.  That's the date of the response.  That's correct.

3  Q.  And the date of last payment is now listed as March 1st,

4  2016; right?

5  A.  Well, again, that's not Shweta's response, but that's what

6  the credit reporting agency sent to be verified.

7  Q.  And, again, Shweta responded to Equifax that Miss Jeffers

8  was 90 days past due; right?

9  A.  I do see that code.  That's a code 80, yes.

10 Q.  And over here, FCRA DOFD, do you see that?  What that

11 stands for is Fair Credit Reporting Act date of first

12 delinquency; right?

13 A.  I do see that, yes.

14 Q.  And Shweta responded that Valerie's first date of

15 delinquency was December 1st, 2015; right?

16 A.  I do see that as well, yes.

17 Q.  And that was false, wasn't it?  She wasn't delinquent

18 December 1st, 2015; correct?

19 A.  Um, I -- well, I would have to actually review the payment

20 history in order to determine that.

21 Q.  Well, the reality, sir, is under the settlement agreement,

22 isn't it a fact that Ocwen agreed that Valerie Jeffers was

23 current the entire time they had the loan?  That's what you

24 agreed to; right?

25 A.  And, again, you know, as I stated before, um, the

17-CV-00025-WYD-KHR       Flannigan - Mr. Osborne                II - 148

1    information that was in the system at the time when these

2    ACDVs were completed, um, did not include the information from

3    the settlement agreement.  The system had not been updated

4    with the information from the settlement agreement.

5    Q.  Okay.  I understand that, sir, but that's not what my

6    question is.  My question is really yes or no.  Under the

7    settlement agreement, isn't it true that Ocwen agreed that

8    Valerie Jeffers was current the entire time Ocwen had the

9    loan?

10   A.  I would have to review the settlement agreement to confirm

11   that.

12        MR. OSBORNE:  Your Honor, I'd request you read the

13   stipulation that we agreed to on that.

14        THE COURT:  All right.  The parties have entered into

15   a stipulation, and the terms of the stipulation are as

16   follows.

17        I'm not going to -- let me ask the parties a

18   question.  Is it your intent that this be provided to the

19   jurors during their deliberation or that it just be read at

20   this time?

21        MR. OSBORNE:  I think it should be provided.  I think

22   actually it should just be substituted maybe as Exhibit 1 or

23   it should be provided somehow.

24        MR. HOFFMAN:  I think we specifically discussed it

25   this morning and agreed it would be read only and that the

Julie H. Thomas, RMR, CRR                                (303)296-3056

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                II - 149

1   document wouldn't be provided.  That was the issue that we

2   talked about.

3          THE COURT:  Yeah, this is -- this is a --

4          MR. HOFFMAN:  Mr. Osborne agreed with that.

5          THE COURT:  Right.

6          MR. OSBORNE:  I agreed it should be read.  I didn't

7   say only read.

8          THE COURT:  Well, here's what I'm going to do.  I'm

9   going to only read it.  That's my ruling.  So I'm going to

10  read it slowly, and if any of the jurors wish to take notes,

11  it's up to them to do it.

12         All right.  So here are the terms of the stipulation

13  agreed to by the parties:

14         1.  On September 8, 2016, Miss Jeffers and Ocwen

15  entered into a settlement agreement, which required the

16  following:

17         Paragraph 2 of the stipulation:  Ocwen agreed to pay

18  Miss Jeffers a confidential sum of money.  It is undisputed

19  that Ocwen fully complied with this term.

20         Paragraph 3 of the stipulation reads as follows:

21  Ocwen agreed to perform the necessary and appropriate

22  corrections to Ms. Jeffers' loan account to reflect that it is

23  current as of September 2016.  The parties agreed that Ocwen

24  had until October 8, 2016, to implement this term.

25         Paragraph 4 of the stipulation reads as follows:

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                    II - 150

1    Ocwen agreed to ask the credit bureaus to fix the credit

2    reporting to reflect that the loan was current and had been

3    current at all times from the time Ocwen began servicing the

4    loan to September 2016.  The parties agreed that Ocwen had

5    until October 8, 2016, to implement this term.

6          Paragraph 5 of the stipulation reads as follows:

7    Ocwen, Ms. Jeffers, and their attorneys agreed that the terms

8    and contents of the settlement agreement and all information

9    and evidence elicited or exchanged during the Action and in

10   negotiating this Agreement would be treated as confidential

11   and not disclosed.

12         Paragraph 6 of the stipulation reads as follows:  The

13   agreement was the compromise of disputed claims, and the terms

14   of the settlement were not intended to be and should not be

15   construed as admissions of any liability or responsibility

16   whatsoever.  Ocwen expressly denied any liability.

17         Paragraph 7, which is the final paragraph of the

18   stipulation, reads as follows:  The parties further agreed to

19   give reasonable cooperation and assistance to any other party

20   to the agreement in order to enable the parties to secure the

21   intended benefits of this agreement.

22         And that completes the Court's reading of the

23   stipulation agreed to by the parties.

24         MR. OSBORNE:  Thank you, Your Honor.

25         THE COURT:  How much longer, Mr. Osborne, are you

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR       Flannigan - Mr. Osborne                II - 151

 1  going to be?

 2          MR. OSBORNE:  15, 20 minutes.

 3          THE COURT:  All right.  What I'm going to do, I want

 4  you to stop in 15 minutes.  You will have an opportunity to

 5  ask some redirect questions.  So take 15 minutes, and we're

 6  going to take our midmorning break.  All right.

 7          MR. OSBORNE:  Okay.

 8  BY MR. OSBORNE:

 9  Q.  Is it your position in this case, sir, that Valerie

10  Jeffers has done anything wrong?

11  A.  Um, not to my knowledge.

12  Q.  And is it your position that she failed to cooperate with

13  Ocwen in any way in implementing the settlement agreement?

14  A.  Um, well, you know, in my opinion, I think there could

15  have been some things done to have it implemented.  I believe

16  there, you know, could have been just a phone call instead of

17  filing a lawsuit.  I believe there could have been, you know,

18  maybe just a call to Ocwen to say, you know, hey, look, it

19  looks like, you know, the remaining terms of the settlement

20  agreement have not been implemented.  She could have contacted

21  you, and you could have contacted our attorneys.  And, you

22  know, obviously I think it would have been taken care of at

23  that point.

24          Were there mistakes made?  Yes.  I think we have

25  already admitted to that.  Definitely not proud of it.  Same

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 152

1    with, you know, with me and my part in the whole situation.

2    My injury, uh, you know, caused some sort of -- you know, part

3    of the time delay.  I think that if I were back in the office

4    at that time, I think I could have helped to get it resolved a

5    lot sooner.  Um, you know, but I think, you know -- there were

6    some things missed, but at the same time I believe that Ocwen

7    went in on the account, made the corrections to the account,

8    and definitely fixed -- fixed the problems with it.

9    Q.   In light of the fact that this lawsuit was filed in

10   January of 2017 and it took Ocwen seven months after the

11   lawsuit was filed to try to fix the loan, what's the basis to

12   say that a simple phone call would have taken care of all of

13   this if a lawsuit took seven months?

14   A.   Well, again, um, you know, at that particular time, first

15   of all, with me being out, um, you know, that caused, you

16   know, a significant time delay, I believe.  You know --

17   Q.   What was the time frame you were out?  It was 45 days?

18   A.   Several weeks, several weeks actually, where I was, you

19   know, impaired to the position where, um, I literally couldn't

20   move.  I mean, I was literally in a, you know, almost a

21   bedridden state, to a wheelchair, to a walker, eventually a

22   cane, you know.  But, again, not making excuses for that, but

23   I'm just letting you know the situation on what happened.

24          Um, there were also -- I believe there were talks

25   about a possible modification during that time period as well

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 153

1    where, you know, I believe, you know -- that may have also,

2    you know, um, been one of the reasons for the delay, um.  But,

3    again, it did take some time to get it done, but it eventually

4    was taken care of.

5    Q.  But you admit that while you were out, somebody was

6    assigned your tasks, named Sony Prudent; true?

7    A.  I did say that, that's correct.

8    Q.  And it's also true, and I don't want to go into the

9    details of these, but over the years, there's been a lot of

10   phone calls between Miss Jeffers and Ocwen; right?

11   A.  Um, that would involve me going presettlement agreement.

12   And, you know, for this particular case, you know, I haven't

13   looked into any calls prior to the settlement agreement, so I

14   don't know if -- I don't know the answer to the many question

15   that you have.

16   Q.  Well, if Miss Jeffers testifies that she had numerous

17   phone calls with Ocwen in the past and it never resolved

18   anything, you don't have any evidence to dispute that; right?

19   A.  I -- I don't, um, believe that, again -- I don't have any

20   evidence to say that it's one way or the other at this point

21   because, again, that was presettlement, and I haven't

22   researched that matter.

23   Q.  Okay.  It's also true that Ocwen didn't call Miss Jeffers

24   and say: Hey, we're not going to be able to comply with this

25   settlement agreement on time.  We'll just freeze all the

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                    II - 154

1    credit reporting.  We'll put everything on hold until we

2    figure this out.

3              That never happened; right?

4    A.  Never happened, but, again, you know, that was never

5    Ocwen's intentions.  We went into a settlement agreement with

6    the intentions to make sure that the loan was fixed, period.

7    That would have been the reason for the settlement agreement.

8    No one goes into a settlement agreement looking forward to a

9    new lawsuit to be filed.  That's the reason -- that's the

10   reason why the settlement was done.  Unfortunately, there were

11   some mistakes made, but eventually we got it fixed.

12   Q.  But each of the four investigations that we have now

13   covered were opportunities for Ocwen to fix the loan had these

14   individuals performed a real investigation; right?

15   A.  If, in fact, they were notified that there was issues with

16   litigation, they would have advised the legal department.

17   Q.  And it's true that although Miss Jeffers couldn't tell the

18   credit bureaus about the settlement agreement, had Ocwen

19   picked up the phone and interviewed her as part of its

20   investigation, they could have learned about the settlement

21   agreement; right?

22             MR. LOPACH:  Your Honor, I'm going to object to

23   the -- I think the question is inappropriate.  It assumes an

24   argument about the scope of the confidentiality agreement

25   between the parties.

1           THE COURT:  Sustained.

2   BY MR. OSBORNE:

3   Q.  I want to ask you a couple of questions.  You admit that

4   Ocwen is no longer sending Miss Jeffers mortgage statements;

5   right?

6   A.  Um, I'm not sure.  I don't know if that's the case or not.

7   That could be the case.  I haven't looked into that.  I don't

8   know.

9   Q.  All right.  Well, if she testifies that's the case, you

10  don't have anything to refute that; right?

11  A.  At this point in time, I don't.  I would have to go back

12  and review that to see.  But at this point in time, I don't

13  know the answer to that.

14  Q.  And is it also true that Ocwen is -- has locked her out of

15  her online account with the company?

16  A.  Um, I believe because of the -- the account having a

17  litigation status, uh, there would have been no access online.

18  But, nevertheless, there would have been opportunities for her

19  to contact Ocwen because I believe that there was information

20  received with information to a relationship manager and

21  information, um, you know, with contact numbers if she wanted

22  to call Ocwen.

23  Q.  Take a look at Exhibit 19, please.

24          MR. OSBORNE:  Your Honor, this is a stipulated

25  exhibit.  I move to admit No. 19.

1           THE COURT:  All right.  Exhibit 19 is received.

2       (Plaintiff's Exhibit 19 received.)

3   BY MR. OSBORNE:

4   Q.  And this is what's called a Form 1098, which is a form

5   Ocwen sends to the IRS to tell them how much interest borrower

6   paid; right?

7   A.  For the year, that's correct.

8   Q.  Right.  And it's generally due around February 15th of the

9   following year; right?

10  A.  I believe so.

11  Q.  So this would have been sent to the IRS around

12  February 15th, 2017; right?

13  A.  Um, I don't know the answer to that.  I'm not sure.

14  Q.  Um, the -- and considering the loan was not actually

15  corrected until July, this information would have been

16  different if the settlement agreement had been implemented;

17  right?

18          MR. LOPACH:  Your Honor, I'm going to object on

19  foundation grounds.  I don't think we have laid any foundation

20  that this witness has information about Exhibit 19 that he can

21  respond to that --

22          THE COURT:  Overruled.  He can answer it if he knows

23  the answer.

24  A.  Would the information here be listed differently?  I -- I

25  don't know the answer to that.

1  BY MR. OSBORNE:

2  Q.  Well, part of fixing the loan was that you had to apply

3  and reapply payments; right?

4  A.  Yes.

5  Q.  And that would have changed the amount of interest

6  applied; right?

7  A.  I believe so, yeah.

8  Q.  You have never issued a corrected 1098 form to

9  Miss Jeffers and the IRS; right?

10  A.  I -- I don't know the answer to that.  I'm assuming that

11  didn't happen, but I don't know the answer to that.

12  Q.  Okay.

13         MR. OSBORNE:  That's all I have.

14         THE COURT:  All right.  So we are going to take our

15  midmorning break.  We will start again in 17 minutes or at

16  10:55.  So we will be in recess until around 10:55.  And then

17  we are going to go to about 12:05 today, and we will take our

18  lunch break.  All right.

19      (Jury out at 10:37 a.m.)

20         THE COURT:  All right, have a seat.  Here's what I

21  think needs to happen with the stipulation because this has

22  happened in other cases.  After proposed Jury Instruction

23  No. 2, which is the statement of the case, we need to create a

24  new instruction, which would be number 3, that basically says

25  that the parties have stipulated to the following facts.  I

 1   think the jurors should have this, but it should be made part

 2   of the jury instructions.  I think that's the only thing

 3   that's fair.

 4            MR. HOFFMAN:  That's fine with us, Your Honor.

 5            THE COURT:  Any objection to that?

 6            MR. OSBORNE:  No, that's fine.

 7            THE COURT:  So then when these are read in final

 8   form, then there will be a new Instruction No. 3 that recites

 9   verbatim what's in here, and that's what I'm going to do.  Is

10   that acceptable to both sides?

11            MR. OSBORNE:  Yes, Your Honor.

12            THE COURT:  All right.

13            MR. HOFFMAN:  Yes, Your Honor.

14            THE COURT:  All right.  We'll start again in 16

15   minutes.

16        (Proceedings recessed 10:39 a.m. to 11:03 a.m.,

17        resuming outside the presence of the jury.)

18            THE COURT:  Okay.  Let's bring the jury back in and

19   have the witness return to the witness stand.

20        (Jury in at 11:04 a.m.)

21            THE COURT:  All right, you may be seated.  Let's

22   proceed with cross-examination of Mr. Flannigan.

23                        **CROSS-EXAMINATION**

24   BY MR. LOPACH:

25   Q.  Good afternoon, Mr. Flannigan.

1          THE COURT:  It's morning.  Don't --

2          MR. LOPACH:  Good morning.  Just feels like

3    afternoon.

4          THE COURT:  I don't want you to push this further

5    along than we are.

6    A.  Good morning.

7    BY MR. LOPACH:

8    Q.  Before we broke, there were some questions you were

9    answering about information on the ACDV form.  Do you remember

10   that?

11   A.  I do, yes.

12   Q.  And the ACDV form is Exhibit 6.  And let's take a look at

13   the top of Exhibit 6.  And this is page 5 of 8 on Exhibit 6.

14   Let me know when you are there, Mr. Flannigan.

15   A.  Okay.  I am there.

16   Q.  And there's a date up top that says the date received.  Do

17   you see that?

18   A.  I do see that, yes.

19   Q.  Okay.  And then there's a date where it says response due.

20   Do you see that?

21   A.  Yes.

22   Q.  Okay.  Let me zoom in a little bit.  And when Ocwen's

23   credit report team, when their credit team is responding to

24   the ACDV, do you have an understanding as to the date on which

25   the data -- or the date on which they are using to respond to

17-CV-00025-WYD-KHR     Flannigan - Mr. Lopach                    II - 160

1  the consumer reporting agency?

2  A.  Yeah.  I mean, it would -- it would have to be a date,

3  obviously, between October 25th to the response date, um, you

4  know, and -- which was, in this case, November the 9th.  So it

5  would have been a date in between then.

6  Q.  Okay.  And do you have an understanding -- when we look at

7  page 5 of 8 on Exhibit 6, and when Ocwen is furnishing

8  information that's contained on this particular page, is the

9  data they are relying on from October 25th, or is it from some

10  subsequent date?

11  A.  Uh, it could have been from October 25th.  It could have

12  been from October 26th.  Um, you know, according to, you know,

13  the information that's listed here as far as the date of the

14  last payment received, which was July two thousand -- 7/16, it

15  appears that it would have been prior to October 27th because

16  that's when, you know, another payment had posted on the loan

17  by that time.

18  Q.  Okay.

19  A.  So --

20  Q.  So when you've looked at Exhibit A, and we talked earlier,

21  you answered some questions from Mr. Osborne about a payment

22  that had come in from Miss Jeffers on October 27th, 2016.

23        Do you recall that?

24  A.  Yes.

25  Q.  Okay.  And when you look at when that payment came in and

Julie H. Thomas, RMR, CRR                              (303)296-3056

1  you look at what's reported here on page 5 of Exhibit 6,

2  comparing that data, does that give you a sense of, you know,

3  when Ocwen was reporting the date of the data it was using

4  when it's reporting back to the consumer reporting agency?

5  A.  Can -- I'm sorry.  Can you repeat the question?

6  Q.  Sure.

7        When you're trying to -- when you're reconciling the

8  October 27th payment --

9  A.  Yes.

10  Q.  -- that came in that we looked at on Exhibit A --

11  A.  Correct.

12  Q.  -- when you compare that to what's being reported back on

13  the ACDV --

14  A.  Right.

15  Q.  -- when you reconcile that information, does that lead you

16  to believe that Ocwen was using data that was available in the

17  system on October 25th before that payment came in?

18  A.  It could have been.

19  Q.  Okay.

20  A.  I mean, that definitely could be the case.

21  Q.  If that was the case, would that lead you to believe there

22  was any incorrect information that was being reported back to

23  the CRA on page 5 of 8?

24  A.  It would not lead me to believe that.

25  Q.  So everything would be correct based upon Ocwen's system;

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 162

1  is that right?

2  A.  That's right.

3  Q.  And let's continue to look at Exhibit 6.  You received

4  some questions earlier, Mr. Flannigan, about a compliance

5  condition code.

6  A.  Yes.

7  Q.  Do you see that?

8  A.  Yes.

9  Q.  Okay.  And I think you made some comments about kind of

10 types of consumer disputes that may come in to Ocwen.  Do you

11 remember that?

12 A.  Yes.

13 Q.  And I think you said that there were direct disputes and

14 there were indirect disputes.  Is that right?

15 A.  That's right.

16 Q.  Could you tell me again, what is a direct dispute?

17 A.  A direct dispute is when Ocwen receives a dispute directly

18 from the borrower.  You know, those type of disputes normally

19 come through what Ocwen calls our ombudsman's department.

20 Ombudsman's department is like a research department that

21 Ocwen has.

22        When those disputes are received, whether it's a

23 credit -- or specifically when it's a credit reporting

24 dispute, that information is sent to the credit bureau

25 department -- credit review department.  Our credit review

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                    II - 163

1  department researches the item, makes sure that the credit

2  information that's submitted back to the credit bureau

3  agencies has a dispute code that's listed on it, um, a

4  specific dispute code.

5          Indirect disputes would actually be where the

6  payments would -- or the dispute information would come from

7  the borrower directly to the credit bureau agency, um, and --

8  should I go on about --

9  Q.  Let me ask you this, because we have got two categories of

10  disputes.  There's direct, and there's indirect.  My

11  understanding is that -- well, the case we are talking about

12  here with Miss Jeffers --

13  A.  Okay.

14  Q.  -- did she make a direct dispute to Ocwen, or did she make

15  an indirect dispute?

16  A.  This would have been an indirect dispute because the

17  information went from Miss Jeffers directly to the credit

18  reporting agency.

19  Q.  And when Ocwen is responding to the credit reporting

20  agency through the ACDV, like we see in Exhibit 6 --

21  A.  Yes.

22  Q.  -- does Ocwen, under those circumstances, have an

23  obligation to put a code in for the compliance condition code?

24  A.  No, it does not.

25  Q.  Okay.  And we have talked about four disputes here today;

1   correct?

2   A.  Yes.

3   Q.  All that are encompassed within Exhibit 6?

4   A.  That's correct.

5   Q.  And Ocwen responded -- there was a request that came in

6   from TransUnion?

7   A.  Right.

8   Q.  And there was a request that came in from Equifax; right?

9   A.  Correct.

10  Q.  And those disputes that came in, um, clearly those credit

11  agencies know that Miss Jeffers is disputing something on her

12  account; correct?

13  A.  Yes.

14  Q.  Okay.  That's what brought about the whole ACDV in the

15  first place; right?

16  A.  That's correct.

17  Q.  Okay.  But in the indirect [sic] reports, when it comes

18  directly from the consumer to Ocwen, in those circumstances,

19  do you have an understanding as to whether or not Ocwen would

20  put a code into this box for the compliance condition code?

21  A.  When it comes from the -- on the ACDVs from the credit

22  bureau agency?

23  Q.  When the dispute comes directly from the consumer.

24  A.  To Ocwen.

25  Q.  Yes.

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 165

1    A.  Yes, they do.

2    Q.  In those instances what would Ocwen do?

3    A.  They would place a, you know, a dispute code on the

4    account.  And I believe a dispute code -- or the compliance

5    condition code for that would be an XB, I believe.

6    Q.  Because in those circumstances, because the consumer has

7    actually come straight to Ocwen, the credit reporting agency

8    may not know that the consumer has a dispute on his or her

9    account; is that correct?

10   A.  Correct.

11   Q.  So would it make sense under those situations that Ocwen

12   would put in that code in the compliance condition code box on

13   the ACDV?

14   A.  Yes.

15   Q.  Mr. Flannigan, yesterday afternoon Mr. Osborne asked you

16   some questions about Ms. Jeffers' loan being in default.  Do

17   you recall that?

18   A.  Yes.

19   Q.  Okay.  Once Ms. Jeffers had settled her dispute with Ocwen

20   in September 2016, did Ocwen ever send Miss Jeffers a notice

21   of default?

22   A.  No.

23   Q.  And yesterday afternoon Mr. Osborne asked you some

24   questions about foreclosure.  Do you recall that?

25   A.  Yes, he did.

17-CV-00025-WYD-KHR       Flannigan - Mr. Lopach                II - 166

1  Q.  Okay.  From the beginning when Ocwen first started

2  servicing Miss Jeffers' loan, did Ocwen ever commence

3  foreclosure proceedings on Miss Jeffers' loan?

4  A.  No.

5  Q.  You recall yesterday, Mr. Flannigan, that Mr. Osborne had

6  asked you a number of questions about payments made by

7  Miss Jeffers --

8  A.  Yes.

9  Q.  -- starting in two thousand -- September of 2016 onward?

10  Do you recall that?

11  A.  I do remember that, yes.

12  Q.  In this case is Ocwen arguing that Miss Jeffers failed to

13  make any of those payments?

14  A.  Ocwen is not arguing that at all, no.

15  Q.  And when Ocwen made the account corrections last summer,

16  how did Ocwen handle any prior payments that had been sent

17  back to Miss Jeffers?

18  A.  Well, um, you know, first of all, the loan was brought

19  current when -- when the corrections were made.  There were,

20  before the loan was brought current, two payments that were

21  sent back to Miss Jeffers.  Those two payments, Ocwen never

22  requested the borrower to send those back in to bring the loan

23  current.  We credited those two payments to the loan.  And so,

24  in essence, there were payments in the amount of twelve -- one

25  was $1200; one was $1240.  So, in essence, I think that was

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 167

1    $2440 that was credited to the loan to advance the due date.

2    Q.  Mr. Flannigan, do you remember you were asked some

3    questions about Ocwen's credit operations team and about that

4    team's ability or inability to make changes directly into

5    Ocwen's loan servicing database?

6    A.  Yes, I do recall.

7    Q.  Do you remember those questions?

8    A.  Yeah.

9    Q.  Can members of that team go directly into Ocwen's loan

10   servicing database and make changes to that database?

11   A.  No.  And that's -- I think I was explaining that earlier

12   when I was speaking to Mr. Osborne is that, you know, there's

13   a checks and balances that has to be done.  If there's a

14   correction that needs to be made on the loan as far as

15   payments that need to be applied, that's not the -- that's not

16   the job of a credit reporting team member, a credit

17   verifications team member.  That would be the job of a

18   cashiering person.  The information would be sent from our

19   credit reporting team member to representatives in the

20   cashiering team to make those adjustments.

21   Q.  Can you, as a senior loan analyst, go into that database

22   and make changes as you see fit?

23   A.  No.

24   Q.  You would have to follow the process that you have

25   outlined?

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 168

1    A.  I definitely would have to follow the processes, yes.

2    Q.  Let me switch gears a little bit, Mr. Flannigan.  I'm

3    going to kind of back up and talk about kind of more generally

4    about you and your work with Ocwen and some of the issues that

5    have come up in this case.

6    A.  All right.

7    Q.  We have been talking to you for over two days now, so I'm

8    going to ask you a couple questions about your background.

9    A.  Okay.

10   Q.  Where do you live?

11   A.  Houston, Texas.

12   Q.  And do you have a family?

13   A.  I do, wife and three beautiful kids.

14   Q.  And tell me a little bit about your educational

15   background.

16   A.  And a beautiful wife, too.  I don't want to leave that

17   out.

18   Q.  Tell me a little bit about your educational background.

19   A.  I went to high school in Houston and went to college at

20   Alcorn State University in Lorman, Mississippi.  Graduated

21   from Alcorn State in 1991 with a bachelor of science in

22   business administration.  And to that extent, I think that's

23   about it.  That's the highest level that I've gotten to

24   anyway.

25   Q.  And after you graduated from Alcorn State, did you enter

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                    II - 169

1    the workforce?

2    A.  I did.  I've pretty much been in the mortgage industry

3    since college, really, started with a company called GE

4    Capital Mortgage Services around '91.  From there, worked at

5    companies like BankUnited.  Um, did some years at a law firm

6    in Houston.  Went on the origination side and worked in

7    licensing for a few years, and then came over to Litton Loan

8    Servicing, which is another mortgage servicing company, in

9    2008.  Litton, ultimately, was acquired by Ocwen in 2011, and

10   with that acquisition, I stayed on with Ocwen.  So . . .

11   Q.  So you have been with either Litton or Ocwen for the last

12   10 years?

13   A.  For the last 10 years, yep.

14   Q.  What is your current title at Ocwen?

15   A.  Senior loan analyst.

16   Q.  And who do you work for?  What's the company you work for?

17   A.  Ocwen.

18   Q.  Okay.  Ocwen Loan Servicing?

19   A.  Yes.  Yeah, Ocwen Loan Servicing is a mortgage servicing

20   company.

21   Q.  What do mortgage loan servicers do?

22   A.  Well, the role of a mortgage servicer is basically to

23   service loans for the most part on behalf of investors.

24   Investors can be companies like Fannie Mae.  They can be

25   securitized trusts.  But the role of a servicer is to service

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 170

1    loans on behalf of those investors.  And so, in essence, a

2    servicer doesn't necessarily own the loan, but, again, it

3    services on behalf of the investors.  Part of that role of a

4    servicer is to, um, you know, take payments and -- not take

5    payments but apply payments from borrowers to the loans, make

6    sure that taxes and insurance get paid accordingly.  Um, you

7    know, loss mitigations efforts are done if a loan is in

8    default where we will go in and perform modifications, and I

9    think I mentioned this a little bit yesterday, but, you know,

10   short sales, whatever the case is, to try to bring the loans

11   out of default.  And just those sorts of things is what --

12   what a mortgage servicer will do.

13   Q.  And at some point in time with Ocwen, did you become a

14   senior loan analyst?

15   A.  Yes.

16   Q.  And when was that?

17   A.  I believe it was around 2013.

18   Q.  Was that a promotion?

19   A.  Yes.

20   Q.  And you were promoted from what position?

21   A.  Senior -- I'm sorry.  Loan analyst to senior loan analyst.

22   Q.  Okay.  Now, at some point in time, did you become familiar

23   with Ms. Jeffers' loan file?

24   A.  Yes.

25   Q.  When was that approximately?

Julie H. Thomas, RMR, CRR                                (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 171

1    A.   It would have been in 2016.

2    Q.   And at that time did you have an understanding that a

3    dispute had arisen between Ocwen and Miss Jeffers?

4    A.   Yes.

5    Q.   And was that dispute ultimately resolved?

6    A.   Yes.

7    Q.   And we have heard a stipulation read about -- was that

8    about the resolution of that dispute?

9    A.   Yes.

10   Q.   Okay.  So how was that dispute resolved?

11   A.   Well, and I think we have talked about this, uh, you know,

12   extensively, but there were three main portions of the

13   dispute.  There was a confidential settlement amount that was

14   paid to Miss Jeffers.  There was two other items, one being

15   the account would be brought current, and the third was that,

16   um, the credit reporting would be fixed.

17   Q.   Now, thinking back to the fall of 2016 when Miss Jeffers

18   and Ocwen entered into the settlement agreement --

19   A.   Yes.

20   Q.   -- can you explain the process for me that was in place at

21   that time in the fall of 2016 to implement the terms of that

22   settlement agreement?

23   A.   Right.  Well, first of all, the two parties would have

24   agreed to the -- the settlement agreement.  The settlement

25   agreement would -- the package would be sent from our

1   attorneys to Ocwen for implementation, signatures.  If there's

2   a check that needs to be cut, certain information has to be

3   done with that, including W-9s, tax identification

4   information.  Those sorts of things would be needed to

5   complete the check portion of the settlement terms.

6            The information would be, like I said before, sent to

7   Ocwen.  Ocwen had, you know, paralegals -- I think one of them

8   was Cori Vercher; the other one was Laurie Stevenson -- who

9   were the persons in charge of making sure that the packages

10  would be distributed to other paralegals to handle.  In this

11  particular case, I think it was Cori Vercher who submitted the

12  package to I think it was Manish Verma to handle.  I think I'm

13  going a little bit lower than the high picture that you are

14  looking for.

15  Q.  That's okay.

16  A.  But, anyway, the package would be assigned to a paralegal.

17  The paralegal would make sure that those items would get done.

18  And once those items were done, then managing counsel would be

19  advised, and the matter would be closed out.

20  Q.  And so were there different units at Ocwen that were

21  involved in carrying out the -- implementing the settlement

22  terms?

23  A.  That's correct, depending on the settlement terms.  For

24  example, if there would -- you know, if a check needed to be

25  cut, then, of course, the paralegal would advise the

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 173

1   cashiering department, um, you know, here's the information

2   for the check.  Here's where it needs to be sent.  Here's the

3   W-9 information.  They would make sure all the information on

4   the check is correct, and then it would be sent.  The

5   cashiering department would make sure that it would be sent

6   either to the borrower or to our managing counsel or our

7   attorneys to make sure that it gets sent to the borrower.

8           And the same with the other portions.  The paralegal

9   would contact credit verifications to make the adjustments on

10  the account as far as the -- well, let me -- let me back up a

11  little bit, because the account would need to be corrected

12  before credit operations would complete any changes on the

13  credit report.  And so our paralegal team would contact the

14  cashiering department to make sure that the items on the

15  credit -- on the account history would be corrected first.

16  After that's done, the information would then be sent to the

17  credit verifications team to update the credit history.

18  Q.  And with that background, let's talk a little bit about in

19  2016 with the settlement agreement between Ocwen and

20  Miss Jeffers.

21  A.  Okay.

22  Q.  Do you have an understanding what happened in the fall of

23  2016 with the implementation of that specific settlement

24  agreement?

25  A.  Right.  There was obviously some confusion at that point

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   of what was to happen.  I think, as I mentioned before, Manish

2   Verma in this particular case was the person who was in charge

3   of making sure that those items got taken care of.  One of the

4   items, such as a check being sent to the borrower, was

5   completed almost immediately.  The other two items,

6   unfortunately, didn't get fixed, which caused the loan to

7   remain in the default.

8   Q.  And the fact that Mr. Verma did not get that second step

9   implemented in the settlement agreement, given your time at

10  Litton and Ocwen and on the cases that you have worked on,

11  have you ever had that situation occur before?

12  A.  Never.

13  Q.  This was an isolated incident?

14  A.  This was definitely an isolated incident.  I have never

15  been a part of a -- an account where, um, you know, that's

16  happened.  And I have worked on hundreds of loans.

17  Q.  So -- and you were familiar with this settlement; is that

18  correct?

19  A.  Yes.

20  Q.  You were working on this file during this period?

21  A.  Yes.

22  Q.  Okay.  So at some point after September 8th or

23  September 9th, 2016, did Ocwen internally decide, hey, we've

24  paid this settlement check, but we're not going to implement

25  the other terms of the settlement agreement?

1    A.   No.

2    Q.   At any time after the parties had signed the settlement

3    agreement, Mr. Flannigan, did Ocwen decide, well, Miss Jeffers

4    has now dismissed her case; ha, we're just going to forget

5    about steps 2 and steps 3 of this settlement agreement?

6    A.   That's -- that's never been the case.

7    Q.   In fact, would Ocwen have any reason whatsoever to not

8    implement the second and third key steps that we have talked

9    about of the settlement agreement?

10    A.   No.  And to the contrary, I think I mentioned this before,

11    you know, by not doing that would have only caused what

12    happened.  I mean, and that was to file another lawsuit.  So

13    definitely the intentions when the settlement was done was to

14    get the settlement terms implemented.  Unfortunately, like I

15    said before, there were some mistakes made, but, you know,

16    ultimately, we went in and made the corrections on the

17    account.

18    Q.   And when were those -- when were those corrections made?

19    A.   In July, in the spring -- well, July, 2017.

20    Q.   Okay.  And, ultimately, how was that done?

21    A.   Well, ultimately, the account was brought current, um, and

22    the credit reporting was fixed to show that the borrower was

23    current, and, uh, that was -- that resolved the delinquency

24    issue.

25    Q.   I'd like to bring up Exhibit B, which has been stipulated.

17-CV-00025-WYD-KHR       Flannigan - Mr. Lopach                    II - 176

1    You may want to look at this in your notebook, Mr. Flannigan?

2            THE COURT:  All right.  Do you want me to receive

3    Exhibit B?

4            MR. LOPACH:  I would like -- yes, I will offer

5    Exhibit B, Your Honor.

6            THE COURT:  All right.  Since it's been stipulated

7    to, Exhibit B is now in evidence.

8        (Defendant's Exhibit B received.)

9    A.  Did you say this was Exhibit B?

10   BY MR. LOPACH:

11   Q.  This is Exhibit B.  I'm going to zoom out.  And it may be

12   easier, Mr. Flannigan, if you identify it in your notebook.

13   A.  Got it right here.

14   Q.  Okay.  What is Exhibit B?

15   A.  Exhibit B is a universal data form, also known as an

16   automated universal data form.  This is a form that is

17   submitted by Ocwen's credit reporting team directly to the

18   credit, um, the credit bureau agencies.

19   Q.  And if we look down at the bottom of -- the bottom corner

20   of Exhibit B, do you see a date at the bottom right-hand

21   corner?

22   A.  Yes.  It says 7-20-2017.

23   Q.  What's your understanding about what that date is?

24   A.  Well, as I mentioned before, that's the time frame in

25   which the corrections were made on the loan.

17-CV-00025-WYD-KHR          Flannigan - Mr. Lopach          II - 177

1    Q.  And if we look at the box at the bottom of Exhibit B, are

2    you able to see that?

3    A.  Yes.

4    Q.  Okay.  What does the -- this -- what does this account

5    history reflect as of July 2017?

6    A.  Well, this one reflects through June, 2017, that the

7    account is reporting as current.

8    Q.  I'm going to put now page 2 of Exhibit B on the screen.

9    A.  Okay.

10   Q.  And let's look at the lower right-hand corner of

11   Exhibit 2.  Do you see a date there, Mr. Flannigan?

12   A.  Yes.

13   Q.  Okay.  What's the date on page 2 of Exhibit B?

14   A.  This is dated August 8, 2017.

15   Q.  Okay.  And let's look again at the account history on

16   page 2.  What's being reflected in the account history on

17   page 2 of Exhibit B?

18   A.  Yes, it shows that the account is current from March,

19   2013 -- 2015 through July, 2017.

20   Q.  Okay.  Was there a small change that was made between July

21   and August between page 1 and page 2 of Exhibit B?

22   A.  Yes.  There was reporting in the month of July on page 2,

23   but there wasn't reporting on page 1.

24   Q.  Do you know what the update was between July and August

25   that's reflected on Exhibit B?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   A.  When the update was done?

2   Q.  Can you tell me what the update was?  What information was

3   updated in August?

4   A.  It was to show that the month of July, 2017, was current.

5   Q.  Okay.  So it was just reflecting a more current

6   information on the account; is that right?

7   A.  That's right.

8   Q.  Okay.  So as of this date, as of summer 2017, is

9   Miss Jeffers -- has the account correction been made that was

10  discussed in the settlement agreement?

11  A.  That's correct.

12  Q.  So let's go back to the -- to October of 2016.  So we know

13  we have a settlement agreement, and there's a 30-day window

14  during which the account was required to be brought current.

15  Correct?

16  A.  Yes, sir.

17  Q.  I think you have testified that that did not occur at that

18  time.  Correct?

19  A.  Correct.

20  Q.  Okay.  So at that point in time in October 9th of 2016 --

21  A.  Mm-hmm.

22  Q.  -- and that account correction has not been made, what's

23  the impact of that on Ocwen's database that we have talked

24  about?

25  A.  Well, um, as I stated before, when the account wasn't

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 179

1    corrected, it would -- the database would have shown that the

2    loan was -- was not current.

3    Q.  In thinking back to October of '16, on October 9th, which

4    is when the -- after the 30 days is up --

5    A.  Right.

6    Q.  -- at that point in time, did Miss Jeffers reach out to

7    you or anyone at Ocwen about the credit correction not having

8    been made?

9    A.  No.

10   Q.  And if you -- you looked back through Exhibit A, right,

11   which was the comments log?

12   A.  Yes.

13   Q.  Okay.  And what sort of information is recorded in the

14   comments log?

15   A.  Um, you know, different types of information.  I mean, it

16   talks about, um, you know, any modification reviews;

17   correspondence that may be sent between the borrower and Ocwen

18   and vice versa, correspondence from Ocwen to the borrower;

19   conversations, telephone calls with the borrower, those sorts

20   of things.  Just daily, um, servicing notes in regards to the

21   mortgage loan.

22   Q.  And you have reviewed Exhibit A and the comments log

23   during this time period?

24   A.  Yes.

25   Q.  So at any time in October 2016, was there anything

1   reflected there that Ocwen had been contacted by Miss Jeffers?

2   A.   No.

3   Q.   Or that Ocwen had been contacted by her counsel?

4   A.   No.

5   Q.   What about in November, 2016?  Was there any indication

6   that Ocwen had been contacted by Miss Jeffers or her counsel?

7   A.   No.

8   Q.   And what about December of 2016?  During that time period

9   when you have looked at the comments log, is there any

10  indication that Miss Jeffers or her lawyer ever reached out to

11  Ocwen?

12  A.   There's no indication, no.

13  Q.   So from October 9th, 2016, we know that the account

14  correction has not been made; correct?

15  A.   Yes.

16  Q.   When does Ocwen first learn -- when is it first brought to

17  Ocwen's attention that we've got a -- we've got a problem that

18  when we -- we were supposed to make this account correction,

19  that didn't occur?  How did Ocwen first learn of that?

20  A.   Right.  It was by way of the lawsuit that was filed in

21  January, 2017.

22  Q.   Do you remember the date that that lawsuit was filed?

23  A.   I think it was January 3rd, I believe.

24  Q.   And you understand that after a lawsuit was filed, there's

25  a process by which the plaintiff, who files the lawsuit,

1    serves it or gives notice to the party who's been sued?

2    A.  Yes.

3    Q.  Okay.  Do you have an understanding as to when Ocwen then

4    actually received the official lawsuit and was served with it?

5    A.  Um, I'm not sure of the exact date.  I believe it was the

6    early part of January, though.

7    Q.  Do you know when that may have coincided with the medical

8    issue that came up with you that we have discussed?

9    A.  It would have been right around that time, yeah.

10         MR. LOPACH:  I'd like to put Exhibit 5 on the screen,

11   Your Honor.  I think this is stipulated, Your Honor.  We offer

12   Exhibit 5 at this time.

13         THE COURT:  All right.  Exhibit 5 is received.

14      (Plaintiff's Exhibit 5 received.)

15   BY MR. LOPACH:

16   Q.  Mr. Flannigan, have you seen this document before?

17   A.  I have, yes.

18   Q.  Okay.  And I'm going to -- this is page 1 of 3 of

19   Exhibit 5.  What's the date on this document?

20   A.  October 27, 2016.

21   Q.  And do you see who is sending this letter?

22   A.  Yes.

23   Q.  Who is sending it?

24   A.  It's being sent by Miss Jeffers, Valerie Jeffers, to

25   TransUnion, the credit reporting agency.

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 182

1   Q.  Okay.  And can you see in the first sentence what

2   Miss Jeffers is -- the information she is providing to

3   TransUnion?

4   A.  Yes.  She's -- it says that she is "writing to dispute an

5   inaccurate account on my credit report."

6   Q.  Okay.  What does the next sentence say?

7   A.  It says "Ocwen Loan Servicing is reporting me as past due,

8   but all payments were made on time and the account was never

9   past due."

10  Q.  Do you see any indication in Exhibit 5 on this letter to

11  TransUnion that's referencing a settlement agreement?

12  A.  No.

13  Q.  And is there anything in Exhibit 5 in the letter to

14  TransUnion that refers to litigation?

15  A.  No.

16  Q.  Let's take a look at page 2 of Exhibit 5.  Mr. Flannigan,

17  have you seen this document before?

18  A.  Yes, I have.

19  Q.  Okay.  And what's this dated?

20  A.  This is dated October 27, 2016.

21  Q.  And who is sending this letter?

22  A.  Valerie Jeffers.

23  Q.  Okay.  Who is she sending it to?

24  A.  Experian.

25  Q.  Is this the same date as Miss Jeffers' letter to

1   TransUnion?

2   A.  Yes.

3   Q.  Have you had a chance to compare the two letters?

4   A.  Yes.

5   Q.  Other than the recipient, is the language identical?

6   A.  Pretty much, yeah.  Same thing.

7   Q.  Okay.  So in the letter to Experian, is there any

8   reference to the settlement agreement?

9   A.  No.

10  Q.  Is there any reference to pending litigation or

11  litigation?

12  A.  No.

13  Q.  And let's look at page 3 of Exhibit 5.  What is this

14  letter dated, Mr. Flannigan?

15  A.  It is dated October 27, 2016.

16  Q.  And Miss Jeffers is sending this letter as well?

17  A.  Yes.

18  Q.  And it's the same date as the other two we have already

19  looked at?

20  A.  That's correct.

21  Q.  Okay.  And to whom is this letter sent?

22  A.  It is sent to Equifax Information Services, the credit

23  bureau agency, and it basically says the same thing as the

24  other two letters.

25  Q.  No reference to a settlement agreement?

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 184

1   A.  No.

2   Q.  No reference to litigation?

3   A.  No.

4   Q.  And you are not aware, again, of any letter or e-mail or

5   call that came in to Ocwen in October or November or December

6   of 2016 from Miss Jeffers about issues with the settlement

7   agreement?

8   A.  No.

9   Q.  So we have looked at ACDVs, which is Exhibit 6, over the

10  past several days, and I'm going to put up page 7 of

11  Exhibit 6.  I'm going to -- actually, I'm going to put up

12  page 1 of Exhibit 6.

13  A.  Page 1.  Okay.

14  Q.  And we've spent some -- a fair amount of time looking at

15  the ACDVs; right, Mr. Flannigan?

16  A.  Yes.

17  Q.  Okay.  So let me ask you -- I'm not going to go over every

18  question.  You have been very helpful in providing information

19  about this process and about this form, but one thing that

20  Mr. Osborne never asked you was the dispute codes.  And on

21  each of these ACDVs there are dispute codes.

22  A.  Yes.

23  Q.  My pen is writing right over the top of it.

24          Do you see that dispute code there?

25  A.  Yes, I do see that.

17-CV-00025-WYD-KHR          Flannigan - Mr. Lopach                    II - 185

1   Q.  Do each -- so there's four ACDVs.

2   A.  Correct.

3   Q.  And each of them have that dispute code; is that right?

4   A.  Uh.

5   Q.  They have different dispute codes, but --

6   A.  They --

7   Q.  -- they each have a box for dispute codes; is that right?

8   A.  That's correct.

9   Q.  Why are those dispute codes -- let me ask you a different

10  question.

11          Are those dispute codes important?

12  A.  They are very much important, yes.

13  Q.  Why?

14  A.  Because it -- it breaks down the -- what the credit review

15  team member needs to review.  It tells them specifically what

16  they need to look at when making, um, corrections,

17  verifications on a credit report.

18  Q.  And is this -- when we look at Exhibit 6 and we look at

19  the dispute that's being made through this ACDV, is this a

20  direct or an indirect dispute?

21  A.  This would be considered an indirect dispute.

22  Q.  Because it's coming to Ocwen through the credit agency?

23  A.  That's correct.

24  Q.  Okay.  Now, if we are looking at the dispute codes, do you

25  know how the credit bureau designates the dispute code that

1   appears in the ACDV in Exhibit 6?

2   A.  They would determine the dispute code by the information

3   that's being sent from the borrower, the customer.  Um . . .

4   Q.  So this -- go ahead.

5   A.  No, that's pretty much what it is.

6   Q.  So in this instance the dispute code is coming -- that's

7   based upon information from Miss Jeffers?

8   A.  Yes.

9   Q.  Okay.  And on page 1 do you believe that the information

10  for this dispute code came from her October twenty -- October

11  letters that we saw as Exhibit 5?

12  A.  Uh, in this particular dispute, uh -- I know that there

13  were three specific letters that were sent that we looked at.

14  There were four ACDVs.  Um, the -- the three letters could

15  have been -- depending on who they were sent to, they could

16  have been sent to, um -- well, they were sent to TransUnion,

17  Equifax, and the other one was Experian.

18  Q.  But is it your understanding that the dispute code is

19  based solely upon the information that came from the consumer,

20  in this case Miss Jeffers?

21  A.  That's correct, yeah.

22  Q.  Okay.  And once Ocwen receives the ACDV --

23  A.  Yes.

24  Q.  -- is it your understanding that the people at Ocwen, the

25  credit team looks at those dispute codes?

1    A.  That is correct, yes.  And, again, in order to, um, make

2    sure that Ocwen properly, you know, answers any concerns, any

3    questions in regards to the borrower's dispute, it reviews the

4    dispute codes.

5    Q.  Does that frame the scope of the investigation?

6    A.  Yes.  That's pretty much what it is, the information

7    that's listed in the dispute code.

8    Q.  When we look at Exhibit 6 on page 1, and I'm going to zoom

9    in a little bit, do you see what that dispute code says there?

10   A.  It's 106 and says "Disputes present/previous Account

11   Status/Account History" and "Payment Rating."  It says "Verify

12   Account History, Account Status, and Payment Rating."

13   Q.  Okay.  So there's kind of two parts, it looks like.

14   There's the dispute, and then is it asking Ocwen to verify?

15   A.  Yes.

16   Q.  Okay.  And if we look at page 3 of 8, and this is the

17   dispute code from TransUnion, what codes do you see on page 3

18   of 8 of Exhibit 6?

19   A.  There are two dispute codes here.  Dispute code 109 and a

20   106.

21   Q.  Okay.  And we already looked at 106.  What's the credit

22   bureau asking Ocwen to verify through Exhibit -- or dispute

23   code 109?

24   A.  It disputes the current balance -- I'm sorry.

25   Miss Jeffers disputes the current balance, original loan

1   amount, scheduled monthly payment amount, actual payment

2   amount, the actual past due, the original charge-off amount,

3   and then it goes on to say verify that information.

4   Q.  And then let's look at page 5 of 8, the dispute code in

5   the same area on this ACDV.  This is from Experian.

6   A.  Yes.

7   Q.  Okay.  And what is that dispute code?

8   A.  This dispute code is 112, consumer states inaccurate

9   information.  Please provide or confirm complete ID and

10  account information.

11  Q.  Okay.  And then let's go ahead and look at page 7 of 8 of

12  Exhibit 6, and this is the -- this is a dispute that went to

13  TransUnion and came to Ocwen from TransUnion.  What dispute

14  code appears on page 7?

15  A.  It's a dispute code 112, consumer states inaccurate

16  information.  Provide or confirm complete and account

17  information -- complete ID and account information.

18  Q.  Okay.  On any of these four ACDVs that we have looked at

19  in Exhibit 6, is there anything about a settlement agreement?

20  A.  No, there is not.

21  Q.  Is there anything about litigation?

22  A.  No.

23  Q.  So once the ACDVs are received by Ocwen, can you explain

24  for me what happens internally?

25  A.  Yes.  When an ACDV is received by Ocwen, our credit

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 189

1    verifications team will go into the database to validate, uh,

2    you know, compare and, you know, make sure that the

3    information that's being reported is accurate.  You know,

4    again, there's numerous parts of the database that persons

5    within our credit operations team has access to.  Information

6    in regards to the loan being past due, the borrower's name,

7    Social Security number, all of that information is confirmed,

8    validated, verified, and then reported back to, um, the credit

9    bureau agencies by way of the ACDV.

10   Q.  And who -- we have talked about this credit review team;

11   correct?

12   A.  Yes.

13   Q.  And for the work that was done here, where is this credit

14   review team located?

15   A.  For the work -- we have a location in -- in Bangalore,

16   India.

17   Q.  And where is that?

18   A.  It's in India.  Again, it's at a -- it's a Pritech park.

19   It's a very modern facility.  I think I mentioned to

20   Mr. Osborne that, you know, you know, this location, the

21   people that work there are Ocwen employees.  They are very,

22   you know, technologically savvy.  You know, these are not

23   people that are just, you know, not concerned about their

24   jobs, just going into a computer and just putting down

25   information.  These people are trained.  Uh, they're my

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 190

1   coworkers.  I depend on them on a regular basis, um, and, you

2   know, just like I depend on the people over here in the United

3   States.  They're hardworking.  And, you know, they have access

4   to our database, and they use it on a regular basis.

5   Q.  And these are real people?

6   A.  They are real people.

7   Q.  They're not fake?

8   A.  No.  No.

9   Q.  And they're doing real work?

10  A.  Yes, they are.

11  Q.  And they take their jobs seriously?

12  A.  They do.

13  Q.  So when we look at the dispute codes -- well, let me ask

14  you a different question.

15       Are you familiar with the dispute codes that appear

16  on the ACDVs?

17  A.  I am.

18  Q.  Is there a dispute code that involves settlements?

19  A.  There is, and --

20  Q.  Do you know what code that is?

21  A.  It's a 010.  Um, if, you know, you know, that code would

22  have been -- and I've said it, you know, before.  If that code

23  would have been included on an ACDV, it would have prompted

24  our credit verifications team to look into a settlement

25  agreement; it would have prompted them to contact the

1    litigations team to find out if there's some issues with a

2    settlement agreement.

3    Q.  Is there a code you are familiar with that can appear on

4    these ACDVs that involves litigation?

5    A.  Yes.  It's a 040 code that instructs the credit operations

6    team to, um, you know, contact our legal team to say:  Hey,

7    look, there may be some issues with this -- this pending

8    litigation.  This is something that you should look into.

9    Q.  And none of those codes appear on Exhibit 6; correct?

10   A.  No, sir.

11   Q.  Okay.  So as you looked at the ACDVs --

12   A.  Yes.

13   Q.  -- and have you looked at what is being reported by the

14   credit bureaus and the information that's being sent back to

15   the credit bureaus?

16   A.  Yes.

17   Q.  Okay.  And when you've looked at that information, you

18   believe that the proper information that was called for by the

19   dispute codes was sent back to -- to the bureaus?

20   A.  Yes.

21   Q.  And we've talked a little bit, Mr. Flannigan, about the

22   length of time that Ocwen takes when it is evaluating these

23   ACDVs, when it's verifying the information, when it sends it

24   back.  Correct?

25   A.  Yes.

17-CV-00025-WYD-KHR          Flannigan - Mr. Lopach                    II - 192

1    Q.  And, for example, so if we look at the top of page -- for

2    example, if we look at the top of page 3 of Exhibit 6 --

3    A.  3 of Exhibit 6.  Okay.

4    Q.  There is a date received.  Do you see that?

5    A.  Yes.

6    Q.  Okay.  And there's also a FCRA response due date.  Do you

7    see that?

8    A.  I do see that, yes.

9    Q.  Okay.  And I think you testified earlier that under the

10   law, a furnisher, such as Ocwen, must respond to this ACDV

11   within 30 days.  Correct?

12   A.  That's correct.

13   Q.  Do you know why our response date is shorter than 30 days?

14   A.  Well, yeah, you want to make sure that you get the

15   response before the 30 days.  You know, you don't want to wait

16   until the deadline to actually respond.

17   Q.  Okay.

18   A.  And so they make a due date that's prior to the actual

19   deadline in order to respond in time.

20   Q.  And for the four ACDVs that we have looked at here, did

21   Ocwen, in fact, respond prior to its own internal deadline?

22   A.  That's correct.

23   Q.  So when, again, did Ocwen first realize that there had

24   been a mistake in implementing the settlement agreement, that

25   the account correction had not occurred?

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                    II - 193

1    A.   Uh, I think it was at the time when the lawsuit was filed.

2    Q.   Okay.  And I think you mentioned earlier a relationship

3    manager.  What is a relationship manager at Ocwen?

4    A.   Yeah, a relationship manager is a -- a special point of

5    contact that a servicer has for borrowers whose loans may be

6    in default.  That special point of contact is a person that if

7    the borrower has any issues can contact to try to get, you

8    know, whatever the issues are resolved.

9    Q.   And are you aware whether or not Miss Jeffers was assigned

10   a relationship manager?

11   A.   Yes.

12   Q.   Do you know who that was?

13   A.   Um, Hope Washington was the most recent relationship

14   manager.

15   Q.   Do you know where Miss Washington works?

16   A.   I believe it's, uh -- I don't want to make any assumptions

17   on that.  I'm not sure the exact location, but I believe it's

18   Fort Washington, but I'm not definitely sure.  But it's in the

19   United States.

20   Q.   Where is Fort Washington?

21   A.   It's in Pennsylvania.

22   Q.   So when Ocwen is served with Miss Jeffers' lawsuit in

23   January, 2017 -- and you said that that coincided right when

24   you were on medical leave?

25   A.   Yes.

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                    II - 194

1    Q.  Do you think that had an impact on the time it took for

2    Ocwen to ultimately respond and make these account corrections

3    last summer?

4    A.  I think so.  I think so.  You know, as -- as I stated

5    before, you know, the -- the matter was assigned to me to

6    handle, and I've said that numerous times already.  Um, I was

7    ultimately in a position to where, um, you know, I was out of

8    the office for my medical issues, and I could not handle it at

9    that time.

10            And, ultimately, the case was assigned to someone

11   else.  Um, you know, these were, as I stated before, you know,

12   not -- not the simplest of issues to try to resolve, and it

13   took some time.  I eventually came back to Ocwen and was

14   reintroduced to, uh, the matters in the case, and, ultimately,

15   we got -- we got the matters taken care of.

16   Q.  And were there -- there were complicating factors you

17   believe that led to the delay here?

18   A.  Yes.  My medical condition being one of them, yeah.

19   Q.  Well, and why don't we -- there's been mention of that,

20   and I don't want to delve into your personal matters --

21   A.  Yeah.

22   Q.  -- Mr. Flannigan, but I understand it was a back issue.

23   Can you explain that for us?

24   A.  It was.  You know, again, I was out, um -- you know, it

25   started, like I said, right around this particular time.  Um,

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 195

1    I had a herniated disc that actually burst and was sitting on

2    my -- the nerve in my back, which paralyzed me basically from

3    the waist down.  And if you have ever had that happen, you

4    know it's no fun.  You basically can't move.  You don't want

5    to move.  You know, it literally forces you -- makes you

6    paralyzed.

7            Went in and was told that I would have to have a

8    delay in my surgery because, um, you know, well, that just is

9    what it is.  Sometimes you -- you know, depending on the

10   doctor's availability, that kind of thing happens.

11   Ultimately, um, I was able to have the surgery.  Again, before

12   then, you know -- you know, I was -- I was basically

13   paralyzed, but eventually had the surgery, went through weeks

14   and weeks of therapy, um, you know.

15           I was -- I was basically put in a wheelchair for a

16   while.  You know, ultimately, I was able to progress from that

17   to a walker, you know, and eventually I used a cane for a long

18   time.  As a matter of fact, I don't know if I used a cane

19   during the deposition or not.  I'm not sure.  But, again, not

20   to harp on that a whole lot, but I do believe that played a

21   big part of the delay in -- in, uh, you know, me or myself and

22   getting the account issues resolved.

23   Q.  And during your absence while you were out, at some point

24   Sony Prudent was assigned this file.

25   A.  Sony Prudent, another loan analyst with Ocwen, was

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR       Flannigan - Mr. Lopach              II - 196

1   assigned, yes.

2   Q.  And you had said that there were factors that may have

3   complicated this.  And could you just state -- we know

4   Mr. Prudent, you said, is a capable colleague --

5   A.  Sure.

6   Q.  -- but you have more knowledge about the history of this

7   loan.  But what other factors would -- do you believe kind of

8   impacted the -- the delay in making these corrections?

9   A.  Well, I mean -- and, again, there were -- it's my

10  understanding that during that time period there were

11  discussions of a possible modification.  You know, that, you

12  know, may have had something to do with it as well.  But, you

13  know, as I stated before, this account, um, had, you know,

14  various issues with the, um, with the escrow, with it being in

15  a bankruptcy, and with it being an adjustable rate mortgage

16  which, you know, complicated things.  And so --

17  Q.  How did the adjustable rate mortgage -- how could that

18  have complicated things?

19  A.  Well, again, with adjustable rate mortgages, you have a

20  variation of payments.  You know, your payments can go up and

21  down.  It's not as easy to go in and review to determine what,

22  you know, is actually, you know, needs to be posted on a

23  certain payment.  You know, those sorts of things will make

24  it -- will make it complicated.  Especially with a bankruptcy

25  where you have prepetition payments and postpetition payments,

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   those sorts of things.  Um, you know, and without getting into

2   a lot of detail about that, Sony would have had to take some

3   time to, you know, kind of find out what was going on and

4   ultimately, you know, decide what to do to get it fixed.

5   Q.  And then, Mr. Flannigan, you got involved at some point

6   during the spring of 2017; is that right?

7   A.  Yes.

8   Q.  And then on the heels of that is when the account

9   correction was made?

10  A.  Yes.

11  Q.  During this time -- so we think about 2017.  Um, from

12  January, 2017, up until the account correction is made, was

13  there any negative credit reporting that was happening on

14  Miss Jeffers' loan?

15  A.  No.

16  Q.  So was there -- if there was reporting from September,

17  2016, up through when the account correction was made in the

18  summer of 2017, do you have an understanding as to why some of

19  that would have appeared in the credit reporting?

20  A.  Well, that -- that is correct.  Now, what would have

21  happened is when the -- the loan was being reported as

22  information was suppressed, meaning there was no reporting

23  going to the credit bureau agencies.  And that's the way loans

24  get reported when, um, you know, a loan is in litigation, uh,

25  whether -- you know, whatever the status is on a loan that

17-CV-00025-WYD-KHR       Flannigan - Mr. Lopach                II - 198

1   causes it to be suppressed, this is what was happening on

2   Mrs. Jeffers' loan.

3            Now, when Mrs. Jeffers requested from the credit

4   bureau agencies to review her loan for a dispute, that's when

5   our credit team submits the ACDV forms back to the credit

6   bureau agencies for a report to be submitted.  And that's why

7   it would show the status of the loan on her credit report

8   during those months that the ACDVs were submitted.

9   Q.  Is that some sort of an override in the system?

10  A.  It does override the litigation flag, which, again,

11  suppresses any reporting on the -- on the account, um.  And so

12  when that information is submitted to the credit bureau

13  agencies, it takes the -- the suppression, so to speak, off of

14  the account and then reports to the credit bureau agencies as

15  required by law to show what Ocwen's system is actually

16  showing to the credit, uh -- the information that Ocwen is

17  showing in its database.

18           THE COURT:  Okay.  We are going to stop here for

19  lunch.  How much longer do you estimate you will be with your

20  examination?

21           MR. LOPACH:  I will go over my notes, Your Honor,

22  through the lunch break, but I don't think it will be long.

23           THE COURT:  What does that mean?

24           MR. LOPACH:  10 minutes maybe, 15 minutes.

25           THE COURT:  Okay.  I'm not putting a time limit.

17-CV-00025-WYD-KHR            Jury Trial                    II - 199

1    Sometimes when attorneys say it won't take a long time, it can

2    take hours or vice versa.  All right.  That's fine.

3          All right.  So we are going to be in recess.  I am

4    just going to say 1:30.  If I say 1:20, we'll start at 1:30

5    anyway.  So come back, and we will start promptly at 1:30 with

6    the continuation with the trial.  So the jury is excused.

7          I need to raise, I think, a legal comment to the

8    attorneys about another matter.  All right.

9       (Jury out at 12:03 p.m.)

10          THE COURT:  All right.  Have a seat, unless you're

11   already standing.  You can stay standing.

12          The witness can --

13          THE WITNESS:  Okay.  Thank you.

14          THE COURT:  -- return to counsel table, if you like.

15          So a couple things.  My law clerk and I have revised

16   the jury instructions so that they include a separate

17   instruction with the stipulation.  And what was 11A we will

18   have a separate instruction.  And we will pass those out.  So

19   when we have our charge conference, I want you to use what I

20   give you now.  So that's an update.

21          The defendant submitted a proposed additional

22   instruction.  I want to take that up at the charge conference

23   because I'm not sure it's necessary, but I need to hear more

24   evidence to figure it out.

25          MR. HOFFMAN:  I will also warn you, Your Honor, I

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    think that following the examination this afternoon or this

2    morning we are going to propose one more about telephone calls

3    because it is clearly not the law in the United States that

4    telephone calls are required in response to ACDVs from a

5    credit reporting agency to the consumer.  And we want to make

6    that clear because that issue has been raised, much like the

7    issue of the limitation of the dispute codes.

8            THE COURT:  Well, whatever you are going to submit,

9    again, I'm not going to make a ruling on it until I hear all

10   the evidence, including from the plaintiff.  But, anyway, just

11   submit that as soon as you can, and make sure Mr. Osborne gets

12   a copy.

13           Now, the final thing is I have carefully read the

14   *Daugherty* case.  And that's *Daugherty versus Ocwen Loan*

15   *Servicing*, 701 Federal Appendix 246.  That's the Fourth

16   Circuit not selected for official publication case.  And I see

17   some significant factual differences between what happened in

18   *Daugherty* and what appears to have happened here.

19           And I'm not making a ruling, but because of those

20   factual dissimilarities, I have a leaning right now, for

21   whatever it's worth -- I am telling you that so when you argue

22   this, you can try to convince me otherwise -- that even if

23   this is relevant that the prejudicial effect outweighs the

24   probative value within the meaning of 403, both for purposes

25   of using it for one -- as a 404(b) and for using it for any

1   other purpose.  Again, I'm not making a ruling, but I went

2   through this and made a lot of notes.

3       There are significant factual dissimilarities,

4   including the fact it was a bifurcated trial.  There was

5   expert testimony by the plaintiff.  Uh, the length of period

6   when there was a reporting error, instead of it being

7   9 months, was some 17 months.  You had a third party

8   aggressive that had wrote numerous letters to Equifax

9   concerning Mr. Daugherty's account.  And so there are a lot of

10  factual dissimilarities, and I'm having trouble understanding

11  how it is fair to the defendant to allow this case to be

12  mentioned because I don't think that the cases are comparable.

13      And then the final point is, on the punitive damages,

14  really the way that the -- the reason the judge allowed

15  Ocwen's 10-K was that there was supposed to be an Ocwen

16  corporate representative, Sandra Lyew, to testify, and she was

17  missing in action.  She wasn't excused by the court or wasn't

18  available to testify.  So the court was in a very difficult

19  position, and it allowed to be tendered as an exhibit this

20  10-K, but the 10-K was for the consolidated entity and wasn't

21  necessarily for Ocwen Loan Servicing.  So -- and that showed a

22  lot of money.

23      And then the final thing is, as you know, for

24  constitutional reasons, the Fourth Circuit reversed the

25  punitive damage award from 2.4 million to 600,000, and it was

17-CV-00025-WYD-KHR            Jury Trial                    II - 202

1    done in the form of a remittitur, which gave Ocwen the option

2    of either accepting the 600,000 or having a new trial on

3    damages.

4           Did Ocwen accept the $600,000 amount?

5           MR. HOFFMAN:  I don't know.

6           THE COURT:  I don't know that.  I just don't know

7    what happened.  But because of the factual dissimilarities, I

8    honestly think -- and we can talk about it in more detail --

9    that the prejudicial effect outweighs the probative value

10   under 403.  But, again, I'm not making a ruling, but I'm just

11   putting you, Mr. Osborne, on notice.  So you need to help me

12   better understand, in light of my understanding of the facts

13   of the case, how those facts can be used as the basis to allow

14   it to be used here, because here we are really talking about a

15   more limited issue.

16          There's no doubt about it.  The settlement agreement

17   required Ocwen to do something by a date certain.  It didn't

18   do it.  And the parties need to argue to the jury through

19   evidence -- present evidence and then ultimately through your

20   closing arguments as to what all that means.  And I express no

21   opinion about any of that because it's not my role to express

22   opinions on the facts.

23          But I view the facts here as being different from the

24   facts of *Daugherty*, and because of that, I'm concerned about

25   the fairness of allowing any reference to *Daugherty* to be made

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                    II - 203

1   as part of Mr. Flannigan's further examination by Mr. Osborne.

2   So, again, I'm not making a ruling, but signal when you want

3   to take that up, Mr. Osborne, and you just better go back and

4   reread this because I've got a lot of notes in this case about

5   the factual things that appear to be different in the

6   per curiam *Daugherty* opinion than from what I've heard so far

7   in this case.

8           All right.  We'll start again at 1:30.

9       (Proceedings recessed 12:09 p.m. to 1:37 p.m.,

10          resuming outside the presence of the jury.)

11      THE COURT:  All right.  Let's bring the jury back and

12  continue.

13      (Jury in at 1:39 p.m.)

14      THE COURT:  All right, you may be seated, and let's

15  continue with Mr. Flannigan's examination by his attorney.

16  BY MR. LOPACH:

17  Q.  Now it's good afternoon, right, Mr. Flannigan?

18  A.  Yes, it is.

19  Q.  We are going to be looking at Exhibit 6.  I know we are

20  all going to be dreaming about Exhibit 6 the next couple of

21  days, but if you could turn your attention back in the exhibit

22  notebook to 6, and I want to start on page 7 of 6.

23          And if you recall, this is an ACDV, Mr. Flannigan,

24  that Ocwen received on October 15, do you see that, of 2016?

25  A.  October 15, yes, I do see that.

1   Q.  Okay, great.  Now, I want to ask you a question about a

2   code that appears down at the lower left hand side, and let me

3   zoom in a little bit.  It is the SCC code.  Do you see that?

4   A.  Yes.

5   Q.  Okay.  And is there any information provided in the SCC

6   code on page 7?

7   A.  No.

8   Q.  What does SCC stand for here?

9   A.  Special comment code.  I may be butchering that, but,

10  uh --

11  Q.  Special comment code?

12  A.  Special comments code.  I apologize.

13  Q.  Okay.  And if you -- let's look one more time at the --

14  what is the date that Ocwen is reporting for the date of last

15  payment?

16  A.  July 8th, 2016.

17  Q.  Okay.  Now let's go to page 5 of Exhibit 6.  Again, this

18  was received October 25th, 2016.  And, again, I'm going to

19  draw your attention to the SCC code on this page.  And is

20  Ocwen reporting any information on page 5 regarding the SCC

21  code?

22  A.  No.

23  Q.  And let's look again at the date of last payment.  What is

24  Ocwen reporting here?

25  A.  July 8 -- July 8th, 2016.

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 205

1    Q.   Okay.  Now let's look at page 3 of Exhibit 6.  And this

2    was the third ACDV that Ocwen received.  This one came from

3    TransUnion.  This was received November 12th, 2016.  And let's

4    look again now at the SCC code.  Do you see something reported

5    on this ACDV for the SCC response?

6    A.   Yes.

7    Q.   What's -- what's -- what appears there?  What's Ocwen

8    reporting?

9    A.   Paying under a partial payment agreement.  That's what the

10   AC code means.

11   Q.   So AC means partial payment?

12   A.   Paying under a partial payment, yes.

13   Q.   Okay.  Now let's look at the date of last payment.  Is

14   there anything reported there?

15   A.   No.

16   Q.   All right.  And then let's look, then, finally at page 1

17   of 8 on Exhibit 6.  And this was the fourth and final ACDV

18   received on December 15th, 2016.  What's being reported on

19   this ACDV for the SCC code?

20   A.   An AC code.

21   Q.   And that again means?

22   A.   Paying under a partial payment agreement.

23   Q.   Is Ocwen reporting anything back to -- to Equifax with

24   respect to the date of last payment?

25   A.   No.

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                    II - 206

1    Q.  Okay.  So let's talk about this ACC [sic] code.  Is there

2    something that happened between ACDV number 2 and ACDV

3    number 3?

4    A.  Well, yeah, I guess the first thing that happens is that

5    the code changes, you know, from a blank to an AC under the

6    SCC code, which would lead me to believe that there were some

7    type of, um, arrangements, um, being done in order to try to

8    mitigate the losses on the account, basically to try to cure

9    the delinquency.

10        As I stated before, when a loan is in delinquency,

11   Ocwen's -- Ocwen looks at loans in delinquency and tries to

12   bring them current, as I mentioned before, whether it's a

13   modification, repayment plans, whatever the case may be.  So

14   this change in the -- in the SCC code means that, yeah,

15   there's something.  Maybe there's a repayment plan, maybe

16   there's a modification going on, but Ocwen is working to try

17   to get the dispute -- or the -- the delinquency cured.

18   Q.  Okay.  So let's look -- I'm going to refer you to

19   Exhibit A.  I'm going to put this up on the screen.  This is

20   stipulated.  We are going to look at page 22 of Exhibit A, and

21   I wanted to draw your attention -- what is the date that

22   appears here?

23   A.  September 26, 2016.

24   Q.  Okay.  And then let's look in the comments side.  What

25   does this reference say that's highlighted?

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                    II - 207

1   A.  It says that a "HAMP Streamline mod approved."

2   Q.  What's a HAMP streamline mod?

3   A.  A HAMP modification is basically a modification that's

4   offered by the federal government.  It stands for home

5   affordable modification plan.  And modifications that are

6   offered by the government are basically, you know, mods that

7   the borrowers can be set up on and, like I said, in order to

8   bring the loans current.  That's basically what it is.

9   Q.  Okay.  And so is it your understanding that at some point

10  in time, looks like in September, was Miss Jeffers approved

11  for this HAMP program?

12  A.  Yes.

13  Q.  And then let's look at Exhibit A again.  This is page 35

14  of 117.  And do you see the date that's highlighted here?

15  A.  Yes.

16  Q.  What date is that?

17  A.  It's November 1st, 2016.  '16.

18  Q.  Let's go over to the comments code.  See if I can blow

19  this up a little bit.  What's -- what language is highlighted

20  here, Mr. Flannigan?

21  A.  It says "Please note that the payment is under a

22  pipe-line."  Uh, I can barely make that next word out.  I'm

23  not sure what that next word says.  Can you clear it a little

24  bit?  Yeah.  "Once payment is reflecting in transaction

25  history, the payment" will code -- "the payment code will be

17-CV-00025-WYD-KHR       Flannigan - Mr. Lopach              II - 208

1   updated on the account."

2   Q.   Okay.  And then let's look here on Exhibit A.  This is

3   page 47.  What's the date on this entry?

4   A.   November 24th, 2016.

5   Q.   Okay.  And is there a name to the right that's

6   highlighted.

7   A.   Yes.  Bindu.

8   Q.   Have we seen that name before?

9   A.   Yes.

10  Q.   Who is Bindu?

11  A.   Bindu is one of the persons that works in our credit

12  verifications team.

13  Q.   Does that indicate that this is her note on this comments

14  log?

15  A.   Yes.

16  Q.   Okay.  Now, I have highlighted something that says special

17  comment.  Can you read what that comment is.

18  A.   Yes.  It says AC, paying under a partial payment

19  agreement.

20  Q.   Okay.  And AC, is that the code that we were looking at

21  earlier in the two later ACDVs?

22  A.   That's correct.

23  Q.   And that was being reported in the SCC section?

24  A.   That's correct.

25  Q.   Okay.  So is it your understanding that at some point

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                II - 209

1    between ACDV number 2 response and response number 3 that

2    Miss Jeffers was put into a HAMP trial program?

3    A.   That is my understanding, yes, to try to cure the

4    delinquency on the loan, yes.

5    Q.   Okay.  And what would have that -- what would that mean

6    then?  If we are looking back at Exhibit 6 and if we're

7    looking -- because there were some questions earlier about the

8    date of last payment that was reflected on July 8th, 2016.

9    What would that mean about why these dates in July -- why

10   Ocwen is reporting this July 8th date back in this ACDV

11   response?

12   A.   Well, that would have been the date that would have been

13   considered the last payment that would have been applied as a

14   regular monthly payment.  And so that's -- that's the date of

15   the regular last monthly payment that would have been applied.

16   All the other payments that were applied after that date would

17   have been considered trial payments or partial payments to go

18   towards a plan or modification to bring the loan current.

19   Q.   Now, and this says July, but are you familiar with the

20   term "last regular spread payment"?

21   A.   Yes.

22   Q.   Okay.  So if this says July 8th, 2016, is that referring

23   to, um -- I know that the -- at this point the scheduled

24   payment Ocwen is reporting is 1,541.

25   A.   Yes.

1    Q.  But the actual payment it received was 1200.  Do you see

2    that?

3    A.  I do see that, yes.

4    Q.  Okay.  So in this reporting situation, how is Ocwen -- how

5    was the fact that the payment -- the actual payment received,

6    it being less than the scheduled payment -- which we thought

7    was the payment at the time.  We understand there was an error

8    that was made on the front end where this account was not

9    corrected.  But how does that factor in with respect to the

10   last regular spread payment?

11   A.  You mean the 1541, or are you referring to the 1200?

12   Q.  I just want to understand -- I guess my question is:  When

13   we are reporting that on July 8, 2016, that that was the last

14   regular spread payment -- is that correct?

15   A.  That's correct.

16   Q.  Okay.  So we had to have enough money in the account to

17   equal 1541?

18   A.  Correct.

19   Q.  And then it's counted as the regular last payment date?

20   A.  Correct.

21   Q.  Okay.  And based upon the -- our record, our report in

22   Exhibit 6 that July 8th of 2016 was the last regular spread

23   payment --

24   A.  That's correct.

25   Q.  -- that Miss Jeffers had made, do you believe Ocwen's

1  reporting properly on this ACDV back to the credit bureaus?

2  A.  That's correct.  Based on the information that was in

3  Ocwen's database, um, with the information that was -- with

4  the loan being set up with a streamline HAMP modification to

5  try to bring the borrower's loan current to consider the

6  payments that were received after July as partial payments for

7  trial payment, the information that's been reported in the

8  ACDVs by the credit ops team was correct.

9  Q.  And would that be the same for page, uh, 1 of 8, which

10  would be the last ACDV that Ocwen made in -- received in

11  December and made in early January of 2017?

12  A.  That's correct.

13  Q.  Okay.  Based upon that information, do you believe that

14  the investigation and the report that Ocwen's credit team made

15  on this account was proper?

16  A.  Yes.

17  Q.  Do you believe that their investigation was reasonable?

18  A.  Yes.

19  Q.  You had some questions earlier today, Mr. Flannigan, about

20  an LP flag.  Do you remember that?

21  A.  Yes.

22  Q.  If an LP flag is in place on a loan, as it was on

23  Miss Jeffers' loan, what impact does that have on Ocwen's

24  communications with the borrower?

25  A.  Well, it limits the communication.  Um, you know, Ocwen

17-CV-00025-WYD-KHR        Flannigan - Mr. Lopach                    II - 212

 1  can -- can no longer contact the borrower.  But, yeah, it does

 2  limit the communication.

 3  Q.  When the LP flag is up, can Ocwen pick up the phone and

 4  call Miss Jeffers?

 5  A.  No.

 6  Q.  So the questions we had earlier about why didn't Ocwen

 7  pick up the phone, is that because the LP flag was raised?

 8  A.  Yes.  And I think I explained that to Mr. Osborne, but

 9  maybe I wasn't clear on that point, but, yes, that is the

10  true -- that is the case.

11  Q.  I have one last question, Mr. Flannigan.  And, you know,

12  we've spent a lot of time the last couple days talking about,

13  uh, you know, Miss Jeffers' claims and Ocwen's response and an

14  explanation to the jury as to what happened here, but, you

15  know, I just want to end with, you know, in your own words on

16  your behalf and on behalf of Ocwen, what -- just briefly,

17  what -- what do you think happened here?

18  A.  Um, you know, again, you know, as I stated from -- from

19  the onset, there were some mistakes made on the account.  It

20  is clear that the, uh -- all the terms of the settlement

21  agreement were not implemented at the time within the

22  deadline, within the initial 30 days, um, because of several

23  reasons, obvious reasons.  Because of mistakes that were made,

24  um, obvious medical reasons, there was a delay in the

25  correction of the account.  However, I do believe that Ocwen

1    made its -- all the corrections on the account and ultimately

2    made the fix on the account in the spring of '17.

3              MR. LOPACH:  Thank you.  I have no further questions,

4    Your Honor.

5              THE COURT:  All right.  Let's have the redirect.

6                           **REDIRECT EXAMINATION**

7    BY MR. OSBORNE:

8    Q.  First of all, sir, with respect to the HAMP program,

9    Miss Jeffers never applied for a HAMP program with Ocwen;

10   right?

11   A.  That's correct.  And as I stated, when loans are

12   delinquent, you know, Ocwen, you know, proactively, um, you

13   know, makes attempts to try to take those loans out of

14   delinquency.

15   Q.  The way that the HAMP program works is a lender sends a

16   thick package to the borrower, and the borrower fills out a

17   HAMP application with all kinds of supporting documents.  And

18   then they send it back, and then they make three trial period

19   plan payments.  Right?

20   A.  I believe that process is a little bit different for a

21   streamline HAMP modification, but, um, at this particular

22   point, you know, I'm -- I'm not a hundred percent sure.  But

23   you are correct; with a normal HAMP, there is a package that's

24   sent to the borrower.

25   Q.  And, in fact, Miss Jeffers never sent any package or

1   request to do a HAMP modification to Ocwen at any point after

2   the settlement agreement; right?

3   A.   That's correct.

4   Q.   And it would make no sense whatsoever for her to do that

5   because she already has a settlement agreement saying she is

6   current; is that correct?

7   A.   And as I explained before, um, if, in fact, those

8   settlement terms had been put in place, there would have been

9   no need for a -- you know, Ocwen to attempt to try to bring

10  the loan current.  That's, you know, been said numerous times.

11  However, at the time when the HAMP modification -- the loss

12  mitigation efforts were being made, the loan was not brought

13  current.  That is correct.

14  Q.   You talked about a litigation pending flag.  That is only

15  supposed to be on the account while active litigation is

16  actually pending; right?

17  A.   While litigation is -- is going on, that's right.

18  Q.   And, in fact, the first lawsuit was dismissed a few days

19  after the settlement agreement in September of 2016.  Isn't

20  that a fact?

21  A.   The first lawsuit, um, was dismissed --

22  Q.   That led to the settlement agreement.

23  A.   That was dismissed, um, I believe -- I'm not sure of the

24  date.  Well, it did lead to the settlement agreement, so that

25  would have been, yeah, sometime in -- in July -- I'm sorry --

1    in --

2    Q.   September.

3    A.   -- September, yeah, 2016.

4    Q.   Right.  So in November of 2016, why is there still a

5    litigation flag on the account if the lawsuit was already

6    dismissed?

7    A.   Right.  And as I've been explaining, the terms, the full

8    settlement package had not been closed out yet.  All the terms

9    of the settlement had not been implemented and applied to the

10   loan.  If, in fact, that were the case, the litigation would

11   have been closed out, the loan would have been brought

12   current, the LP flag would have been lowered.

13   Q.   And once the LP flag was lowered, Ocwen could have

14   absolutely picked up the phone and called Valerie Jeffers;

15   isn't that true?

16   A.   That's correct.

17   Q.   Even with an LP flag, Ocwen could have called me and

18   talked to me instead of her; isn't that true?

19   A.   Right.  And, again, I'm not denying the fact that there

20   were mistakes made, but, again, the LP flag was on the

21   account, which would have led Ocwen employees not to contact

22   Miss Jeffers.

23   Q.   All right.  I'm going to ask you some questions about

24   Exhibit B really briefly.  The first time Ocwen -- to fix the

25   credit reporting in July of 2017 --

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 216

1              THE REPORTER:  I'm sorry.  I couldn't hear part of

2    your question.  "The first time Ocwen --"

3    BY MR. OSBORNE:

4    Q.  Okay.  So the first time, July of 2017, Ocwen submitted

5    the request to the credit bureaus to fix it; right?

6    A.  July, yes, sir.

7              MR. OSBORNE:  Robb, can I display the Elmo, please?

8              COURTROOM DEPUTY:  It's on.

9              MR. OSBORNE:  It's on?

10   BY MR. OSBORNE:

11   Q.  So the monthly payment was wrong; right?  1541.

12   A.  Right.

13   Q.  That's the real reason Ocwen had to submit a second one in

14   August of 2017; right?

15   A.  It -- it did submit this one with a scheduled monthly

16   payment of 1541 with a due date of June, but, yeah, it

17   ultimately did change the payment here, um --

18   Q.  If we look at page 2 --

19   A.  Yeah.

20   Q.  -- the payment amount changed to 1235; right?

21   A.  Correct.

22   Q.  So you didn't just change it the next month to give her

23   another monthly payment --

24   A.  Right.

25   Q.  -- like you said.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 217

1    A.   There was a correction to correct the monthly payment as

2    well.   That's right.

3    Q.   You testified that at no point in time since Ocwen has had

4    the loan did they commence a foreclosure proceeding; true?

5    A.   Correct.

6    Q.   Isn't it a fact that in 2013 Ocwen specifically requested

7    permission from Miss Jeffers' bankruptcy judge to foreclose?

8    A.   I don't know if that's considered a, um, foreclosure

9    proceeding, because in order to -- to complete a foreclosure

10   proceeding, I think that a foreclosure proceeding has to be

11   filed, is my understanding.

12   Q.   Well --

13   A.   To ask -- to ask that foreclosure proceedings be or that a

14   loan be removed from a bankruptcy to begin foreclosure, I

15   don't think that actually starts a, um, a foreclosure

16   proceeding.

17         Now, to answer your question, I guess the -- first of

18   all, the answer would be I don't know the answer to that, but

19   I'm not sure if that actually means that foreclosure

20   proceedings actually begin at that point.

21   Q.   Well, let me ask you this:   When -- just generally

22   speaking, when one of your borrowers is in bankruptcy, you

23   can't just foreclose.   You have to go get what's called relief

24   from the automatic stay, which means you have to ask the

25   bankruptcy judge for permission to foreclose.   Right?

1   A.  In order to, yeah, be out of the bankruptcy, that's

2   correct.

3   Q.  And isn't it a fact that Ocwen did that in June of 2013?

4   They asked her judge for permission to get relief from the

5   automatic stay, and the judge said no.  Isn't that true?

6        MR. LOPACH:  Objection:  foundation.  I think it's

7   been asked and answered.

8        THE COURT:  Well, I'm not sure it has been answered.

9   Overruled.

10  A.  I don't know the answer to that.

11  BY MR. OSBORNE:

12  Q.  All right.  Sir, I'm going to ask that you take a look at

13  Exhibit 26.

14        MR. OSBORNE:  And this is not stipulated, if we can

15  turn the feed off.  And I'm going to have to show it to you

16  electronically because it's massive.

17  A.  Did you say 26?

18        THE COURT:  There's nothing in the book under 26.

19        MR. OSBORNE:  Yes, Your Honor.  I just have it

20  electronically.

21        THE COURT:  All right.

22        MR. OSBORNE:  Which we're going to display here.

23        THE COURT:  What's the exhibit called?  What is the

24  exhibit?

25        MR. OSBORNE:  It's Ocwen's loan servicing notes.

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne        II - 219

```
 1              THE COURT:  How come I don't have a paper copy?  Oh,
 2    it's long.
 3              MR. OSBORNE:  It's -- well, it's 370 pages.
 4              THE COURT:  That means it's long.
 5              MR. OSBORNE:  Yes.
 6              Hey, Robb, could I get the feed to the laptop?
 7              COURTROOM DEPUTY:  It's on the laptop.  The jury is
 8    blank.
 9              MR. NOBEL:  Okay.
10              COURTROOM DEPUTY:  Is there a copy in the notebook
11    for the witness?
12              MR. OSBORNE:  No.  We are just using electronic.
13              COURTROOM DEPUTY:  We will need a paper copy as well.
14              MR. OSBORNE:  I can get you one.
15    BY MR. OSBORNE:
16    Q.  Sir, isn't it true that on June 28, 2013, Ocwen filed a
17    motion for relief from stay in Miss Jeffers' bankruptcy case?
18              THE COURT:  Wait a minute.  This is not in evidence.
19    So you can use this, if you choose, to refresh his
20    recollection, but that's all you can use it for, which means
21    he needs to look at it.  You need to ask him does that refresh
22    his recollection.  We need to take the exhibit down if his
23    recollection is refreshed, and you can re-ask the underlying
24    question.
25              But I'm not going to let you have him read this
```

Julie H. Thomas, RMR, CRR                                (303)296-3056

1    because it's not in evidence, unless it's stipulated to.

2            MR. LOPACH:  No, it's not stipulated, Your Honor.  In

3    order to refresh recollection, the witness has to have a prior

4    knowledge of this.  And he's already testified he has no prior

5    knowledge.

6            THE COURT:  Well, I understand that, but if this can

7    be used -- it can be used to refresh his recollection.  If it

8    doesn't refresh his recollection, then he can say that.  All

9    right.  So that's all I'm going to let him do.  So he needs to

10   read this document silently.  And when he is finished reading

11   it, he needs to tell you that, Mr. Osborne, and you need to

12   take it down from the screen, and you need to re-ask the

13   underlying question.

14           MR. OSBORNE:  Yes, Your Honor.

15   A.  Okay.  I've read it, and, no, it doesn't refresh my

16   recollection.

17   BY MR. OSBORNE:

18   Q.  All right.  I'll move on.

19           Can you please turn to Exhibit 6, page 2.

20   A.  Okay.

21           All right.  I am there.

22   Q.  All right.  And I've circled where it says "Images

23   Information," "Associated Images:  Yes."  Right?

24   A.  I do see that.

25   Q.  And what that means is that when Equifax sent to you this

1   ACDV, they had an attachment to this ACDV; right?

2   A.  I believe that's correct.

3   Q.  All right.  So you got more than just the dispute code.

4   You also got an attachment; right?

5   A.  I believe so.

6   Q.  And I have been asking you the whole time to produce those

7   attachments.  You have never produced them in this case; isn't

8   that true?

9           MR. LOPACH:  Objection: argumentative.  There are

10   avenues for opposing counsel -- if he thinks something wasn't

11   produced, he has rules.  He can move to compel.  He is

12   bringing up a discovery issue well after it is relevant.  I

13   mean --

14           MR. OSBORNE:  Well, it goes to the credibility, Your

15   Honor.

16           THE COURT:  Well, hold on.  Hold on.  The question is

17   misleading and argumentative because it's not this witness

18   that produces documents.  It's the party.  So I sustain the

19   objection to the question as phrased.

20   BY MR. OSBORNE:

21   Q.  Let me try to rephrase it.  As far as you know, sir, Ocwen

22   has not provided a copy of whatever the attachment was that

23   went with this ACDV; right?

24   A.  I'm not sure.

25   Q.  It's not in any of the exhibit notebooks in front of you;

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 222

1    right?

2    A.  I'm not sure.

3    Q.  I think you sort of implied maybe that Miss Jeffers should

4    have used the word "litigation" in her dispute letters to the

5    credit bureaus.  Is that true?

6    A.  I think I implied that the litigation code, which would

7    have been I think a 040, um, could have been applied to the

8    ACDV forms.

9    Q.  Well, you do understand Miss Jeffers doesn't get to choose

10   the code; right?  That's actually done by the credit bureaus

11   themselves.

12   A.  Right.  And -- yeah.  And so with that being said, yeah, I

13   think the mention of litigation would have -- would have

14   prompted a 040 code.

15   Q.  But, in any event, regardless of what code was on there,

16   when Bindu did her first investigation, she learned the loan

17   had a litigation flag already; right?

18   A.  Right.  Yeah.  And it's not just about a litigation flag,

19   an LP flag; it's about what's being presented in the ACDVs.

20   Q.  Well, at a minimum, if you saw a litigation flag, you know

21   that there's been some kind of prior litigation; right?

22   A.  Right.  I mean, but, again, that doesn't prompt a credit

23   reporting team member to go in and question the litigation.

24   Um, as I -- as I mentioned before, what would prompt them to

25   review the loan for litigation would be a specific, um, code

1    on the ACDV form.

2    Q.  So just because a code would say "litigation," that would

3    prompt Bindu to pick up the phone?  That's your testimony?

4    A.  Pick up the -- I don't know what the --

5    Q.  Pick up the phone and call the legal department and see

6    what's going on with this?

7    A.  Contact the other department.  I'm not sure if "pick up

8    the phone" is correct there, but, yeah -- the information

9    would have needed to be included in the ACDV form.  That's

10   correct.

11   Q.  And I just want to confirm.  That's just what Ocwen's

12   policies require; right?

13   A.  Well, you know, that, um -- I'm not sure if that -- to be

14   honest with you, I'm not sure if that's a law, but I do know

15   that that's Ocwen's procedures because it has to be a

16   direct -- it has to be a direct contact or sent directly to

17   Ocwen in order for there to be, um, you know -- Ocwen to --

18   well, I guess I'm getting the two mixed up here.

19          If, in fact, the borrower submitted information

20   regarding litigation to the credit bureau agencies, the credit

21   bureau agencies would have noted the ACDV form with a 040

22   code, which mentions litigation.  Ocwen would have then

23   responded to the litigation -- our credit ops team would have

24   contacted the litigation team in order to respond to the

25   litigation.

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 224

1    Q.  And what specific information do you contend Miss Jeffers

2    should have given to the credit bureaus?

3    A.  That there's a dispute with the litigation or that there's

4    some dispute with the settlement agreement.

5    Q.  So just that phrase exactly?

6    A.  I believe that -- that would have been enough information

7    to prompt a code 010, which would have been settlement

8    agreement dispute, or a 040 litigation dispute, yes.

9    Q.  But you would acknowledge that under the settlement, she

10   couldn't go into any specific details and say one of the terms

11   of the agreement was that Ocwen was supposed to fix all the

12   credit reporting through September 2016; right?

13   A.  Right.  Just the mention of an existence of a settlement

14   agreement, yeah, without explaining the terms of it would have

15   been enough, yes.

16   Q.  You testified that this was an isolated incident; right?

17   A.  To the best of my knowledge, yes, mm-hmm.

18          MR. OSBORNE:  Your Honor, may we approach and discuss

19   the evidentiary issue?

20          THE COURT:  No.  We are going to have the jury leave,

21   and I am going to stay up here, and you are going to stay out

22   there.

23          So there's a legal matter that I need to take up with

24   counsel, so we are going to take a short break.  So stay back

25   in the jury room, please.

1      (Jury out at 2:09 p.m.)

2          THE COURT:  All right.  Let me hear some argument in

3   support of something.  I'm not sure what the something is,

4   although I think I know what it is.  Go ahead.

5          MR. OSBORNE:  Yes, Your Honor.  Well, at this time we

6   would request the Court's permission to ask the witness

7   questions about the *Daugherty* case versus Ocwen, which we

8   discussed briefly earlier.  I think it's relevant under 404(b)

9   to disprove the claims of mistake and unintentional conduct,

10  and I don't think it's too prejudicial under 403.

11         Although, you know, there are differences in the

12  facts between the cases, there are a lot of common themes,

13  too.  And the common themes are that there was inaccurate

14  information reported.  There was multiple disputes in both

15  cases.  In both cases, Ocwen did computerized a pro forma

16  cursory investigation of merely matching data in its own

17  computer versus what the credit bureaus had on file.  And in

18  both cases Ocwen didn't do anything else other than that to

19  investigate.  And so from a broad perspective, the cases are

20  substantially similar.

21         Now, yes, there are differences in maybe why the

22  information was inaccurate, sure, and there was also more

23  disputes filed by Mr. *Daugherty*.  I think he did 21, and

24  Miss Jeffers did four.  But I think what the evidence has

25  demonstrated is that it wouldn't have mattered if there was

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                    II - 226

1    four disputes or 400 disputes.  The response would have been

2    exactly the same every single time.  And so based upon that, I

3    would request that the Court allow us to go into that line of

4    questioning.

5              THE COURT:  All right.  Response from the defendant.

6              MR. LOPACH:  Your Honor, I believe that you covered a

7    lot of the issues that we had already raised in our briefing

8    on the dissimilarities between the *Daugherty* case and the case

9    here.  We had four disputes here that covered a short span of

10   approximately two months.  In *Daugherty* there were dozens of

11   disputes that were prolonged almost a year.

12             In this case I think really the threshold inquiry is

13   that, you know, this case involves a settlement agreement.  We

14   had a contract.  Um, there's a claim for breach of contract,

15   and it's really the main focus.  And the investigation itself

16   was just that short three-week period from when the ACDV was

17   received and when our response went out.  And I think trying

18   to conflate the situation in *Daugherty* with what happened

19   here, which is really a much more discrete issue, um, it does

20   not meet the test the Tenth Circuit has set out for 404.

21             And I think that, you know, almost as importantly is

22   that under 403 the evidence that the plaintiff seeks to

23   introduce on this issue is highly prejudicial.  And this case

24   should be decided on the facts and circumstances that

25   Miss Jeffers faced.  And I think what the -- what the

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                II - 227

1    plaintiff is trying to do is just prejudicially expand the

2    scope and try to impugn the defendant with something that

3    happened to another person under different circumstances at a

4    different time.  And so I think that under 404 and 403, the

5    proposed evidence is -- should not be allowed.

6           THE COURT:  All right.  Mr. Osborne, do you have any

7    reply to what counsel has said in response to your initial

8    remarks?

9           MR. OSBORNE:  Nothing further.

10          THE COURT:  All right.  So let's talk about a couple

11   things.  So plaintiff seeks to admit, allegedly, information

12   from the *Daugherty versus Ocwen* case that was originally tried

13   in United States District Court for the Southern District of

14   West Virginia and then was appealed to the Fourth Circuit

15   Court of Appeals.  The only case decision that I have is the

16   Fourth Circuit opinion.  I don't have anything that tells

17   me -- for example, the transcript -- what happened at trial

18   and all the nuances that occurred.

19          I can draw an inference that given the difference in

20   issues between that case and this case, that that trial lasted

21   a lot longer.  I have no ability to evaluate the capabilities

22   of the advocates for either side.  And obviously I didn't hear

23   any testimony.  I haven't read any testimony.  I don't know

24   anything about the credibility of most of the witnesses.

25          But what I do know is that the underlying facts that

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                II - 228

1   gave rise to Mr. Daugherty's complaint under the Fair Credit

2   Reporting Act are different, significantly different, from the

3   facts that underlie this case.

4        All right.  So let's talk about what *Daugherty* stands

5   for and what it doesn't stand for, and then I'll come back to

6   the rules.  So in July 1999 David Daugherty and his wife

7   purchased a home in Vienna, West Virginia.  And what I'm doing

8   is I am paraphrasing, I'm not going to read all of this, from

9   the Fourth Circuit's opinion decided on July 26, 2017 and

10  reported at 701 Fed. App. 246.  This case was not selected for

11  publication in West's Federal Reporter.

12       But, in any event, in July 1999 Daugherty and his

13  wife purchased a home in Vienna, West Virginia, which was

14  financed through a note secured by a mortgage on the property.

15  Terms of the note required that the Daughertys make monthly

16  payments for 15 years followed by an almost $83,000 balloon

17  payment, which was due on July 26, 2014.

18       Ocwen, and it's the same Ocwen entity that's involved

19  in this case, being Ocwen Loan Servicing, LLC, acquired the

20  Daughertys' note in November 2011.  When Ocwen acquired the

21  note, the Daughertys were delinquent in making their monthly

22  payments.  By February of 2012 the total delinquency on the

23  account was $6,128.39, and Ocwen initiated foreclosure

24  proceedings on the Daughertys' property in April 2012.

25       Ocwen accurately reported to certain consumer credit

1    reporting agencies, including Equifax, that Daughertys'

2    account was past due and in foreclosure proceedings.  But

3    within one month following Ocwen's report, the Daughertys used

4    Mrs. Daugherty's retirement savings to pay the past due

5    balance, and their payment plan was reinstated.

6          Now, the inaccuracies in the credit reports that

7    formed the basis for the lawsuit dealt with the status of

8    Mr. Daugherty's credit and did not involve his wife's credit

9    status.  At some point during the Daughertys' period of

10   arrearages, Ocwen discovered that its predecessor in interest

11   had conveyed to the reporting agencies an incorrect loan

12   origination date for the Daughertys' loan.

13         To correct this error, starting in April 2012, Ocwen

14   submitted information to the reporting agency that correctly

15   reflected the accurate loan origination date of July 1999.

16   However, Equifax misinterpreted Ocwen's corrected reports as

17   referencing a separate account and created a new entry or

18   tradeline in Mr. Daugherty's credit report.  As a result,

19   Equifax began reporting two separate tradelines for the same

20   loan account, and parenthetically there should have only been

21   one.  And that pattern really led to all the issues the

22   Daughertys raised.

23         So continuing on here.  After the Daughertys cured

24   the loan deficiency and had their payment plan reinstated,

25   Ocwen informed the reporting agencies that the loan account

17-CV-00025-WYD-KHR      Flannigan - Mr. Osborne                II - 230

 1    was no longer past due or in foreclosure.  Equifax, however,

 2    updated only one of the two tradelines, and the uncorrected

 3    tradeline continued to reflect that an account in

 4    Mr. Daugherty's name was in foreclosure.  Therefore, from

 5    April, 2012, through July, 2014, a span of some 17 months, I

 6    think that's what the case said later, Equifax incorrectly

 7    reported an account opened in August 1999 that was over

 8    120 days past due and in foreclosure and at the same time

 9    correctly reported an account opened in July 1999 that was

10    current and in good standing.

11            So I want to stop there.  So the underlying facts are

12    what I have just read and summarized.  In this case there is

13    no dispute that Miss Jeffers and Ocwen entered into a

14    settlement agreement in September of 2016, and it required

15    three things to happen.  That a payment be made to

16    Miss Jeffers in the amount of $80,000.  That payment was

17    timely made.  But what wasn't timely done were corrections to

18    two things.  One, the loan was supposed to be brought current,

19    and, further, the credit was to be corrected.  Neither of

20    those things happened until July of 2017.  And we're talking

21    about some eight months later, if my math is right, eight

22    months or nine months.  Let's see, July -- no, nine months.

23    It's nine months, nine months later.  So Ocwen was nine months

24    late in correcting the two things that were caused by the

25    settlement agreement.

1        But those underlying facts are much, much different

2   from the underlying facts here.  And then there are some other

3   facts that also complicate the *Daugherty* case that aren't

4   involved here.

5        So even though there were some other things that the

6   Daughertys did, including attempting to get a refinancing when

7   they discovered that the Equifax credit report continued to

8   refer to two loans when there was really only one and that one

9   was current, Mr. Daugherty in March of 2013 hired a company

10  known as Aggressive Credit Repair, Aggressive, to help correct

11  the errors in his credit report.  So from March 2013 through

12  July 2014, Aggressive wrote numerous letters to Equifax

13  concerning Mr. Daugherty's account with Ocwen.

14       Now, the trial judge ultimately did not allow the

15  admission of those letters because he concluded that that's

16  not something that Mr. Daugherty would have known about

17  necessarily, but, anyway, he didn't even let those in.  But,

18  again, that's another complicating factor.

19       So in March 2013 Ocwen received the first two dispute

20  verification requests which contained both 001 and 007 codes

21  only one day after replying to Mr. Daugherty's direct

22  correspondence concerning the same disputed information.  Both

23  dispute verification requests referenced the same account

24  number.  However, one of those requests referenced an

25  incorrect current balance, past due balance, late payment

17-CV-00025-WYD-KHR       Flannigan - Mr. Osborne                II - 232

1   date, and actual payment amount.  This incorrect information

2   was accompanied by additional incorrect notations,

3   "foreclosure proceedings started," and account 120 days past

4   the due date.  Ocwen did not notice the errors or the

5   inconsistencies between the two disputed verification requests

6   and responded to Equifax that the information submitted was

7   "verified as reported."

8          All right.  Now, what happened here?  There was never

9   a foreclosure proceeding.  And what I've just read from the

10  *Daugherty* opinion is not -- there's not a comparable fact in

11  the fact pattern related to Miss Jeffers' claims.

12         All right.  From March 23rd through July -- strike.

13         From March, 2013 -- excuse me -- through July, 2014,

14  Ocwen received from Equifax a total of 23 dispute verification

15  requests, 11 of which had included erroneous information about

16  Mr. Daugherty's account.  And then the appellate opinion cites

17  a charge where Ocwen continued to report to Equifax as correct

18  the erroneous information concerning Mr. Daugherty's loan

19  account.  And this shows numerous dates, and it's far more

20  extensive and more involved and has different issues than

21  what's involved in this case.

22         In nine of the dispute verification requests

23  submitted by Equifax, Ocwen ultimately verified as correct

24  information that was incorrect.  In the remaining two dispute

25  verification requests listing erroneous information, Ocwen

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 233

 1   updated the account status from account 120 days past the due

 2   date to current account but did not correct erroneous entries

 3   in the same account stating five or more payments past due and

 4   foreclosure proceedings started.

 5          All right.  So how does that compare to the facts

 6   here?  There's no dispute that Ocwen failed to implement two

 7   terms of the settlement.  This witness has explained his

 8   version of all of that, and Miss Jeffers, presumably, will

 9   talk about -- Jeffers will talk about its impact on her.  But,

10   again, the facts that we're dealing with here are far

11   different than what occurred in the *Daugherty* case.

12          The next thing that differentiates the cases is the

13   following:  The district court conducted a bifurcated trial.

14   The first phase of the trial dealt with issues of liability,

15   compensatory damages, and whether any violation of the FCRA by

16   Ocwen was willful.  The second phase of the trial resolved the

17   question of punitive damages.

18          When *Daugherty* rested its case during the first phase

19   of the trial, Ocwen moved for judgment as a matter of law.

20   The district court granted Ocwen's motion with respect to

21   economic damages but denied the rest of the motion and

22   submitted *Daugherty*'s remaining claim to the jury.  The jury

23   found that Ocwen had violated the FCRA, that the violation was

24   willful, and that the violation caused *Daugherty* $6,128.39 in

25   noneconomic damages.

1              During the punitive damages phase of trial, as

2     evidence of Ocwen's wealth, the district court admitted

3     evidence of a public filing by Ocwen Financial Corporation,

4     parent company.  The jury returned a punitive damages award of

5     2.5 million.

6              All right.  Now, how does that differ from this

7     trial?  This is not a bifurcated trial.  It's one trial, and

8     the issues of either statutory or actual damages will be

9     presented to the jury along with -- you haven't seen the

10    verdict form, but I have, but it's going to require the jury

11    to answer the question of whether or not they find that

12    there's been a violation of the FCRA using the legal test

13    that's supported by the law, and then there will be a separate

14    finding as to whether or not they find the conduct willful.

15             Now, there may be some motion from the defendant at

16    the end of the trial to get rid of willfulness, and I will

17    have to rule on that, but it seems to me that until there's a

18    motion filed and I do something differently, the parties

19    should assume that the jury will consider willfulness.  Well,

20    the willfulness consideration in this case is a whole lot

21    different than what was considered in *Daugherty*.

22             All right.  Let's talk about the punitive damages.

23    The only reason the judge allowed the 10-K to come in about

24    Ocwen's financial is because during the punitive damage phase

25    of the bifurcated trial, Daugherty attempted to recall Ocwen's

1  corporate representative, Sandra Lyew -- it's L-y-e-w -- to

2  testify about Ocwen's financial worth.  Although the district

3  court had not excused Lyew as a witness, she already had left

4  West Virginia and was unavailable to provide further

5  testimony.  As a substitute for Lyew's testimony, Daugherty

6  proffered the 10-K of Ocwen's publicly traded parent company,

7  OFC, which contained a consolidated balance sheet of OFC and

8  its subsidiaries, including Ocwen.  Although Ocwen objected

9  that the document had not been previously disclosed, the

10  district court overruled that.

11         Now, in this case Mr. Osborne asked me to take

12  judicial notice of Ocwen Financial's 10-K, and I said I

13  wouldn't do it.  And one of the reasons is I don't know the

14  correlation between Ocwen Financial, Ocwen Loan Services, and

15  the other Ocwen companies.  And if that's going to come in,

16  assuming that the Court finds that there's a basis for the

17  jury to consider willfulness, that evidence has to be

18  presented separately.  And so the -- and I don't know from

19  this opinion what the net worth was of the consolidated or

20  combined companies, but I suspect it was a big number.

21         So -- and then related to damages, even though

22  punitive damages of 2.5 were awarded, the Fourth Circuit found

23  that that amount was unconstitutional because it was totally

24  out of proportion to the compensatory damage award of

25  $6,128.39.  So for those constitutional reasons, the

17-CV-00025-WYD-KHR        Flannigan - Mr. Osborne                    II - 236

1    $2.5 million amount was reduced to $600,000.  The appellate

2    court found that a remittitur was in order and remanded that

3    case with a remittitur to the trial court, and Ocwen had one

4    of two things it could do.  It could accept the $600,000 or

5    have a retrial on punitive damages.  I'm not sure which it did

6    because I don't know.

7            So what else?  So the other thing is there was expert

8    testimony in the West Virginia trial, and Ocwen on appeal

9    argued that the district court should have excluded the

10   testimony of Daugherty's expert witness, Evan Hendricks, on

11   two bases.  I am not going to go into all that.  And the

12   appellate court said, no, the expert should have been allowed

13   to testify.

14           We don't have any expert witnesses here.  We have

15   only two witnesses, one of whom has been on the stand a long

16   time, and maybe at some point today his testimony will end,

17   and then Miss Jeffers.  So we have two witnesses.  We don't

18   have any economists.  We don't have any experts.  We don't

19   have any other witnesses from Ocwen.  Now, I'm not drawing any

20   inferences there's anything improper about that, but this is a

21   much simpler trial.

22           Now, I have been doing this almost 23 years, and I

23   have tried cases for 24 years before I became a judge.  The

24   courtroom dynamic, which includes the issues to be tried, the

25   skill level of the attorneys representing the parties, the

Julie H. Thomas, RMR, CRR                            (303)296-3056

17-CV-00025-WYD-KHR       Flannigan - Mr. Osborne                    II - 237

1    capability of the trial judge, and all the other variables

2    have a significant impact on the trial today.  I can't

3    apprehend any of that as it relates to what happened when the

4    *Daugherty* case was tried before the trial court in West

5    Virginia because I wasn't there, I don't have a transcript,

6    and I don't know.  But what I do know on appeal is there were

7    significant differences between the underlying facts of this

8    case and the underlying facts of the *Daugherty* case.

9         So Mr. Osborne, on behalf of the plaintiff, seeks to

10   admit evidence in this trial of what happened in the other

11   case on two bases:  One, he argues that the information is

12   relevant under 404 -- 401 -- excuse me -- and further that the

13   evidence should come in under 404(b)(2).  404(b)(2) is

14   entitled "Permitted Uses; Notice in a Criminal Case.  This

15   evidence may be admissible for another purpose, such as

16   proving motive, opportunity, intent, preparation, plan,

17   knowledge, identity, absence of mistake, or lack of"

18   evidence -- "lack of accident."  Excuse me.  And I think

19   what's being urged here is being offered to show absence of

20   mistake.

21        But the mistakes that occurred in *Daugherty* are

22   different mistakes than occurred here, and they're not the

23   same.  The mistake here is that -- and there's no dispute

24   about this.  This witness has over and over said that mistakes

25   were made.  Ocwen had 30 days to fix two things it didn't fix

 1   until some eight months after it should have, meaning there

 2   was a nine-month delay.  But the underlying facts from which

 3   all this emanated are just so vastly different between the two

 4   cases, and I don't know the trial dynamics of the first case

 5   along the lines I have already suggested, that it would be

 6   fundamentally unfair, perhaps, for me to allow this to come

 7   in.

 8          But whether we are talking about Rule 401 as to

 9   relevant evidence or Rule 404(b)(2) as it relates to 404(b)

10   type evidence, both of them require the Court to decide

11   whether Rule 403 applies.  And Rule 403, as you know, is

12   entitled "Excluding Relevant Evidence for Prejudice,

13   Confusion, Waste of Time, or Other Reasons."  And the

14   rule reads as follows.  It's not a long rule, but it's

15   probably one of the more important rules I have to consider

16   when I have to make evidentiary rulings, which I'm happy to

17   do.  Let me just say that.

18          And the rule reads as follows:  "The court may

19   exclude relevant evidence if its probative value is

20   substantially outweighed by a danger of one or more of the

21   following:  Unfair prejudice, confusing the issues, misleading

22   the jury, undue delay, wasting time, or needlessly presenting

23   cumulative evidence."

24          So I make a finding based on the request made by the

25   plaintiff that even though this evidence perhaps is relevant

Julie H. Thomas, RMR, CRR                    (303)296-3056

1    and potentially could be used under 404(b)(2), that it must be

2    excluded because its probative value is substantially

3    outweighed by unfair prejudice, confusing the issues, and

4    misleading the jury.  So for those reasons, the request to

5    reference anything from the *Daugherty* trial is denied.

6              All right.  Let's bring the jury back in, and we will

7    continue.

8          (Jury in at 2:34 p.m.)

9              THE COURT:  All right.  You may be seated.  So it

10   took me a little longer than I thought to resolve some legal

11   issues and make a ruling on this exclusively legal matter, but

12   we didn't take a break, so we are going to take our

13   midafternoon break, oh, no later than about 3:15.  And that

14   will be a shorter break.  And then we will come back, and we

15   will go until 5 o'clock today.

16             All right.  Let's continue.

17             MR. OSBORNE:  I have nothing further for

18   Mr. Flannigan.

19             THE COURT:  All right.  Is there any recross of the

20   witness?

21             MR. LOPACH:  No, Your Honor.

22             THE COURT:  All right.  The witness may --

23             THE WITNESS:  Thank you, Your Honor.

24             THE COURT:  -- step down.

25             All right.  Call your next witness.

1          MR. OSBORNE:  I call Valerie Jeffers.

2          COURTROOM DEPUTY:  Please raise your right hand.

3      (The witness was sworn.)

4          COURTROOM DEPUTY:  Please be seated.  Please state

5  your full name, and spell your full name for the record.

6          THE WITNESS:  Middle name also?

7          COURTROOM DEPUTY:  Full name.

8          THE WITNESS:  Okay.  Valerie Barajon Jeffers,

9  V-a-l-e-r-i-e, B-a-r-a-j-o-n, J-e-f, as in Frank, -f, as in

10  Frank, -e-r-s, as in Sam.

11  **VALERIE BARAJON JEFFERS, PLAINTIFF HEREIN, DIRECT EXAMINATION**

12  BY MR. OSBORNE:

13  Q.  Have you ever testified in a trial before?

14  A.  Um, no, sir.

15  Q.  Tell us where you live.

16  A.  I'm sorry?

17  Q.  Tell us where you live.

18  A.  I live, um, at 2274 Thomas Court, Parker, Colorado, in

19  Elbert County.

20  Q.  And do you have some land out there?

21  A.  I have a few acres, yes, sir.

22  Q.  All right.  What do you -- what do you use the land for?

23  A.  Well, at one point I used it for some horses, some

24  personal horses.  Um, during my financial crisis, if you will,

25  I had to sell them.

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 241

1   Q.  All right.  And what do you use the land for now?

2   A.  Well, I have the land, so, hopefully, again I can have

3   horses in the future.  I've got some dogs and cats, and, you

4   know, I'm quite the animal lover.  I have some up for foster

5   care if anyone is interested.

6   Q.  Do you have any children?

7   A.  I have two daughters, uh, 31, she, um -- I'm sorry.  I'm

8   nervous.  She graduated from Florida Atlantic University with

9   a degree in architecture.  She actually finished her second

10  level of architecture, and she's living in Venice, Italy.

11  Then I have a 23-year-old who is going to the Art Institute of

12  Orange County studying fashion design.

13  Q.  All right.  And what's your education background?

14  A.  I have a bachelor's of science degree in management from

15  University of Phoenix.  I graduated in 1998.  And I actually

16  just started on a master's program, master's of business

17  administration.  I just finished my first class.

18  Q.  When do you expect to complete your master's?

19  A.  It's a two-year online program.

20  Q.  All right.  And you are currently employed at Travelers?

21  A.  Yes, sir.

22  Q.  All right.  And how long have you worked there?

23  A.  I started December 11th -- I'm sorry.  December 27th,

24  2011, was my first day.

25  Q.  What do you do there?

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 242

1    A.  I am an underwriter, and my job is to assist military,

2    ex-military and current active military members, to insure

3    farm and ranches across the country.  I have licenses in 46

4    states across the country for insurance, and my job is to get

5    them the best coverage and the best rate I can per their

6    military status.

7    Q.  How long have you worked in the insurance industry?

8    A.  I got my insurance licenses originally in 1999.

9    Q.  All right.  And why did you decide to get your insurance

10   license?

11   A.  Well, I -- I was part of -- I worked in telecom for quite

12   a few years, and I was part of that whole MCI Worldcom debacle

13   when telecommunications went down the tubes.

14   Q.  And so were you laid off by MCI?

15   A.  Yes.  I lost my job with MCI, and I felt -- and it was

16   very difficult to get a job in telecom because of the whole

17   US West and Qwest, and there were just several things that

18   were going on in the telecom industry at the time that I felt

19   I would get into the insurance industry because it was

20   steadier employment.

21   Q.  All right.  So where did you go work after MCI?

22   A.  Well, I found different jobs in insurance.  I worked at,

23   um, a horse insurance company because of my horse background

24   and a couple different companies.  I could never find

25   employment that paid me what I was used to when I worked in

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR          Jeffers - Mr. Osborne                    II - 243

 1   telecom.

 2           So during that time I started working two jobs to not

 3   only, you know, pay my normal bills but keep the lights on and

 4   everything else.  In the meantime, I still tried to pursue

 5   finding a position that would pay me what I was accustomed to

 6   or at least had the potential in the long run while I grew

 7   with the company.

 8   Q.  And at this time in your life, were you raising your

 9   children as a single mom?

10   A.  Yes, sir.

11   Q.  All right.  I want to go to 2011.  You admit that you

12   filed a Chapter 13 bankruptcy; correct?

13   A.  Yes, sir.

14   Q.  And what was the main reason you filed bankruptcy?

15   A.  Well, I wanted to save my home.  The company that I was

16   with at the time, I did try to restructure the loan because I

17   knew I was behind in payments, and I knew that I was going to

18   get hired by Travelers.  I knew it.  And I tried to

19   restructure the loan.  Well, during the time when I was

20   restructuring the loan, the company I was with put foreclosure

21   notices on my door and -- to the point where it was in the

22   paper.  And my friend -- my daughters' friend's parents were

23   telling my daughters that my home was getting foreclosed on.

24   I felt the only way I could save my home was to file

25   bankruptcy, and that's why I did it.

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                II - 244

1   Q.  So explain to me what your understanding is of how a

2   Chapter 13 bankruptcy works.

3   A.  I paid back all my arrears plus interest.  I am -- I am

4   dictated by the court ruling to pay a certain amount of money

5   for so long until the debt is cleared and, um, taken care of

6   and paid off as it's supposed to be.

7   Q.  So how long was your bankruptcy plan?

8   A.  I believe my bankruptcy plan was actually five years, and

9   I paid it off in four.

10  Q.  Okay.  And do you recall about what your monthly payment

11  was during the bankruptcy?

12  A.  600 additional dollars a month.

13  Q.  So you had to pay that.  And then did you also have to

14  make your postbankruptcy payments to Ocwen?

15  A.  Yes, sir.

16  Q.  All right.  And while you're in the bankruptcy, where did

17  you work?

18  A.  I worked at Travelers.  Again, I was hired there December

19  in 2011.  And I took several odd jobs.  I worked, um, at one

20  point for customer service at home.  You could hook up your

21  telephone at home and accept calls in for customer service

22  through like the Best Buy program, that type of thing, and I

23  worked until 2 o'clock in the morning on the phones helping

24  customers with their accounts.

25          My job was very important to me at Travelers.  And

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                II - 245

1   working until 2 o'clock in the morning, then going to bed at

2   2:30, getting up at 6:00 was not cutting it.  So my daughter

3   actually at the time, my younger daughter, worked at Wendy's.

4   And she said, why don't you just come over and work with me if

5   you are going to work a second job?  So I thought, okay, I

6   have to work a second job anyway; I might as well just go to

7   Wendy's and work with her.  And that way --

8   Q.  What was your job at Wendy's?

9   A.  You know how the fast food industry is.  You do

10  everything.  You are a cashier.  You take orders.  You make

11  the fries.  You clean the toilets.  You mop the floors.  I

12  mean, anything that's expected to do, you do.  And my -- my

13  closing was usually mopping floors and vacuuming and cleaning

14  tables and cleaning the bathrooms.

15  Q.  And did you make -- after your bankruptcy was filed, were

16  you ever late on any bills after 2011?

17  A.  Never.

18  Q.  And you received your bankruptcy discharge around April or

19  May of 2015 --

20  A.  Yes, sir.

21  Q.  -- is that right?

22          And what was your understanding about rebuilding your

23  credit and financial life after your bankruptcy discharge?

24  A.  It was my understanding that I could start moving forward

25  in my life.  I had a good job.  I had paid off my bankruptcy.

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 246

1    I fulfilled my obligations that I needed to fulfill, and I

2    could start moving forward rebuilding my credit.

3    Q.  So I want to take you to June of 2015, so a few months

4    after your bankruptcy discharge.  Do you recall purchasing a

5    car?

6    A.  Yes, sir.  I was able to, um, purchase a Ford Escape.

7    Q.  And did you take out a loan for that?

8    A.  I did, sir.  And I got a 3.9 percent interest rate, which

9    I thought was pretty decent two months after my bankruptcy was

10   discharged.

11   Q.  Okay.  And I want to ask you to look at Exhibit 8, please.

12          MR. OSBORNE:  Your Honor, this is a stipulated

13   exhibit.  I move to admit Exhibit 8.

14          THE COURT:  All right.  Exhibit 8 is received.

15       (Plaintiff's Exhibit 8 received.)

16   BY MR. OSBORNE:

17   Q.  And I will have you focus here.  Do you see at the top of

18   the page it reflects that in June of 2015, the Ocwen Loan was

19   suppressed and not reporting?

20   A.  Yes, sir.

21   Q.  And that was right around the time you purchased your car;

22   right?

23   A.  Yes, sir.

24   Q.  All right.  Leading to September of 2016 and the

25   settlement agreement, please tell me what your understanding

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 247

1    is of whether you could discuss that with any third parties.

2    A.  If I understand, your question is after we made the

3    settlement in 2016, September, was I allowed, so to speak, to

4    talk to anyone or let anybody know about the settlement

5    agreement?

6    Q.  Correct.

7    A.  Is that --

8    Q.  That's the question.

9    A.  My understanding was there was a very strong stipulation

10   in the order that I think we have discussed here already that

11   I was not allowed to talk to anyone about the settlement

12   agreement or the fact that there was a settlement agreement.

13   That was between myself, you, the Ocwen attorneys.

14   Q.  All right.  So in October of 2016, a month after the

15   settlement agreement, do you recall going to the Sunglasses

16   Hut?

17   A.  Yes, sir.

18   Q.  And why did you go there?

19   A.  They had a good sale on some sunglasses.  It had been a

20   long time since I had purchased anything for myself.

21   Q.  All right.

22   A.  So I wanted to, you know, kind of treat myself because

23   I've worked hard those past few years to try to do things

24   right.

25   Q.  And did you apply for a credit card with the Sunglasses

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 248

1   Hut?

2   A.  Yes, sir.

3   Q.  And why did you do that?

4   A.  Because I felt that my credit was rebuilding.  Since I was

5   able to get a car loan with very little problem, why wouldn't

6   I be able to get a $2,000, $1500 Sunglass Hut credit card?

7   Q.  And were you approved for that credit card?

8   A.  No, sir.

9   Q.  All right.  Were you given an alternative?

10  A.  We talked about it, and I said I believe I can get my

11  boyfriend to help me and he can probably cosign for me, or he

12  can get a card in his name, and I can piggyback off of his

13  card.  He was willing to do that, so they -- I said, just hold

14  on; I will be back.  And I went back, and we got the card.

15  Q.  Okay.  Was that situation embarrassing for you --

16  A.  It was extremely embarrassing.  You know, again, I worked

17  so hard to do things right, and I worked so hard to move

18  forward with my life, and it was a very embarrassing

19  situation.

20  Q.  So after that incident, was there a point that you checked

21  your credit report?

22  A.  Yes, sir.

23  Q.  And tell us how you do that.

24  A.  I, um, I go on Credit Karma, which is pretty easy to do,

25  and I check -- I started checking my credit report actually

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 249

1    monthly to see if Ocwen had adhered to their part of the

2    settlement agreement to fix my report.

3    Q.  And did you notice whether Ocwen had done that or not?

4    A.  They had not.

5            MR. HOFFMAN:  Objection:  foundation, hearsay.

6            THE COURT:  Overruled.  I will let her answer.

7    BY MR. OSBORNE:

8    Q.  Can you answer that again?

9    A.  I'm sorry.  Can you repeat the question?

10   Q.  The question was:  Did you notice whether Ocwen had fixed

11   the credit reporting?

12   A.  I noticed they had not fixed the credit report.  It was

13   still showing that I was 90 days late on my payments.

14   Q.  And so after that, did you dispute it with the credit

15   bureaus?

16   A.  Yes, sir.

17   Q.  All right.  Let me show you your dispute at Exhibit 5.

18   Can you explain why you didn't reference the settlement

19   agreement in this dispute letter?

20   A.  It was my understanding that I was not to talk about that

21   there was any type of settlement agreement at all.  So I

22   believed that if I had mentioned it in any documentation like

23   this, there was no doubt in my mind Ocwen would have turned

24   around and countersued me for breach.

25   Q.  Now, why didn't you dispute with Ocwen directly rather

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 250

 1    than, uh, dispute with the credit bureaus themselves?

 2    A.   Over the past years, I've called Ocwen numerous times to

 3    get resolution to problems or issues.

 4    Q.   Were they ever successful, these phone calls?

 5    A.   No, sir.  What would happen is I would get transferred to

 6    different departments, and many times I couldn't understand

 7    the people I was talking to or they really couldn't understand

 8    me.  They were nice enough, and I believe they probably -- I

 9    can only believe -- wanted to help, but it got to the point

10    where I felt like the different departments didn't talk to

11    each other, and there was a bit of frustration I believe on

12    their part.

13            And there were several times when I was hung up on.

14    And I don't believe it was intentional.  I don't believe it

15    was -- or I didn't take it personally.  I believe it was a

16    frustrating situation probably for both parties, not only

17    myself but for them because I couldn't get resolution.

18            And to think that I would have to go through that

19    again, honestly, I just didn't have the desire, the energy to

20    do it.  I just couldn't do it.

21    Q.   Now, what was your understanding about whether you were

22    required to dispute with the credit bureaus or dispute

23    directly with Ocwen?

24    A.   My understanding is for the dispute to count as a true

25    dispute, it had to go directly to the credit bureaus.

17-CV-00025-WYD-KHR       Jeffers - Mr. Osborne              II - 251

 1  Q.  All right.  And had you gained that understanding from

 2  your --

 3  A.  From the lawsuit in September, 2016.

 4  Q.  I'm going to ask you to turn to Exhibit 9.

 5          MR. OSBORNE:  And this is not stipulated.

 6  BY MR. OSBORNE:

 7  Q.  All right.  Does Exhibit 9 appear to be the results of the

 8  investigation from TransUnion?

 9  A.  Yes, sir.

10  Q.  And this was to your -- the results of your dispute with

11  Ocwen; right?

12  A.  I would believe so, yes.

13          MR. OSBORNE:  Your Honor, I move to admit Exhibit 9.

14          MR. HOFFMAN:  Objection, Your Honor.  It's hearsay.

15  Lacks foundation.

16          MR. OSBORNE:  Well, it's --

17          THE COURT:  Hold on.  This is a TransUnion document.

18  What's the hearsay exception that would allow this witness to

19  comment on an out-of-court statement that's being offered

20  presumably for the truth of what it asserts?

21          MR. OSBORNE:  Well, it's not being offered for the

22  truth.  It's being offered to show that TransUnion notified

23  her of the results of the investigation.  If it is hearsay, I

24  think the exception would be 803(21) as a statement of

25  plaintiff's reputation or character.

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR       Jeffers - Mr. Osborne                    II - 252

1              THE COURT:  803(21) or --

2              MR. OSBORNE:  Yes, Your Honor.

3              THE COURT:  Well, 803(21) talks about a reputation

4   concerning character reputation among a person's associates or

5   in the community concerning the person's character.  I don't

6   understand how that --

7              MR. OSBORNE:  I think that's -- a credit report is a

8   statement of your reputation for paying your bills.

9              THE COURT:  All right.  Without saying what is in

10  here, what part of this exhibit are you seeking to have her

11  talk about?  What pages?

12             MR. OSBORNE:  It would be page 5 of 13.

13             THE COURT:  Mr. Hoffman, do you have anything further

14  you want to say about this?

15             MR. HOFFMAN:  It doesn't meet the hearsay exception,

16  but other than that, no.

17             THE COURT:  This is a hearsay document.  It was

18  prepared by TransUnion.  This witness is not connected with

19  TransUnion.  There's nobody here from TransUnion to verify its

20  accuracy or how the information was obtained, and so I'm going

21  to sustain the objection and disallow or refuse the exhibit at

22  this time.

23  BY MR. OSBORNE:

24  Q.  Let me ask you this:  What is your understanding of what

25  the results of your investigation was with TransUnion?

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                II - 253

1        MR. HOFFMAN:  Objection:  Lacks foundation.

2        THE COURT:  Sustained.

3   BY MR. OSBORNE:

4   Q.  Let's move to December 2016.  Did you decide to apply for

5   a mortgage refinance?

6   A.  Yes, sir.

7   Q.  And why did you decide to do that?

8   A.  Well, there were a number of reasons.  One, you hear on TV

9   and radio commercials all the time that bankruptcy is okay.

10  If you have a couple dings on your credit report, um, go ahead

11  and refi, and we'll see if we can help you.  And, secondly, I

12  really just wanted to get away from Ocwen.  I really -- I

13  really wanted to get away from them as my loan servicer.

14  Q.  So walk me through the process of how you went about it.

15  A.   I -- I believe it was, um, I went online to -- I believe

16  it was LendingTree.  And I went there because what they do is

17  you put in your information, and they send it out to several

18  different companies.  And I felt that would be my best chance

19  to be able to get a loan to be able to refi to get away from

20  Ocwen Loan Servicing.

21  Q.  And I will ask you to turn to Exhibit 21.

22        MR. OSBORNE:  Your Honor, this is a stipulated

23  exhibit.  I move to admit 21.

24        THE COURT:  All right.  Let me see here.  Hold on.

25        All right.  So -- all right.  Exhibit 21 is agreed to

Julie H. Thomas, RMR, CRR                         (303)296-3056

1    in its entirety now; is that right?

2              MR. HOFFMAN:  It is.

3              THE COURT:  All right.  So Exhibit 21 is received.

4         (Plaintiff's Exhibit 21 received.)

5    BY MR. OSBORNE:

6    Q.  All right.  And I'm going to ask you to turn to page 6,

7    please.  And does this appear to be a cover letter to you from

8    loanDepot?

9    A.  Yes, sir.

10   Q.  All right.  And then attached to the cover letter is

11   various documents associated with your refinance attempt;

12   right?

13   A.  Correct.

14   Q.  All right.  And I'm going to ask you to look at page 56.

15             All right.  So this is the Ocwen loan tradeline, and

16   is the information accurate on this tradeline, from your

17   perspective?

18   A.  No, sir.

19   Q.  And can you please describe how you felt that inaccurate

20   information about you was given to loanDepot?

21   A.  Well, again it's showing that I have late payments, which

22   I did not have any late payments to Ocwen Loan Servicing.

23   Q.  And how does that make you feel that that information was

24   provided to a third party?

25   A.  Well, there's several different things how it makes me

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 255

1   feel.  Angers me.  It upsets me.  It frustrates me.  It makes

2   me sad.  You know, I felt that, again -- and I keep going back

3   to the fact that, you know, I worked hard to make things right

4   and to make sure my payments were made on time after I filed

5   the bankruptcy and after that was discharged.  And I felt like

6   every time I turned around, truly, Ocwen was not adhering to

7   their end of the agreement and not correcting what they said

8   they were going to correct.

9   Q.  All right.  And then I'm going to ask you to turn to

10  page 7.

11  A.  Seven zero?

12  Q.  Zero seven.

13  A.  Oh, zero seven.

14  Q.  All right.  So do you see the language where I checked

15  where it talks about under no circumstances can you be late on

16  your existing mortgage loan payment while your loanDepot

17  refinance loan is pending?  Do you see that?

18  A.  Yes, sir.

19  Q.  What is your understanding of what that means?

20  A.  Well, when I investigated it, from what I understand, if

21  there had been a couple months where Ocwen had misapplied my

22  payments and given the credit bureau misinformation, I most

23  likely could have gotten the refi through because it was only

24  a couple months, I could prove it.  This had been going on

25  month after month, and it's provable month after month after

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR       Jeffers - Mr. Osborne                    II - 256

1    month, that they were reporting me late on my payments,

2    specifically stating I had not made a payment -- from what I

3    understand, in July of 2016 was the last payment that was even

4    indicated on my credit report.  There was no way for me to

5    overcome that misinformation for me to get a new loan.

6    Q.  Did you believe that you would have been able to get

7    approved based upon what you have seen in page 7?

8    A.  Not with the credit reporting as it was at this time.

9    Q.  Okay.  So at that point in time, did you move forward with

10   filling out the entire packet?

11   A.  No, sir, I did not.

12   Q.  And then I'll ask you to turn to Exhibit 20, please.

13        MR. OSBORNE:  And I move to admit Exhibit 20, which

14   is stipulated.

15        THE COURT:  Yeah, Exhibit 20 is received in its

16   entirety.

17      (Plaintiff's Exhibit 20 received.)

18   BY MR. OSBORNE:

19   Q.  And does this appear to be -- let me have you go to

20   page 13, actually.

21        Does this appear to be an explanation for you to fill

22   out from one of the lenders?

23   A.  Page 000013, right?

24   Q.  Right.

25   A.  Okay.  And what was the question?  I'm sorry.

17-CV-00025-WYD-KHR       Jeffers - Mr. Osborne              II - 257

1   Q.  Does this appear to be an explanation letter -- do you see

2   the top title of the document?

3   A.  Oh, yes, sir.

4   Q.  "Consumer Explanation Letter"?

5   A.  Yes, I see that now.

6   Q.  All right.  Oh, I'm sorry.  I'm on -- go to the previous

7   page, page 12.  Sorry.  That's where the confusion is.

8   A.  Okay.  Thank you.

9   Q.  Okay.  And so do you see how the Ocwen tradeline is listed

10  there?

11  A.  Yes, sir.

12  Q.  And based upon that false information, was it your

13  understanding you would be able to get approved for this loan?

14  A.  No, sir.

15  Q.  All right.  After you saw that, did you then move forward

16  with filling out the remaining application?

17  A.  No, sir.

18  Q.  I want to ask you about Exhibit 15.

19          MR. OSBORNE:  And I believe 15 is stipulated, Your

20  Honor.  I move to admit.

21          THE COURT:  All right.  Exhibit 15 is received.

22      (Plaintiff's Exhibit 15 received.)

23  BY MR. OSBORNE:

24  Q.  All right.  And does this appear to be your credit -- your

25  TransUnion credit report in February of 2017?

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 258

1    A.  Yes, sir.

2    Q.  Okay.  Turn to page 163 at the bottom, please.  And do you

3    see that the negative payment information over here was

4    corrected for the most part?

5    A.  Yes, sir.

6    Q.  All right.  Did Ocwen have anything to do --

7    A.  No, sir, they did not.

8    Q.  -- with correcting that?

9         MR. HOFFMAN:  Objection:  hearsay.  It lacks

10   foundation.  She doesn't know how this document was

11   formulated, or there's no foundation to establish that she

12   does.

13        THE COURT:  Yeah, I'm going to sustain the objection

14   and direct the jury, of course, to disregard the question and

15   the answer.  A foundation has to be laid before the witness

16   can comment about what Ocwen did or didn't do in relationship

17   to this document.

18        MR. OSBORNE:  Okay.

19   BY MR. OSBORNE:

20   Q.  Did you have anything to do with getting your credit fixed

21   in February of 2017?

22   A.  If I can say, I believe I did.  I sent the letters -- and,

23   actually, I called, and then I sent letters.  And I put a

24   freeze on my account so that way Ocwen would not be able to

25   report any more derogatory information on the account.  And I

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    got it repaired via that avenue.  And my credit report

2    actually went up 50 points within 24 hours.

3         MR. HOFFMAN:  Objection, Your Honor.  She has moved

4    into the portion that she was prohibited from saying a moment

5    ago.  I move to strike that last portion.  What she did is

6    fine, but what others did supposedly in reliance upon it is

7    what I'm objecting to.

8         THE COURT:  Overruled.  I will allow the answer.

9    BY MR. OSBORNE:

10   Q.  I want to ask you about Exhibit 25.  And this is the

11   letter that Ocwen sent to you.  Can you tell me how you felt

12   when you received this letter?

13   A.  I don't know.  Pretty unbelievable.

14   Q.  Why --

15   A.  Pretty surprised.

16   Q.  Why was it unbelievable?

17   A.  Well, they are sending me back my payment, if I can say

18   again, stating -- indicating that they were going to not stop

19   any foreclosure proceedings that they had started previously.

20   That's how I read that.  When I had not been late on my

21   payments at all.

22   Q.  And were you worried that a foreclosure proceeding --

23   A.  Scared to death.

24   Q.  And then I'll have you look at Exhibit 22, which is the --

25   basically the same letter, but it's in June of 2017.  What was

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 260

1  your reaction when you received this letter?

2  A.  It made no sense.  They send me back my April payment,

3  which was indicated in the documents here.  They obviously

4  cashed my May payment.  They send me back my June payment,

5  again saying that they are not going to stop any foreclosure

6  proceedings.  I was literally at a loss as to what was going

7  on.  I had no idea or why.

8  Q.  And was this around the time, from your recollection, that

9  Ocwen took your deposition in this case?

10  A.  Yes, sir.  They took it I believe in June of 2017.

11  Q.  I'm going to ask you to look at Exhibit 4, please.

12          MR. OSBORNE:  And Exhibit 4 I believe is stipulated,

13  Your Honor.  So I move to admit.

14          THE COURT:  All right.  Exhibit 4 will be received.

15      (Plaintiff's Exhibit 4 received.)

16  BY MR. OSBORNE:

17  Q.  All right.  So can you look through Exhibit 4 briefly and

18  tell me what it is.

19  A.  Well, what happened was that they stopped sending me my

20  monthly statements in July of 2016.  So what I did was I kept

21  printing off the same statement so that way when I sent them

22  my check, they would know what account it went to.  I crossed

23  out the false information that was -- I knew that was

24  inaccurate because I was never late on my payments.  I did not

25  owe them any backpay.

1           And at that time I believe I started sending them my

2    payments in a certified manner.  I sent them two-day delivery,

3    signature required, so I can tell you exactly when my payments

4    were mailed, when they were delivered, who signed for them,

5    and when they were cashed.  Because after my payments were

6    returned, it started scaring me to death that I didn't know

7    what was going to happen.

8    Q.  And is this how you've -- you make your payments still to

9    this day?

10   A.  To this day.

11   Q.  Do you have any access to your online -- your Ocwen --

12   A.  Zero.

13   Q.  -- online account?

14   A.  And it's -- it's been a little frustrating for me to hear

15   that -- how my payments may be applied, how they are not being

16   applied, because I have had no indicat- -- I have had no

17   communication as to how they were supposed to be applied or

18   being applied and -- or anything.  And it's a bit eye opening

19   for me to hear some of the information.

20   Q.  Have you -- after the settlement agreement was entered

21   into, has Ocwen ever sent you any correspondence showing you

22   how your payments were applied?

23   A.  No, sir.

24   Q.  Okay.  So why is it that you go to the post office every

25   month and mail your payments by certified mail?

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 262

1    A.   Because in the past they would -- I would mail the

2    payment.   I can tell you when I mailed it, when they received

3    it.   And let's say they got it, as an example -- because I

4    have an Excel spreadsheet showing this information

5    specifically.   But let's say they get it May 1st.   The payment

6    is due by the 16th of the month.   They were cashing it on the

7    17th and the 18th of the month.   I didn't know if they were

8    cashing them late --

9              MR. HOFFMAN:   Objection, Your Honor.   I'm not sure

10   what time frame we are in here, but I think we are in the -- I

11   think that we are back in the pre-2016 --

12   A.   No, sir.

13             MR. HOFFMAN:   -- time frame.

14             MR. OSBORNE:   This is postsettlement time frame, Your

15   Honor.

16             MR. HOFFMAN:   So if I can get clarification on that,

17   it would be helpful, time frame.

18             THE COURT:   Why don't you re-ask the question and

19   make it clear what year you are referencing, Mr. Osborne.

20             MR. OSBORNE:   Okay.

21             THE COURT:   Just re-ask your question, and make it

22   clear what month and year you are referencing.

23             MR. OSBORNE:   Okay.

24   BY MR. OSBORNE:

25   Q.   So I'm asking you about the post-September 2016 settlement

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                II - 263

 1  agreement.

 2  A.   Correct.

 3  Q.   And can you please tell me how you make your payments and

 4  how you personally keep track of it.

 5  A.   I, um, I have an Excel spreadsheet to show exactly when I

 6  made the payment -- or the day I mailed it.  And I have -- and

 7  I send it two-day -- two-day Priority Mail because you have a

 8  tracking that way.  And I started making sure somebody signed

 9  for it because they would get it two days after I mailed it,

10  but many times it wasn't getting cashed for 10 business days,

11  sometimes 12 business days after they received the check.

12  That concerned me.

13          I already believed that my -- I can't say that.  I

14  wasn't sure how my payments were being, um, accounted for on

15  my loan.  And my fear was that I was being charged late fees

16  and additional interest that I should have never been charged.

17  So I felt I needed to keep a better tracking mechanism as to

18  how I was making my payments to them and when they were

19  getting cashed.  And I would go online on a daily basis and

20  check my accounts to see if the check had cleared or not.

21  Q.   So after September of 2016, how many hours do you think

22  you've spent going to the post office and trying to track

23  payments and all that?

24  A.   Well, I'll kind of answer the way Mr. Flannigan did.  It's

25  kind of difficult to say exactly how much time it took, but,

Julie H. Thomas, RMR, CRR                                (303)296-3056

17-CV-00025-WYD-KHR       Jeffers - Mr. Osborne                II - 264

1    um, as far as timing goes to write the checks and go to the

2    post office, that type of thing, I can't answer.  I can tell

3    you the emotional toll it took on me.  I cannot quantify.

4    Q.  Okay.  What --

5    A.  Because it's a scary situation not knowing what's

6    happening.  I mean, this is my life.

7    Q.  I want to ask you about the damages that you claim Ocwen

8    has caused you.  Have you had any difficulty sleeping?

9    A.  Always.

10   Q.  All right.  Can you explain in a little more detail how

11   that works.

12   A.  Well, I usually -- if you want specifics, I usually try to

13   go to bed around 9:00, 9:30.  I'm up at about 12:00, 12:30.

14   I'm up until about 3:30, 4:00, worried all night, just my head

15   racing.  I can't even tell you what this has done to my

16   stomach and my digestive system, my nerves overall.

17   Q.  What specifically are you worried about?

18   A.  Well, my body doesn't know if it should gain weight or

19   lose weight.  It doesn't know how to digest food anymore.  I

20   feel like -- you know, I wash my hair, and there's clumps of

21   hair that's just coming out in the shower.  And it's a very,

22   very -- it's been a very distressing situation.

23   Q.  How often have you witnessed your hair falling out more

24   than normal?

25   A.  Oh, I wash my hair maybe now two or three times a week,

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1    trying to avoid losing more hair.  But every time I wash it,

2    I've got clumps in the --

3    Q.  Had you experienced problems with hair loss prior --

4    A.  No, sir.

5    Q.  -- to Ocwen?

6    A.  Even during the bankruptcy, I was working a couple jobs.

7    I was working until 11:00 p.m., 2 o'clock in the morning.  But

8    I was happy because I was doing the right thing, and I was

9    working hard, and I was getting back on track.

10   Q.  Is there any other situation in your life that -- other

11   than Ocwen, that you can think that may have caused you extra

12   stress?

13   A.  Not that I can think of, no, sir.

14   Q.  Have you experienced any embarrassment or humiliation

15   after September 2016 as it relates to Ocwen?

16   A.  Well, if you look at the Sunglass Hut situation or trying

17   to refi my mortgage, any of the creditors that look at my

18   credit report, that's an embarrassing situation when I believe

19   I can go somewhere, and I've got a good job, I've worked hard.

20   I've paid all my bills on time, and because of the false

21   reporting on the credit reports, I have not been able to move

22   forward with getting credit or refinancing.  And that's an

23   embarrassing situation.

24   Q.  All right.  And you do acknowledge that prior to 2011, you

25   had a couple of late payments on --

1   A.  Oh, absolutely.

2   Q.  And you own that; right?

3   A.  Absolutely I do.

4   Q.  But after your bankruptcy was filed, have you ever been

5   late on any bills?

6   A.  Not one payment, no, sir.

7   Q.  Have you experienced any difficulty concentrating in your

8   everyday life?

9   A.  At work it's difficult to concentrate.  I'm on the phones

10  all day, and my job is to help ex-military or active military

11  people.  And it can be fairly disheartening for me when I

12  start having a panic attack or an anxiety attack or I start --

13  my mind starts wandering because I'm not sure if my payment is

14  going to be cashed this month or not.  So it's been fairly

15  disruptive in my day-to-day activities.  I try to shield it

16  from my kids as much as possible.  They're older now, but they

17  can feel the stress that I'm under.

18  Q.  And how --

19  A.  My job can feel it.

20  Q.  How did you feel in the fall of 2016 when you found out

21  that Ocwen was not going to correct the credit reporting?

22  A.  In -- so if -- just to be clear, so September 2016 when we

23  filed the agreement and they said they were going to and then

24  when I found out they didn't?

25  Q.  Well, no, actually what I mean is after you did your

17-CV-00025-WYD-KHR      Jeffers - Mr. Osborne                    II - 267

1  disputes and you found out it wasn't going to be changed, how

2  did that make you feel?

3  A.  I didn't know what to do.  I felt confused.  And I had --

4  I had called Ocwen in the past to try to get resolution for

5  other things that I never got a resolution for.  The only way

6  I got their attention was with the first lawsuit.  And I was

7  pretty excited because I thought, this was great, my credit is

8  going to be fixed.  I will really be able to move on now.  Out

9  of the many years or the few years that I worked trying to

10  piece my life back together financially, I thought this is

11  going to be great.

12          When it came to having to fix my credit report on my

13  own and calling them up to freeze it, I thought the only way

14  I'm going to get their attention again is to file another

15  lawsuit because nothing else worked.

16  Q.  And other than everything we have just covered, has Ocwen

17  caused you any other damages that I forgot to mention?

18  A.  Not that I can think of right now.

19  Q.  Okay.

20          MR. OSBORNE:  No further questions, Your Honor.

21          THE COURT:  All right.  We are going to take our

22  midafternoon break for 20 minutes.

23          How long, Counsel, do you estimate you will be with

24  your examination?

25          MR. HOFFMAN:  I would guess a half an hour.

Julie H. Thomas, RMR, CRR                              (303)296-3056

 1          THE COURT:  All right.

 2          MR. HOFFMAN:  Maybe less.

 3          THE COURT:  So here's what we are going to do.  When

 4   this witness is finished today, will there be any other

 5   testimony to be offered by the plaintiff?

 6          MR. OSBORNE:  No.

 7          THE COURT:  What about the defendant?  Do you have

 8   any testimony?  And I will ask you again when we get to that

 9   point.

10          MR. HOFFMAN:  I don't currently anticipate any, no.

11          THE COURT:  All right.  So, anyway, so it may be that

12   if we finish before 5:00, there's some legal matters regarding

13   jury instructions that the attorneys and I can work on.  So I

14   will probably you send home, and we will determine what time

15   tomorrow it will be appropriate for you to come back.  All

16   right?  So we will be in recess now for 20 minutes.

17       (Proceedings recessed 3:20 to 3:42 p.m.,

18       resuming outside the presence of the jury.)

19          THE COURT:  All right, let's have a seat.  Let's

20   bring the jury back in.

21          Miss Jeffers, you should go back to the witness

22   stand, please.

23       (Jury in at 3:44 p.m.)

24          THE COURT:  All right, you may be seated.  Let's

25   proceeded with the cross-examination.

1          MR. HOFFMAN:  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3    BY MR. HOFFMAN:

4    Q.  Good afternoon, Miss Jeffers.  My name is Robert Hoffman.

5    We met about two weeks ago; right?

6    A.  Yes, sir.

7    Q.  And before I introduced myself to you a couple weeks ago,

8    we had not met or talked --

9    A.  No, sir, we had not.

10   Q.  You heard in opening statement the first thing I said to

11   the jury was that Ocwen apologizes for what happened in this

12   case for failing to timely implement the settlement agreement.

13   You heard that; correct?

14   A.  Yes, sir.

15   Q.  And you had heard an apology from Ocwen previous to that

16   as well, haven't you?

17   A.  Yes, sir.

18   Q.  In fact, in the summer of 2017, Mr. Flannigan apologized

19   to you personally and on behalf of Ocwen?

20   A.  Yes, sir.

21   Q.  What did you say to Mr. Flannigan in response to that

22   apology?

23   A.  Nothing.

24   Q.  I want to ask you about the Sunglass Hut issue.  Am I

25   correct in understanding that that is the only time that you

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman                    II - 270

1    contend that you are -- that you actually applied for credit

2    and were denied the credit that you applied for?

3    A.  Yes, sir.

4    Q.  Okay.  So the one instance was the Sunglass Hut situation?

5    A.  Yes, sir.

6    Q.  And that was really with -- it was Synchronicity Bank

7    [sic] with the Sunglass Hut?

8    A.  Yes, sir.

9    Q.  Do you have in front of you in the book Exhibit 15, which

10   has been admitted?

11           Let me set the stage first.  You understand that the

12   settlement agreement was entered on September 8th of 2016;

13   right?

14   A.  Yes, sir.

15   Q.  And that Ocwen was to have 30 days under the settlement

16   agreement to implement any credit changes and the accounting

17   issues that it was supposed to address?

18   A.  Yes, sir.

19   Q.  So that it -- the time that it had to address those things

20   was until October 8th of 2016?

21   A.  Yes, sir.

22   Q.  And your claim was only that -- your claim is only that

23   Ocwen was contractually obligated to do that after or sometime

24   by October 8th of 2016?

25   A.  Yes, sir.

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman                    II - 271

1   Q.   Okay.  Let me -- on page 164 do you see the itemization

2   there for the Sunglass Hut on this credit report that you

3   received from TransUnion?

4            COURTROOM DEPUTY:  Is this Exhibit 15?

5            MR. HOFFMAN:  This is Exhibit 15.  I'm sorry.  Yes.

6   A.   Yes, sir.

7            MR. HOFFMAN:  It's page 164 of Exhibit 15.

8   BY MR. HOFFMAN:

9   Q.   And you see there right underneath the entry it says that

10  the date that account was opened was October 3rd of 2016?

11  A.   Yes, sir.

12  Q.   Okay.  So that that was five days before you had expected

13  implementation of the settlement agreement by Ocwen?

14  A.   Yes, sir.

15  Q.   Okay.  So it's fair to say that whatever happened at the

16  Sunglass Hut, you don't contend that was a result of a breach

17  of contract by Ocwen, do you?

18  A.   I saw that date of October 3rd.  My recollection was that

19  it was after that.  I'm not going to dispute what the document

20  says, but I believe I was fairly cognizant or aware of my time

21  frame of when I went in there because I didn't want to go in

22  before the agreement was supposed to be settled.

23  Q.   Do you know why there would be an error on the account

24  if --

25  A.   No, sir.

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman                II - 272

1   Q.  -- that is -- if your recollection is correct and this is

2   inaccurate?

3   A.  No, sir.

4   Q.  Let me ask you to take a look at Exhibit 20.  And that's

5   another credit report that you had received or that

6   creditors you were interested in applying for lending with at

7   some point received; right?

8   A.  Yes, sir.

9   Q.  And about the Sunglass Hut incident, when you went in, you

10  said that you were denied the credit, and then you had to go

11  in -- was it the next day?

12  A.  Yes, sir.

13  Q.  Okay.  And then so it's the second day that you went in --

14  A.  I believe so, yes, sir.

15  Q.  -- with a friend?

16  A.  Yes, sir.

17  Q.  Okay.  Take a look, if you would, on Exhibit 20, the

18  credit report that you received from Universal, um, page 9.

19  And do you see there that in the section under "Inquiries

20  (Last 120 Days)," they note inquiries from Synchronicity Bank

21  on October 2nd, 2016, and October 3rd of 2016?

22  A.  Yes, sir.

23  Q.  Does that refresh your recollection that it was

24  October 2nd that you went in and attempted to receive credit

25  but were denied, and then it was the 3rd that you went in

Julie H. Thomas, RMR, CRR                         (303)296-3056

1    again with a colleague and -- or a friend and received the

2    credit?

3    A.   That's what the documents state, yes, sir.

4    Q.   You don't disagree with that date.

5    A.   I don't -- I guess I don't agree with what is in the

6    document.   That would be correct, sir.

7    Q.   You do disagree with it?

8    A.   I do not.

9    Q.   So if those events occurred on the 2nd and 3rd of October,

10   then you don't claim that that denial of credit that happened

11   on the 2nd of October was a breach of contract or a result of

12   a breach of contract by Ocwen.   Am I correct?

13   A.   That would be a correct statement.

14   Q.   Okay.   And the embarrassment and the upset that happened

15   on the 2nd of October you don't contend is the fault of

16   Ocwen's failure to implement the settlement agreement in a

17   timely way.

18   A.   The embarrassment would be the fact that I'm still getting

19   denied credit because there's false credit reporting on my

20   credit report.

21   Q.   You are not making a claim for damages in this case for

22   something that occurred on October 3rd or 2nd, are you --

23   A.   No, sir.

24   Q.   -- of 2016?

25   A.   No, sir.

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman                II - 274

1    Q.  Okay.  So that, I can say, is out of the case.

2    A.  Okay.

3    Q.  Is that accurate?

4    A.  That would be accurate.

5    Q.  Okay.  And that's the only time when you claim to have

6    been denied credit at all by any potential creditor; am I

7    correct?

8    A.  That would be correct.

9    Q.  Okay.  And I understand your testimony is that in

10   mid-October of 2016, you discovered that Ocwen had not

11   implemented credit reporting changes to your account as

12   agreed.

13   A.  That's correct.

14   Q.  When you discovered that -- and I heard an explanation, I

15   think, from -- in your direct testimony, but I want to be sure

16   that I have the facts correct.

17   A.  Yes, sir.

18   Q.  You did not call Ocwen directly.

19   A.  Correct.

20   Q.  You did not call any number at Ocwen.

21   A.  Correct.

22   Q.  You did not call your assigned account representative,

23   Hope Washington?

24   A.  That's correct.

25   Q.  You knew you had an assigned account representative, Hope

Julie H. Thomas, RMR, CRR                            (303)296-3056

1    Washington, didn't you?

2    A.  I knew from the attorneys because I had never received any

3    documentation showing that I had any type of relationship

4    manager.

5    Q.  Okay.  You have in front of you Exhibit 3; right?  Is that

6    right?

7    A.  I'm looking.

8            THE COURT:  It's not in evidence, for the record.

9            MR. HOFFMAN:  Oh, I'm sorry.  4.  Let's go to 4.

10           THE COURT:  All right.

11   BY MR. HOFFMAN:

12   Q.  And this is the payment stub that you say you keep and

13   send copies of --

14   A.  Yes, sir.

15   Q.  -- and you make the marks on --

16   A.  Yes, sir.

17   Q.  -- every month?

18           Okay.  And at the bottom of this payment stub that

19   you keep, it says "If you have any questions about your loan,

20   please call" -- and it gives you an 800 number -- "and ask to

21   set up an appointment with Hope Washington, your relationship

22   manager."

23           Right?

24   A.  Yes, sir.  I see that now.

25   Q.  And you also knew that from your attorneys, you said, I

1   think.

2   A.  I believe so, yes, sir.

3   Q.  That you had --

4   A.  Yes.

5   Q.  -- an assigned representative?

6   A.  Yes.

7   Q.  Have you ever called Hope Washington?

8   A.  No, sir.

9   Q.  So when you've had questions about your account, when

10  you've had the concerns about the letters that you've

11  received, when you've had, uh, concerns that you don't have

12  payment stubs to send in, any of those instances you've never

13  called Hope Washington?

14  A.  No, sir.

15  Q.  And you've never called anyone at Ocwen about those

16  issues?

17  A.  That's correct.

18  Q.  When -- back in October of 2016 when you had discovered

19  this concern about the implementation of the settlement

20  agreement, you did not instruct your lawyer to call Ocwen's

21  lawyers, did you?

22  A.  No, sir.

23  Q.  You did not write a letter to Ocwen?

24  A.  No, sir.

25  Q.  You did not write a letter to Ocwen's lawyers?

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman                    II - 277

1   A.  No, sir.

2   Q.  You knew Ocwen's lawyer, Miss Cynthia Lowery-Graber;

3   right?

4   A.  Yes, sir.

5   Q.  You had known her for a couple years?

6   A.  Yes, sir.

7   Q.  And your -- you knew that your lawyer also knew

8   Miss Cynthia Lowery-Graber?

9   A.  Yes, sir.

10  Q.  And you knew that your lawyer also had worked with Cynthia

11  Lowery-Graber as a representative, a legal counsel for Ocwen;

12  right?

13  A.  Yes, sir.

14  Q.  You knew that they had worked directly together in

15  reaching the terms of the settlement agreement?

16  A.  Yes, sir.

17  Q.  You knew that Ocwen had made the payment that it agreed to

18  make to you through Miss Cynthia Lowery-Graber to Mr. Osborne?

19  A.  Yes, sir.

20  Q.  And so there was a line of communication there; right?

21  A.  Yes, sir.

22  Q.  But you did not choose to utilize it?

23  A.  Correct.  Yes, sir.

24  Q.  And you don't dispute, of course, that Ocwen made its

25  payment obligation to you, under the settlement agreement?

1    A.  You are correct, sir, yes.

2    Q.  But neither you nor anyone on your behalf reached out to

3    Miss Cynthia Lowery-Graber or anyone else representing Ocwen

4    or at Ocwen to see if the account correction issue was just an

5    error or an oversight?

6    A.  Correct.

7    Q.  In October of 2016, you wrote letters to TransUnion,

8    Experian, and Equifax?

9    A.  Yes, sir.

10   Q.  And those are Exhibit 5, which I believe have been

11   admitted.  Let's look at the one that you wrote to TransUnion.

12           First of all, did you actually write this letter?

13   A.  Yes, sir.

14   Q.  Did you do it on the computer and --

15   A.  Yes, sir.

16   Q.  So these are your words?

17   A.  Yes, sir.

18   Q.  And you said that you were afraid to mention anything

19   about a settlement because you were concerned about the

20   confidentiality agreement; right?

21   A.  Yes, sir.

22   Q.  But you understood that the confidentiality agreement

23   prohibited you from discussing the terms or contents of the

24   settlement agreement; right?

25   A.  Correct.

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman                II - 279

1    Q.  Not the fact of a settlement agreement?

2    A.  Correct.

3    Q.  And you didn't mention the fact of a settlement agreement

4    in this letter either, did you?

5    A.  Correct.

6    Q.  You didn't mention that there had been prior litigation?

7    A.  Correct.

8    Q.  You didn't say that we have resolved this issue and

9    there's -- there must be some mistake?

10   A.  Correct.

11   Q.  You said you are just writing to dispute an inaccurate

12   account on your credit report.

13   A.  Yes, sir.

14   Q.  And you didn't -- when you sent this letter, you did not

15   copy or also send a letter to Ocwen, of course.

16   A.  Correct.

17   Q.  And, of course, with -- when you made the dispute report

18   to Experian, you used the exact same language; right?

19   A.  Correct.

20   Q.  And you also didn't send that to Ocwen?

21   A.  Correct.

22   Q.  And when you made the dispute to Equifax, you used the

23   exact same language again?

24   A.  Correct.

25   Q.  And did not send that to Ocwen?

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman                II - 280

1    A.   That's correct.

2    Q.   And you said you received responses from credit agencies;

3    right?

4    A.   Correct.

5    Q.   When you received the responses, you did not then call

6    Ocwen or call Ocwen's lawyers?

7    A.   Correct.

8    Q.   You didn't write a letter at that time either?

9    A.   Correct.

10   Q.   You didn't ask your lawyer to write a letter?

11   A.   Correct.

12   Q.   I want to -- I want to ask you about the emotional

13   distress issues you described.  And I understood from the

14   comments that your lawyer made in opening statement yesterday

15   that you chose not to seek any medical attention.  Is that

16   right?

17   A.   Correct.

18   Q.   So you sought -- or you decided not to seek -- talk with a

19   therapist or anybody like that?

20   A.   Correct.

21   Q.   And the reason he said that you didn't seek medical

22   attention is that you didn't want drugs and you thought that's

23   all that would happen --

24   A.   That's not --

25   Q.   -- is that right?

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman                II - 281

1    A.  -- all that I thought would happen.  I did not believe any

2    doctor could force Ocwen to do what they said they were going

3    to do for the settlement agreement.

4    Q.  Would you at least agree that what you were dealing with

5    was not so severe or serious to require medical attention?

6    A.  No, sir.

7    Q.  But you chose not to seek medical attention?

8    A.  Yes, sir.

9    Q.  Okay.  And that was your voluntary choice.

10   A.  Correct.

11   Q.  And you also chose not to seek a counselor.

12   A.  Correct.

13   Q.  And so would you agree it wasn't the type or severity of

14   issue that would require a counselor?

15   A.  No, sir.  I thought about it, and I did not believe that

16   any type of doctor or counselor would be able to force Ocwen

17   to adhere to their settlement agreement.  As I stated before,

18   this was the first time I've really -- in my life that I've

19   dealt with this type of stressful situation.

20   Q.  In any event, when you were dealing with the stressful

21   situation and addressing those issues, you made the conscious

22   decision on your own to not seek medical attention.

23   A.  Correct.

24   Q.  And to not seek any sort of counseling or therapy.

25   A.  Correct.

Julie H. Thomas, RMR, CRR                              (303)296-3056

 1   Q.  You mentioned that one of the things that you were

 2   concerned about was that Ocwen might initiate foreclosure

 3   proceedings or had initiated foreclosure proceedings; is that

 4   right?

 5   A.  Yes, sir.

 6   Q.  Now, you -- I think at the beginning of your testimony on

 7   direct you described that you had been through the foreclosure

 8   process back in 2011 maybe.

 9   A.  Yes, sir.

10   Q.  And that was a -- that was not Ocwen; right?

11   A.  Correct.

12   Q.  That was some other lender or some other --

13   A.  That's correct.

14   Q.  -- entity entirely?

15   A.  Yes, sir.

16   Q.  Okay.  And I think you described that in that situation

17   you had had postings on your door.  Maybe there was a

18   notification in the newspaper, you said.

19   A.  Yes, sir.

20   Q.  And somebody told you about it, told you they had seen

21   your name.  Nothing like that -- nothing like that happened

22   after September of 2016, did it?

23   A.  From what I understand, in two thousand -- let's see.  In

24   2013 --

25   Q.  I'm asking you about 2016.

1    A.   Okay.

2    Q.   After 2016, the time period we are talking about, after

3    September of 2016, nothing like that happened?

4    A.   I never had a notice on my door.  You are correct.

5    Q.   You never had a notice on your door.  You never received

6    mailings saying there was a foreclosure.  You never heard

7    anything -- anything like that from Ocwen, did you?

8    A.   If I may, the documents that I received when my checks

9    were returned indicating that foreclosure proceedings would

10   not be stopped --

11   Q.   If there were foreclosure proceedings, they would not be

12   stopped.

13   A.   Correct.

14   Q.   Okay.  So it was those letters that caused that concern,

15   and nothing else?

16   A.   Correct.

17   Q.   Okay.  Now, the payments were returned to you, of course,

18   with those letters?

19   A.   Yes, sir.

20   Q.   And that was on two occasions?

21   A.   In 2016, yes, sir.

22   Q.   In 2017, I think.

23   A.   Oh, or two thousand -- you're correct.  Thank you.

24   Q.   It would have been April and June?

25   A.   Yes, sir.

1    Q.  And the total amount of those payments was $2,440?

2    A.  Something to that effect.

3    Q.  And you know now, of course, that your account has been

4    credited those payments; right?

5    A.  I have been told that, and I understand that through these

6    proceedings, yes, sir.

7    Q.  You have been told that by Ocwen?

8    A.  I have been told that in the proceedings here.  I was not

9    told that by Ocwen before the proceedings that I recall.  And

10   I did not receive any type of documentation showing that those

11   payments had been applied.

12   Q.  You knew it at least two weeks ago.

13   A.  During -- you're correct, when we were here two weeks ago.

14   Q.  So you know you have received the benefit of those

15   payments; right?

16   A.  Yes, sir.

17   Q.  And, of course, you got to keep the funds.

18   A.  Yes, sir.

19   Q.  Mr. Osborne showed you Exhibit 20 and addressed in it a

20   portion of -- a portion of that document.  This is what the

21   first page of Exhibit 20 looks like.  Do you have it there in

22   front of you?

23   A.  Yes, sir.

24   Q.  And this is a subpoena response from a company called

25   Universal; right?  Universal --

Julie H. Thomas, RMR, CRR                                   (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman               II - 285

1   A.  Lending.

2   Q.  -- Lending Corporation?

3   A.  Yes, sir.

4   Q.  And on page 2 in Universal Lending Corporation's response

5   to the subpoena, they said "Ms. Jeffers did not officially

6   apply for a loan with our company."

7            Right?

8   A.  Correct.

9   Q.  And you agree with that.

10  A.  Correct.

11  Q.  You didn't apply.

12  A.  Correct.

13  Q.  So you weren't denied credit.  You didn't apply.  You

14  chose not to because you didn't think that you would be

15  able -- you decided you wouldn't be able to get the credit.

16  A.  Yes, sir.

17  Q.  And there was -- this is the page that Mr. Osborne showed

18  you.  There was -- excuse me -- of course, the comment from

19  Ocwen; right?

20  A.  What page is that, sir?

21  Q.  I'm sorry.  12.

22  A.  Thank you.

23  Q.  At the bottom it's 12.

24  A.  Thank you.  I've got it.

25  Q.  And then there's also a derogatory account with AC

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   Autopay; right?

2   A.   Yes, sir.

3   Q.   And there is a derogatory account with AHF?

4   A.   Yes, sir.

5   Q.   And there is a derogatory account with Homeward?

6   A.   Yes, sir.

7   Q.   And there are negative public records with, it looks like,

8   Capital One or Cap One?

9   A.   Yes, sir.

10  Q.   Where they sued you and received a judgment?

11  A.   Yes, sir.

12  Q.   And there was, of course, the Chapter 13 bankruptcy that

13  was also on this report.

14  A.   Correct.

15  Q.   You are not able -- well, you don't have any special

16  training or expertise in assessing the effect of one

17  derogatory remark on a credit score or a credit application,

18  do you?

19  A.   No, sir.

20  Q.   So you are not able to say what relative impact, that is,

21  the Ocwen negative reporting compared to the other negative

22  reporting had or might have.  You have no basis for that;

23  right?

24  A.   Correct.

25  Q.   In any event, you didn't file a loan application with

1    Universal Lending Corporation.

2    A.   That's correct.

3    Q.   You -- Mr. Osborne also showed you -- also showed you --

4    excuse me -- Exhibit 21.  That was also a subpoena response,

5    right, from loanDepot.com?

6    A.   Correct.

7    Q.   And would you flip to page 9?  It's marked at the bottom

8    in the big print, Loan Depot 0009.  And they actually provided

9    to you a loan estimate; right?

10    A.   Correct.

11    Q.   Estimated terms of a loan that, if you applied for it,

12    they would offer you?

13    A.   Correct.

14    Q.   But you didn't apply for it?

15    A.   That's correct.

16    Q.   And then let's go back to Exhibit 15.  That was the credit

17    report from TransUnion that you received February 21st of

18    2017; correct?

19    A.   Correct.

20    Q.   So February 21st of 2017, you had by then filed a lawsuit

21    against Ocwen; right?

22    A.   Yes, sir.

23    Q.   That was in January that you filed that lawsuit?

24    A.   From what I remember from the testimony, I believe

25    January 3rd.

1    Q.   Okay.  And you knew that there had been this failure to

2    implement timely the settlement agreement terms; right?

3    A.   Yes, sir.

4    Q.   And so that's one of the things, of course, that you were

5    suing Ocwen for --

6    A.   Yes, sir.

7    Q.   -- right?

8            And you got this credit report, and the Ocwen --

9    well, let's just go through it.  First, it shows -- the

10   February report shows an adverse -- I'm sorry.  I'm on

11   page 159.

12   A.   Thank you.

13   Q.   Yeah.

14   A.   You read my mind.

15   Q.   It shows an adverse report from the Colorado Federal

16   Court, Denver; right?

17   A.   Yes, sir.

18   Q.   The bankruptcy.

19   A.   Correct.

20   Q.   On page 160 it shows an adverse account with a company

21   called AC Autopay; right?

22   A.   Yes, sir.

23   Q.   It shows you had a Capital One.  Was that a credit card?

24   A.   Yes, sir.

25   Q.   You had a Chase Bank.  Is that also a credit card?

1   A.  Yes, sir.

2   Q.  On the next page, 161, Citicards, is that another credit

3   card?

4   A.  Yes, sir.

5   Q.  And by the way, these are all, the ones I'm looking at

6   now, are all under the heading "Satisfactory Accounts"; right?

7   Which is on page 160.  It starts listing them --

8   A.  Yes, sir.

9   Q.  -- satisfactory accounts --

10  A.  Yes, sir.

11  Q.  -- and it goes on for several pages.

12  A.  Yes, sir.

13  Q.  So we have the Citicards is a credit card.  There's the

14  Ford Motor credit.  That's your car loan; right?

15  A.  Yes, sir.

16  Q.  Kohl's department store, credit card?

17  A.  Yes, sir.

18  Q.  And there's the Ocwen Loan Servicing under the

19  satisfactory accounts; right?

20  A.  What page is that again, sir?  I'm sorry.

21  Q.  I'm sorry.  163.

22  A.  Thank you.

23  Q.  That's shown under satisfactory accounts?

24  A.  Yes, sir.

25  Q.  So you knew that by February 21st Ocwen was reporting

17-CV-00025-WYD-KHR        Jeffers - Mr. Hoffman                    II - 290

1   satisfactory credit for you; correct?

2   A.  Yes, sir.

3   Q.  And it says, in fact, "Pay Status:  Terms:  Current; Paid

4   or Paying as Agreed $1,200 per month, paid Monthly for

5   360 months."

6   A.  Yes, sir.

7   Q.  And then there are actually things marked in the boxes;

8   right?  There's information provided in the boxes.

9   A.  Yes, sir.

10  Q.  Right?

11          And I understand your testimony.  You say you

12  provided all this information?

13  A.  I said I called the credit bureau and had my account

14  frozen and had it corrected so it would be reported correctly

15  that I was paying on time and I was not late in any of my

16  payments.

17  Q.  You understand also that Mr. Flannigan says Ocwen had

18  suppressed any negative credit reporting about you, don't you?

19  A.  I understand that, sir.  Yes, sir.

20  Q.  But either way, you knew certainly by February 21st of

21  2017 that you did not have any adverse credit reporting by

22  Ocwen; right?

23  A.  You are talking -- can I clarify?  Just are you talking

24  February of 2017 or afterwards, sir?

25  Q.  Well, by February 21st of 2017, you knew there was no

1   adverse credit reporting.

2   A.  Yes, sir.

3   Q.  And you don't have any evidence of any adverse credit

4   reporting, do you?

5   A.  As a matter of fact, sir, I do.

6   Q.  Is there an exhibit that --

7   A.  No, sir.  It --

8   Q.  Okay.

9   A.  I --

10  Q.  If you are going to tell me something somebody told you --

11  A.  No, sir.

12  Q.  -- I don't want that.

13  A.  Okay.  No, sir.

14  Q.  Do you have a document or something?

15  A.  This morning when I was up at 2 o'clock because I can't

16  sleep at night, I went onto Credit Karma --

17  Q.  I -- I don't want to hear --

18  A.  Okay.

19  Q.  -- about what Credit Karma says.

20  A.  Okay.

21  Q.  If it's not an exhibit in the case --

22  A.  Okay.

23  Q.  -- it's not going to be evidence.

24  A.  Okay.

25  Q.  So thank you, but I don't want to hear about that.

1   A.  Okay.

2   Q.  So I think you said in -- let me explain that.  You

3   understand I'm not able to cross-examine you about documents

4   that aren't here in the courtroom; right?

5   A.  Yes, sir.

6   Q.  And I'm not able to ask you questions or ask Credit Karma

7   questions about this case because they are not here in the

8   courtroom; right?

9   A.  Yes, sir.

10  Q.  Okay.  That's why I don't want to hear about things that

11  aren't in the courtroom.

12          You testified, I think, that you were, in December,

13  very desperate to get away from Ocwen.

14  A.  Yes, sir.

15  Q.  And you wanted to refinance your loan.  That's why you

16  submitted those credit applications --

17  A.  Yes, sir.

18  Q.  -- that you -- well, you didn't submit the credit

19  applications.  That's why you made inquiries.

20  A.  You're correct, sir, yes.  Thank you for clarifying your

21  question.

22  Q.  And then after February when you knew that there was not

23  adverse credit reporting by Ocwen, did you seek any home loans

24  or refinancings?

25  A.  Well, I -- I can't bring up the fact that after February

1  of 2017, starting in March and April, the derogatory

2  information was back on my credit report.  And I understand

3  you're -- I understand your thought process there, and I

4  apologize.

5  Q.  I'm not aware that that's true.

6  A.  I understand.

7  Q.  So I understand you want to say it, but do you have a

8  single document to prove it?

9  A.  I have my documentation that I saw at 2 o'clock this

10  morning.  That's it, sir.

11  Q.  And you didn't bring it to the courtroom?

12  A.  I have it on my phone.  I can easily show you.

13  Q.  Did you request credit after February of 2017?

14  A.  No, sir.

15  Q.  I take it you are contending that there was derogatory

16  credit after February of 2017.  Right?

17  A.  Yes, sir.

18  Q.  But you brought no evidence to provide to the jury or the

19  Court or me about it other than what you say is on your phone.

20  A.  Yes, sir.

21  Q.  Okay.

22       MR. HOFFMAN:  I have nothing further at this time.

23  Thank you.

24       THE COURT:  All right.  Redirect.

25  ///

1                        **REDIRECT EXAMINATION**

2    BY MR. OSBORNE:

3    Q.  At any point has Ocwen apologized using the words "we're

4    sorry for doing fake investigations"?

5    A.  No, sir.

6    Q.  Have they ever apologized to you for the way they handled

7    your credit disputes?

8    A.  No, sir.

9    Q.  And to clarify, why didn't you send your dispute letters

10   to Ocwen directly as opposed to the credit bureaus?

11   A.  It was my understanding that a dispute would not be

12   counted unless it was sent directly to the credit bureaus.

13   Q.  All right.  The other derogatory accounts that Mr. Hoffman

14   covered with you, were those all pre-2011 bankruptcy accounts?

15   A.  Yes, sir, they were.

16   Q.  And Mr. Hoffman asked -- he showed you the proposed rate

17   from loanDepot.

18   A.  Yes, sir.

19   Q.  Was it your understanding you could still obtain that rate

20   in spite of the fact of Ocwen's false reporting?

21   A.  I --

22             MR. HOFFMAN:  Objection:  lacks foundation.

23             THE COURT:  Overruled.

24   BY MR. OSBORNE:

25   Q.  You can answer that.

 1    A.  Can you repeat it for me?  I'm sorry.

 2            MR. OSBORNE:  I'm sorry.  Could you read that back?

 3    I forgot what I said.  I'm sorry.

 4            THE WITNESS:  Thank you.

 5        (The record was read by the reporter.)

 6    A.  From the documents I read, that was a preliminary proposal

 7    or estimation of what could possibly happen.  It was my

 8    understanding that my current loan had to be reflected as

 9    accurate and up-to-date as far as payments go on the credit

10    bureaus, and it was not.  And I believe if it had only been a

11    couple of months type of situation, I probably could have

12    worked on it and gotten it approved, but since it was a

13    month-over-month longtime problem, I didn't believe I would

14    get approved.  And that was from the documentation I read in

15    that document, in that letter.

16            MR. OSBORNE:  Okay.  Your Honor, I'd like to mark an

17    exhibit as Exhibit 28.  It's a screen shot that we were able

18    to print from her phone at lunch.  I'd like to show it to

19    Mr. Hoffman first.

20            THE COURT:  Go ahead.

21            MR. HOFFMAN:  I can tell you I'm going to object to

22    it as hearsay, Your Honor.

23            THE COURT:  Well, I understand, but you need to look

24    at it.

25            And do you have a copy for me?

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR        Jeffers - Mr. Osborne                    II - 296

1            MR. OSBORNE:  I just have two.  Is there a way I

2     could get one more real quick?

3            THE COURT:  Let me see it, and then we can give it to

4     Mr. Keech.

5            MR. OSBORNE:  Thank you.

6            THE COURT:  All right.  What are you doing?  Are you

7     going to give this to her?  Do you want to mark it and give it

8     to Ms. Jeffers?

9            MR. OSBORNE:  Yes.

10            THE COURT:  All right.  Let's --

11            COURTROOM DEPUTY:  What number did you want?

12            MR. OSBORNE:  28.

13            MR. HOFFMAN:  That's not being shown to the jury, is

14     it?

15            MR. OSBORNE:  No, it's not.

16            Is that right?  It's off?

17            COURTROOM DEPUTY:  The big monitor is what they can

18     see.

19            MR. NOBEL:  Yeah, there's nothing on it.

20     BY MR. OSBORNE:

21     Q.  All right.  Miss Jeffers, I have marked as Exhibit 28 --

22     can you see that on the screen in front of you?

23     A.  Yes.

24     Q.  Please tell me what this document is.

25     A.  At 2 o'clock this morning, I thought I would check my

17-CV-00025-WYD-KHR      Jeffers - Mr. Osborne          II - 297

1   credit information.  So I went on to both TransUnion and

2   Experian to take a look to see how my Ocwen Loan was being

3   reported.

4   Q.  Okay.

5           MR. OSBORNE:  Your Honor, I'd like to move to admit

6   Exhibit 28.

7           MR. HOFFMAN:  Objection:  lacks foundation.

8           THE COURT:  Sustained.

9           MR. OSBORNE:  I have nothing further, Your Honor.

10          THE COURT:  All right.  Any recross?

11          MR. HOFFMAN:  No recross, Your Honor.

12          THE COURT:  All right.  So does the plaintiff now

13  rest?

14          MR. OSBORNE:  Yes, Your Honor.

15          THE COURT:  Does the defendant rest?

16          MR. HOFFMAN:  We'd like to discuss a motion first,

17  Your Honor.  I know your position, but --

18          THE COURT:  No, no, no.  I want -- no, I want to know

19  if you are going to call any more witnesses.  Do you have any

20  more evidence to present?  That doesn't foreclose you from

21  making whatever motion you want to make.

22          MR. HOFFMAN:  I don't anticipate any more witnesses,

23  no.

24          THE COURT:  So, again, are you resting?

25          MR. HOFFMAN:  We'll rest, yes.  I want to interpose a

 1   motion.

 2            THE COURT:  That's fine.  You are entitled to do

 3   that.

 4            All right.  So it seems that the evidence portion of

 5   this trial is complete.  So I've given to both counsel jury

 6   instructions.  We have not had a chance to look at them and

 7   talk about them.

 8            So, Counsel, how long do you think it will take us to

 9   review the set of jury instructions?  And there's a verdict

10   form that my law clerk may or may not have given you yet.  And

11   I need to know that so that I can figure out what time to have

12   the jury return tomorrow morning.

13            MR. HOFFMAN:  I think we are going to need at least

14   an hour.

15            MR. OSBORNE:  That sounds fine, Judge.

16            THE COURT:  All right.  Why don't we do this.  Let me

17   have the jury return at 9:30 tomorrow morning, and we will

18   start as close to 9:30 as we can.

19            Now, even though the evidence portion of the case is

20   concluded, it would be a violation of your oath if you were to

21   begin to discuss the case and figure out what you think or

22   don't think with your fellow jurors or with anyone else

23   because you need to hear the Court's final instructions of the

24   law as well as closing argument from the attorneys.

25            And so just be here promptly at 9:30, and we will

Julie H. Thomas, RMR, CRR                           (303)296-3056

 1  start as close to 9:30 as you can.  All right.  So you are

 2  excused for the evening.

 3      (Jury out at 4:25 p.m.)

 4          THE COURT:  All right, so have a seat.  I'm trying to

 5  figure out what I want to do here.  I think I want to deal

 6  with the jury instructions first.  I need to stop by 5:15.  So

 7  let's talk about jury instructions.  And to the extent -- are

 8  you talking about a Rule 50 motion?

 9          MR. HOFFMAN:  Yes.  And I think we have a written

10  motion for you.

11          THE COURT:  Where is it?  I haven't seen it.  Has it

12  been filed?

13          MR. LOPACH:  Not yet, Your Honor.  I think there's a

14  hard copy here.  I can call my assistant, and we can have that

15  filed.

16          THE COURT:  Well, what's the subject matter?  You

17  don't need to file it.  I mean, if it's -- what are you asking

18  me to do through the motion?

19          MR. LOPACH:  We are going to move under Rule 50, Your

20  Honor, that Ocwen is entitled to judgment as a matter of law

21  regarding the reasonableness of its investigation and also on

22  the willfulness component under the FCRA.

23          THE COURT:  All right.  I don't think you are, but if

24  you want to make a brief record.  Here's the problem you have

25  got.  I don't care what I've heard today.  The agreement

1    required Ocwen to do two important things within 30 days.

2    One, to adjust her account and bring it current, which it

3    didn't do until nine months later, and you were supposed to

4    fix her credit reports, and you didn't do that until much,

5    much later.  So even if the case is weak from the plaintiff's

6    standpoint, when you view the case in the light most favorable

7    to the nonmoving party, meaning the plaintiff, there's enough

8    evidence here for the jury to consider both willfulness and

9    reasonableness, or reasonableness and willfulness.

10           So I'm not -- I figured you were going to say this.

11   I am not inclined to grant a Rule 50 because I think it's

12   inappropriate.  And the sheer delay, coupled with the excuse

13   making made by your side, draws an inference there could be

14   some other reasons.  I don't know.  I'm not -- if I got a

15   motion from the plaintiff for me to find as a matter of law

16   that there was willfulness, I'd do the same thing.  I think

17   it's something the jury needs to decide.

18           You have a company like Ocwen.  Even if Mr. Flannigan

19   got sick, somebody should have talked to the lawyers about a

20   settlement with what is perceived to be a difficult account

21   and perhaps even a difficult mortgage holder.  And that -- and

22   there was -- I heard no explanation as to why the mistake

23   occurred.  It occurred, but it did have an impact on the

24   plaintiff.

25           So, anyway, I am inclined to deny.  If you want to

1   say more for the record, say it.  Don't file anything.  If

2   there's more you want to say, put it on the record, but I want

3   to move on.  So go to the microphone if you want to say

4   anything.  I'm not going to grant it, but I will give you a

5   few minutes to make a more complete record if there's more you

6   want to say.

7          MR. LOPACH:  Sure, Your Honor.  And I think, just

8   based upon your comments, there's a couple things to keep in

9   mind, which is that I think what the Court has mentioned with

10  respect to the length of time and those three issues, those

11  all go to the breach of contract case.  So what we are moving

12  on is the FCRA case.  So the plaintiff has two claims; one for

13  breach of contract, the second claim for a violation of the

14  Fair Credit Reporting Act.

15         THE COURT:  Well, but you didn't deal with the credit

16  issues.  Her credit report was still messed up for months

17  after you should have fixed it.

18         MR. LOPACH:  The issue here, Your Honor, and this is

19  specifically if we look at the specific FCRA section that was

20  cited initially in the Complaint, and we look at the same

21  specific FCRA section that is contained within the Final

22  Pretrial Order, and that is 15 U.S.C. Section 1681s-2(b)(1),

23  under -- and that's the issue -- that's the legal issue, the

24  claim that was framed under the FCRA for these proceedings.

25         The sole inquiry for liability under the negligence

1    standard there is whether the furnisher's investigation was

2    reasonable.  And that reasonableness is a 30-day period.  So

3    we talked about the ACDVs in Exhibit 6.  A furnisher such as

4    Ocwen when it receives the ACDV from the consumer reporting

5    bureau has 30 days, and that is the operative focus to

6    determine the reasonableness of the investigation under the

7    FCRA.  It is just those 30 days.

8            Doesn't have anything to do with the -- some other

9    codes on there.  Doesn't have anything to do with the breach

10   of contract.  It doesn't have anything to do with the

11   implementation, the payment of the settlement funds, and when

12   the account was corrected or when the credit was reported

13   back.

14           The issue here, and I think this will come up in our

15   jury instructions as well, is just this 30-day period and the

16   reasonableness of that investigation.  And we believe that,

17   based upon the evidence that we have heard, number one, that

18   the investigation was reasonable, and, number two, even if it

19   wasn't reasonable, there certainly has been no testimony that

20   would establish as a preponderance -- by a preponderance of

21   the evidence that Ocwen's conduct was willful.

22           So starting with reasonableness -- and, again, I

23   think, you know, one of the things -- and this is in the jury

24   instructions -- is that even if the conclusion of that

25   investigation was erroneous, that doesn't mean that the

1    investigation itself was unreasonable.  You can have an

2    outcome that is not advantageous to the consumer or isn't even

3    correct, but that in and of itself, the correctness, the end

4    result of that investigation should not be confused with the

5    determination of the reasonableness of what the furnisher did

6    during that operative 30-day window under the statute.

7            And so what we believe is what the evidence has shown

8    and based upon the testimony -- there was really only one

9    witness that the plaintiff called to talk about the

10   reasonableness of the investigation.  It was Mr. Flannigan.

11   And Mr. Flannigan's testimony was that what Ocwen did during

12   this time period is they receive the complaint from the credit

13   bureau.  They -- it's noted in the ACDV, which was Exhibit 6.

14   They have got 30 days to respond.  They create an internal

15   shorter deadline so they never run the risk of running afoul

16   of that 30 days.  And in this instance they reported well

17   within that 30-day period each and every time.

18           They assign it to their credit operations team, and

19   what the credit operations team does is they look at the

20   dispute code.  And that's a very important issue here.  And in

21   the four ACDVs in Exhibit 6, we have a dispute code of 106,

22   109, and two with a 112.  That dispute code, which comes from

23   the consumer, frames the scope of the investigation.  And

24   that's well settled law that the -- that code, the dispute

25   code, which ultimately comes from the consumer, that sets our

 1   framework.

 2          And so we have got 30 days to look within that

 3   framework of the dispute code, and that's what we are

 4   analyzing.  So in these instances, you know, we look at the

 5   dispute code -- the credit team does.  That's what the

 6   testimony was.  And they are analyzing, well, is the account

 7   information correct?  And they were looking at their system.

 8   And the testimony was, what these individuals -- who are

 9   trained, and they are Ocwen employees, and they are retrained

10   and have updated training, and they are looking at the

11   universe of information framed by the consumer's complaint.

12   And so they look at their -- they look at the information

13   that's in the Ocwen Loan Servicing database.

14          And here they looked at the information, and they

15   said, this is -- she wants to know whether or not the account

16   is current or not.  They had a very limited amount of

17   information that we saw in Exhibit 25, which were the

18   letters -- or Exhibit 5 -- excuse me -- Exhibit 5, which were

19   the letters from Miss Jeffers to the four credit agencies.

20   Those are converted into the -- into the dispute codes.

21          And when Ocwen -- what the testimony was was they

22   looked, and they looked at -- it's a -- you know, at this

23   inquiry.  They look at their system.  They rely on the

24   information in their system, and they reported back.  Now,

25   there was nothing that was reported on any of the four

 1    occasions to the credit bureaus that would have led Ocwen's

 2    internal credit reporting team to look at the settlement

 3    agreement, and there's a code --

 4             THE COURT:  No, that's hogwash.  Come on.  Give me a

 5    break here.  Mr. Flannigan testified that if Ocwen had timely

 6    corrected the financial records, that what would have been

 7    reported would have been different than what was reported.

 8    Ocwen made a mistake because it didn't communicate within its

 9    chain of command about the settlement.  And because it didn't

10    communicate, the information that should have been in the file

11    wasn't there.

12             And then you want to argue that I should grant

13    Rule 50 relief because, as Instruction 12 talks about, your

14    investigation was reasonable.  That's hogwash.  It wasn't

15    reasonable.  Ocwen, as a company, had an obligation to fix her

16    credit within 30 days.  And it's broader than the breach of

17    contract because under Instruction 12 proposed by the Court, a

18    furnisher of information who has received notice of a dispute

19    from a CRA, and the notice was received based on what

20    Miss Jeffers sent in to the credit bureau, is required to,

21    one, reasonably investigate the disputed information, to

22    review all relevant information provided by the CRA, report

23    the results of the investigation.

24             And, sure, technically they reported results that

25    were in response to what was in their system.  That would have

1   been reasonable, but you've got to look at the whole context

2   of the thing.  The breach of contract and the FCRA claim are

3   interrelated.  What you are saying makes no sense to me.  It

4   just makes no sense.  So it's denied.  I don't want to hear

5   any more of this.

6                MR. LOPACH:  Okay.  Can I make a record, Your Honor?

7                THE COURT:  Briefly.

8                MR. LOPACH:  On the issue of recklessness, that's the

9   second component of the FCRA claim.  We are also moving under

10  Rule 50 that the plaintiff has failed to prove as a matter of

11  law that Ocwen's conduct rises to a willful -- a level of

12  willfulness.  And a violation of the FCRA is intentional or

13  willful only if the defendant acted with specific intent not

14  to comply with the FCRA's obligations.  A violation of the

15  FCRA is committed with reckless disregard only if the

16  defendant acted purposefully with knowledge that his conduct

17  was dangerous, done heedlessly and recklessly without regard

18  to consequences or of the rights and safety of others,

19  particularly the plaintiff.

20               Here --

21               THE COURT:  Wait a minute.  Ocwen waited nine months

22  to fix her questioned credit.

23               MR. LOPACH:  And, again, I would --

24               THE COURT:  Hold on.  Stop.  I'm talking; you are

25  not.  It seems to me that Ocwen had an obligation to

1    communicate to everybody who needed to know the requirements

2    of the settlement agreement.  It didn't happen.  I'm not

3    saying that equals willfulness, but it's a jury question, and

4    I can't decide it as a matter of law.  I'm going to have the

5    jury decide this.

6           It's inappropriate, it's wrong for me to issue a

7    Rule 50 relief.  I'm not going to do it.  I will give you

8    another minute to say whatever else you want to say, and then

9    you have to sit down.  I want to work on jury instructions.

10           MR. LOPACH:  Thank you, Your Honor.  I appreciate it.

11    I would just direct the Court's attention to the fact that

12    there was no evidence that Ocwen acted willfully here.  In

13    fact, I think the sole testimony on this issue from

14    Mr. Flannigan was:  Was there ever any time after the parties

15    entered into this settlement agreement when it was finalized

16    in September of 2016 that Ocwen said, gosh, we are going to --

17    we know what we are supposed to do, and we are going to

18    disregard that?  And the unrebutted testimony in the record is

19    that there was never any intent by Ocwen to willfully or

20    recklessly or intentionally not reasonably investigate

21    the -- the complaints that are received through Exhibit 6.

22           THE COURT:  All right.  I hear you.

23           Do you have a response that you want to make,

24    Mr. Osborne?  If so, make it brief.

25           MR. OSBORNE:  Well, just briefly, Your Honor, the

1   standard is recklessness.  We don't have to show evil motive.

2   A reasonable jury could easily view this as reckless.  This

3   was a very sloppy, cursory review of the disputes as a matter

4   of practice.  They didn't call anybody.  They didn't talk to

5   each other.  There is evidence that Bindu actually learned of

6   the litigation in their second investigation and still didn't

7   even bother checking with the legal department.  I have a

8   bunch of cases -- if the Court wants me to cite them, I'm

9   happy to -- that say these similar type of automated, cursory,

10  sloppy reviews could be willful and are jury questions.

11          THE COURT:  All right.  Here's what I'm going to do.

12  Rule 50 is the operative rule, and (a)(1) says when a party

13  has been fully heard on an issue during a jury trial and the

14  court finds that a reasonable jury would not have a legally

15  sufficient evidentiary basis to find for the party on the

16  issue, the Court may (A) resolve the issue against the party.

17          The defendant has filed a -- not filed -- has

18  asserted a Rule 50 motion on two grounds:  One, as it relates

19  to whether or not there is evidence of negligence or

20  recklessness within the meaning of the FCRA and, further,

21  whether there's willfulness.  And in ruling on this motion, I

22  must view the evidence in the light most favorable to the

23  nonmoving party, which is the plaintiff.

24          The problem with this motion is the evidence here

25  would support -- well, there's enough evidence for the jury to

1    find in favor of the plaintiff, if it chose to, on all these

2    claims.  And it has to do with what Mr. Flannigan said.  He

3    acknowledged mistakes.  Well, the mistakes lasted for nine

4    months.  And even though technically what was reported to the

5    credit bureau was what was in the file, the problem is the

6    file should have been fixed.  And Mr. Flannigan said

7    repeatedly that if the files had been fixed in a timely

8    manner, the information that would have been submitted to the

9    credit bureau would have been different.

10          And so on this record, it is ridiculous and

11    preposterous for the Court to not consider the context in

12    which all of this occurred.  Ocwen knew or should have known

13    that it entered into a settlement agreement.  It agreed to pay

14    $80,000.  It paid that, but it didn't pay any attention to the

15    other two obligations.  Now, whether or not that means

16    plaintiff wins in a big way at trial is up to the jury.  But

17    to say the jury shouldn't decide that makes no sense to me.

18    So the Rule 50 motion in its entirety is denied.

19          All right.  Now I want to talk about these jury

20    instructions.  So starting with you, Mr. Osborne, I want you

21    to tell me the jury instructions for which you have a comment,

22    an objection, or a concern.  And I don't want you to tell me

23    what it is.  Just give me the number.  We will do the same

24    thing for the defendant, and then we will come back to these

25    one by one.

17-CV-00025-WYD-KHR        Instruction Conference                II - 310

1          No, you can stay in your seat.  You don't need to

2    stand up.  Stay in your seat.  Sit with your client.  And you

3    don't need to jump up and down or do whatever.  All right.

4          MR. OSBORNE:  Well, overall I find --

5          THE COURT:  I want you to tell me the number of any

6    instruction for which you have a comment or a concern.  Don't

7    tell me what it is.  Just give me the number.

8          MR. OSBORNE:  Number 10.

9          THE COURT:  Is that the only one?

10         MR. OSBORNE:  10 and number 16.

11         THE COURT:  Those are the only two?

12         MR. OSBORNE:  Yes.

13         THE COURT:  What about the defendant?  Same thing.

14         MR. HOFFMAN:  We have number 6, number 7, number 10,

15    number 13, number 15, number 20, number 21, and number 22.

16         THE COURT:  So just so I'm clear on the Rule 50

17    motion, don't file anything because I have already ruled on

18    it.  So --

19         MR. HOFFMAN:  I think we already have.

20         THE COURT:  Well, when it comes in, Mr. Keech, it's

21    denied, whenever we see it, for the reasons stated on the

22    record.  I'm not going to take --

23         COURTROOM DEPUTY:  Last I checked, it had not been

24    filed.  It has not been filed yet.

25         THE COURT:  Okay.  Tell your people not to file it.

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR       Instruction Conference                II - 311

 1  But if they have filed it, it's denied.

 2          COURTROOM DEPUTY:  I just refreshed.  It's not filed.

 3          THE COURT:  All right.  So tell your people not to

 4  file it because it's been denied.

 5          MR. HOFFMAN:  If you don't mind, Your Honor, I

 6  understand your ruling, and I'm not challenging your ruling.

 7  We'd like to have the record of the motion filed.  It sets

 8  forth a complete articulation of our argument.

 9          THE COURT:  Do you want to file a response?

10          MR. OSBORNE:  No, Your Honor.

11          THE COURT:  All right.  It's denied.

12          All right.  In fact, I will probably strike it as

13  useless because we had this discussion in court.  So I don't

14  want it filed is what I'm telling you.  If you file it, I'm

15  going to strike it.

16          MR. HOFFMAN:  Okay.

17          THE COURT:  So do what you want.

18          MR. HOFFMAN:  I understand.

19          THE COURT:  And I'll do what I have to.

20          All right.  Let's go then to number 6.  This is a

21  stipulated instruction.  And the only thing that was added to

22  what you stipulated to, we added the first paragraph from

23  FJI:153:20 so that it would be more complete.

24          MR. HOFFMAN:  And that's the first paragraph we

25  object to.

Julie H. Thomas, RMR, CRR                        (303)296-3056

 1            THE COURT:  All right.  What's the plaintiff's

 2   response?

 3            MR. OSBORNE:  Well, I just noticed that as well, Your

 4   Honor.  I think that's standard, failure to follow reasonable

 5   procedures to assure maximum possible accuracy.  I think

 6   that's actually the standard for credit bureaus under 1681.

 7            THE COURT:  So you don't think we need it?

 8            MR. OSBORNE:  Right.

 9            THE COURT:  Hold on a second.  Let me look at it.

10   You could be right on that.

11            So what are you seeking to have me take out of 6?

12            MR. HOFFMAN:  The words that follow -- in the first

13   sentence you get to "Act" and everything that follows that.  I

14   think we should change the Act --

15            THE COURT:  "Plaintiff claims defendant negligently

16   failed to comply with the Act" and then period?

17            MR. HOFFMAN:  Or it could be "the Fair Credit

18   Reporting Act" would be fine.

19            THE COURT:  "Plaintiff claims defendant negligently

20   failed to comply with the FCRA"?

21            MR. HOFFMAN:  Sure.

22            MR. OSBORNE:  That's fine.

23            THE COURT:  And put a period after that?

24            MR. OSBORNE:  Sure.

25            THE COURT:  Okay.  We will do that.  And I agree with

1   your comment there.  All right, we will put a period.  And the

2   rest of that sentence comes out.

3          And other than that, is the rest of the Instruction

4   No. 6 acceptable to both sides?

5          MR. OSBORNE:  Yes, sir.

6          MR. HOFFMAN:  Yes.

7          THE COURT:  All right.  Let's go then to 7.  What's

8   the issue with 7?

9          MR. HOFFMAN:  We think it's out of order and it

10  should come earlier.  It's in the middle of the charge about

11  the FCRA.

12         THE COURT:  So you don't object to what it says.  You

13  object to where it's located.

14         MR. HOFFMAN:  Correct.

15         THE COURT:  Where do you want to put it?

16         MR. HOFFMAN:  I would suggest at number 3 or 4.

17  Actually, that may have changed now because they were

18  reordered.  Let's see.

19         THE COURT:  Well, we have the stipulation as 3.

20         MR. HOFFMAN:  Yeah.

21         THE COURT:  It would seem to me -- and I agree with

22  you.  This is more of a background instruction, and so why

23  don't we move it up and make it number 4.

24         MR. HOFFMAN:  That's fine.

25         THE COURT:  Does that work for the plaintiff?

1              MR. OSBORNE:  Sure.

2              THE COURT:  All right.  We will move to 4.  We will

3     make it Instruction No. 4.  All right.

4              All right.  So the next one is number 10.  Number 10,

5     what's the issue on number 10?

6              MR. HOFFMAN:  The first paragraph has the same

7     language from the wrong statute.  It's from 1621d instead of

8     1621s-2(b) [sic].

9              THE COURT:  Okay.  So what are you proposing that we

10    take out of number 10?

11             MR. HOFFMAN:  The entire first sentence.  "Plaintiff

12    claims defendant willfully failed to follow reasonable

13    procedures to assure maximum possible accuracy of the

14    information contained in the reports concerning plaintiff."

15             THE COURT:  What do you propose, Mr. Osborne?

16             MR. OSBORNE:  We could just replace that with

17    "Plaintiff claims defendant willfully violated the FCRA"

18    period.

19             THE COURT:  Willfully --

20             MR. OSBORNE:  Violated.

21             THE COURT:  -- violated the FCRA.  Any objection to

22    that by the defendant?

23             MR. HOFFMAN:  No.

24             THE COURT:  All right.  And so we will put a period

25    there.  The rest of that sentence comes out.

1           And then we pick it up with "Plaintiff has the burden

2    of proof on each of the following propositions."  Do you agree

3    with that?  The rest of it is acceptable?

4           MR. HOFFMAN:  The rest of it is --

5           THE COURT:  All right.

6           MR. HOFFMAN:  The rest of it is acceptable, yes.

7           THE COURT:  All right.  And it's acceptable to you,

8    Mr. Osborne?

9           MR. OSBORNE:  Well, Your Honor, the only thing I

10   wasn't totally clear on, so my understanding of willfulness is

11   that the jury could award punitive damages even if they don't

12   find actuals, and that's a Tenth Circuit case.

13          THE COURT:  Well, I understand that.  I read that in

14   the *Llewellyn* case.  Is that the one you are talking about?  I

15   was confused by that, but when you look at the verdict form,

16   the verdict form -- where is it?  I don't have the proposed

17   verdict form.

18          Okay.  The verdict form, if you look at it, has two

19   Fair Reporting Act claims.  One is:  "Has the Plaintiff proved

20   by a preponderance of the evidence the defendant negligently

21   violated the Fair Credit Reporting Act as defined in

22   Instruction No. 15?"  Yes or no.  And then:  "Has the

23   Plaintiff proved by a preponderance of the evidence the

24   Defendant willfully violated the Fair Credit Reporting Act as

25   defined in Instruction No. 16?"

17-CV-00025-WYD-KHR          Instruction Conference                    II - 316

 1          And by the way, I think moving that one, 7, back to 4

 2  shouldn't change these numbers, because we are not adding one.

 3  We are just repositioning one earlier.

 4          Then "If you answered 'Yes' to Question 1 or 2, or

 5  both, then state the amount of Plaintiff's actual damages on

 6  her Fair Credit Reporting Act claim."

 7          Because there's a suggestion that either for

 8  negligence or willfulness damages could be awarded, meaning a

 9  nonpunitive damage award, but then there has to be willfulness

10  to support a punitive damage award.  And I'm open to reworking

11  this, because I read the statute, and this is -- it's a little

12  bit confusing.  But I'd like to take care of your concern with

13  the verdict form rather than the instructions.  That's really

14  what I'm saying.

15          MR. OSBORNE:  I understand.

16          THE COURT:  Does that make sense to you?

17          MR. OSBORNE:  Yeah.  I can live with that.  Sure.

18          THE COURT:  Okay.  Is there any other issue with

19  number 10?

20          MR. HOFFMAN:  The only issue for the record is that,

21  obviously, we think willfulness hasn't been established and

22  there's not sufficient evidence for the instruction.  So we

23  generally object to the instruction.

24          THE COURT:  No, I understand.  You have made a record

25  on that, and I have no issue with you saying that, but I want

17-CV-00025-WYD-KHR       Instruction Conference                    II - 317

1    to get your comment --

2              MR. HOFFMAN:  I understand.

3              THE COURT:  -- on if willfulness is given, do you

4    agree with --

5              MR. HOFFMAN:  The instruction is fine with that

6    change.

7              THE COURT:  All right.  All right.  Let's go to --

8    what's the next one?  Let's go back to the sheet here.

9    Number 13 is the next one.  What's the issue on number 13?

10             MR. HOFFMAN:  The issue there is the first sentence.

11   "An 'investigation' is a detailed inquiry or systematic

12   examination of the furnisher's records to determine whether

13   the disputed information can be verified."  And we believe

14   that goes to a heightened standard above and beyond reasonable

15   investigation.  The *Johnson* case is the case I believe that it

16   comes from.

17             THE COURT:  Right, *Johnson versus MBNA American Bank*.

18             MR. HOFFMAN:  The Johnson case provides that

19   definition and then goes on to conclude that what -- in that

20   case the MBNA bank was arguing that there should be no

21   qualifier at all.  It should just say "investigation."  And

22   the *Johnson* court concluded that the qualifier should be

23   reasonable investigation, and that -- it got to that

24   conclusion because it determined that "investigation" implies

25   reasonableness and some level of reasonable inquiry.  And it

1   goes on to make the -- to the finding that the reasonable --

2   reasonable inquiry is what's required.  So it's reasonable

3   investigation without defining the other portion.

4         And in the *Gorman* case, which it's also addressed in,

5   in *Gorman* the court notes that the -- that using the

6   language -- the "investigation" language describing the

7   investigation further or other than reasonable imposes a

8   heightened standard over and above reasonableness.

9         So we think all we have is a reasonable inquiry

10  standard, a reasonable investigation standard, and imposing a

11  detailed inquiry or systematic examination of the furnisher's

12  records heightens that inquiry.

13        THE COURT:  So what are you proposing that this

14  instruction say or not say?

15        MR. HOFFMAN:  We propose that it strike that

16  sentence.

17        THE COURT:  Which sentence?  The first one?

18        MR. HOFFMAN:  First sentence.  "An 'investigation' is

19  a" -- we don't think "investigation" needs to be defined to

20  the jury.  It's a common term.  And "reasonableness" does, and

21  it's defined elsewhere, but "investigation" we don't think is

22  appropriate to define for the jury, and doing it imposes a

23  heightened standard.  We move to strike that first sentence.

24        THE COURT:  Respond.

25        MR. OSBORNE:  Well, I have a much different reading

1    than *Gorman* and *Johnson*.  So *Johnson* was an order affirming a

2    jury verdict, and it's actually a pretty similar fact pattern

3    to this where the bank was just doing cursory reviews of the

4    disputes and not really doing an investigation.  And the

5    furnisher tried to argue and say, well, that meets the

6    standard 'cause it's just an investigation.

7         And then the Fourth Circuit and the Ninth Circuit

8    pointed out to those furnishers the dictionary definition of

9    "investigation" which is this first sentence.  And they say

10   what you did doesn't even meet the definition of

11   "investigation" let alone get to "reasonableness."  And then

12   they say, to clarify, we are imposing the reasonable standard

13   because it would make no sense whatsoever for Congress to pass

14   a law requiring banks to do sloppy, cursory investigations

15   that don't really do anything.

16        So I think this sentence should stand because it's an

17   accurate statement of the law.

18        THE COURT:  Let me just note in the *Johnson* case,

19   page 431, the Fourth Circuit notes:  "We therefore hold that

20   Section 1681s-2(b)(1) requires creditors, after receiving

21   notice of a consumer dispute from a credit reporting agency,

22   to conduct a reasonable investigation of their records to

23   determine whether the disputed information can be verified."

24        And then in the *Gorman* case, *Gorman versus Wolpoff*,

25   584 F.3d 1147, the Ninth Circuit notes that "We emphasize that

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-CV-00025-WYD-KHR       Instruction Conference                II - 320

1    the requirement that furnishers investigate consumer disputes

2    is procedural.  An investigation is not necessarily

3    unreasonable because it results in a substantive conclusion

4    unfavorable to the consumer, even if that conclusion turns out

5    to be inaccurate."

6            So I think "investigation" should be defined.  If

7    it's not defined, the jury won't have any guidance, and the

8    purpose of jury instructions is to provide guidance.  So I

9    will overrule the objection, and number 13 will be given as

10   appears.

11           All right.  What's the next instruction?

12           MR. HOFFMAN:  In addition, Your Honor, I don't know

13   if you want to take it up with this instruction or -- we filed

14   two additional proposed instructions.

15           THE COURT:  We are going to get to those last --

16           MR. HOFFMAN:  Okay.

17           THE COURT:  -- because they are not in here, and we

18   will come back to them.  And if I think they are

19   appropriate --

20           MR. HOFFMAN:  They would likely fit here.

21           THE COURT:  I looked at the first one a couple days

22   ago, or whenever you filed it.  I haven't seen the second one

23   because I have been out here working.

24           MR. HOFFMAN:  Okay.

25           THE COURT:  The next one is Instruction No. 13.

1   What's the issue on 13 for the defendant?  Not 13.  I'm sorry.

2   We did 13.  I meant 15.  Pardon me.  15.

3            MR. HOFFMAN:  The issue on 15 is the language in the

4   first -- I'm sorry -- the second paragraph at the end when the

5   itemization of damage -- forms of damages under the Act.

6   Frankly, we think that's advocacy to list all of those

7   itemizations:  "embarrassment, humiliation, worry, stress,

8   inconvenience, difficulty sleeping, hair loss, and emotional

9   distress."  And "emotional distress" would be fine to cover

10  all of that without advocating for the plaintiff.

11           THE COURT:  Okay.  Respond, Mr. Osborne.

12           MR. OSBORNE:  Well, I don't view it as advocating.  I

13  think it's completely appropriate to list examples of types of

14  damages.  I know I have seen similar instructions approved

15  before, and I think we should leave it how it is.

16           THE COURT:  So, for example, in the pattern

17  instruction it says:  "You should include each of the

18  following items of damages that you decide has been sustained

19  by Plaintiff by Defendant's negligent noncompliance with the

20  Act."  List items of damage asserted by plaintiff, e.g.,

21  mental anguish, embarrassment, humiliation.

22           So let's look at the items for which there's some

23  evidence.  So she talked about credit denials in the context

24  of her saying that because of the misinformation on these loan

25  packages she got, she decided not to apply.  And I think

1    that's a form of denial because she reached the conclusion

2    that because of the false information in these reports that

3    there was no way she could have gotten her loan financed.

4           Damage to credit.  That's part of this clearly.

5           Damage to reputation is implicit in not having the

6    defendant update her financial information for the mortgage

7    and the credit information in a timely manner.

8           She talked about embarrassment, uh, not just about

9    the Sunglass Hut but also about the embarrassment of not

10   having her credit reflect what it should have been.

11          Was there evidence on humiliation?  Did she say

12   anything about humiliation, Mr. Osborne?

13          MR. OSBORNE:  I believe so, Your Honor.  I think it's

14   actually pretty much the same as embarrassment.

15          THE COURT:  Yeah, I'm going to leave it in.

16          Worry, stress, inconvenience, difficulty sleeping --

17   she talked about that -- hair loss, and emotional distress.

18   I'm leaving all of this in.  I am not being an advocate, but

19   the -- because, if anything, the rulings in this case have

20   been as much favorable for the defendant as for the plaintiff,

21   although I didn't do that for that reason.  So the Court is

22   fair to everybody or unfair to everybody to the same extent.

23          So I think the enumeration is consistent with what

24   the pattern instruction requires, and I think the enumeration

25   that's noted here is supported by Miss Jeffers' testimony, and

 1    I'm going to leave it in.  So your objection is noted.

 2            Anything else about 15?

 3            MR. HOFFMAN:  Yes.  Two paragraphs down.  There's the

 4    sentence "If any item of damage is of a continuing nature, you

 5    must decide how long it may continue."  I don't believe

 6    there's been any evidence of damages of a continuing nature.

 7            THE COURT:  Respond.

 8            MR. OSBORNE:  Well, I think that's just a jury

 9    question.  I think it should stay in there.

10            THE COURT:  I'm going to leave it in.  It's part of

11    the pattern instruction, and the parties can argue whether or

12    not there's continuing damage or not.  I don't know.  The jury

13    needs to decide this, not the Court.

14            All right.  Anything else on 15?

15            MR. HOFFMAN:  Nothing else on 15.

16            MR. OSBORNE:  Nothing from me.

17            THE COURT:  All right.  Let's go to 20.

18            MR. HOFFMAN:  20 --

19            THE COURT:  Hold on.  Hold on.  Let me look at it.

20    Hold on.

21            All right.  20 comes from 30-13.  Now, let me just

22    tell you.  The change we made was from "reasonably foreseeable

23    damages" to "damages naturally arising from the breach" to

24    match the federal pattern instruction 126:07.  That's what the

25    change is.  All right.

17-CV-00025-WYD-KHR        Instruction Conference              II - 324

 1              MR. HOFFMAN:  The other -- there's an option in the

 2    instruction for -- it's the last sentence.  "If Plaintiff has

 3    proved" -- and the word is "general damages" --

 4              THE COURT:  Hold on.  Let me get 126:07.

 5              All right.  Go ahead.  Let me hear your objection.

 6              MR. HOFFMAN:  We just want to change the word

 7    "general damages" to "actual damages."  We think in a contract

 8    case and a case like this one "actual damages" is the right

 9    word, not "general damages" which might be confused with the

10    broader testimony that's been admitted for purposes of the

11    damage statute under the FCRA claim.  It would not be

12    appropriate to award those types of damages here.

13              THE COURT:  Respond, Mr. Osborne.

14              MR. OSBORNE:  I'm not really sure what the difference

15    is, so if they want to change it to "actual damages" I don't

16    object.

17              THE COURT:  How about just say "damages"?  What's the

18    problem with saying "damages"?  The reason I say that, when we

19    get to the verdict form -- and I spent some time this

20    afternoon with this verdict form.  I had a question about --

21    well, let me back up.

22              I changed it so it's "she incurred damages under her

23    Breach of Contract claim as defined in Instruction No. 20."

24    So really perhaps we should say "actual damages" so that it's

25    clearer what we are talking about.  All right.  All right.  So

1   if I change the word to "actual damages" is this acceptable to

2   both sides?

3           MR. HOFFMAN:  Yes.

4           MR. OSBORNE:  Yes.

5           THE COURT:  All right.  Anything else on 20?

6           MR. HOFFMAN:  No.

7           THE COURT:  All right.  Let's go to 21.

8           MR. HOFFMAN:  It's a continuation of the same issue.

9   The word "general" appears in the first sentence and also the

10  first sentence of the second paragraph.

11          THE COURT:  Hold on.  Let's look at this.  "If you

12  find in favor of the Plaintiff on her claim of breach of

13  contract, then you must award her" -- you want to make it

14  "actual or nominal"?

15          MR. HOFFMAN:  Correct.

16          THE COURT:  And we don't need "nominal actual

17  damages."

18          MR. HOFFMAN:  No, we don't.

19          THE COURT:  It would be "nominal damages."

20          MR. HOFFMAN:  Correct.  And that's in both places.

21          THE COURT:  So where does that appear next -- oh, in

22  the next sentence?

23          MR. HOFFMAN:  Yes.

24          THE COURT:  So we will make it "actual or nominal

25  damages."

1          Then if you look at the very end, "If you find in

2    favor of the Plaintiff, but do not find any general actual

3    damages, you shall award Plaintiff nominal damages."  So

4    should we say "general actual damages" or just "actual

5    damages"?

6          MR. HOFFMAN:  I think we should say "actual damages."

7          THE COURT:  So this would read then in the first

8    sentence "If you find in favor of the Plaintiff on her claim

9    of breach of contract, then you must award her actual or

10   nominal damages."  That repeats itself in the first sentence

11   of the next paragraph.  And then in the last sentence of the

12   third paragraph, it would read "If you find in favor of the

13   Plaintiff, but do not find any actual damages, you shall award

14   Plaintiff nominal damages."

15         All right.  Anything else on -- is that acceptable to

16   both sides?

17         MR. OSBORNE:  Yes, Your Honor.

18         MR. HOFFMAN:  Yes, Your Honor.

19         THE COURT:  All right.  And then Instruction No. 22,

20   what's the issue there?

21         MR. HOFFMAN:  Same issue.  The word "general damages"

22   should be "actual damages."

23         THE COURT:  Okay.  And that's "Plaintiff nominal

24   damages in the sum of one dollar."  All right.  Fair enough.

25         And so, therefore, it may be that -- let's go to the

 1   verdict form.  When we go to question 6, instead of saying

 2   Instruction 20, it should be Instructions 21 -- 20, 21, and

 3   22, shouldn't it?

 4          MR. HOFFMAN:  Yes.

 5          THE COURT:  Because it's really those three

 6   instructions that define the range of damages.  Is that

 7   acceptable?  I want to hear your other comments on the verdict

 8   form, but in 6 it should be changed "as defined in Instruction

 9   Nos. 20, 21, and 22."  Do you agree with that?

10          MR. OSBORNE:  Yes, Your Honor.  That's fine.

11          THE COURT:  Mr. Hoffman, do you agree with that?

12          MR. HOFFMAN:  I'm sorry.  One second.  I'm --

13          THE COURT:  We are going to come back to the verdict

14   form in general, but anyway.

15          All right.  Okay.  Are there any comments -- now,

16   let's go to the instructions that were tendered.  Oh, you

17   mentioned 16, Mr. Osborne.  What about 16?

18          MR. OSBORNE:  Well --

19          THE COURT:  What's the issue with 16?

20          MR. OSBORNE:  It was the same issue we talked about

21   before, but I think you had said you were going to clarify

22   that on the verdict form.  So that's fine.

23          THE COURT:  Okay.  So we're through with the

24   instructions that the Court submitted.  Now let's look at

25   defendant's additional instructions.

17-CV-00025-WYD-KHR       Instruction Conference                II - 328

1          All right.  The first one -- and this is the one that

2     came in yesterday.  "In determining whether the Defendant

3     reasonably investigated, you should consider the content of

4     the notice of dispute that the Defendant received from the

5     consumer reporting agencies because that notice sets the scope

6     of the dispute that the Defendant has been asked to

7     investigate."

8          While I denied that as the basis for a Rule 50, this

9     seems to be an accurate proposition in a general sense.  So

10    tell me what your thought is about whether this instruction

11    should either be included or not included, Mr. Osborne.

12          MR. OSBORNE:  Well, Your Honor, I don't think it

13    should be included because actually I don't agree that that's

14    a correct statement of the law.  The case law that I have

15    suggests that furnisher must consider all information

16    available to it.  *Boggio versus USAA Federal Savings Bank*, 696

17    F.3d --

18          THE COURT:  Hold on.  Before I hear more from you, I

19    want to hear from the defendant.

20          Is there a case -- one of these cases that actually

21    quotes this language that you have here?  If so, which case is

22    it.

23          MR. HOFFMAN:  I'm looking for my text of the *Collins*

24    case, which is a case that you decided, Your Honor, on summary

25    judgment, and I think we have actually --

Julie H. Thomas, RMR, CRR                         (303)296-3056

1          THE COURT:  I don't remember the case, but I'm sure

2   if my name is on it, I decided it.

3          MR. HOFFMAN:  I will tell you we think if you read

4   it, you would change your view about the Rule 50 motion --

5          THE COURT:  No.

6          MR. HOFFMAN:  -- but the issue certainly has some

7   language in there.  The language that it approved, and that

8   was a magistrate that decided it, and you approved the

9   magistrate --

10          THE COURT:  Oh, so I affirmed the magistrate judge?

11          MR. HOFFMAN:  Correct.

12          THE COURT:  No wonder I don't remember this.

13          MR. HOFFMAN:  And Magistrate Tafoya quotes a number

14   of cases, the *Cousineau* case on page 14 of the -- have you got

15   a copy of the case?

16          THE COURT:  I do.  It's right here.  I've got it.

17   Page what?

18          MR. HOFFMAN:  On page 14 of the Westlaw printout near

19   the bottom on the left, it says "The wording of the notice of

20   dispute, as" --

21          THE COURT:  Wait a minute.  Hold on.  I'm on a page

22   that has --

23          MR. HOFFMAN:  Oh, I'm sorry.  The star pagination

24   is -- here.  How about -- may I approach to give you this

25   copy?

17-CV-00025-WYD-KHR       Instruction Conference              II - 330

1            THE COURT:  Sure, go ahead.

2            MR. HOFFMAN:  So that we are on the same page.

3            THE COURT:  Show me in here.

4            MR. HOFFMAN:  Yeah, let me -- if you don't mind me

5    finding it in this.

6            THE COURT:  Yeah, go ahead.  Is yours highlighted?

7            MR. HOFFMAN:  Highlighted at the bottom.

8            THE COURT:  Okay.  You can have that back.

9            MR. HOFFMAN:  That "The wording of the notice of

10   dispute, as the furnisher receives it from the CRA, constrains

11   the investigation:  the furnisher need only respond to the

12   specific dispute, as it is received."

13           And it has a string quote there, which is the gist of

14   what the proposed language is.

15           THE COURT:  The problem is this instruction is really

16   slanted in favor of the defendant in this case.  Let me

17   explain what I'm talking about.  If we were dealing with a

18   situation where -- let's assume the records had been

19   corrected, which they weren't here, and then there was a

20   request from the credit agency, and Ocwen reported what the

21   records reflected.  Then maybe this would make some sense.

22           My concern is that -- and the reason I denied the

23   Rule 50 relief is that we had testimony from Mr. Flannigan

24   that when his credit folks responded to the credit inquiries,

25   they looked at what the documents showed.  The problem is the

17-CV-00025-WYD-KHR        Instruction Conference                    II - 331

1   documents should have been corrected, and they weren't

2   corrected.  And that's just not a breach of contract claim;

3   it's also -- has to do with reasonable investigation.

4           So I think that giving this instruction in this case

5   is not a fair, balanced instruction, and it would tend to tilt

6   the case in favor of the defendant.  And I always give

7   instructions that are neutral.  So while this might be an

8   accurate proposition of the law for some cases, it's not in

9   this case.  So I'm going to refuse this instruction for the

10  reasons noted.  And will say that any case that I decided

11  years ago obviously had to involve different facts, and I'm

12  sure it was a correct statement of the law for the intended

13  purpose, but not the purpose intended in this case.

14          All right.  So what we're going to do, Mr. Keech --

15  where is it?  Let me tear this out.  And I will give it to

16  you.  All right.  So it's refused, and I put a stamp on it

17  that shows it's refused.  Can you read the stamp, Mr. Keech?

18          COURTROOM DEPUTY:  Yes.

19          THE COURT:  Okay.  All right.  So let's go to the

20  next one.  And I haven't read this before now, so let me read

21  it.

22          Let me hear a brief argument as to why you think this

23  should be given.

24          MR. HOFFMAN:  Well, we think it should be given

25  because there was -- the issue was introduced, and it's been

17-CV-00025-WYD-KHR        Instruction Conference                    II - 332

1    argued already by plaintiff's counsel that we should have

2    called and it is -- would have been an appropriate thing to do

3    in the investigation.  And it is plainly not the law.  The law

4    does not require that to be a part of a reasonable

5    investigation for a furnisher under the Fair Credit Reporting

6    Act.

7              THE COURT:  Respond.

8              MR. OSBORNE:  I'm sorry.  I don't have that one.

9    Could I hear what it says?

10             THE COURT:  Here, give him a copy and let him --

11             MR. HOFFMAN:  Yeah, I'm sorry.  I am reading it on my

12   phone because I don't have a copy myself.

13             MR. OSBORNE:  Well --

14             THE COURT:  Go ahead.

15             MR. OSBORNE:  I do not think that should be given.  I

16   don't think that's an accurate statement of the law.  The

17   standard is reasonableness, and whether Ocwen should have

18   called or not can be argued either way as being reasonable or

19   unreasonable.  There's definitely nothing in the FCRA that

20   prohibits them from calling, and there's nothing that says

21   that they are not required to call.  It just says "reasonable

22   investigation."

23             THE COURT:  All right.  Here's the thing.  It's the

24   same point I raised a minute ago.  This is a slanted

25   instruction.  I want the jury to fairly consider all the

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    evidence in this case, and I think to give this instruction is

2    slanted in favor of the defendant when it isn't necessary.

3    I'm going to refuse this instruction on grounds similar to the

4    last one because I don't think it's a proper balanced

5    instruction that is appropriate given the facts in the record

6    in this case.  So it's refused.

7              All right.  Mr. Keech, do you want to come and get

8    it, please.

9              All right.  Does either side have any additional

10   instructions to tender?

11             Does either side have any additional instructions to

12   tender?

13             MR. HOFFMAN:  Um, we -- we would like to tender one.

14   I don't have it written, but in the cross-examination of

15   Ms. Jeffers we think we established a basis for a failure to

16   mitigate instruction, and we would like to propose a standard

17   failure to mitigate instruction.

18             MR. OSBORNE:  Well, I don't -- first of all, I don't

19   think failure to mitigate --

20             THE COURT:  Did you plead a failure to mitigate in

21   your --

22             MR. HOFFMAN:  No.

23             THE COURT:  -- in your case?

24             MR. HOFFMAN:  We did not.  But it was --

25             THE COURT:  No, it's too late.  And I'm not going to

1   let you raise failure to mitigate this late in the trial.  If

2   it was not in the Answer, if it's not in the Pretrial Order,

3   if it wasn't preserved as a defense, I'm not going to let you

4   add it.

5           MR. HOFFMAN:  We believe it was tried by consent,

6   just for the record.  But I understand.

7           THE COURT:  What was tried by consent?

8           MR. HOFFMAN:  That issue of failure to mitigate.

9           MR. OSBORNE:  Well, I don't agree with that.  He was

10  just asking questions to try to refute her damages.  And,

11  second of all, I don't even think failure to mitigate is a

12  defense to a statutory violation.  It may be to negligence or

13  something.

14          THE COURT:  I'm not giving it.  It's asserted too

15  late, and the last thing I'm going to do is muddle this case

16  any more than it is muddled.

17          All right.  Let's go to the verdict form.

18          All right.  So give me your comments first,

19  Mr. Osborne, as to the verdict form.

20          MR. OSBORNE:  I like it.  It's fine with me.

21          THE COURT:  Okay.  And you agree with the change that

22  I made on the last page where in question number 6 we expand

23  the instructions to include Instruction Nos. 20, 21, and 22?

24          MR. OSBORNE:  Yes.

25          THE COURT:  Okay.  All right.  What about for the

 1   defendant?

 2         MR. LOPACH:  We don't have any proposed changes, Your

 3   Honor.  We think it's --

 4         THE COURT:  You can remain seated.  It doesn't help

 5   if you stand up.

 6         MR. LOPACH:  Sorry, Your Honor.  No, we agree with

 7   the verdict form as proposed by the Court.

 8         THE COURT:  All right.  So then what we're going to

 9   do is we will make these changes -- my law clerk will make

10   these changes, but he's got my -- my original.

11         So we will give those to you first thing in the

12   morning.  We are going to start at 9:30.  And so I will read

13   the instructions first, after which we will have closing

14   arguments.

15         So how much time, Mr. Osborne, do you want for

16   closing arguments?

17         MR. OSBORNE:  Say 40 minutes.

18         THE COURT:  What about for the defendant?

19         MR. HOFFMAN:  Uh, I think half hour is fine, but if

20   he gets 40, I want 40.  So . . .

21         THE COURT:  Well, all right.  Let's think about this.

22         Okay.  Let's do this.  I will give both sides up to

23   40 minutes, with the understanding that for Mr. Osborne it's

24   to be divided between your original closing and any rebuttal

25   closing.  And you tell Mr. Keech how you want to allocate the

1    time.  And if you use all your 40 minutes for your original

2    closing, you will not have time for a rebuttal.  So you will

3    have to figure out how you do that.

4          And even though I'm giving 40 minutes, I'm not,

5    obviously, suggesting that you should use all of that time if

6    you don't believe you really need it, so -- but I agree if I

7    give him 40, I should give the defendant 40.

8          Who is going to do the closing for the defendant?

9          MR. HOFFMAN:  I will.

10         THE COURT:  All right.  Is there anything else we

11   need to do today?

12         MR. OSBORNE:  No, Your Honor.

13         MR. HOFFMAN:  I don't think so, Your Honor.

14         THE COURT:  All right.  We'll see you then in the

15   morning.

16         Okay.  Let's do this.  We won't make a record, but

17   why don't you be here by 9:15, and my law clerk will give you

18   the revised instructions.  And there shouldn't be any further

19   changes, but I'll give you a chance to respond.  But I'm not

20   going to come out until around 9:30.  And maybe what you can

21   do is look at them and then tell Mr. Keech if you have any

22   concerns or that everything is okay.  And then if there are

23   some concerns, I may come out a few minutes earlier.  If not,

24   I will just come out right at 9 :30.

25         MR. HOFFMAN:  Very good.

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR            Jury Trial                    II - 337

1           THE COURT:  All right.

2       (Proceedings recessed 5:19 p.m.,

3       February 21, 2018.)

4
                       REPORTER'S CERTIFICATE
5
            I, JULIE H. THOMAS, Official Court Reporter for the
6   United States District Court for the District of Colorado, a
    Registered Merit Reporter and Certified Realtime Reporter,
7   CA CSR No. 9162, do hereby certify that I reported by machine
    shorthand the proceedings contained herein at the time and
8   place aforementioned and that the foregoing pages constitute a
    full, true and correct transcript.
9           Dated this 12th day of March, 2018.

10
                      /s/ Julie H. Thomas
11                  Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                            (303)296-3056