1                   IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF COLORADO

3
     Civil Action No. 17-CV-00025-WYD-KHR
4

5    VALERIE JEFFERS,                          Volume III of III
                                               (Pages 338 - 413)
6            Plaintiff,

7            vs.

8    OCWEN LOAN SERVICING, LLC,

9            Defendant.

10   -----------------------------------------------------------

11                      REPORTER'S TRANSCRIPT
                            JURY TRIAL
12
     -----------------------------------------------------------

13
             Proceedings before the HONORABLE WILEY Y. DANIEL,
14   Judge, United States District Court for the District of
     Colorado, and a jury of ten, commencing at 9:44 a.m. on the
15   22nd day of February, 2018, in Courtroom A1002, Alfred A.
     Arraj United States Courthouse, Denver, Colorado.

16

17                          APPEARANCES

18   For the Plaintiff:
     MATTHEW R. OSBORNE, MATTHEW R. OSBORNE, P.C., 11178 Huron
19   Street, Suite 7, Northglenn, CO 80234

20   For the Defendant:
     PAUL J. LOPACH, BRYAN CAVE, LLP, 1700 Lincoln Street,
21   Suite 4100, Denver, CO 80203

22   ROBERT J. HOFFMAN, BRYAN CAVE, LLP, 1200 Main Street, One
     Kansas City Place, Suite 3800, Kansas City, MO 64105
23

24
         JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25        Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

             Proceedings reported by mechanical stenography;
                 transcription produced via computer.

17-CV-00025-WYD-KHR            Jury Trial                    III - 339

1                             I N D E X

2

JURY INSTRUCTIONS                                            PAGE

3

Instructions of the Court                                    340

4

5

MOTIONS                                                     PAGE

6

Plaintiff's Motion in Limine

7        Ruling of the Court                                 405

8    Defendant's Motion in Limine
         Ruling of the Court                                 406

9

Defendant's Motion for Directed Verdict

10       Ruling of the Court                                 407

11

12   CLOSING ARGUMENTS                                       PAGE

13   Mr. Osborne                                             364
     Mr. Hoffman                                             378

14   Mr. Osborne                                             399

15

16   JURY VERDICT                                            PAGE

17   Rendition of Verdict                                    408

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                        (303)296-3056

1        (Proceedings resumed 9:44 a.m.,

2        February 22, 2018, outside the presence of the

3        jury.)

4            THE COURT:  All right, have a seat.  So with these

5    last changes that I caught myself before we resent them out to

6    you, does everyone agree that these jury instructions and

7    verdict form are consistent with the record we made yesterday?

8            MR. HOFFMAN:  Yes.

9            MR. OSBORNE:  Yes.

10           THE COURT:  Okay.  Well, let's bring the jury in, and

11   I'll read these instructions, after which we'll have the -- at

12   least the initial closing.  And we may take a short break

13   before we do the defendant's closing and any rebuttal.  I'll

14   just have to see how our time is progressing.

15       (Jury in at 9:46 a.m.)

16           THE COURT:  Good morning.  Have a seat.

17           So I'm going to read you the final jury instructions.

18   You don't need to take notes because, as I mentioned at the

19   beginning of the trial, we'll give the jury, when they

20   deliberate, the original instructions and verdict form and a

21   draft set for each of you.  So you will have this both in

22   original form and a separate draft set for each of you.

23           All right.  Instruction No. 1.  Now that you have

24   heard the evidence and before hearing the closing arguments,

25   it is my duty to instruct you about the applicable law.  It is

1    your duty to follow the law as I will state it.  You must

2    apply the law to the facts as you find them from the evidence

3    in the case.  Do not single out one instruction as stating the

4    law, but consider the instructions as a whole.  Do not be

5    concerned about the wisdom of any rule of law stated by me.

6    You must follow and apply the law.

7    The lawyers may properly refer to some of the

8    governing rules of law in their arguments.  If there is any

9    difference between the law stated by the lawyers and these

10   instructions, you must follow my instructions.

11   Nothing I say in these instructions indicates that I

12   have any opinion about the facts.  You, not I, have the duty

13   to determine the facts.

14   You must perform your duties as jurors without bias

15   or prejudice as to any party.  The law does not permit you to

16   be controlled by sympathy, prejudice, or public opinion.  All

17   parties expect that you will carefully and impartially

18   consider all the evidence, following the law as it is now

19   being given to you, and reach a just verdict, regardless of

20   the consequences.

21   Instruction No. 2.  The Court will now explain the

22   claims and defenses of each party to the case and the law

23   governing the case.  Please pay close attention to these

24   instructions.  These instructions include both general

25   instructions and instructions specific to the claims and

17-CV-00025-WYD-KHR      Instructions of the Court        III - 342

1    defenses in this case.  You must consider all the general and

2    specific instructions together.  You must all agree on your

3    verdict, applying the law to the facts as you find them to be.

4          The parties to this case are Valerie Jeffers,

5    Plaintiff, and Ocwen Loan Servicing, LLC, Defendant.

6          Plaintiff claims that the Defendant both violated the

7    Fair Credit Reporting Act, FCRA, by failing to reasonably

8    investigate Plaintiff's disputes of Defendant's credit

9    reporting and breached a contract by failing to comply with a

10   settlement agreement.

11         The Defendant claims that its investigation was

12   reasonable.  Defendant further contends that Plaintiff has not

13   been damaged.

14         These are the issues for you to decide.

15         Instruction No. 3.  And this is a -- I decided after

16   I read this to you that we needed to include this in the

17   instructions, so these are the stipulations the parties agreed

18   to.  So I am going to read them again, and you will have them

19   as Instruction No. 3.

20         The parties have stipulated to the following facts:

21         1.  On September 8, 2016, Miss Jeffers and Ocwen

22   entered into a settlement agreement, which required the

23   following:

24         2.  Ocwen agreed to pay Miss Jeffers a confidential

25   sum of money.  It is undisputed that Ocwen fully complied with

1    this term.

2            3.   Ocwen agreed to perform the necessary and

3    appropriate corrections to Miss Jeffers' loan account to

4    reflect that it is current as of September 2016.  The parties

5    agreed that Ocwen had until October 8, 2016, to implement this

6    term.

7            4.   Ocwen agreed to ask the credit bureaus to fix the

8    credit reporting to reflect that the loan was current and had

9    been current at all times from the time Ocwen began servicing

10   the loan to September 2016.  The parties agreed that Ocwen had

11   until October 8, 2016, to implement this term.

12           5.   Ocwen, Miss Jeffers, and their attorneys agreed

13   that the terms and the contents of the settlement agreement

14   and all information and evidence elicited or exchanged during

15   the action and in negotiating this agreement would be treated

16   as confidential and not disclosed.

17           6.   The agreement was the compromise of disputed

18   claims, and the terms of the settlement agreement -- and the

19   terms of the settlement were not intended to be and should not

20   be construed as admissions of any liability or responsibility

21   whatsoever.  Ocwen expressly denied any liability.

22           7.   The parties further agreed to give reasonable

23   cooperation and assistance to any other party to the agreement

24   in order to enable the parties to secure the intended benefits

25   of this agreement.

1          Instruction No. 4.  This case should be considered

2    and decided by you as a dispute between persons of equal

3    standing in the community, of equal worth, and holding the

4    same or similar stations in life.  All persons stand equal

5    before the law and are to be treated as equals.

6          Instruction No. 5.  Plaintiff has the burden in a

7    civil action, such as this, to prove every essential element

8    of Plaintiff's claims by a preponderance of the evidence.  If

9    Plaintiff should fail to establish any essential element of

10   Plaintiff's claims by a preponderance of the evidence, you

11   should find for Defendant as to that claim.

12          "Establish by a preponderance of the evidence" means

13   evidence which, as a whole, shows that the fact sought to be

14   proved is more probable than not.  In other words, a

15   preponderance of the evidence means such evidence as, when

16   considered and compared with the evidence opposed to it, has

17   more convincing force and produces in your minds belief that

18   what is sought to be proved is more likely true than not true.

19   This standard does not require proof to an absolute certainty,

20   since proof to an absolute certainty is seldom possible in any

21   case.

22          In determining whether any fact in issue has been

23   proved by a preponderance of the evidence, unless otherwise

24   instructed you may consider the testimony of all witnesses,

25   regardless of who may have called them, and all exhibits

 1  received in evidence, regardless of who may have produced

 2  them.

 3          Instruction No. 6.  Generally speaking, there are two

 4  types of evidence presented during a trial, direct evidence

 5  and circumstantial evidence.  "Direct evidence" is the

 6  testimony of a person who asserts or claims to have actual

 7  knowledge of a fact, such as an eyewitness.  "Indirect or

 8  circumstantial" evidence is proof of a chain of facts and

 9  circumstances indicating the existence or nonexistence of a

10  fact.

11          The law generally makes no distinction between the

12  weight or value to be given to either direct or circumstantial

13  evidence.  A greater degree of certainty is not required of

14  circumstantial evidence.  You are required to find the facts

15  in accordance with the preponderance of all the evidence in

16  the case, both direct and circumstantial.

17          Instruction No. 7.  Plaintiff claims Defendant

18  negligently failed to comply with the Fair Credit Reporting

19  Act.  Plaintiff has the burden of proof on her claim for

20  negligent violation of the FCRA.  Plaintiff must prove by a

21  preponderance of the evidence --

22          It should be "each of the following," don't you

23  agree, Counsel?  We will take out the word "of".

24          MR. HOFFMAN:  Yes.

25          MR. OSBORNE:  Yes.

 1          THE COURT:  Okay.  So let me just read that sentence

 2   again.

 3          Plaintiff must prove by a preponderance of the

 4   evidence each of the following:

 5          First, Defendant violated the FCRA; second,

 6   Defendant's violation of the FCRA was caused by negligence;

 7   third, Plaintiff was injured by the violation; fourth, the

 8   negligence of the Plaintiff [sic] was the proximate cause of

 9   the injury to Plaintiff.

10          Your verdict will be for Plaintiff if you find that

11   Plaintiff proved that Defendant negligently violated the FCRA,

12   that Plaintiff was injured, and that Defendant's negligent

13   violation of the FCRA was the proximate cause of Plaintiff's

14   injury.

15          Your verdict will be for Defendant if you find that

16   Plaintiff did not prove one or more of the following:  a

17   violation of the FCRA, the violation was caused by Defendant's

18   negligence, Plaintiff was injured as a result, or the

19   negligence of Defendant was the proximate cause of Plaintiff's

20   injuries.

21          Instruction No. 8.  Plaintiff alleges Defendant

22   negligently violated Section 1681s-2(b) of the FCRA.

23   "Negligently" means failing to do something that a reasonably

24   prudent person would do, or doing something that a reasonably

25   prudent person would not do under the circumstances that you

 1   find existed in this case.  You are to decide what a

 2   reasonably prudent person would do or not do under the

 3   circumstances.

 4           Instruction No. 9.  The term "proximate cause" means

 5   there must be a connection between Defendant's conduct that

 6   Plaintiff claims was negligent and the injury complained of by

 7   Plaintiff.  The act Plaintiff complains -- strike that.  The

 8   act Plaintiff claims to have produced the injury must have

 9   been a natural and probable result of Defendant's conduct.

10           Instruction No. 10.  Plaintiff claims Defendant

11   willfully violated the Fair Credit Reporting Act.  Plaintiff

12   has the burden of proof on each of the following propositions:

13           First, Defendant willfully failed to comply with the

14   Fair Credit Reporting Act; second, Plaintiff was injured; and,

15   third, the willful failure of Defendant to comply was the

16   proximate cause of injury to Plaintiff.

17           Your verdict on this claim will be for Plaintiff if

18   you find that she proved that Defendant willfully failed to

19   comply with the Fair Credit Reporting Act, that Plaintiff was

20   injured, and the willful failure to comply was a proximate

21   cause of Plaintiff's injuries.

22           Your verdict on this claim will be for Defendant if

23   Plaintiff does not prove a willful violation of the Act, or if

24   Plaintiff was not injured, or if Plaintiff's injury was not

25   proximately caused by the willful violation of the Act.

1           Instruction No. 11.  A violation of the FCRA is

2     "willful" only if the Defendant intentionally violated the

3     FCRA or acted with reckless disregard of its duties under the

4     FCRA.

5           A violation of the FCRA is intentional only if the

6     Defendant acted with the specific intent not to do something

7     that the FCRA requires to be done, in other words, acted with

8     the purpose of disobeying or disregarding the FCRA.

9           A violation of the FCRA is committed with reckless

10    disregard only if the Defendant acted purposefully and the

11    Defendant must have realized that its conduct was dangerous,

12    done heedlessly and recklessly, without regard to consequences

13    or of the rights and safety of others, particularly the

14    Plaintiff.

15          Instruction No. 12.  Plaintiff alleges Defendant

16    negligently and willfully violated Section 1681s-2(b) of the

17    FCRA.  For purposes of this case, Plaintiff is a "consumer"

18    under the FCRA.  Defendant is a "furnisher of credit

19    information" that reports the payment status of mortgage loans

20    to the consumer reporting agencies, CRAs, such as Equifax,

21    Experian, and TransUnion.

22          Under this section, a furnisher of information who

23    has received notice of a dispute from a CRA is required to:

24          1, reasonably investigate the disputed information;

25    2, review all relevant information provided by the CRA; 3,

1    report the results of the investigation to the CRA; 4, report

2    the results of the investigation to all other CRAs if the

3    investigation reveals that the information is incomplete or

4    inaccurate; and, 5, modify, delete, or permanently block the

5    reporting of the disputed information if it is found to be

6    inaccurate, incomplete, or unverifiable.

7         Instruction No. 13.  An "investigation" is a detailed

8    inquiry or systematic examination of the furnisher's records

9    to determine whether the disputed information can be verified.

10   A reasonable investigation is one that a reasonably prudent

11   person would undertake under the circumstances.

12        An investigation is not necessarily unreasonable

13   because it results in a substantive conclusion unfavorable to

14   the consumer, even if that conclusion turns out to be

15   inaccurate.

16        Instruction No. 14.  If you decide that Defendant

17   violated the Fair Credit Reporting Act, Plaintiff could not

18   have incurred actual damages from any such violation until

19   after the violation took place.  Consequently, the earliest

20   that Plaintiff could have incurred any actual damages on her

21   Fair Credit Reporting Act claim was November 2016, which is

22   when Defendant completed its investigation of the first

23   dispute that it received.  Nothing that occurred prior to

24   November 2016 is relevant to your consideration of Plaintiff's

25   actual damages on her Fair Credit Reporting Act claim.

 1          Instruction No. 15.  If your verdict is for Plaintiff

 2   on Plaintiff's claim for negligent compliance [sic] with the

 3   Act, your duty is to determine the amount of money that

 4   reasonably, fairly, and adequately compensates Plaintiff for

 5   the damage you decide resulted from Defendant's failure to

 6   comply with the Act.

 7          You should include each of the following terms --

 8   following items of damage that you decide has been sustained

 9   by Plaintiff by Defendant's negligent compliance [sic] with

10   the Act, credit denials, damage to credit, damage to

11   reputation, embarrassment, humiliation, worry, stress,

12   inconvenience, difficulty sleeping, hair loss, and emotional

13   distress.

14          You should also include each of these items of damage

15   that you decide Plaintiff is reasonably certain to sustain in

16   the future.

17          If any item of damage is of a continuing nature, you

18   must decide how long it may continue.

19          You must decide which, if any, of these items of

20   damage has been proved by Plaintiff based upon evidence and

21   not upon speculation, guess, or conjecture.  The amount of

22   money to be awarded for certain of these items of damage, such

23   as mental anguish, cannot be proved in a precise dollar

24   amount.  The law leaves such amount to your sound judgment.

25          Denial of or delay in granting credit does not

1    constitute damage in and of itself under the law.

2         Damages for embarrassment, humiliation, and mental

3    anguish will not be presumed to have occurred.  Plaintiff must

4    prove they have occurred.

5         Plaintiff must prove that any damages incurred were

6    caused by acts or omissions of Defendant that were not in

7    compliance with the Fair Credit Reporting Act.  Even if you

8    find that Plaintiff was damaged, if you find that the damage

9    was not the result of Defendant's noncompliance with the Fair

10   Credit Reporting Act, you must find for Defendant.

11        Even if you find that Plaintiff suffered damage as a

12   result of the denial or delay in granting credit and the

13   denial or delay was not caused by Defendant's noncompliance

14   with the Act, then you must find for Defendant.

15        Instruction No. 15 -- excuse me -- number 16.  Got to

16   move forward here, not remain stationary.

17        Instruction No. 16 reads as follows:  Damages

18   recoverable for willful noncompliance with the Fair Credit

19   Reporting Act are of two kinds.  First are the damages

20   actually suffered by reason of the wrong complained of and,

21   second, punitive damages, which means damages over and above

22   the actual damages, if any, suffered by Plaintiff.  Punitive

23   damages that may be awarded by you in your discretion for the

24   purpose of making an example of and punishing Defendant for

25   the wrong done and to serve as an example to others not to

1    engage in such conduct.  If you find from a preponderance of

2    the evidence that Plaintiff is entitled to actual damages, and

3    you further find that the acts or omissions of Defendant that

4    proximately caused the actual injury or damage to Plaintiff

5    were willfully done, then you may add to the award of actual

6    damages such amount as you shall unanimously agree to be

7    proper as punitive damages.

8          Whether or not to make any award of punitive damages

9    in addition to actual damages is a matter exclusively within

10   your authority.  You should bear in mind that punitive damages

11   may be awarded only if you first unanimously award Plaintiff a

12   verdict for actual damages.

13         You should also bear in mind not only the conditions

14   under which and the purpose for which the law permits an award

15   of punitive damages to be made, but also the requirement of

16   the law that the amount of such punitive damage -- damages

17   must be fixed with calm discretion and sound reason and must

18   never be either awarded or fix in an amount, because of any

19   sympathy or bias or prejudice with respect to any party to the

20   case.

21         Instruction No. 17.  And just so you know, we have 27

22   instructions, so we have 11 more to go.

23         Plaintiff may not recover twice for the same injury,

24   even though she seeks an award of damages under multiple

25   theories of relief.  This is because damages awarded for one

 1   claim may not be duplicative of damages awarded in another

 2   claim.  For example, a plaintiff that seeks $100 as a result

 3   of defendant's conduct may recover only $100, even if she

 4   sought the same $100 in damages in multiple claims.

 5        Instruction No. 18.  For the Plaintiff to recover

 6   from the Defendant on her claim of breach of contract, the

 7   Plaintiff must prove by a preponderance of the evidence all of

 8   the following:

 9        1.  The Plaintiff entered into a contract with the

10   Defendant to correct her loan and request that the consumer

11   reporting agencies correct the credit reporting within

12   30 days; and, 2, the Defendant failed to correct her loan and

13   failed to request that the consumer reporting agencies correct

14   the credit reporting within 30 days; and, 3, the Plaintiff

15   "substantially complied with" her part of the contract.  If

16   you find that any one or more of these three statements has

17   not been proved, then your verdict must be for the Defendant.

18   On the other hand, if you find that all of these three

19   statements have been proved, then your verdict must be for the

20   Plaintiff.

21        Instruction No. 19.  A breach of contract is the

22   failure to perform a contractual promise when performance is

23   due.  A material breach occurs when a party fails to

24   substantially perform or substantially comply with the

25   essential terms of a contract.

1       A breach is not material if the other party received

2  substantially what it contracted for.  In determining whether

3  a breach is material, you may consider the nature of the

4  promised performance, the purpose of the contract, and whether

5  any defects in performance have defeated the purpose of the

6  contract.

7       A material breach by one party excuses performance by

8  the other party to the contract.

9       Instruction No. 20.  If you find that a contract

10  existed between the parties and that one party breached the

11  contract, the nonbreaching party is entitled to recover those

12  damages naturally arising from the breach of a contract, that

13  is, an amount that would place the nonbreaching party in the

14  position she would have been in if the breaching party had

15  adequately performed its promises, less any amounts saved by

16  the nonbreaching party.

17       If Plaintiff has proved actual damages by a

18  preponderance of the evidence, you shall award damages and

19  losses suffered by the Plaintiff.

20       Instruction No. 21.  If you find in favor of the

21  Plaintiff on her claim of breach of contract, then you must

22  award her actual or nominal damages.

23       To award actual or nominal damages, you must find by

24  a preponderance of the evidence that the Plaintiff had damages

25  as a result of the breach, and you must determine the amount

 1  of those damages.

 2          If you find in favor of the Plaintiff but do not find

 3  any actual damages, you shall award Plaintiff nominal damages.

 4          Instruction No. 22.  If you find in favor of the

 5  Plaintiff on her breach of contract claim, but do not award

 6  any damages [sic] you shall award the Plaintiff nominal

 7  damages in the sum of one dollar.

 8          Instruction No. 23.  The fact that I have instructed

 9  you as to the proper measure of damages should not be

10  considered as indicating any view of mine as to which party is

11  entitled to your verdict in this case.  Instructions as to the

12  measure of damages are given for your guidance only in the

13  event you should find in favor of Plaintiff from a

14  preponderance of the evidence in the case in accordance with

15  the other instructions.

16          Instruction No. 24.  The verdict must represent the

17  considered judgment of each of you.  In order to return a

18  verdict, it is necessary that each juror agree.  Your verdict

19  must be unanimous.

20          It is your duty, as jurors, to consult with one

21  another and to deliberate with a view to reaching an agreement

22  if you can do so without disregard of individual judgment.

23  You must each decide the case for yourself, but only after an

24  impartial consideration of the evidence in the case with your

25  fellow jurors.  In the course of your deliberations, do not

 1   hesitate to reexamine your own views and change your opinion,

 2   if convinced it is erroneous.  But do not surrender your

 3   honest conviction as to the weight or effect of evidence

 4   solely because of the opinion of your fellow jurors or for the

 5   mere purpose of returning a verdict.

 6          Remember at all times that you are not partisans.

 7   You are judges, judges of the facts.  Your sole interest is to

 8   seek the truth from the evidence in the case.

 9          Instruction No. 25.  And you heard this before.  I am

10   reading it again.  During your deliberations, you must not

11   communicate with or provide any information to anyone about

12   any means about this case.  You may not use any electronic

13   device or media, such as a telephone, a cell phone, a smart

14   phone, iPhone, Blackberry or computer, the Internet, any

15   Internet service, any text or instant messaging service, any

16   Internet chat room, blog, or website such as Facebook,

17   MySpace, LinkedIn, YouTube or Twitter, to communicate to

18   anyone any information about this case or to conduct any

19   research about this case until I accept your verdict.  In

20   other words, you cannot talk to anyone on the phone,

21   correspond with anyone or electronically communicate with

22   anyone about this case.  You can only discuss the case in the

23   jury room with your fellow jurors during deliberations.  I

24   expect you will inform me as soon as you become aware of

25   another juror's violation of these instructions.

1        You may not use these electronic means to investigate

2   or communicate about the case because it is important that you

3   decide this case based solely on the evidence presented in the

4   courtroom.  Information on the Internet or available through

5   social media might be wrong, incomplete, or inaccurate.  You

6   are only permitted to discuss the case with your fellow jurors

7   during deliberations because they have seen and heard the same

8   evidence you have.  In our judicial system, it is important

9   that you are not influenced by anything or anyone outside of

10  this courtroom.  Otherwise, your decision may be based on

11  information known only by you and not your fellow jurors or

12  the parties in the case.  This would unfairly and adversely

13  impact the judicial process.

14        Instruction No. 26.  You must follow these rules

15  while deliberating and returning your verdict:

16        First, when you go to the jury room, you must select

17  a foreperson.  The foreperson will preside over your

18  discussions and speak for you here in court.  Second, it is

19  your duty, as jurors, to discuss this case with one another

20  and try to reach agreement.

21        Each of you must make your own conscientious

22  decision, but only after you have considered all the evidence,

23  discussed it fully with the other jurors, and listened to the

24  views of the other jurors.

25        Do not be afraid to change your opinions if the

 1   discussion persuades you that you should.  But do not make a

 2   decision simply because other jurors think it is right or

 3   simply to reach a verdict.  Remember at all times that you are

 4   the judges of the facts.  Your sole interest is to seek the

 5   truth from the evidence in the case.

 6          Third, if you need to communicate with me during your

 7   deliberations, you may send a note to me through the Court

 8   Security Officer, signed by one or more jurors.

 9          Now, let me stop there.  If you do send me a note,

10   and I don't -- I neither discourage it or encourage you.  Make

11   sure that, whoever has written the note, that it's legible and

12   that if there's a name associated with it, whether it be the

13   foreperson or someone else, that you both print your name,

14   sign your name, and also indicate the time of your note and

15   the date.

16          All right.  Remember, you should not tell anyone,

17   including me, how your votes stand numerically.  Wait a

18   minute.  I omitted something.  I said if you have to send a

19   note, send it to me through the Court Security Officer signed

20   by one of the jurors.  Then I explained how you write the note

21   so I can read it and understand it, but the next sentence

22   reads as follows:  I will respond as soon as possible either

23   in writing or orally in open court.  Remember you should not

24   tell anyone, including me, how your votes stand numerically.

25          Fourth, your verdict must be based solely on the

 1   evidence and on the law I have given to you in these

 2   instructions.  The verdict must be unanimous.  Nothing I have

 3   said or done is intended to suggest what your verdict should

 4   be.  That is entirely for you to decide.

 5          And the final instruction, Instruction No. 27, reads:

 6   Nothing said in these instructions and nothing in any verdict

 7   form prepared for your convenience is meant to suggest or

 8   convey in any way or manner any suggestion or hint as to what

 9   verdict I think you should find.  What the verdict shall be is

10   your sole and exclusive duty or responsibility.

11          Now I want to just briefly touch on the verdict form.

12   It's two pages.  Actually, it's three pages with the third

13   page being the page where you put the date, and it will be

14   signed by the foreperson and the other jurors.

15          On page 1, we have a caption, and then it reads

16   Verdict Form.  And then it reads as follows:

17          We, the jury, being duly empaneled and sworn to try

18   the above-captioned case, do unanimously find our verdict as

19   follows:

20          I.  Fair Credit Reporting Act Claims.

21          Question 1:  Has the Plaintiff proved by a

22   preponderance of the evidence that Defendant negligently

23   violated the Fair Credit Reporting Act as defined in

24   Instruction No. 15?

25          You will answer that by either checking the box with

1  Yes on it or No.

2          Question 2:  Has the Plaintiff proved by a

3  preponderance of the evidence that Defendant willfully

4  violated the Fair Credit Reporting Act as defined in

5  Instruction No. 16?

6          You will check that with either a yes or no.

7          Question 3:  If you answered "Yes" to Question 1 or

8  Question 2, or both, then state the amount of Plaintiff's

9  actual damages on her Fair Credit Reporting Act claims.

10          Question 4:  If you answered "Yes" to Question 2,

11  then state the amount of Plaintiff's punitive damages on her

12  Fair Credit Reporting Act claim.

13          II.  Breach of Contract Claim.

14          Question 5:  Has the Plaintiff proved by a

15  preponderance of the evidence that Defendant breached the

16  contract?

17          And you answer that by either checking the box that

18  says Yes or No.

19          Question 6:  If you answered "Yes" to Question 5, has

20  the Plaintiff proved by a preponderance of the evidence that

21  she incurred damages on her breach of contract claim as

22  defined in Instruction Nos. 1 -- Nos. 20, 21, and 22?

23          And, again, you will answer that with a yes or no.

24          And then following that it says:  If your answer to

25  Question 6 is "Yes," what is the amount?

 1          There is a dollar sign and blank line.  If you get to

 2     that and it's appropriate, you enter whatever amount you seek

 3     to award, if any.

 4          Then the final thing on page 2 is please sign the

 5     appropriate form and certification section, which is on

 6     page 3.

 7          So, Counsel, do these jury instructions as read by

 8     the Court, along with the verdict form which has been read by

 9     the Court, constitute and represent the jury instructions and

10     form of verdict agreed to by the Court and counsel, subject to

11     the record previously made?

12          MR. OSBORNE:  Yes, Your Honor.

13          MR. HOFFMAN:  Your Honor, I think that there was --

14     on the verdict form, there was a misnumbering on Question 1

15     and on Question 2.  I think that they should refer to

16     Instructions 7 and 10, respectively.

17          THE COURT:  As it relates to Question 1 and 2?

18          MR. HOFFMAN:  Correct.

19          THE COURT:  All right.  Let me look at it.

20          MR. HOFFMAN:  Question 1 I think should refer to 7,

21     and Question 2 should refer to 10, I believe.

22          THE COURT:  Mr. Osborne, what do you think?

23          MR. OSBORNE:  Uh, that looks right to me, Your Honor.

24          THE COURT:  Yeah, I agree.  All right.  So let me

25     reread -- well, okay.  I'll change that to 7.  I agree.  And

 1   what's the other one?

 2          MR. HOFFMAN:  10, I believe.

 3          THE COURT:  Would be for Question 2?

 4          MR. HOFFMAN:  Correct.

 5          THE COURT:  All right.  Do you agree with that,

 6   Mr. Osborne?

 7          MR. OSBORNE:  Yes, Your Honor.

 8          THE COURT:  I wonder if it shouldn't be Instructions

 9   10, 11, and 12, which seem to be the three instructions that

10   talk about "willfully."

11          MR. OSBORNE:  I would agree with that, actually.

12          MR. HOFFMAN:  I agree.  I think 12 should also be

13   referenced then on Question 1, because 12 addresses both

14   "negligently" and "willfully."

15          THE COURT:  And what about Instruction 11?

16          MR. HOFFMAN:  I think that just addresses the second

17   question, "willfully."

18          THE COURT:  I understand, but what I'm saying is it

19   is my strong suggestion that instead of just saying

20   Instruction 10, we say "as defined in Instruction Nos. 10, 11,

21   and 12."

22          MR. HOFFMAN:  Yes.

23          THE COURT:  Any objection to that from either of you?

24          MR. HOFFMAN:  Perhaps should include 13 then.

25          THE COURT:  Let me look at it.  All right.  Maybe 13

17-CV-00025-WYD-KHR     Instructions of the Court          III - 363

1   as well.  Is that acceptable to you, Mr. Osborne?

2          MR. OSBORNE:  Yes, Your Honor.

3          THE COURT:  All right.  So let me make this change,

4   and then I will reread these two questions on the verdict

5   form.

6          So -- all right.  So we will change this, of course,

7   before you get it.

8          I.  Fair Credit Reporting Act Claims.

9          Question 1:  Has the Plaintiff proved by a

10  preponderance of the evidence that Defendant negligently

11  violated the Fair Credit Reporting Act as defined in

12  Instruction No. 7?

13         MR. HOFFMAN:  And I'm sorry to interrupt, Your Honor,

14  but I think that's the one we should include 12 on also.

15  That's what I was saying, because 12 makes reference to

16  "negligent."

17         THE COURT:  Hold on.

18         MR. HOFFMAN:  I'm sorry.  Is it 12?  Yes, 12.  12 and

19  13 as well.

20         THE COURT:  Mr. Osborne?

21         MR. OSBORNE:  That's fine.  Sure.

22         THE COURT:  All right.  So you want to make Question

23  No. 1, it's numbers 7, 12, and 13?

24         MR. HOFFMAN:  Yes.

25         MR. OSBORNE:  That's fine.

17-CV-00025-WYD-KHR        Plaintiff's Closing                III - 364

 1              THE COURT:  All right.  Let's do it again.

 2              Has the Plaintiff proved by a preponderance of the

 3      evidence the Defendant negligently violated the Fair Credit

 4      Reporting Act as defined in Instruction Nos. 7, 12, and 13?

 5              And, again, you would answer that yes or no.

 6              Question 2:  Has the Plaintiff proved by a

 7      preponderance of the evidence that Defendant willfully

 8      violated the Fair Credit Reporting Act as defined in

 9      Instruction Nos. 10, 11, 12, and 13?

10              All right.  Counsel, with those changes, do you agree

11      that the jury instructions and verdict form as summarized by

12      the Court and read to the jury constitute the jury

13      instructions and verdict form agreed to by the Court and

14      counsel, subject to the record previously made?

15              MR. HOFFMAN:  Yes, Your Honor.

16              MR. OSBORNE:  Yes.

17              THE COURT:  All right.  Off the record.

18          (Off-the-record discussion between the Court and

19          his Law Clerk.)

20              THE COURT:  All right.  Mr. Osborne, you may proceed

21      with your closing argument.

22              MR. OSBORNE:  Hello.  I ask that you please put a

23      stop to Ocwen's fake investigations.  We heard Mr. Flannigan

24      say that this is the way we can expect Ocwen to continue

25      investigating.  That should be a scary proposition, I hope,

1   considering that they're a nationwide mortgage company with

2   who knows how many borrowers around the country.

3          If you take a close look at Instruction 13 and the

4   definition of "investigation" and you just kind of use your

5   common sense, you know, what is an investigation, well, the

6   first objective is you want to try to figure out something,

7   right, whether something is true?  And you would look at

8   evidence, and you would talk to people, and you would look for

9   clues.  That's common sense; right?

10         And then compare it to what Ocwen actually does, and

11  it's not an investigation.  All they are doing is

12  rubber-stamping their previous inaccurate information.  The

13  system that they put in place is designed to never figure out

14  the truth.  And it wouldn't have mattered if Valerie Jeffers

15  submitted four disputes or 4,000 disputes; you would have had

16  the exact same result every single time.  And that's the way

17  that they set it up.  It wasn't an accident to set it up that

18  way.  And it's pretty obvious to me why they did it:  to save

19  money.  Because investigations, if you do it right, actually

20  cost money, and they don't want to pay wages to workers to do

21  that.

22         And so I know we didn't hear from any of the

23  higher-ups at Ocwen, but I guarantee you that they are sitting

24  down there in Florida waiting to see what this jury in Denver

25  is going to do with this case.  And if you say this is

1    acceptable, they are going to be celebrating tonight down in

2    Florida.  But if you tell them this is unacceptable, they are

3    going to change their practices.

4           Now, profits are what motivates Ocwen.  That's how we

5    got here to begin with.  The Ocwen executives are not stupid.

6    You can't be stupid and run a nationwide mortgage company.

7    And they are in the business of making the maximum possible

8    profits.  And if it gets to the point where doing fake

9    investigations is more expensive, they'll gladly change their

10   practices and start doing real ones.

11          And so how do you do that?  Well, unfortunately the

12   only justice under the law that I am allowed to ask you for is

13   money.  I can't ask you to write up an order to Ocwen and tell

14   them we think the following things need to be changed with

15   your policies and practices.  I can't ask you to throw Ocwen

16   in jail or anything.  All I can ask you to do is award money.

17   And that's really the only thing that big corporations

18   understand.

19          So how much to award?  Well, I'm not going to ask you

20   for a specific amount.  I'm going to leave it up to your

21   discretion, and I will respect whatever you decide.  But one

22   thing to think about is when you are dealing with big

23   companies, it has to be a fairly significant amount because of

24   how big they are.  If you award a small amount of money, it's

25   not going to have any impact on them because of their size.

17-CV-00025-WYD-KHR          Plaintiff's Closing                III - 367

1           So what I like to say is if you think -- imagine

2    there's a box on the table and it has some money in it.  Well,

3    how much is in the box?  That's up to you.  Now, Ocwen says,

4    hey, we should just forget about all of this.  Valerie should

5    forget about this and go on her merry way, and Ocwen will keep

6    the box.  Should we do that when our mortgage companies screw

7    us over like what Ocwen did to her?  Should we just walk away

8    and do nothing?

9           Or should we, as consumers, stand up for our rights

10   and challenge them?  The society that I want to live in, and I

11   hope it's the one you want to, is that we don't just bow to

12   big corporations when they violate our rights, and we stand up

13   for ourselves.  And that's what she did.  And that's part of

14   the reason this case went to trial is she wants you to change

15   their practices.

16          You know, Ocwen offered a lot of excuses.  Did they

17   intentionally breach the settlement contract?  No.  I'm not

18   going to sit here and tell you that they intentionally did it.

19   Did they intentionally set up a system to not comply with the

20   FCRA by doing fake investigations?  Yes.  And they just kind

21   of say, well, yeah, it took 10 months or whatever it was, but

22   that's okay, don't worry about it.

23          But imagine if the shoe was on the other foot.

24   Imagine if Valerie didn't make 10 months of payments.  You

25   think they would just walk away from that?  They would have

1    foreclosed on her in a heartbeat.

2          And I didn't go through the painstaking efforts of

3    going through their Exhibit A because it's a lot of brain

4    damage, but take a look at it in deliberations and just look

5    through.  What are they doing after this settlement is

6    supposed to be implemented?  And look at how they reacted when

7    they thought that she was in default, even though she wasn't.

8    The whole time that's all they're talking about, foreclose,

9    foreclose, foreclosure.

10         And you know the real reason they didn't start one?

11   They lost the original note.  They couldn't find it.  And you

12   will see that on page 33 of Exhibit A.  Right around Halloween

13   they make a note:  The note is missing.  And they start asking

14   all these other banks, like Wells Fargo and U.S. Bank and Bank

15   of the New York Mellon for where is the note?  Where's the

16   note?  And they finally find it after this lawsuit was filed,

17   and Deutsche Bank has it.  But had they found it, they were

18   going to foreclose on her again.

19         And then they say, oh, we are these kind people, and

20   we like to offer people these modifications and stuff.  She

21   never even applied for a modification.  But take a close look

22   at the terms of that.  They were trying to set it up as a

23   480-month loan, like 40 years, with a $144,000 balloon.  That

24   was going to result in a payback of the loan of almost

25   $600,000 on a $200,000 note.  Are they just being kind, or are

1    they trying to make a whole bunch of interest?

2            Now, we heard Ocwen say they're sorry, but, you know,

3    what exactly are they sorry for?  Yeah, they're sorry they

4    didn't comply with the settlement.  They're not sorry about

5    the fake investigations.  And unless you tell them this is

6    unacceptable, this is the way they are going to keep doing it.

7            I would also suggest that, you know, the real

8    question is:  Is Ocwen sorry?  You know, maybe Mr. Flannigan

9    is sorry.  Is the company sorry?  In reality, they don't give

10   a damn about Valerie Jeffers.  Part of being sorry is that you

11   don't go and blame the person that you hurt, and you accept

12   responsibility for your own actions.

13           And almost the whole time they are sitting there

14   blaming Valerie for almost everything.  Oh, she didn't use the

15   word "settlement" in Exhibit 5.  Well, she's not a lawyer.

16   She wrote it the best way that she could.  And, frankly, I

17   think if you take a close look at Instruction No. 3, it's

18   pretty clear she couldn't mention the settlement agreement to

19   the credit bureaus.  If she did, that would have been a breach

20   of the settlement agreement, and they could have sued her.

21           And they probably thought of this argument over the

22   weekend and they said, oh, yeah, well, technically you could

23   have said the word "settlement" without saying anything else.

24   I don't know.  Maybe that's true.  But would that have really

25   done anything?  You think Ocwen -- you think for a minute

1   Ocwen would have done one thing differently during their

2   investigation?  Of course not.

3          You know, they blame her for all kinds of stuff.  Oh,

4   she didn't call Ocwen.  Well, this has been screwed up for

5   years, and you heard her say she had tons of calls that went

6   nowhere.  And, yeah, the Ocwen people that answer the phone,

7   they're nice and stuff, but they don't have the training to

8   fix this.  I mean, you heard Valerie say yesterday --

9   Mr. Hoffman asked her, well, we haven't reported anything

10  since February 2017.  And Valerie says, no, it's still screwed

11  up today.  And, unfortunately, I couldn't get the actual

12  credit report into evidence, so you are stuck with her verbal

13  testimony, but she's been completely honest this entire case.

14  There's really no doubt at all that she's telling the truth

15  about that.

16         So you think:  We have gone through two lawsuits,

17  this thing has been screwed up for years, a full-blown jury

18  trial, and it's still screwed up, and you want to believe that

19  one simple phone call would have resolved this?  Of course

20  not.

21         And, by the way, notice how they don't focus on the

22  fact that they never called her.  They want to criticize her

23  all the time, but a telephone works both ways.  And there's

24  tons of times that they could have called her.  Like it seems

25  to me that if I was doing an investigation, the first thing

 1    that I would do, if I was an investigator, is I would call the

 2    borrower and say:  Okay, we got your dispute.  Tell me a

 3    little bit about your concern.

 4         It might take five or ten minutes, and they won't do

 5    that.  They even said that's our policy.  We never call the

 6    borrowers.  But then they have time to call the insurance

 7    company and verify coverage.  Look at -- just look at

 8    Exhibit A.  They had time to do all kinds of stuff other than

 9    comply with the settlement agreement.  They picked up the

10    phone and called all kinds of people, but they can't even call

11    their own customer?

12         They criticize Valerie:  Oh, it's your fault.  You

13    didn't call Hope Washington.  She's your relationship manager.

14         When did Hope Washington ever call Valerie Jeffers?

15    As a relationship manager, shouldn't you call somebody and

16    introduce yourself and say, the company has assigned me to be

17    your relationship manager, uh, you know, let's talk about

18    things?  That never happened.

19         And, by the way, Hope Washington, you will see it in

20    Exhibit A, she didn't even become the relationship manager

21    until this lawsuit, until -- well, not -- until the first

22    lawsuit.  So when she has a lawyer and stuff, it doesn't make

23    sense for her to be calling Ocwen and Hope Washington directly

24    because all the communication is through the lawyers.

25         And, you know, Ocwen also gave us a lot of excuses

1    about, oh, the codes in the ACDVs, you know, were vague or

2    whatever.  Valerie has no control over that stuff.  I mean,

3    that's what the credit bureaus do.  And the credit bureaus are

4    the ones that do this ACDV form thing that we saw.  It really

5    doesn't seem like an effective system to me, and I don't know

6    why they do it that way.  Probably because both the credit

7    bureaus and the banks, they all want to make everything as

8    automated as possible with as little human intervention as

9    possible.  So the credit bureaus, they just fill out this

10   ACDV, send it off to Ocwen, and Ocwen spends a minute or two

11   on it and sends it back.  And that's not an investigation.

12          But Valerie has no control over what codes they use.

13   But, you know, when you look at those codes, they are pretty

14   broad.  They are basically saying investigate everything,

15   confirm the accuracy of everything, and it lists complete

16   account information, payment history, stuff like that.  What

17   did Ocwen do to confirm that any of that was accurate?

18   Nothing.

19          The other thing I'll say about Valerie's dispute

20   letters is it basically says the same thing as what the

21   settlement agreement says without using the word "settlement."

22   So the settlement agreement says basically she's always been

23   current the whole time Ocwen's had the loan, and that's what

24   her dispute letter says is it says:  I have made all my

25   payments on time; this is inaccurate.

1          Did Ocwen even review the payment history to try to

2     figure it out?  Take a look at their payment history,

3     Exhibit A, page 116, and see if you can figure it out.  I

4     mean, it makes no sense.  It's supposed to be an accounting

5     ledger?  They don't even have the columns labeled to show you

6     what column is what.  They say they fixed the loan.  See if

7     you can figure out their math because I can't.

8          So they have also never apologized for the damages

9     that they have caused Valerie.  In fact, you know, it's bad

10    enough they put her through all of this, but then she has to

11    come to court.  And they didn't expressly say she's lying, but

12    they sure implied it.  They sure made it sound like:  Oh,

13    you're faking it.  You didn't go to the doctor.  You didn't

14    fully complete the applications with the mortgage companies.

15         Well, if you are really sorry, you would accept

16    responsibility for the damages you caused.  And, yeah, she

17    didn't go to the doctor.  I think that's reasonable.  I mean,

18    what's the doctor going to do?  The doctor can't fix her

19    credit report.  The doctor can't order Ocwen to comply with

20    the settlement.  You know, she just decided to handle it the

21    only way she knew how, and that was to deal with it.  That's

22    what most people would do.

23         And it's totally reasonable for her to not complete

24    the mortgage applications when she saw what was on there.  I

25    mean, it's crystal-clear in Exhibit 21, page 7.  It expressly

1    says you cannot be late on your existing mortgage payment

2    while your application is pending.  I mean, it couldn't be

3    more clear.  So there's no way she would have been approved

4    for that loan because of Ocwen's credit reporting.  And so why

5    should she waste her time filling out all these documents and

6    all these applications and submit them to the mortgage

7    company?

8          And that's a very embarrassing and humiliating

9    experience for somebody.  You know, she worked incredibly hard

10   to get back on her feet.  And she fell on hard times, and she

11   filed bankruptcy, and she did her four-year payment plan, and

12   she worked a second job at Wendy's to save her house.  And

13   this was the house that she raised her children in as a single

14   mom.  And this is the time she is supposed to be rebuilding.

15   And so look at how important her house is and how important

16   her credit is, and they just destroyed and trashed it.  And I

17   don't know what that's worth, but I've got to think that it's

18   worth something.

19         Now, let me show you the verdict form.

20         Is this thing on, Robb?

21         So the answer to Question 1 should be "yes," I think.

22   I don't see any way it can possibly be "no."  I mean, what did

23   they even do to investigate?  Nothing.  They didn't even look

24   at the settlement agreement.  They didn't even contact the

25   legal department.  We saw that even Bindu found out in the

1    second -- or, no, Bindu's first investigation, which was the

2    second investigation total, that it was in litigation and

3    still didn't call the legal department.  I mean, all Bindu had

4    to do was pick up the phone and just call the legal department

5    and say:  Hey, I see this is in litigation.  What's going on

6    with this?  Then the legal department would have said:  Yeah,

7    this -- there's a settlement agreement, and this thing has

8    been resolved, and we've got to fix it.

9           But at the same time, Bindu and Maithreyi and Shweta,

10   they are also just following the company policy.  So they are

11   doing exactly what Ocwen trained them to do, which is nothing.

12   So that's how it was willful.  So the answer to Question No. 2

13   I think should be "yes."  And if you -- pay very special

14   attention to the definition of "willful."  So "willful" is

15   kind of one of those words that can have a lot of different

16   meanings, but it's found in Instruction No. 11.  And what it

17   doesn't mean is it doesn't mean we have to prove that Ocwen

18   had an evil motive.  It doesn't mean we have to prove that

19   Ocwen put a bull's-eye on Valerie's head and said, Let's get

20   her.  Okay?  That's not what it means.  "Willfulness" means a

21   reckless disregard.  So in plain English, you are aware of a

22   risk, and you do it anyways because you just don't care.

23          And that's what we heard.  Kevin Flannigan admitted,

24   you know, yeah, it's very important for us to report accurate

25   information about people because if we don't, people can be

17-CV-00025-WYD-KHR          Plaintiff's Closing                III - 376

 1   damaged.  And I think that's pretty common sense.  I think,

 2   you know, a sixth grader would know that.  And in spite of

 3   knowing that, they employed this system that was never going

 4   to correct things.  It was never going to find out the truth.

 5   It was never going to find out if something was accurate.  So

 6   it clearly meets the definition of willful.  And in order to

 7   award punitive damages, the only way you can do it is if you

 8   say "yes" to willfulness.  Because if you say "no" to that,

 9   the law does not allow you to award punitive damages.  And,

10   quite frankly, if you don't award punitive damages, Ocwen is

11   not going to change, and they're just going to keep doing this

12   on and on and on.

13          We heard Kevin Flannigan say yesterday, oh, yeah,

14   this was an isolated incident.  Do you believe that for even

15   one minute, the way that their software and system works?  You

16   just look at the system and you know, this is going to happen

17   again to other people.  There's no question.  Because the

18   system is designed to not work.  And who benefits from that?

19   The executives, because the more automated things are, the

20   less wages we have to pay and the more profits we get.

21          And, again, I'm not going to -- I'm not going to

22   suggest an amount of actual damages or punitive damages.  I'm

23   going to leave that up to you.

24          And on question number -- part II, Question 5:  Has

25   the Plaintiff proved by a preponderance of the evidence that

 1    Defendant breached the contract?  The answer to that has to be

 2    "yes."  I mean, they admit it.  It's as clear as day.  They

 3    had 30 days, so by October 8th, they were required to fix the

 4    loan and required to fix the credit reporting.  It's

 5    undisputed.  They didn't do that -- well, the first time they

 6    even asked the credit bureaus to do that was July 2017, so

 7    that's almost 10 months later.  They screwed that up, and they

 8    had to re-ask it again in August, and it's now still screwed

 9    up.  There's no way that you could say "no" to Question 5.

10         How much damages to award for that?  I don't know,

11    but just look at all of the stuff.  I mean, if her loan was

12    corrected, she would have gotten accurate tax documents.  She

13    would have mortgage statements.  She'd have online access.

14    She wouldn't have to waste time every month going to the post

15    office and sending them the old screwed-up mortgage statement,

16    writing her correct amount, having to mail it off certified

17    mail.  She wouldn't have gone through all of the stuff that

18    she's been through.  And those are all damages, and you all

19    will have to decide what a fair amount of that is.

20         And so I appreciate your time and thank you for

21    listening to our story.  You know, Valerie has been trying to

22    tell this story to Ocwen for years, and they have never

23    listened to anything she said.  So we have waited a long time

24    to get here, and I appreciate you listening.  And thank you

25    for your time.

17-CV-00025-WYD-KHR          Defendant's Closing                    III - 378

1           THE COURT:  All right.  Let's have the closing from

2    the defendant.

3           MR. HOFFMAN:  Thank you, Your Honor.

4           Good morning, ladies and gentlemen.  Thank you, first

5    of all.  I know when the summons arrives and you are required

6    to appear, it's not a voluntary act, but we do greatly

7    appreciate your time.  And I know you have been attentive.  I

8    have watched you all taking notes and focusing very closely on

9    the witnesses and the evidence as it's presented, and thank

10   you for that.  I'm sorry that we have had to spend this time

11   together the last three days.  Unfortunately, there's been no

12   other way for the parties to reach a resolution of this case,

13   and so we have to put it to you to decide.

14          The first thing -- excuse me.  The first thing that

15   you will do, the Court instructed you, when you go back in the

16   jury room is select a foreperson amongst yourselves.  And

17   after that I expect that you will talk about the case and the

18   facts, but you will set about filling out the verdict form.

19   That is ultimately, of course, what your task is, to fill out

20   the form.  And, as the Court instructed, you will use the

21   instructions to guide you through it.  So rather than give you

22   a summary of what I think you have heard the last two days --

23   I know you have heard it; I know you have paid attention; I

24   know you focused -- I think I'm going to walk through the

25   instructions and talk about what the law is as the Court gave

1    it to you and how we see that applying to the facts of the

2    case as has been presented in the evidence, not in conjecture

3    or things that lawyers say, but in the evidence, the witnesses

4    and the testimony on the stand.

5            And so the first thing is, there are two types of

6    claims presented to you -- you know that already -- the Fair

7    Credit Reporting Act claim and the breach of contract claim,

8    but they are distinct and separate claims.  And I asked you in

9    opening statement to please focus on not conflating those two

10   claims but that they are different claims and they focus on

11   different issues.

12           The breach of contract claim focuses on the alleged

13   breach of the settlement agreement and the issues related to

14   that and the damages allegedly arising from that.  And the

15   Fair Credit Reporting Act claim focuses on the reasonableness

16   of the investigation in the time period from beginning in

17   November and ending in -- I guess the last one was the end of

18   December when there were three -- four reports to the -- from

19   the credit reporting agencies to Ocwen that Ocwen had to

20   respond to.  That's the issue is did Ocwen do what it's

21   required to do under the Fair Credit Reporting Act in

22   addressing those reports.

23           And the instructions lay that out very clearly, but

24   before I jump to that instruction, of course, the opening

25   issue in terms of burden of proof and claims is on the

1    plaintiff on every issue.  And the Court told you that.

2    That's Instruction No. 5, which couldn't be more clear.  So if

3    there's a failure of proof, that instruction -- and there's

4    more detail to what it means to be by a preponderance of the

5    evidence, but on every issue, on every claim the burden is on

6    the plaintiff to bring forward evidence, not conjecture or

7    speculation, but evidence for you to hear and believe.  And I

8    asked you about that, and I know that the Court has instructed

9    you several times to base your verdict solely on the evidence

10   and the law as he is instructing you.

11        The Fair Credit Reporting Act claim, and it's

12   addressed in the verdict form, you are going to be guided

13   first by Instruction No. 7.  There are two issues in the Fair

14   Credit Reporting claim.  The first one is negligent, and the

15   second one is willful.  They are different instructions, and I

16   will talk about each one separately.  But the plaintiff has

17   the burden of proof on all of the elements of the negligent

18   Fair Credit Reporting Act claim.  And this is on the verdict

19   form, Question No. 1.  You are going to be guided by these

20   instructions:  7, 12, and 13.  And then there are some

21   definitions instructions that affect those as well.  So I just

22   want to walk you through those.

23        But the plaintiff's burden is to prove all of these

24   elements to you.  First, that the defendant violated the Fair

25   Credit Reporting Act.  And during voir dire, the Judge asked a

1   lot of people what do you think the Fair Credit Reporting Act

2   entails, and a lot of people had opinions and views.  These

3   instructions tell you exactly what it entails, and I would ask

4   you to look at the instructions and not the things that people

5   thought it entails or just the general supposition that this

6   is what it means.  Instructions tell you -- instructions tell

7   you exactly what it means to violate the Fair Credit Reporting

8   Act.

9           And so on that issue, you will want to look to

10  Instruction 12.  And Instruction 12 addresses what does it

11  mean to violate the Fair Credit Reporting Act.  And it is

12  relevant to both the first and second questions, whether it is

13  done negligently or willfully.  What does it mean to violate

14  the Fair Credit Reporting Act?

15          First of all, the plaintiff has the burden of proof,

16  again, on all of these issues.  What is required in the

17  circumstances that we are talking about here where Ocwen is a

18  furnisher of information to the credit reporting agency and

19  Miss Jeffers is a consumer?  Here is what's required.  It's

20  right here, 1 through 5.

21          Number 1, to reasonably investigate the disputed

22  information.  Not to reasonably investigate everything in the

23  world.  Not to reasonably investigate the entire history of

24  her relationship.  To reasonably investigate the disputed

25  information.

 1         So when Mr. Flannigan was being cross-examined for

 2    several hours, you will remember the spirited discussion

 3    between him and Mr. Osborne about, no, the ACDV has dispute

 4    codes, and the dispute codes describe what the dispute we are

 5    being asked to investigate is.  They come to us from the

 6    credit reporting agencies.  It's Exhibit 6.  It has a dispute

 7    code section coded right in the middle, and there are a number

 8    of codes.  He pointed those out to you.  And they say this is

 9    what the credit reporting agency, not Miss Jeffers, the credit

10    reporting agency is asking us to verify or look into.

11         And there's a basis in the law for saying -- for

12    exactly what Mr. Flannigan said.  In fact, it's consistent

13    exactly with this instruction.  He doesn't -- Ocwen doesn't

14    have an obligation or a duty and it's not a violation by Ocwen

15    to not investigate everything.  They must only investigate the

16    disputed information, which is exactly why the nature of the

17    dispute matters so much.  The dispute that they are brought --

18    that is brought to them and what it says matters to the Fair

19    Credit Reporting Act claim very much.

20         The second thing they have to do is review all

21    relevant information provided by the credit reporting agency,

22    the CRA.  Not review all relevant information.  Not look

23    everywhere.  Review all information -- relevant information

24    provided by the credit reporting agency.  What did the credit

25    reporting agency ask them to look at?  That frames the nature

17-CV-00025-WYD-KHR          Defendant's Closing                    III - 383

1    of the dispute.

2           And so the sequence of events here that launched the

3    credit reporting agency inquiry and dispute was the letter

4    that Miss Jeffers sent on October 27th to the three different

5    credit reporting agencies.  And no one is blaming her for what

6    she said in that.  No one is saying this is all her fault.

7    What we are saying is the words that she chose do matter in

8    the process.  They have a consequence in the law and in --

9    it's right here in the instruction.  They go to the credit

10   reporting agency, those words, and the credit reporting agency

11   takes them, codes them, and defines to Ocwen the nature of the

12   disputed information, and they describe this is what is

13   disputed in the issue.

14          And if they had said there's a dispute about a

15   settlement agreement, that codes a different inquiry than what

16   they say, which was just account verification, verify these

17   numbers.  And so that codes a different inquiry.  It will send

18   the investigator down a different path.

19          And so the supposition that the law requires Ocwen to

20   look everywhere and uncover any issue, that seems to be the

21   foundation of Mr. Osborne's argument, is just wrong.  The law

22   does not support that, and Instruction No. 12 tells you so.

23   The dispute is defined -- or the investigation, rather, is

24   defined by the dispute and by the information that is received

25   from the credit reporting agency, a tightly narrow -- a tight

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-CV-00025-WYD-KHR        Defendant's Closing                    III - 384

1    and narrowly focused issue that these investigators are being

2    asked to look at.

3           So this idea that Ocwen's policies or its procedures

4    for investigations are somehow fake is absolutely unsupported

5    by the law.  There's no violation for asking the people who

6    are doing the investigations to focus on what is in the

7    dispute.  What does the credit reporting agency say the issue

8    is?  What do the dispute codes register for us to process,

9    investigate, and turn around?  And that's exactly what the

10   evidence shows Ocwen's investigators did.

11          Now, it's true that they did not uncover the

12   settlement agreement, the existence of a settlement agreement

13   in a different area of the organization, and that is

14   unfortunate, but it's true.  It happened.  It doesn't -- and,

15   again, another instruction that the Court provides important

16   to this issue is Instruction No. 13.  And I mentioned this

17   issue in opening statement.  But Instruction No. 13 makes

18   clear, and I have highlighted the language here, that an

19   investigation is not necessarily unreasonable because it

20   results in a substantive conclusion unfavorable to the

21   borrower even if that conclusion turns out to be inaccurate.

22          I guess the analogy I think of here is if you went to

23   the doctor and told the doctor that you had a sore throat, you

24   would expect that the doctor would look in your throat.  You

25   would not expect the doctor to find problems with your leg or

17-CV-00025-WYD-KHR          Defendant's Closing                    III - 385

1   your foot or some other part.  And the scope of the

2   investigation is tailored by the dispute, and it is not

3   necessarily an unreasonable investigation just because it

4   yields inaccurate information.  So the supposition that "hey,

5   they got it wrong" means the investigation is unreasonable is

6   wrong, and the law and the instructions of the Court provided

7   you tell you exactly that.  It must be more than just the

8   report or the information was wrong or inaccurate, because

9   inaccurate reports can still be -- arise from a reasonable

10  investigation, defined by the scope of the dispute and the

11  nature of the information provided by the credit reporting

12  agencies.

13          I would ask you to focus very closely on the

14  requirements of Instruction No. 12, which is the one that

15  defines what the obligations of a furnisher of information

16  under the Credit Reporting Act are, and No. 13, which defines

17  this idea that it's not necessarily an unreasonable

18  investigation just because it yields a decision adverse to the

19  borrower or the consumer and that later it turns out to be

20  wrong, inaccurate.

21          The other elements, the other obligations of the

22  furnisher of information really is the first and the second

23  one that I think are addressed or at issue in this case.  The

24  third, there is no question that the results of the

25  investigation were reported.  There's no question that the

1    investigation did not yield information -- show information

2    that was incomplete or inaccurate, so the reporting

3    obligations of 4 were not apparently triggered, not triggered.

4    5, there were no modification or deleting because the

5    investigation did not find -- of the disputed information was

6    not found to be inaccurate, incomplete, or unverifiable.  They

7    provided those reports, and the ACDVs showed them.  They

8    provided answers, and they provided the reports back and sent

9    them to all places that they were required to send them to.

10         So, going back, that really addresses the first

11   element of -- just the first element of plaintiff's burden of

12   proof under the Fair Credit Reporting Act claim, but that

13   claim is focused very narrowly on the reasonableness of the

14   investigation defined by the dispute and the relevant

15   information provided by the credit reporting agency.

16         So, first, they have to show there was a violation of

17   the Fair Credit Reporting Act, and we believe that their

18   evidence fails that.  They have not shown that.  Mr. Osborne

19   suggested that we need to bring you other people.  That's not

20   true.  The burden of proof is on the plaintiff.  We don't need

21   to bring you any people.  They have the burden of proof to

22   prove these allegations that they asserted, which we don't

23   believe they've -- they've met.  They've failed.  So they have

24   not demonstrated a violation of the Fair Credit Reporting Act

25   in the first instance.  They fail on number 1 of this claim.

1          The second claim -- the second element they also fail

2    on that defendant's violation was caused by negligence.

3    There's no indication that any of the investigators did

4    something negligent or irresponsible in their search at all.

5    You heard one witness on that, Mr. Flannigan.  You didn't

6    hear -- Mr. Osborne -- Miss Jeffers didn't bring you an expert

7    witness or somebody that would say:  Hey, this is what is

8    normally done in an investigation like this.  I have

9    experience in this area, and I know what investigations

10   usually entail.  This one doesn't seem like it was reasonable.

11         The only person in the courtroom who knows anything

12   about the reasonableness and the scope of ordinary

13   investigations of this sort is Mr. Flannigan, and his

14   testimony was unequivocal that he believed these were

15   reasonable investigations and these fit with the policies of

16   Ocwen and were appropriate under the circumstances and met the

17   obligations of the Fair Credit Reporting Act, which was only

18   to investigate the disputed information and the information

19   provided by the credit reporting agency.

20         The third element the plaintiff has to prove to you

21   is that plaintiff was injured by the violation.  We believe

22   she's failed on her evidence of that.  She's told you that she

23   did not apply for any credit in November, December, or

24   January.  Those are the relevant months.  By February there's

25   no dispute -- I believe there's no dispute that her credit was

1    corrected.  There's Exhibit 15 which shows the report from

2    Ocwen with no problems.  It's shown as a -- as a satisfactory

3    account, no issues on the Ocwen account, because the negative

4    credit -- any negative credit reporting was suppressed.

5    Mr. Flannigan told you that began sometime in mid-January.  He

6    wasn't certain of the date because he had been out, but it was

7    sometime in mid-January shortly after receipt of the Complaint

8    it began, and it extended at least into February.  And there's

9    been no evidence at all that there was anything -- any

10   negative credit reporting after that, and there wasn't, that

11   any negative credit reporting was suppressed regarding

12   Miss Jeffers after the middle of January, 2015 -- 2017,

13   rather.  And there has been no evidence, none at all,

14   presented in the courtroom that contradicts that.  In fact,

15   Exhibit 15 shows specifically that that was true on

16   February 21st of 2017.  Credit was shown satisfactory, paid as

17   agreed, from Ocwen on that exhibit.

18          She has not been injured by the alleged violation.

19   She did not seek any credit.  She wasn't denied any credit.

20   She didn't file applications.  She chose not to.  We don't

21   know what would have happened.  She supposes that she wouldn't

22   have gotten those, but we don't know the answer to that.  We

23   also know that the loanDepot one offered terms or had terms in

24   it specifically generated for her, which would lead most

25   people, I would think, to conclude that they were going to be

 1   able to get that loan, not that they weren't going to be able

 2   to get that loan, but that it was available on those terms.

 3   There is a loan estimate amount in that exhibit.

 4          Finally, that it was -- the fourth element that she

 5   must prove to prove a violation of the Fair Credit Reporting

 6   Act is that the negligence of the defendant was the proximate

 7   cause of her injury, not -- this is the negligence related to

 8   the Fair Credit Reporting Act.  Specifically, the

 9   investigation was the cause of whatever of the injuries that

10   she claims.  Not the failure to implement the settlement

11   agreement, we'll talk about that later, but the investigation

12   was the cause of her injuries.  There's a failure of proof on

13   that.  That was not the cause of any claimed injuries.

14          We don't believe there were any injuries or injuries

15   that have been proven to you with evidence.  Those injuries

16   are not to be assumed -- they are not to be presumed.  You

17   will see that in the instructions as well.  They need to be

18   proven to you with evidence, and there was no evidence of

19   those injuries, of claimed injuries, of loss of credit or of

20   the economic loss, of anything other than the general

21   frustration, but not a frustration that was enough to cause a

22   phone call or a letter or any communication of that type,

23   which would be what one would ordinarily expect.  None of

24   those things happened.

25          So we believe, after you have considered Instruction

 1   No. 7, 11 -- I'm sorry -- 7, 12, and 13 and you focus on what

 2   those instructions say about what it means to be a violation

 3   of the Fair Credit Reporting Act, about what it means for the

 4   plaintiff to prove those things with evidence, you will

 5   conclude that the answer to Question No. 1 is "no," she's not

 6   proven those claims.  She's brought no evidence to establish

 7   those claims.

 8          So the second question you will be presented with is

 9   has the plaintiff proved -- here they are with my handwritten

10   notes changing those instructions as we just discussed with

11   the Court.  Question 2 is:  Has the Plaintiff proved by a

12   preponderance of the evidence that the Defendant willfully

13   violated the Fair Credit Reporting Act as defined in

14   Instructions 10, 11, 12, and 13?

15          So it takes you back into many of those same

16   instructions that we just discussed, but the first element

17   that they will have to prove in order to prove a willful

18   violation of the Fair Credit Reporting Act is, of course, a

19   violation of the Fair Credit Reporting Act.  And that's the

20   instruction that we just went through, 7 and 12, about what

21   does that mean to violate the Fair -- what are the obligations

22   that Ocwen actually has, not the ones that Mr. Osborne says we

23   have, but the ones that we actually have by the law.

24          And there is no violation utilizing those -- the

25   definition in those instructions, using what the Court

 1   provided to you about what the Fair Credit Reporting Act

 2   means.  We believe your answer to that question will also be

 3   "no."

 4          Furthermore, of course, to prove a willful violation,

 5   they would have to prove -- and there are specific

 6   instructions on what a willful violation would mean.  Those

 7   are in Instruction 11.  And Instruction 11 tells you that a

 8   violation -- a willful violation under the Fair Credit

 9   Reporting Act can only be found if the defendant intentionally

10   violated the Fair Credit Reporting Act, intentionally didn't

11   investigate or intentionally didn't -- just disregarded its

12   obligations entirely under the Fair Credit Reporting Act.

13          That didn't happen.  There's a whole department set

14   up to address Fair Credit Reporting Act claims.  They have

15   policies.  They have procedures.  They are trained.  They are

16   asked to address the disputes as they come in, as required by

17   law, defined by the credit reporting agencies.  This is the

18   dispute.  And Mr. Flannigan described what they do.  Certainly

19   it was not a willful or intentional violation of the Fair

20   Credit Reporting Act, nor was there a reckless disregard of

21   the obligations.

22          There's no question that the investigators did take a

23   look, did go through the credit reporting agency, the ACDVs.

24   They did respond to them.  They did systematically address the

25   issues that were raised in the dispute -- violations in the

 1    dispute codes themselves, which is exactly what they are

 2    required to do, went through them one by one by one.  They

 3    made changes in places.  Yes, yes, they yielded inaccurate

 4    information, but that does not equal an unreasonable

 5    investigation.  That's Instruction 13.  Inaccurate information

 6    and an unreasonable investigation are different issues

 7    undeniably by the law.

 8           Of course, what I told you in opening statement is

 9    true.  That investigation, it was reasonable.  The systems

10    were appropriate.  The people that do the investigations, they

11    do their job.  They take it very seriously.  It's an important

12    issue for Ocwen that they treat very seriously.  And there's

13    been no evidence to the contrary.  None at all.  Mr. Flannigan

14    has told you that.  He's told you it's serious.  He's told you

15    that these employees are very real people.  He works with

16    them.  He trusts them.  He depends upon them.  He's told you

17    all about how that works, and it's all very real.

18           He -- the issue, um -- I lost my train of thought

19    there.

20           There's been no evidence of willful violation

21    whatsoever.  There's been no evidence of a reckless violation

22    whatsoever.  Your answer to Question 2 should be "no," it's

23    not been proven.  There's been no proof of a violation at all,

24    much less a willful or intentional one.

25           I know.  I'm sorry.  What I was going to say is of

1    course the investigation didn't yield accurate information.

2    And why did it not yield accurate information?  Not because

3    the investigation wasn't reasonable, but because there was an

4    error on the front end by a paralegal who failed to put the

5    settlement agreement into the system, didn't image it into the

6    system, and didn't implement the items in the system.  That

7    was an error.  It was a human error, but not in the

8    investigation, not in the obligations under the Fair Credit

9    Reporting Act, not in any of those things.  It was all in the

10   front end.  That error caused a problem.  We acknowledge that.

11   We recognize it, and we have addressed it from the very

12   beginning of this case.

13           The investigation was also thwarted by the

14   description, the narrow and bland description of what the

15   dispute was.  And, again, that's relevant to your inquiry on

16   was there a violation under Instruction 13 -- under

17   Instructions 7, 12, 13, 10, 12 -- 10, 11, 12, and 13 as well.

18   But the answer to both of those first questions about

19   violations under the Fair Credit Reporting Act should be "no."

20   The plaintiff has not proven a violation of the Fair Credit

21   Reporting Act because it requires different things than the

22   plaintiff says or suggests it requires.

23           Question 3.  Because we expect you will answer

24   Questions 1 and 2 "no," we would suggest you leave it blank or

25   write "not applicable," "N/A" in the answer.

 1          If you determine that there was a violation of the

 2   Fair Credit Reporting Act and you assess damages under

 3   Question 3, I ask you to consider carefully:  What were the

 4   damages proven?

 5          And I recall in voir dire I asked you if the

 6   plaintiff had the burden of proof to prove damages, and we

 7   were going to admit certain wrongdoing in this case, was there

 8   anybody here who would have a difficult time saying no if the

 9   plaintiff's evidence on damages failed and providing a verdict

10   of zero, even though we admitted to certain wrongdoing in the

11   case.  And every one of you answered the question that you

12   could, you could do that, you would be able to do that, and

13   you would take your duty seriously.  And we, of course, expect

14   you to and are counting on it.

15          The answer to that question is:  What are the

16   damages?  There has been no evidence of damages of compensable

17   injuries.  The answer is the plaintiff hasn't proven damages

18   by evidence, not supposition or -- or estimation, by evidence.

19   There's been none at all.  If you get to that question, we

20   would suggest the answer is zero.

21          Question 4.  That would only be answered if you said

22   "yes" to Question No. 2, which was about the willfulness under

23   the willful violation of the Fair Credit Reporting Act, and

24   since we suggest your answer should be "no" to that question,

25   2, there was no willful violation, there was no evidence of

 1  anything intentional or willful here, your answer to

 2  Question 4 should be "not applicable" or left blank, something

 3  like that.

 4          The breach of contract claim.  Has the Plaintiff

 5  proved by a preponderance of the evidence that she -- that --

 6  that the Defendant breached the contract?  That's the question

 7  you will be asked.  And the instruction that will guide you on

 8  that is No. 18.  For the Plaintiff to recover from Defendant

 9  on her claim of breach of contract, she must prove these three

10  things.  And they are laid out in exhibit -- or in Instruction

11  18, rather.

12          Of course, we have told you 1 and 2 are true.

13  They're stipulated.

14          Did the plaintiff substantially comply with her part

15  of the contract?  Well, I would ask you to consider -- and, of

16  course, our principle defense on the breach of contract claim

17  relates to damages, but I would ask you to consider, in

18  entering the settlement agreement, what was it that Ocwen was

19  seeking to get?  What was the benefit of the settlement

20  agreement for Ocwen?  It was to be not involved in litigation

21  and to be avoiding disputes, fighting with Miss Jeffers.

22          And in the early instructions, I think it's

23  Instruction 3 which contains the stipulations, you will see

24  stipulation number 7.  "The parties further agreed to give

25  reasonable cooperation and assistance to any other party to

17-CV-00025-WYD-KHR          Defendant's Closing                    III - 396

1    the agreement in order to enable the parties to secure the

2    intended benefits of this agreement."

3          And I just ask you, was it reasonable?  It's fair for

4    you to consider was it reasonable that after discovering that

5    the -- that she believed that the settlement agreement had not

6    been fully implemented and the issues had not been fully

7    addressed by Ocwen, was it reasonable for Miss Jeffers to say

8    nothing at all to Ocwen, to not write a letter, to not have

9    her lawyer write a letter, to reach out through the contacts

10   that they already had, to not try to address this issue

11   directly and head-on so that all of this could be avoided?

12   Was that a reasonable way to address it or not?

13         And certainly we think you could find that the answer

14   to the question about breach of contract is "no" because

15   that's not a reasonable way.  It's not what one would

16   ordinarily expect.  One would expect a letter or a contact

17   with counsel to address these issues and say, hey, you gave me

18   that check, but it looks like this other part hasn't been

19   resolved, and bring it to Ocwen's attention, rather than file

20   an ACDV and address a Fair Credit Reporting Act claim, which

21   is what happened instead.

22         Finally, the issue -- if you find in favor of the

23   plaintiff on breach of contract, the last issue you will be

24   asked to decide is what are her damages, if any, from that.

25   And, again, damages are not presumed.  Damages must be proven

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    by the plaintiff.  And what damages under the breach of

2    contract claim are there?  That instruction -- that

3    instruction is a different type of damage instruction than the

4    one under the Fair Credit Reporting Act.  Of course, there are

5    no punitive damages available under the breach of contract

6    claim, and there are also no emotional distress damages or

7    other damages that are like the kind laid out in the Fair

8    Credit Reporting Act claim.  It's to put the parties back in

9    the position that they would have been had the settlement

10   agreement been implemented timely.

11          What would do that?  Would it be the payment of the

12   mortgage expenses that -- two payments of which have already

13   been credited to Miss Jeffers?  Would that address that

14   situation?

15          But the issue is it's a different type of damages,

16   not the type that are available under the Fair Credit

17   Reporting Act.  And this instruction, Instruction No. 20,

18   guides the question of damages under the breach of contract

19   claim.  The nonbreaching party is entitled to recover those

20   damages naturally arising from the breach and be put back in

21   the situation they would have been otherwise if there hadn't

22   been a breach.

23          We would suggest to you that if those damages -- if

24   there are any damages proven on that, we don't think there are

25   any, but if there are any, they are very small.  It would be a

Julie H. Thomas, RMR, CRR                            (303)296-3056

1   nominal amount.  There are -- there's been no evidence of

2   real -- any economic damages, no evidence of loss of credit,

3   no evidence of any of those things.  Her credit was repaired

4   from February onward.  There's been no evidence otherwise.

5   There was a small gap in time where there was an issue,

6   clearly, but no denial of applications because none were sent

7   in.

8            There was no embarrassment because it was all done

9   online.  She decided not to apply and wasn't denied.  And, of

10  course, we talked about the Sunglass Hut thing.  That preceded

11  and has nothing to do with the breach of contract claim.  It

12  wouldn't be an event that compensable damages are available

13  for.

14           So we would suggest to you that if you get to that

15  last answer, the answer would be a nominal or a very small

16  amount, but nothing like what she is asking -- we think she is

17  asking for there.

18           Ladies and gentlemen, again, I thank you.  The -- you

19  know, mistakes happen, and obviously Ocwen made a mistake.  It

20  acknowledges it, recognizes it, has tried to address it, has

21  tried to fully address it head-on.  We haven't quite been able

22  to get that done.  We have to be here to have you help get it

23  fully resolved.  But -- and I'm sorry for that.  I'm sorry

24  that the mistake has led to us being here and that you have

25  all had to -- all had to deal with that.  I truly am, and

17-CV-00025-WYD-KHR          Plaintiff's Rebuttal                    III - 399

 1  Ocwen truly is.  It's not -- the failure to implement the

 2  settlement agreement is not Ocwen's finest hour, and it's not

 3  proud of it, but it is not a Fair Credit Reporting Act

 4  violation.  It is not a willful act or willful disregard of

 5  its obligations under the Fair Credit Reporting Act.  The Fair

 6  Credit Reporting Act addresses different issues entirely,

 7  different types of claims entirely.  Ocwen's policies and

 8  procedures are adequate and appropriate under the Fair Credit

 9  Reporting Act, and there's been no evidence to the contrary,

10  none at all, and we ask for your verdict on the Fair Credit

11  Reporting Act claim and on the breach of contract claim.

12  Thank you for your time.

13          THE COURT:  All right.  Let's have rebuttal.  And you

14  know what your time remaining is; right?

15          COURTROOM DEPUTY:  I'm not sure he does.  It's

16  16 minutes.

17          MR. OSBORNE:  Well, the analogy about going to the

18  doctor for your throat and expecting them to find a problem

19  with your foot is wrong.  The better analogy would be if you

20  go to the doctor for your throat and they don't even look at

21  you and they just say, ah, you're fine.  That's what actually

22  happened here.

23          Look at those dispute codes carefully.  They are very

24  broad.  They say:  Disputes payment history.  What did they

25  ever do to investigate the payment history?  Nothing.  Why

1    don't they -- they say they acted so reasonably.  Why don't we

2    have any details whatsoever on what they actually did?  I

3    asked Kevin Flannigan about all that stuff.  He doesn't know.

4    All he knows is that they looked at the computer, and they

5    matched the data.  That's it.  He has no other evidence of

6    anything.

7            They criticize us for not spending thousands of

8    dollars to bring an expert in here to tell you about

9    investigations.  Why should we do that?  Because you all are

10   smart enough to know, anybody with common sense who looks at

11   this, this is not even an investigation.  This was not

12   reasonable.

13           They try to say, oh, Kevin Flannigan, he works with

14   these people, and they're real people, and he -- you know,

15   remember when I asked him:  Sir, remember at your deposition

16   you didn't even know if these people were Mr. or Mrs.?  Do you

17   remember that?  He doesn't even know them.  He doesn't work

18   with them.  He's just saying that to act like there's some

19   sort of comradery at the company or whatever.  He's never even

20   spoken to them.  I asked him:  Have you ever even interviewed

21   these individuals to see what they did?  No.  He doesn't know

22   them.

23           I would also argue to you that the credit dispute

24   department is supposed to be the last line of defense.  They

25   are supposed to be the people who figure out when mistakes

17-CV-00025-WYD-KHR        Plaintiff's Rebuttal              III - 401

1    were made on the front end.  And if you never do anything to

2    figure that out, you'll never learn if there was a mistake or

3    not.  And just looking at the computer, that's not going to do

4    it.  But had they looked at their own file, which I don't

5    think -- is it really that unreasonable to say they should

6    look at their own file?  They would have seen the settlement

7    agreement.  They would have seen the huge document

8    Mr. Flannigan mentioned that talked about the years of all the

9    issues.  They would have seen it's in litigation.  That would

10   have been a clue to then call the legal department.  Is it

11   really that unreasonable to ask that they take five minutes

12   and pick up the phone and call her and say, can we get your

13   version of events?  And then she could have told them directly

14   about the settlement during that call, but she can't tell the

15   credit bureaus about it.

16           They said, well, what was the benefit of the

17   settlement agreement to Ocwen?  Well, we got out of

18   litigation.  Well, what was the benefit of the settlement

19   agreement supposed to be for Valerie?  She was finally

20   supposed to have a mortgage loan that was correct that had

21   been screwed up for years, and she completely lost the benefit

22   of that deal.

23           They say she didn't cooperate.  What did she do to

24   not cooperate?  Where's the evidence that they ever asked her

25   to do anything that she didn't do?

17-CV-00025-WYD-KHR        Plaintiff's Rebuttal            III - 402

1          You know, the reality is that Mr. Hoffman doesn't

2     want you to know the truth in this case.  And remember he

3     asked her yesterday, oh, your credit is fixed after February

4     2017, and she tells him, no, it's not, it's still screwed up

5     today.  Notice how he cuts her off and says, I don't want to

6     hear about it.  That's consistent with how they have treated

7     her for years.  They have never wanted to hear her side of the

8     story or what the truth was.  They only want what they think

9     is good for them.

10          I want to show you real quick Instruction No. 12.

11     The two things that they violated, it's number 1 and number 5.

12     There was never an investigation to begin with, so you don't

13     even need to get to whether it was reasonable.  And, secondly,

14     they have already admitted -- if you look at number 5, they

15     have already admitted the information was inaccurate.  They

16     didn't modify it, they didn't delete it, and they didn't

17     permanently block it.  So those are both clear violations of

18     the Fair Credit Reporting Act.

19          Now, about damages, you heard Valerie testify about

20     her damages, about how her hair had been falling out, and

21     she's so stressed about the whole situation she can barely

22     sleep, and all of the stuff that they have put her through.

23     Do you really think she is lying about that stuff?  Because I

24     don't.  I think she came across as very credible.

25          And she answered all of Mr. Hoffman's questions,

1   whether they were good or bad for her case.  Notice how the

2   other side didn't do that.  He barely answered any questions I

3   asked.  Every question I asked he answers a different

4   question.  That's usually a good sign that somebody is not

5   being totally truthful.

6           And so there's clear violations of the Fair Credit

7   Reporting Act, and it was both negligent and willful, and I

8   ask that you put a stop to this.  Thank you.

9           THE COURT:  All right.  Let's have our CSO come

10  forward.

11          COURTROOM DEPUTY:  Please raise your right hand.

12     (Court Security Officer sworn.)

13          THE COURT:  All right.  So in a few minutes, I'm

14  going to send you back to begin your deliberations, and once

15  we've had counsel verify that the exhibits which you should

16  get are the ones that were admitted, you will get the exhibits

17  that have been received in evidence.

18          Also, I want counsel to verify these last-minute

19  changes we made in the jury instructions, just one minor

20  change in the instructions, and the verdict form.  I think our

21  revision of that is accurate, but I want to give them a chance

22  to look at it.  But you will get that soon, meaning the

23  original jury instructions, the verdict form, and then copies.

24  We will have draft copies for each of you.

25          And, finally, I want to add this about your

17-CV-00025-WYD-KHR                Jury Trial                        III - 404

1    deliberations.  You can only deliberate when all ten of you

2    are in the room.  So if you take a stretch break or restroom

3    break, you need to suspend your deliberations until all of you

4    are there.

5          Lunch will be provided by the Court.  I always say

6    it's a gourmet lunch, but you can decide if that's true or

7    not.  But there will be food for you in the jury deliberation

8    room, and it will arrive about 12 noon.  So you need to stay

9    in the room and deliberate while you're eating lunch.

10          Mr. Keech, is JERS available in this case or not?

11          COURTROOM DEPUTY:  It should be.  Counsel will have

12    to review that as well.

13          THE COURT:  Yeah.  We have a Jury Electronic

14    Recording System; it's called JERS.  And what it does is it

15    puts electronically on a computer the exhibits that have been

16    received in evidence.  So you will get a hard copy, but you

17    will also get a computer and screen that will allow you to

18    pull them up electronically.  Counsel just needs to make sure

19    that that's the only thing on the computer.  But once they do

20    that, then you will have two options of reviewing the

21    exhibits; hard copy, and then you can also pull them up

22    electronically.  And Mr. Keech will show you how to pull them

23    up once you begin your deliberation.

24          So if the deliberation goes all day, and it's totally

25    up to you how long you deliberate, of course, then I will send

17-CV-00025-WYD-KHR             Jury Trial                      III - 405

1   you home around 5 o'clock and have you return back tomorrow

2   early in the morning to resume your deliberation.

3           All right.  So without further ado, you should go

4   back into the jury room and commence your deliberation.

5           COURTROOM DEPUTY:  All rise.

6       (Jury out at 11:29 a.m.)

7           THE COURT:  All right, a couple things.  My law clerk

8   will give you the revised verdict form and a new page,

9   whatever it is, that has Instruction 7, because we took out

10  that one word.  Just take a minute and look at those and tell

11  me if you agree that what's in these revisions is correct

12  based on the record we made.

13          MR. HOFFMAN:  We do, Your Honor.

14          MR. OSBORNE:  Yes, I do as well.

15          THE COURT:  All right.  So have a seat.  I want to

16  make a ruling on some things that have not been ruled on.  The

17  first one has to do with the motions in limine that I held in

18  abeyance until trial.  So the first motion in limine was one

19  filed by the plaintiff, and it sought a ruling on the

20  admissibility of cases including the *Daugherty versus Ocwen*

21  case.  And initially it was the *Llewellyn versus All State*

22  *Home Loan* case, but I never heard Mr. Osborne raise that later

23  when we actually argued this.  And, obviously, based on the

24  ruling I made, I believe that motion should be denied.  So I'm

25  denying that motion in limine, and it's document number 37.

17-CV-00025-WYD-KHR                    Jury Trial                    III - 406

1          Regarding the other motion in limine, it's

2     defendant's combined motion in limine, 43, and I believe that

3     that motion has been mooted by the course of events.  And so I

4     think I should deny that as moot.  Any objection to that?

5          MR. HOFFMAN:  Uh, you're going to -- I don't know

6     that I'm objecting to your ruling.  I don't know exactly what

7     it is, what those motions are.

8          THE COURT:  Well, this is the motion where you asked

9     that five things be excluded, but none of them actually became

10    an issue during the trial.

11         MR. HOFFMAN:  Yeah.

12         THE COURT:  They exclude evidence of the size,

13    financial condition or resources, and out-of-state residency

14    of Ocwen; to exclude evidence arguing that plaintiff incurred

15    damages to her credit.  I mean, we covered some of those

16    things, but there was never an objection made to anything

17    that -- so I don't see the necessity for me to rule on the

18    merits of this motion.

19         MR. HOFFMAN:  Fair enough.

20         THE COURT:  I think this should be denied as moot.

21         MR. HOFFMAN:  Understood.

22         THE COURT:  Do you agree with that, Mr. Osborne?

23         MR. OSBORNE:  I do.

24         THE COURT:  All right.  So document number 43 should

25    be denied as moot.

17-CV-00025-WYD-KHR            Jury Trial                        III - 407

1          Then at 5:30 yesterday, the plaintiff filed -- not
2     the plaintiff -- defendant filed a motion entitled Defendant's
3     Motion for Directed Verdict.  I'm going to strike that motion
4     for this reason.  First, it's the wrong title.  There is no
5     motion for directed verdict that can be filed under the
6     federal rules.  It's a Rule 50 motion.  I acknowledge that in
7     the first paragraph you call it a motion for directed verdict
8     pursuant to Federal Rule of Civil Procedure 50(a), but really
9     it's a -- it's not a motion for directed verdict.  It's a
10    motion under Rule 50 for a judgment pursuant to Rule 50.  But
11    that's not why I'm striking it, because of terminology.
12         I'm striking it because before this was filed,
13    defendant's counsel made a full argument covering these
14    points, and I denied it.  So I told you not to file it.  You
15    filed it anyway.  It's superfluous, so it's stricken and
16    denied because I previously heard argument on the verbal
17    motion, and I denied it.  So the minutes should reflect that
18    the Defendant's Motion for Directed Verdict, document
19    number 80, is stricken.
20         All right.  So make sure Mr. Keech has all of your
21    contact information, which I think he does.  So I direct
22    counsel for both sides to go see Mr. Keech and make sure we
23    have a full agreement on the exhibits that have been received.
24    And once that's done, then he can take back to them the
25    exhibits along with the JERS, and they can receive the

17-CV-00025-WYD-KHR         Rendition of Verdict              III - 408

1    originals of the jury instructions and the form of verdict

2    along with the copies for them to look at.

3              All right.  Anything else you need to raise with me?

4              MR. OSBORNE:  No, Your Honor.

5              MR. HOFFMAN:  No, Your Honor.

6              THE COURT:  Okay.  All right.  We'll see you later

7    today or tomorrow or sometime.  I'll see you later today.  If

8    we don't hear anything, then be back here at 4:30.

9              MR. HOFFMAN:  Okay.

10             THE COURT:  Obviously if we get a question or if we

11   get a verdict before then, we'll let you know.  All right.

12        (Proceedings recessed 11:34 a.m. to 4:06 p.m.,

13        resuming outside the presence of the jury.)

14             THE COURT:  All right.  So the jury, as you know from

15   the note, has reached a verdict.  The only thing I ask is that

16   there be no reaction to the verdict, whatever it might be.

17             So let's bring the jury in.

18        (Jury in at 4:08 p.m.)

19             THE COURT:  All right, have a seat.

20             Mr. Harrell, has the jury reached a verdict?

21             JUROR NO. 5:  Yes, Your Honor.

22             THE COURT:  Would you give the form of verdict to the

23   CSO, who, in turn, will give it to me.

24             All right.  I have both the original jury

25   instructions and the verdict form, just for the record.

1           All right.  So I'm going to read this in a minute,

2   but in the verdict form under Roman numeral I, there's a

3   Question 2.  And apparently both were answered, a "Yes" and a

4   "No."  Then on the "No" it's scratched out and initials

5   appear.

6           So, Mr. Harrell, explain that, if you don't mind.  Do

7   you mind?  Do you understand what I'm saying?

8           JUROR NO. 5:  Yes, sir.  It was, um -- it was marked,

9   and then we changed it.

10          THE COURT:  Okay.  Okay.  Okay.  All right.  But when

11  you initialed this, you -- you're initialing this on behalf of

12  the jury in your capacity as foreperson?

13          JUROR NO. 5:  Yes, sir.  Yes, sir.

14          THE COURT:  All right.

15          So 17-CV-00025, Valerie Jeffers, plaintiff, versus

16  Ocwen Loan Servicing, LLC.  We, the jury, being duly empaneled

17  and sworn to try the above-captioned case, do unanimously find

18  our verdict as follows:

19          I.  Fair Credit Reporting Act Claims.

20          Question 1:  Has the Plaintiff proved by a

21  preponderance of the evidence that Defendant negligently

22  violated the Fair Credit Reporting Act as defined in

23  Instruction Nos. 7, 12, and 13?

24          The jury answers that question "Yes."

25          Question 2:  Has the Plaintiff proved by a

1    preponderance of the evidence that Defendant willfully

2    violated the Fair Credit Reporting Act as defined in

3    Instruction Nos. 10, 11, 12, and 13?

4            The jury's answered this with a "Yes."

5            And just so that I'm clear, this is the one where

6    beside the "No" it appears there was a check.  It's been lined

7    out and initialed by the foreperson.  And we'll probably poll

8    the jury.  I would do that anyway, but we will poll the jury

9    when we finish because we do need to affirm that this is the

10   verdict of each of you when we get to that.  All right.

11           All right.  So Question No. 3 -- and so let me

12   finish.  Question No. 2 the Court believes has been answered

13   "Yes" for the reasons I have just explained.

14           Question No. 3:  If you answered "Yes" to Question 1

15   or Question 2, or both, then state the amount of Plaintiff's

16   actual damages on her Fair Credit Reporting Act claims.  And

17   the amount entered here is $25,000.

18           Question 4:  If you answered "Yes" to Question 2,

19   then state the amount of Plaintiff's punitive damages on her

20   Fair Credit Reporting Act claim.  And the number here is

21   $360,000.

22           II.  Breach of Contract Claim.

23           Question 5:  Has the Plaintiff proved by a

24   preponderance of the evidence that Defendant breached the

25   contract?

1          And the jury's answered "Yes."

2          Question 6:  If you answered "Yes" to Question 5, has

3     the Plaintiff proved by a preponderance of the evidence that

4     she incurred damages on her Breach of Contract claim as

5     defined in Instruction Nos. 20, 21, and 22?

6          The jury has answered that question "Yes."

7          If your answer to Question 6 is "Yes," in what

8     amount?  And the jury has indicated $15,000.

9          Proceed to sign the appropriate form of certification

10    section.  It's dated this 22nd day of February, 2018.  It's

11    signed by the foreperson, Mr. Harrell, and the rest of the

12    jurors.

13         So I'm going to ask the jury be polled.  Normally I

14    ask counsel if they want it, but I want it as well because of

15    the change in the verdict form.

16         So, Mr. Keech, would you poll the jury.

17         And what we mean by "polling" is that each of you

18    will be asked a question individually to affirm that the

19    entirety of the verdict form as read by the Court is your own

20    respective understanding of your verdict.  All right.

21         COURTROOM DEPUTY:  Hunter Laird, was this and is this

22    your verdict?

23         JUROR NO. 1:  Yes.

24         COURTROOM DEPUTY:  Michelle Branch, was this and is

25    this your verdict?

1           JUROR NO. 2:  Yes.

2           COURTROOM DEPUTY:  Marlene Brubaker, was this and is

3    this your verdict?

4           JUROR NO. 3:  Yes.

5           COURTROOM DEPUTY:  Jeffrey Godlin, was this and is

6    this your verdict?

7           JUROR NO. 4:  Yes.

8           THE COURT:  Martin Martinez, was this and is this

9    your verdict?

10          JUROR NO. 6:  Yes.

11          THE COURT:  Colleen Orr, was this and is this your

12   verdict?

13          JUROR NO. 10:  Yes.

14          THE COURT:  Abraham Salas, was this and is this your

15   verdict?

16          JUROR NO. 9:  Yes.

17          COURTROOM DEPUTY:  Jody Baerga, was this and is this

18   your verdict?

19          JUROR NO. 8:  Yes.

20          COURTROOM DEPUTY:  Jacob Kurzawa, was this and is

21   this your verdict?

22          JUROR NO. 7:  Yes.

23          COURTROOM DEPUTY:  Johnny Harrell, Jr., was this and

24   is this your verdict?

25          JUROR NO. 5:  Yes.

17-CV-00025-WYD-KHR        Rendition of Verdict        III - 413

1          COURTROOM DEPUTY:  The jury has been polled, Your

2    Honor.

3          THE COURT:  All right.  Ladies and gentlemen of the

4    jury, we have a rule in this Court.  It's District of Colorado

5    LCiv Rule 47.2 titled "Communication with Jurors."  It reads

6    as follows:

7          A party or attorney shall not communicate with, or

8    cause another to communicate with, a juror or a prospective

9    juror before, during, or after a trial without order of the

10   judicial officer to whom the case is assigned.

11         It's my practice, and I'm going to follow it here, to

12   not allow communication by the attorneys or the parties with

13   any of you regarding your decisions in this case as jurors.

14         So on behalf of the parties, the Court thanks you for

15   your service, and you are discharged and free to go.

16         COURTROOM DEPUTY:  All rise.

17      (Jury out at 4:14 p.m.)

18         THE COURT:  So when Mr. Keech comes back, I will have

19   him make a copy of this for both sides, and then it will be

20   filed electronically.

21         MR. HOFFMAN:  All right.

22         THE COURT:  All right.  Okay.  We're done.

23      (Proceedings concluded 4:15 p.m.,

24      February 22, 2018.)

25

Julie H. Thomas, RMR, CRR                          (303)296-3056

1

<u>REPORTER'S CERTIFICATE</u>

2

3           I, JULIE H. THOMAS, Official Court Reporter for the
United States District Court for the District of Colorado, a
Registered Merit Reporter and Certified Realtime Reporter,

4   CA CSR No. 9162, do hereby certify that I reported by machine
shorthand the proceedings contained herein at the time and

5   place aforementioned and that the foregoing pages constitute a
full, true and correct transcript.

6           Dated this 13th day of March, 2018.

7

8           _____/s/ Julie H. Thomas_____
                Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25