**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:17-cv-00025-WYD-KHR**

**VALERIE JEFFERS,
Plaintiff,**

**v.**

**OCWEN LOAN SERVICING, LLC,
Defendant.**

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR A NEW TRIAL,
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, AND MOTION FOR
CONSTITUTIONAL REMITTITUR [Doc. #101]**

Defendant's Motion should be denied for the following reasons:  1) there was no
error giving the jury the dictionary definition of the word "investigation" in the jury
instruction because the 10th Circuit has held that dictionary definitions are proper to
determine ordinary meaning; 2) this Court did not err by refusing Defendant's slanted
and unbalanced proposed jury instruction; 3) the punitive damages were a 9:1 ratio,
were within constitutional boundaries, and should be upheld to deter Ocwen from
continuing to violate the FRCA; and 4) the 7th Amendment to the U.S. Constitution
prevents the Defendant from supplanting the jury's award of $15,000 on the breach of
contract claim with the Defendant's own desired verdict of $1.

**LEGAL STANDARD - MOTION FOR NEW TRIAL**

A motion for new trial "is not regarded with favor and should only be granted with
great caution."  *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991).  The
decision whether to grant a new trial is committed to the sound discretion of the trial

court.  *Id.*   In order to prevail on a motion for a new trial, it must be shown that "the

jury's verdict was so against the weight of the evidence as to be unsupportable."

*Bangert Bros. Const. Co. v. Kiewit Western Co.*, 310 F.3d 1278, 1299 (10th Cir. 2002).

The Seventh Amendment constrains the trial court to defer to the fact-finding function of

the jury, which includes questions of liability and the amount of compensatory damages.

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 437 n11, 121 S. Ct.

1678, 149 L. Ed. 2d 674 (2001).   Under this deferential standard, when "a new trial

motion asserts that the jury verdict is not supported by the evidence, the verdict must

stand unless it is clearly, decidedly, or overwhelmingly against the weight of the

evidence."  *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1284 (10th Cir. 1999) (internal

quotations omitted).

## LEGAL STANDARD - MOTION TO AMEND OR ALTER JUDGMENT

A motion under FED. R. CIV. P. 59(e) to alter or amend a judgment "should be

granted only to prevent manifest errors or law or to present newly discovered evidence."

L*oughridge v. Chiles Power Supply Co., Inc.*, 431 F.3d 1268, 1274-75 (10th Cir. 2005).

Because the jury found in favor of Plaintiff, the court reviews the evidence in the light

most favorable to Plaintiff.   *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*,

170 F.3d 985, 988 (10th Cir. 1999).   In ruling on the motions to alter or amend the

judgment, the court must "accept the jury's factual determinations as long as they are

reasonably based on some evidence or the inferences that may be drawn from such

evidence."  *Id.*

## LEGAL STANDARD - FAIR CREDIT REPORTING ACT (FCRA)

A. The Reasonable Investigation Standard

After receiving notice from a Consumer Reporting Agency (CRA) that information provided by the furnisher has been disputed, the furnisher must review the information provided by the CRA and conduct its own investigation of the accuracy and completeness of the disputed information.  *15 U.S.C. § 1681s-2(b)*.  While the FCRA does not contain specific standards or procedures for the furnisher's investigation, the federal courts consistently have adopted the "reasonable investigation" standard that requires that the furnisher conduct a substantive inquiry "to determine whether the disputed information can be verified."  *Johnson v. MBNA Am. Bank*, 357 F.3d 426, 431 (4th Cir. 2004); *see also Maiteki v. Marten Transp. Ltd.,* 828 F.3d 1272, 1275 (10th Cir. 2016).

One specific obligation is that the furnisher must consider the information communicated in or with the notice of dispute from the CRA.  *15 U.S.C. § 1681s-2(b)(1)(B).*  However, the Circuit Courts are unanimous in holding that a furnisher such as Defendant may not limit its investigation to **only** that information supplied by the CRA.  See e.g. *Gorman v. Wolpoff & Abramson, L.L.P.*, 584 F.3d 1147, 1157 n.11 (9th Cir. 2009) ("In deciding that the notice determines the nature of the dispute to be investigated, we do not suggest that it also cabins the scope of the investigation once undertaken."); *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1306 (11th Cir. 2016) (same); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 619 (6th Cir. 2012) (reversing summary judgment for the furnisher whose "policy prohibited its employees from performing anything more than a cursory confirmation" of its own records that listed the consumer's disputed status as an obligor on the challenged account and "a reasonable investigation under the circumstances would require that USAA review the

relevant, underlying documentation"). S*ee also Drew v. Equifax Info. Serv., L.L.C.*, 690

F.3d 1100, 1107 (9th Cir. 2012) ("Ultimately, as we have noted in Gorman, an

inadequate CRA notification may limit the scope of a furnisher's § 1681s-2(b) duty, for

example, by excusing a more limited investigation; it does not, however, eliminate the

duty altogether." (emphasis in original)).

As part of the investigation, the furnisher must also consider other information

available to it, including its own records and earlier complaints or other communications

received from the consumer before reinvestigation was even begun.   *Daugherty v.*

*Equifax Info. Servs., LLC,* 2015 WL 6456572, at *7 (S.D. W. Va. Oct. 26, 2015*)* (denying

summary judgment on claim that Ocwen engaged in "a mere 'data conformity' review"

because it limited itself to "brief reviews of internal records" when it had additional

information available for review about potential inaccuracies), *later opinions sub nom*,

*Daugherty v. Ocwen Loan Servicing, LLC,* 2016 WL 6650856, 2016 WL 6658966, 2016

WL 6656750, and 2016 WL 66580853 (S.D. W. Va. Oct. 12, 2016) (following jury verdict

awarding plaintiff $6,128 actual damages and $2,500,000 punitive damages, denying

furnisher's post-trials for remitter, new trial, etc. and awarding plaintiff reasonable

attorney fees), granting remittitur and otherwise aff'd, 701 Fed. Appx. 246 (4th Cir.

2017); *see also Kim v. BMW Fin. Servs.*, 142 F. Supp. 3d 935, 948 (C.D. Cal. 2015)

("Defendant should have considered information it received directly from Plaintiff on

previous occasions as part of its 15 U.S.C. § 1681s-2(b) investigation), *affirmed by Kim*

*v. BMW Fin. Servs. NA LLC*, 702 Fed. Appx. 561 (9th Cir. 2017); *Allicon v. Wireless,*

2012 WL 380147, at *3 (D.N.H. Jan. 18, 2012*)* (Mag.) (furnisher failed to review its own

records that confirmed the consumer's dispute and revealed the defendant's erroneous

reporting), *adopted* by 2012 WL 405502 (D.N.H. Feb. 8, 2012); *Watson v. Citi Corp.*,

2008 WL 4186317, at *4 (S.D. Ohio Sept. 5, 2008) (evidence that furnisher should have

known from prior disputes and consumer's earlier telephone complaints that its debt

collector had reached a compromise settlement of the account raised questions of

material fact whether furnisher's investigation resulting in verification of debt was

reasonable), *later op., Watson v. Citi Corp.*, 2009 WL 161222 (S.D. Ohio Jan. 22, 2009)

(finding at bench trial that credit card company did not conduct a reasonable

investigation when it failed to contact its collection agency to verify or refute consumer's

claim that agency had compromised and settled debt and instead "merely relied on its

own incomplete records"); *Saunders v. Equifax Info. Serv., L.L.C.*, 2006 WL 2850647

(E.D. Va. Oct. 3, 2006) (denying furnisher summary judgment when its "perfunctory

response" to the dispute did not include reviewing its own records that sustained the

consumer's contention), *aff'd sub nom. Saunders v. Branch Bank & Trust Co.*, 526 F.3d

142 (4th Cir. 2008).

## ARGUMENT

### I. The Court Did Not Err By Giving the Dictionary Definition of "Investigation" on Jury Instruction #13

There was nothing improper about the Court giving the jury the dictionary

definition of the term "investigation" - especially since this term is not defined in the

FCRA.  The Supreme Court has held that when a statute does not define a term, the

Court is to look to its ordinary meaning.  *FCC v. AT&T Inc.*, 562 U.S. 397, 403, 131 S.

Ct. 1177, 179 L. Ed. 2d 132 (2011) ("When a statute does not define a term, we typically

give the phrase its ordinary meaning" (internal quotation marks omitted)).  The Tenth

Circuit has instructed that courts routinely use dictionary definitions for guidance.  *See*

5

e.g. *NCUA Bd. v. Nomura Home Equity Loan, Inc.,* 764 F.3d 1199, 1227 (10th Cir. 2014)

("Courts often begin an ordinary meaning analysis by consulting contemporary

dictionary definitions.") (citations omitted).   The definition that this Court gave the jury is

the dictionary definition, which was adopted by the 4th Circuit in the seminal FCRA

furnisher case some 14 years ago:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or
> systematic examination." Am. Heritage Dictionary 920 (4th ed. 2000); see
> Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a
> searching inquiry").

*Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004).

Defendant cites no authority whatsoever that it was improper to give a dictionary

definition of "investigation."  To the contrary, FCRA cases that Defendant does not cite

are exactly on point on this issue and reject Defendant's argument.  See e.g. *Brim v.*

*Midland Credit Mgmt.*, 795 F. Supp. 2d 1255, 1268-69 (N.D. Ala. 2011).  In *Brim*, the

Court gave the jury the dictionary definition of "investigation" just like the Court did in

this case.  *Id.*  The jury returned a verdict of $100,000 actual damages, and $623,000

punitive damages.  *Id.* at 1261-1262.  The collection agency argued that it was error to

give the jury the dictionary definition of "investigation," and this argument was properly

rejected by the Court.  *Id.* at 1268-69. Ocwen's argument is a thinly veiled attempt to

encourage this Court to redefine the word "investigation" to include merely rubber

stamping its previous false reporting.  This is the identical argument that federal courts

routinely reject, as discussed above and as exemplified by the 9th Circuit:

> The Fourth Circuit's reasoning in *Johnson* is entirely persuasive.  By its ordinary
> meaning, an "investigation" requires an inquiry likely to turn up information about
> the underlying facts and positions of the parties, not a cursory or sloppy review of
> the dispute.  Moreover, like the Fourth Circuit, we have observed that "a primary
> purpose for the FCRA [is] to protect consumers against inaccurate and
> incomplete credit reporting."  *Nelson*, 282 F.3d at 1060. A provision that required

6

only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry.

*Gorman v. Wolpoff & Abramson*, LLP, 584 F.3d 1147, 1155-1156 (9th Cir. 2009).

Defendant relies heavily on *Maiteki, supra.*   Ironically, *Maiteki* does not support Defendant's position here and is actually helpful to Plaintiff for several reasons.  The 10th Circuit took note of the 4th Circuit's decision in *Johnson,* which affirmed the jury's verdict finding unreasonable the furnisher's investigation that relied solely on its own computer data, and then distinguished *Johnson* and explained that the furnisher there did not rely solely on its own computer data:

> [I]nstead of relying on the bare HRIS data, Ms. Konsela followed up with Ms. Sobotta, who confirmed that she had reviewed the underlying SpeedGauge reports and that the HRIS information was accurate.  It was reasonable for Ms. Konsela to rely on Ms. Sobotta's confirmation.  Further, the record evidence shows that Marten believed Code 938 was appropriate even if the Illinois incident were the only incident.   In these circumstances, Ms. Konsela could properly decide not to reach out to SpeedGauge.

828 F.3d at 1276-77.

Because Ocwen did nothing other than rely on its own inaccurate computer screen data, *Maiteki* is of no help to the Defendant.   Most importantly, *Maiteki* held that in the circumstances of that case, it would have been futile to consult further records as they would not negate the truth.  *Id.* at 1276 (such additional investigation would not negate the Illinois warning and the SpeedGauge data that caused Ms. Konsela to conclude that Code 938 was accurate).   The reverse is true in this case - had Ocwen reviewed the additional information in its own records, such as the settlement agreement and the previous litigation, and had consulted with its own legal department,

it would have negated the inaccurate computer data and thereby sustained Plaintiff's dispute.

Moreover, the facts of *Maiteki* do not support Defendant's argument.  First, *Maiteki* involved a consumer report about driving records.  *Id.* at 1273.  The furnisher reported to the CRA that Mr. Maiteki's employment was terminated due to "Unsatisfactory Safety Record".  *Id.* at 1274.  As part of its investigation, the furnisher reviewed Mr. Maiteki's personnel file and the company's computer data, including information in its Human Resources Image Screen (HRIS) records.  *Id.*  During the investigation, the furnisher saw that Mr. Maiteki's file contained a July 16, 2011 Driver/Vehicle Examination Report by the Illinois State Police stating that Mr. Maiteki had traveled between six and ten miles per hour over the speed limit; accompanying the report was a contemporaneous written police warning indicating he had been speeding. In addition, the file included a "Written Warning" from Marten placing Mr. Maiteki on a six-month probation for this incident.  *Id.*  The furnisher also saw comments dated October 5, 2011, regarding data gathered on Mr. Maiteki's driving speeds, including that a vendor had recorded Mr. Maiteki's truck traveling 12 miles per hour over the speed limit in Connecticut in October 2011 and had recorded him as having 13 incidents of driving at least four miles per hour over the speed limit in a seven-day period in September/October 2011.  *Id.*  Further, there was a notation that fleet manager Wendy Sobotta had issued Mr. Maiteki a "Serious Warning" based on this SpeedGauge data. *Id.*  The furnisher interviewed Ms. Sobotta as part of its investigation.  The investigation concluded that the information was accurate.  *Id.*  In sharp contrast to the facts constituting the reasonable investigation conducted in *Maiteki*, Ocwen did not review its

own records here, such as the settlement agreement, the previous litigation, and its own loan servicing notes that in fact sustained Plaintiff's dispute. *Ex. 1,* Vol. II at 130:6-23. It is for this reason that *Maiteki* is of no assistance to Defendant and instead supports the jury's verdict here.

Defendant's reliance on *Chiang v. Verizon New England Inc.*, 595 F.3d 26 (1st Cir. 2010), is also misguided.   First, in stark contrast to the facts here, the consumer in *Chiang* was unable to demonstrate that the information being reported was inaccurate, a threshold showing necessary to state an FCRA furnisher claim and thus survive summary judgment. *Id.* at 38.   Second, the consumer was unable to offer any evidence to survive summary judgment that Verizon's investigation was unreasonable.  *Id.*   By comparison to this case, Plaintiff proved at trial that the information Defendant reported was inaccurate, and Plaintiff proved that Defendant's "investigations" were unreasonable and wholly inadequate.   Although *Chiang* noted "the scope of a reasonable investigation turns on the information about the dispute that the furnisher has received," the information that Defendant received here from the CRAs about Plaintiff's dispute was geared precisely to Plaintiff's dispute:

> 106:Disputes present/previous Account Status/Account History/Payment Rating. Verify Account History, Account Status, and Payment Rating.
>
> 109:Disputes Current Balance, Original Loan Amount, Scheduled Monthly Payment Amount, Actual Payment Amount, Amount Past Due, or Original Charge-off Amount.  Verify Original Loan Amount, Scheduled Monthly Payment Amount, Actual Payment Amount, Amount Past Due, Current Balance, and Original Charge-off Amount.
>
> 112: Consumer states inaccurate information.  Provide or **confirm complete** ID and **account information**.

*Doc. #101-2, p. 1, 3, 7 (bolded for emphasis).*

These dispute codes were appropriate for the CRA to use because Plaintiff's dispute was that the account status and payment history were wrong, as she had made all payments on time, and that the loan should be reporting as current.  This is essentially what the settlement agreement required.  *Ex. 1,* Vol. III at 342-343. Moreover, dispute code 112 asked Ocwen to confirm the entire account information. The dispute code used in *Chiang* was "claims that this account was never paid late," which was inappropriate because the consumer admitted to paying late.  *Id.* At 33-34. In contrast to the furnisher in *Chaing*, the dispute codes Ocwen received from the CRAs encompassed exactly what the dispute was, i.e. account status and payment history were inaccurate.  *Doc. #101-2*.

Nothing in *Maiteki* or *Chaing* changes the definition of "investigation" as defined in the dictionary and Jury Instruction #13.  Both *Maiteki* and *Chaing* presumed that an actual investigation would take place – and most important, neither decision approved of Ocwen's standard practice that it performed here of merely rubber stamping its previous false reporting.  Even if the scope of an investigation were somehow limited, the duty to conduct an investigation still exists, and is not eliminated.  *Drew,* 690 F.3d at 1107  The 11th Circuit has similarly rejected Ocwen's argument:

> Although we agree that whether an investigation is reasonable will depend on what the furnisher knows about the dispute, we reject the proposition that a furnisher may truncate its investigation simply because the CRA failed to exhaustively describe the dispute in its § 1681i(a)(2) notice. *See Gorman*, 584 F.3d at 1157 n.11 (explaining that although "the notice determines the nature of the dispute to be investigated" it does not "cabin" the scope of the investigation once undertaken"). When a furnisher has access to dispute-related information beyond the information provided by the CRA, it will often be reasonable for the furnisher to review that additional information and conduct its investigation accordingly.

*Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1306 (11th Cir. 2016).

Thus, Defendant has failed to meet its heavy burden to demonstrate that the jury was not "fairly guided" by the jury instructions. *United States v. Little*, 829 F.3d 1177, 1181 (10th Cir. 2016)  (A jury's verdict will be reversed on the basis of jury instructions "only if we have substantial doubt that the jury was fairly guided." Id. (internal quotation marks omitted)).

## II. The Court Did Not Err By Refusing Defendant's Proposed Instruction #6 Because Defendant Did Not Tender a Balanced Instruction

The Defendant failed to tender a balanced instruction that accurately reflected the law as a whole, and instead cherry picked one quote out of *Maiteki, supra*, that would have improperly slanted the instructions in the favor of the defense.  This defect was the primary reason this Court gave for refusing the instruction, and that explanation remains persuasive and dispositive of Defendant's current argument:

> THE COURT: The problem is this instruction is really slanted in favor of the defendant in this case…. So I think that giving this instruction in this case is not a fair, balanced instruction, and it would tend to tilt the case in favor of the defendant. And I always give instructions that are neutral…

*Ex. 1,* Vol. II, at 330-331.

And the Court was naturally correct in ruling that jury instructions should be balanced.  *Chums, Ltd. v. Snugz/USA, Inc.,* 64 F.3d 669 (Table), 1995 WL 503975, at *2 (10th Cir. Aug. 25, 1995) (jury instructions should be "neutral statements of the law"). The lack of balance in Defendant's proposed instruction necessarily invokes the related rule that any error in the jury instructions is harmless if the party suffered no prejudice. *Osteguin v. Southern Pac. Transp. Co.*, 144 F.3d 1293, 1295 (10th Cir. 1998).  Most importantly, the Defendant has failed to offer any evidence at all to show prejudice - Defendant made this exact argument to the jury in their closing argument, which was rejected by the jury:

MR. HOFFMAN:  And the scope of the investigation is tailored by the dispute, and it is not necessarily an unreasonable investigation just because it yields inaccurate information.

*Ex. 1*, Vol. III, at 385.

Defendant's proposed jury instruction is at most a "permissive inference" that is properly left for counsel to argue in closing, as occurred.  *EEOC v. Loral Aero. Corp.*, 162 F.3d 1172 (Table), 1998 WL 769820, *1 (10th Cir. 1998) ("a judge need not deliver instructions describing all valid legal principles, particularly where the inference is permissible but not obligatory"), *citing Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994).  The jury instructions were clear that Ocwen had to perform a reasonable investigation, which is what the law requires, and Ocwen was free to present its argument that it acted reasonably based on the information received from the CRAs.

The Court did not abuse its discretion in refusing Defendant's Proposed Instruction #6.   *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 996 (10th Cir. 2005) (admission or exclusion of a particular jury instruction is left to the sound discretion of the trial court), *citing Coletti v. Cudd Pressure Control*, 165 F.3d 767, 771 (10th Cir. 1999).  "As long as the charge as a whole adequately states the law, the refusal to give a particular instruction is not an abuse of discretion." *McKenzie v. Benton*, 388 F.3d 1342, 1348 (10th Cir. 2004).  "The exclusion of one correct statement of law does not necessarily constitute error. Rather, the instructions as a whole need only convey a correct statement of applicable law." *National Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1004 (10th Cir. 2001) (quotation marks and citation omitted).

Here, Defendant has failed to show abuse of discretion.  The jury instructions adequately instructed the jury on the law of the FCRA as a whole.  *Ex. 1*, Vol. III, at 345 - 349; *accord Llewellyn v. Allstate Home Loans, Inc.,* 711 F.3d 1173, 1178-1179 (10th

Cir. 2013) (describing FCRA law as it applies to furnishers, and what a plaintiff must prove to prevail).

### III.  The Evidence Was More Than Sufficient on Plaintiff's Claim for Willful Violations of the FCRA

The Supreme Court has held that the term "willful" as used in the FCRA includes conduct that is either intentional or in reckless disregard of the duties imposed under the law.  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57, 127 S. Ct. 2201, 2208, 167 L. Ed. 2d 1045 (2007).  The jury correctly found that Ocwen either intentionally or recklessly, or both, disregarded its obligations under the FCRA to conduct a reasonable investigation.  The evidence demonstrated that Ocwen merely rubber stamped its previous false reporting – remarkably, misconduct and a breach of statutory duty that was undertaken in accordance with company policy.  Ocwen testified as follows:

Q. And as far as you are concerned, Maithreyi completely followed Ocwen's policies and procedures in investigating this dispute?

A. I believe that's a fair statement.

Q. And it's fair to say this is the way we can expect Ocwen to continue to investigate disputes in the future; true?

A. I believe that's a fair statement.

*Ex. 1*, Vol II at 119.

The jury was completely justified in viewing Ocwen's actions of failing to review the settlement agreement, the 370 page history of the loan, and the prior litigation as part of its investigations as reckless disregard.  Ocwen cites no legal authority for the proposition that merely rubber stamping its previous false reporting is a reasonable

investigation, and Ocwen lost this exact argument recently at the 4th Circuit, which

soundly rejected it as follows:

> We next consider Ocwen's argument that, as a matter of law, the evidence failed
> to show that Ocwen "willfully" violated the FCRA. Ocwen argues that it
> reasonably interpreted the FCRA as requiring furnishers of credit information to
> investigate only the information identified by the credit reporting agency as
> "disputed," and to consult only records within its own possession. Thus, Ocwen
> argues, its conduct falls under the safe harbor of *Safeco Insurance Co. of
> America v. Burr*, 551 U.S. 47, 57, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007),
> and does not support the jury's finding of a "willful" violation. We disagree.

*Daugherty v. Ocwen Loan Servicing, LLC*, 701 Fed. Appx. 246, 255 (4th Cir. 2017).

The 4th Circuit further noted that, just as here, "Ocwen possessed the information

in its own records necessary to correct the erroneous data identified by Equifax as

'disputed' in its '007' verification requests. Thus, the jury could have concluded that it

was reckless for Ocwen, after having received the '007' dispute verification requests,

not to investigate and correct the erroneous information regarding Daugherty's current

balance, past due amounts, last payment date, actual payments, and foreclosure

status." *Id.*   In a similar fashion here, dispute codes 106, 109, and 112 signaled broad

challenges to Ocwen's report of the entire account information, including the account

status, payment rating, account history, and amount past due.   *Doc. 101-2, p. 1, 3, 7*.

The evidence was undisputed that Ocwen reported false information for each of these

fields – for example, Ocwen reported that Plaintiff was 90 days past due when she was

current, that Plaintiff was thousands of dollars "past due" when she was current, and

that no payments had been made in several months.  *Id*.

The 4th Circuit also found that a reasonable jury could conclude from the

evidence that Ocwen was reckless in processing each dispute verification

request independently, without consulting the context of prior correspondence from

Daugherty, from the CFPB, or from Equifax regarding the same account.  701 Fed. Appx. at 256.  By comparison, the jury in this case could reasonably conclude from the evidence that Ocwen was reckless in processing each of Plaintiff's disputes without consulting the settlement agreement, the 370 pages of notes on the account history, and the previous litigation.

Likewise, the 11th Circuit has held that a reasonable jury could conclude that a furnisher recklessly disregarded its duties under the FCRA by engaging in a system of perfunctory review of disputes and responding to the CRAs that the information had been "verified" without obtaining any proof of the same.  *Hinkle,* 827 F.3d at 1307. In this case, the jury could have reasonably concluded that the evidence demonstrated that Ocwen recklessly disregarded its duties under the FCRA by responding the to the CRAs that Plaintiff was 90 days past due, when it had no evidence to support it, and Ocwen was in possession of substantial evidence to sustain Plaintiff's dispute, i.e. the settlement agreement.

Another independent ground to uphold the jury's finding of willfulness is that Defendant testified that it did not report that Plaintiff disputed the debt each of the four times that it responded to the CRAs.  *Ex. 1*, Vol II at 120, 142; *see also Doc. #101-2* (failing to note that plaintiff disputed the debt).  The 10th Circuit has previously held that this practice may run afoul of the FCRA, as it can be viewed as inaccurate to report that the borrower owes the debt without reporting that the borrower disputes the debt. *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1186 (10th Cir. 2013). Significantly, Ocwen was a party defendant in *Llewellyn* and thus was on actual notice of the 10th Circuit's warning that it eschewed here.  Further, it should be noted that the

4th Circuit had held that it could be inaccurate to report a debt without reporting the borrowers' dispute of the debt well before *Llewellyn* was decided. *Id. citing Saunders v. Branch Banking & Trust Co. of Va.,* 526 F.3d 142, 150 (4th Cir. 2008).  Even since the 10th Circuit's warning to Ocwen on this exact issue in 2013, the jury heard evidence from Ocwen itself that it continues to engage in this discredited practice:

Q. Right. And do you think it's accurate to respond to a credit bureau that the borrower does not dispute your credit reporting when you have actual knowledge that they do dispute your credit reporting? Is that accurate?

A. I -- well, like I said before, this was actually responded to. The response was done by Ocwen.

Q. I'm aware of that. My question is: Was it accurate to report that Miss Jeffers did not dispute your credit reporting when you had actual knowledge that she did?

A. So your question is was it accurate to not include a compliance condition code?

Q. Was it accurate to not report that she disputed your credit reporting?

A. To report that the account was disputed would have been to -- would be to have added a compliance condition code. I assume that that's your question.

Q. Yes, sir. That's the way it works; right?

A. Okay. That's --

Q. You enter a code.

A. Then if that's your question, then no. She was accurate in what was done here. She did not include a compliance condition code for the reasons that I just gave you earlier.

Q. Okay. So it's your position that that's perfectly acceptable?

A. That is correct.

*Ex. 1*, Vol II at 121:18-25, 122:1-17.

## IV. The Punitive Damages Award Was Not Unconstitutional

Defendant urge this Court to adopt a mathematical formula on punitive damages

of a 4:1 ratio between punitive and actual damages.  However, both the Supreme Court

and the 10th Circuit have specifically rejected Defendant's argument.   *See e.g.*

*Haberman v. Hartford Ins. Group,* 443 F.3d 1257, 1272 (10th Cir. 2006) (upholding 20:1

ratio between punitive and actual damages), *citing State Farm Mutual Auto. v.*

*Campbell,* 538 U.S. 408, 425 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003).  Indeed, the

Supreme Court has specifically stated:

> Courts have consistently rejected the notion that the constitutional line
> determining excess in an award of punitive damages is marked by a simple
> mathematical formula, even one that compares actual and potential damages to
> the punitive award. Indeed, low awards of compensatory damages may properly
> support a higher ratio than high compensatory awards, if, for example, a
> particularly egregious act has resulted in only a small amount of economic
> damages. A higher ratio may also be justified in cases in which the injury is hard
> to detect or the monetary value of non-economic harm might have been difficult
> to determine.)

*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 582 116 S. Ct. 1589, 134 L. Ed. 2d
809 (1996).

Defendant relies on *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041 (10th Cir.

2016), a case that is distinguishable.  The jury awarded Ms. Lompe $3 million in actual

damages and an additional $25 million in punitive damages.  *Id.* at 1053.  In reducing

the punitive damages to $1.9 million, the Court noted that the Plaintiff's actual damages

were "substantial."  *Id.* at 1069 (in cases decided since *State Farm*, compensatory

damages have often been considered "substantial" when they are over $1,000,000).

Here, unlike in *Lompe,* the jury awarded a small amount of actual damages on the FCRA claim ($25,000).  When the amount of actual damages is small, as in this case, *Lompe* shows that a higher ratio may be appropriate.   *Accord State Farm*, 538 U.S. at 425; *Gore*, 517 U.S. at 582 ("A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.")  The 10th Circuit has shown the limits of *Lompe* by continuing to recognize that the ratio between actual damages and punitive damages may well reach double digits when actual damages are low.  *BNSF Railway Co. v. United States Dep't of Labor*, 816 F.3d 628, 644 (10th Cir. 2016) (20:1 ratio, case remanded because lower court failed to analyze due process factors in order awarding punitive damages).

"To satisfy due process, one must receive fair notice both that certain conduct will subject him to punishment, and the possible severity of the punishment that may be imposed." *Id.* at 643 (internal quotes and ellipsis omitted).  "In analyzing the constitutionality of punitive damages, the Supreme Court has instructed courts to look to (1) the degree of reprehensibility of the defendant's action; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases." *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1121 (10th Cir. 2004), citing *Gore,* 517 U.S. at 574-75.

A. Reprehensibility

The following factors are relevant to the reprehensibility analysis: (1) whether the harm was physical or economic; (2) whether the conduct showed an indifference or reckless disregard for the health or safety of the plaintiff; (3) whether the target of the

defendant's conduct was financially vulnerable; (4) whether the conduct was an isolated incident or involved repeated actions; and (5) whether the harm was caused by intentional malice, trickery, or deceit, or was merely the result of negligence. Id. The existence of any one of these factors does not necessarily sustain an award of punitive damages, but "the absence of all of them renders any award suspect." *State Farm,* 538 U.S. at 419.

Under these factors, Defendant's repetitive misconduct taking economic advantage of a financially vulnerable consumer in the face of notice and knowledge of the true facts supports the jury's imposition of punitive damages in at least the amount awarded.  For example, Ms. Jeffers testified that she has just completed a Chapter 13 bankruptcy and was trying to get a fresh start and rebuild her credit and financial life after the bankruptcy.  Ms. Jeffers testified about how she worked a part time job at Wendy's during the bankruptcy and raised her two daughters as a single mom. Additionally, as to the fourth factor - repeated conduct - Ocwen repeatedly failed to properly investigate all of Plaintiff's disputes, failed to consider its own records such as the settlement agreement, and repeatedly rubber stamped its previous false reporting. Additionally, Ocwen was already on notice that such a system violates the FCRA, and yet continued to operate that way, as illustrated by *Daugherty, supra*.  Further, the 10th Circuit in *Llewellyn* warned Ocwen in 2013 that failing to report that a borrower disputes a debt may run afoul of the FCRA, and the evidence the jury heard here unequivocally showed that Ocwen continues to engage in this practice.  The jury's verdict quite properly reflects an objective assessment of the reprehensibility factor.

B. Ratio Between Punitive Damages Award and Compensatory Damages

To begin with, the ratio of 14.6:1 that Ocwen uses is wrong.  The actual ratio is 9:1, as the actual damages awarded were $40,000 ($25,000 on FCRA claim and $15,000 on breach of contract claim).  $40,000 x 9 = $360,000.  Ocwen wishes to exclude the $15,000 compensatory damages awarded on the breach of contract claim, but it cites no authority for doing so.  Federal precedent in fact commands the opposite result.  In *Bains LLC v. ARCO Prods. Co.*, 405 F.3d 764, 776 (9th Cir. 2005), the jury awarded $1 on the discrimination claim under § 1981 and $50,000 on a breach of contract claim.  The 9th Circuit instructed that when calculating the ratio for punitive damages, courts should include the breach of contract damages and treat the harm as $50,000 rather than $1 because the claims were intertwined.  *Id.*  The Court then took $50,000 and multiplied it by 9, resulting in a punitive damages award of up to $450,000.  The Court similarly ruled that Plaintiff's FCRA claims and breach of contract claim were interrelated.  *Ex. 1*, Vol II at 306.   Thus, the actual damages used to calculate the ratio should be $40,000, not $25,000, which results in a 9:1 ratio.

9:1 ratios in FCRA cases are fairly routine.  *See e.g. Dixon-Rollins v. Experian Info. Solutions, Inc.*, 753 F. Supp. 2d 452, 467 (E.D. Pa. 2003) (actual damages of $30,000 on FCRA claim, punitive damages of $270,000); *see also Miller v. Equifax Info. Servs., LLC*, 2014 WL 2123560, *1 (D. Or. May 20, 2014) (actual damages of $180,000 on FCRA claim, punitive damages of $1.62 million).  The Supreme Court has even approved a ratio of 526:1.  *Txo Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 459 (1993).   Moreover, $40,000 in actual damages, although not nominal, can hardly be described as "substantial" so as to justify a possible reduction to a lower ratio.  The 10th Circuit has indicated that damages are considered "substantial" when they are over $1

million dollars.  *Lompe* at 1069.  Even if $40,000 were considered to be substantial, a
single digit ratio of 9:1 does not cross constitutional lines.  *State Farm*, 538 U.S. at 410
("Single-digit multipliers are more likely to comport with due process, while still
achieving the State's deterrence and retribution goals").


C. Penalties in Comparable Cases

An award of $360,000 in punitive damages is not very large in FCRA cases.
Plaintiff was able to find many other FCRA cases around the country which had higher
or comparable punitive damage awards, which are identified in the following chart:

| Name of Case | Venue | Amount of Punitive Damages |
|---|---|---|
| Williams v. First Advantage LNS Screening Solutions, Inc., 238 F. Supp. 3d 1333, 1339 (Mar. 2, 2017) | United States District Court for the Northern District of Florida | $3.3 million |
| Williams v. Equifax, 48-2003-CA-9035-0 (2008) | Orange Co, FL | $2.9 million |
| Miller v. Equifax Info. Servs., LLC, 2014 U.S. Dist. LEXIS 69450 (May 20, 2014) | United States District Court for the District of Oregon | $1.62 million (reduced from jury's verdict of $18.4 million in punitive damages). |
| Conseco v. Carlson, CJ-00-227 | Oklahoma | $900,000 |
| Thomas v. Trans Union, 3-00-01150 | United States District Court for the District of Oregon | $1 million (reduced from jury's verdict of $5 million) |
| Drew v. Equifax Info. Servs., LLC, 2010 U.S. Dist. LEXIS 131643 *8(Dec 3, 2010) | United States District Court for the Northern District of California | $700,000 |
| Soghomonian v. Trans Union, 2003 WL 25859527 | United States District Court for the Northern District of California | $325,000 |
| Bach v. First Union, 486 F.3d 150 (6th Cir. 2007) | United States District Court for the Southern District of Ohio | $400,000 (punitives remitted from $ 2,628,600 assessed by jury) |

| Brim v. Midland Credit Mgmt., 795 F. Supp. 2d 1255 (N.D. Ala. 2011) | United States District Court for the Northern District of Alabama | $623,000 |
|---|---|---|
| Daugherty v. Ocwen Loan Servicing, LLC, 701 Fed. Appx. 246 (4th Cir. 2017) | United States District Court for the Southern District of West Virginia | $600,000 (reduced from jury verdict of $2.5 million) |
| Lewis v. United Joint Venture, 691 F.3d 835 (5th Cir. 2012) | United States District Court for the Northern District of Ohio | $420,000 |
| Davis v. AT&T Wireless, 3:01-cv-03813-MJP Doc.#60 | United States District Court for the District of South Carolina | $475,000 |

Defendant argues that the maximum civil penalty available under the FCRA is $1,000.  However, the maximum penalty is actually $2,500 per violation.  15 U.S.C. § 1681s(a)(2)(A).  However, because there is no private right of action under this section, most courts have concluded that this penalty fee is not particularly helpful in FCRA cases when analyzing the third factor.  *See e.g. Cortez v. Trans Union, LLC,* 617 F.3d 688, 724 (3d Cir. 2010); *Saunders v. Branch Bank & Trust Co.*, 526 F.3d 142, 152 (4th Cir. 2008), *citing Bach v. First Union Nat. Bank,* 486 F.3d 150, 154 n.1 (6th Cir. 2007).

In sum, the modest punitive damages award of $360,000 should be upheld in light of Ocwen's flagrant and reckless disregard of its duties under the FCRA. Ocwen's refusal to follow the law indicates that "strong medicine is required to cure the defendant's disrespect for the law." *Gore*, 517 U.S. at 576-77 (1996).  The FCRA put Ocwen on fair notice that punitive damages were an available remedy under the law, and the numerous jury verdicts that are public record put Ocwen on notice that an award of $360,000 was a likely possibility.  Ocwen's loss in *Daugherty* certainly put Ocwen on notice that an award as high as $600,000 in punitive damages was a possibility.   *Daugherty* also highlights that $600,000 was not enough, and did not

achieve the purposes that an award of punitive damages is designed to accomplish,

"namely to punish and deter." *Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262,

1273 (10th Cir. 2000).  Ocwen provides no evidence or even argument that its

suggested amount of $100,000 in punitive damages would accomplish the purpose of

deterrence, or even punishment. *Id.*  Considering Ocwen's status as a leading

nationwide mortgage company, it is highly unlikely that a small punitive damages award

of $100,000 would accomplish deterrence, especially since Ocwen is a repeat FCRA

offender whose misconduct here shows no appreciation for or deterrence from its prior

payment of punitive damages to aggrieved consumers.   Plaintiff is naturally not

requesting an additur of punitive damages, but the full punitive damages of $360,000

awarded by the jury should be upheld to encourage Ocwen to start complying with the

FCRA.

## V.  The Evidence Was Sufficient to Support Damages on Plaintiff's Breach of Contract Claim

The jury was properly instructed on the elements of a breach of contract claim

and reached its verdict in favor of Plaintiff in accordance with those instructions and the

evidence presented.   There were several different types of damages identified during

the trial.  For example, had the Defendant not breached the contract, Plaintiff would not

have been on the receiving end of foreclosure threats and returned payments as

identified in Trial Exs. 22 & 26.  Further, had Defendant not breached the contract,

Defendant would have issued a different Form 1098 for tax purposes, which would have

contained different figures, and Defendant admits it has never issued Plaintiff a

corrected Form 1098 for tax purposes.  Ex. 1, Vol. II at 156-157.  If Defendant had

complied with the contract, Plaintiff would have had an accurate mortgage loan showing

current status rather than a defaulted status.  Additionally, had Defendant complied with

the contract, it would have treated the loan as current, thus allowing Plaintiff to receive

mortgage statements and online access to her account.  Another type of damage was

the inaccurate credit reporting from October 8, 2016 to November 1, 2016 – all

damages to Plaintiff's credit rating on the FCRA claim occurred after November 1, 2016.

*Ex. 1,* Vol. III at 349.   An additional damage was that Plaintiff had to take time out of her

busy day each month, make copies of old inaccurate statements, cross out the

inaccurate figures, write in the correct figures, and drive down to the post office each

month to mail her payments via certified mail.  Since the jury was properly instructed on

the breach of contract elements and damages, this Court's role is not to second guess

the jury's decision on damages.   The jury was entitled to make its own assessment of

the amount necessary to put Plaintiff in the position that she would have enjoyed had

the breach not occurred and was not constrained in making that assessment to specific

evidence of the actual amount.

Once the *fact* of damages is proved by a preponderance of the evidence,

"uncertainty as to the *amount* of damages will not bar recovery."  *Tull v. Gundersons,*

*Inc.*, 709 P.2d 940, 943 (Colo.) (emphasis added).  As stated by the Colorado Court of

Appeals: "The rule which precludes recovery of uncertain and speculative damages

applies only where the fact of damages is uncertain, not where the amount is uncertain."

*Cope v. Vermeer Sales and Service of Colorado, Inc.*, 650 P.2d 1307, 1309 (Colo.App.

1982).

As long as there was some evidence on actual damages that could be viewed in

Plaintiff's favor, the 7th Amendment prohibits the Defendant from supplanting the jury's

verdict with a different verdict.   *Cooper,* 532 U.S. at 437 n.11.   Ironically, Defendant complains that its constitutional rights were violated by the jury's verdict, but then the Defendant has no problem at all asking the Court to eliminate the Plaintiff's 7th Amendment rights.  There is no basis to arbitrarily reduce the jury's verdict of $15,000 on the breach of contract claim to the $1 as Defendant asks.

WHEREFORE, Plaintiff prays that Ocwen's Motion be Denied in its entirety.

Respectfully submitted,

s/ Matthew R. Osborne
11178 Huron St., Ste 7
Northglenn, CO 80234
(303) 759-7018
matt@mrosbornelawpc.com
*Attorney for Plaintiff*

### CERTIFICATE OF SERVICE

I certify that on 4/6/2018, I served a true and correct copy of the foregoing via CM/ECF to the following:

Paul Lopach
Cynthia Lowery-Graber,
Robert Hoffman
Bryan Cave, LLP, Attorneys for Defendant.

s/ Mike Nobel